## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- x

:

In re: : Chapter 11

:

PADDOCK ENTERPRISES, LLC : Case No. 20-10028 (LSS)

:

Debtor.[1] : **Related to Docket Nos. 1355, 1356, 1357, 1358, 1362 & 1400**

:

-------------------------------------------------------- :

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE THIRD AMENDED PLAN OF REORGANIZATION FOR PADDOCK ENTERPRISES, LLC UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

[1]  The last four digits of the Debtor's federal tax identification number are 0822.  The Debtor's mailing address is One Michael Owens Way, Perrysburg, Ohio 43551.

US-DOCS\130474138.9
RLF1 27405258v.1

**WHEREAS** the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") hereby makes the following findings of fact and conclusions of law (the "Findings of Fact and Conclusions of Law") in support of this order (as may be modified, amended or supplemented from time to time, collectively, this "Confirmation Order") confirming the *Third Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code* (the "Plan")[2] [Docket No. 1400] (annexed hereto as Exhibit A) pursuant to section 1129 of title 11 of the United States Code (the "Bankruptcy Code");

**WHEREAS** the Plan is jointly-proposed by Paddock Enterprises, LLC (the "Debtor"), O-I Glass, Inc. ("O-I Glass"), the court-appointed legal representative for all Future Demand Holders (the "Future Claimants' Representative") and the Official Committee of Asbestos Personal Injury Claimants (the "Asbestos Claimants Committee" and, together with the Debtor, O-I Glass, and the Future Claimants' Representative, the "Plan Proponents"); and

**WHEREAS** the Bankruptcy Court having found that notice of the Confirmation Hearing and the opportunity for any party in interest to object to confirmation of the Plan has been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and that the legal and factual bases set forth in the Confirmation Submissions (as defined below) and all evidence presented at the Confirmation Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing

---

[2]   Capitalized terms and phrases used but not otherwise defined herein have the meanings given to them in the Plan or the *Disclosure Statement for First Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 1220] (as supplemented, revised, and amended, the "Disclosure Statement"), as applicable.  The rules of interpretation set forth in Article I of the Plan apply to this Confirmation Order.  In addition, in accordance with Section 1.1 of the Plan, any term used in the Plan or this Confirmation Order that is not defined therein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, has the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

therefor, the Bankruptcy Court hereby makes and issues the following Findings of Fact and Conclusions of Law and Confirmation Order:

**IT IS HEREBY FOUND AND DETERMINED THAT:**

1.      The findings and conclusions set forth herein and on the record of the Confirmation Hearing constitute the Bankruptcy Court's Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any findings of fact constitute conclusions of law, or any conclusions of law constitute findings of fact, they are adopted as such.

**I.      FINDINGS OF FACT**

      **A.      PROCEDURAL HISTORY**

2.      On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  Since the Petition Date, the Debtor has remained in possession of its property and has operated as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      On January 16, 2020, the United States Trustee appointed the Asbestos Claimants Committee, consisting of the following nine members: (a) Ernest Moseto c/o Simmons Hanly Conroy; (b) Troy Baldwin as the Special Administrator for the Estate of James Baldwin, c/o The Gori Law Firm; (c) Kristal Smith Stone, c/o Cooney & Conway; (d) Candus Ranshaw, Ind., and as the Special Administrator for the Estate of Frank J. Gawel, c/o MRHFM Law Firm; (e) Gary Richard Batteiger, c/o O'Brien Law Firm; (f) Kenneth Hagerman, c/o Bergman, Draper, Oslund, Udo; (g) Allene Wallace, c/o Levy Konigsberg, LLP; (h) John H. Peckham, c/o Waters & Kraus, LLP; and (i) Joseph Solazzo, III, as the Administrator of the Estate of Joseph Solazzo, Jr., c/o Weitz & Luxenberg, PC [Docket No. 47].

4.      On June 18, 2020, the Bankruptcy Court entered an order appointing James L. Patton, Jr., as the Future Claimants' Representative [Docket No. 377].

5.      On January 12, 2022, the Debtor, with the support of the other Plan Proponents, filed its initial *Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 1130] and the corresponding Disclosure Statement [Docket No. 1131].  On January 26, 2022, the Debtor filed the Solicitation Procedures Motion [Docket No. 1163].  On February 14, 2022, the Debtor filed its *First Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 1204] and the corresponding Disclosure Statement [Docket No. 1205].  Thereafter, on February 17, 2022, the Debtor filed the solicitation version of the *First Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 1219] and the Disclosure Statement.  A hearing to consider approval of the Disclosure Statement and entry of the Solicitation Procedures Order [Docket No. 1216] was held on February 16, 2022.

6.      On February 17, 2022, the Bankruptcy Court entered the Solicitation Procedures Order.  In the Solicitation Procedures Order, the Bankruptcy Court concluded that (a) the Disclosure Statement contains "adequate information" (as such term is defined in section 1125(a)(1) and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Plan and the transactions contemplated therein; (b) the combination of direct and publication notice prescribed therein provides "good and sufficient notice" and "satisfies the requirements of due process with respect to all known and unknown creditors"; and (c) the solicitation procedures contained therein provide for a fair and equitable voting process and are in accordance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rule 3017, and the Solicitation Procedures Order.  See Solicitation Procedures Order at I, D, and ¶¶ 2, 23.

7.      The Solicitation Procedures Order established (a) April 8, 2022 at 4:00 p.m. (prevailing Eastern Time) as the Voting Deadline; (b) May 5, 2022 at 4:00 p.m. (prevailing Eastern Time) as the Objection Deadline; (c) May 11, 2022 at 4:00 p.m. (prevailing Eastern Time) as the date by which any replies in support of the Plan were to be filed; and (d) May 16, 2022 at 10:00 a.m. (prevailing Eastern Time) as the date and time the Confirmation Hearing would commence.

8.      Under the Solicitation Procedures Order, the Debtor was required, on or before February 23, 2022 (the "Solicitation Date"), to commence solicitation of votes to accept or reject the Plan.  Specifically, on the Solicitation Date, the Balloting Agent commenced service of Solicitation Packages (as defined in the Solicitation Procedures Motion) – which included, among other materials, the Plan, the Disclosure Statement and all exhibits thereto – to Holders of Claims in the Voting Class (i.e., Holders of Claims in Class 3 (Asbestos Claims)) or their attorneys. Further, pursuant to the Solicitation Procedures Order, on or around the Solicitation Date, the Balloting Agent, at the direction of the Debtor, (a) served a copy of the Confirmation Hearing Notice (as defined in the Solicitation Procedures Motion) and Notice of Non-Voting Status on Known Holders of Claims in certain of the Unimpaired Classes (i.e., Classes 1, 2, 4, and 5) and to the Known Holders of Unclassified Claims (as defined in the Solicitation Procedures Motion) and (b) served counterparties to Executory Contracts who do not have scheduled Claims or Claims based upon filed Proofs of Claim with the Contract/Lease Notice.  Thereafter, on April 18, 2022, the Debtor filed and served the *Supplemental Notice to Certain Contract and Lease Counterparties* [Docket No. 1314] on certain additional counterparties to Executory Contracts who may not have received the initial Contract/Lease Notice. See Affidavit of Service [Docket No. 1333].

9.      The Balloting Agent filed affidavits of service with respect to the mailing of Solicitation Packages, the Confirmation Hearing Notice, the Contract/Lease Notice, and other

materials in respect of the Plan in accordance with the Solicitation Procedures Order, which were filed with the Bankruptcy Court on March 7, 15, and 22, April 8, and 27, 2022 (the "Affidavits of Service").  See Docket Nos. 1244, 1253, 1269, 1304, and 1333, respectively.

10.     On February 23, 2022, the Debtor timely and properly commenced the supplemental publication plan contemplated in and approved pursuant to the Solicitation Procedures Order, which was developed with the assistance of the Balloting Agent and provided widespread notice regarding the deadlines for voting on, and objecting to, the Plan through various media sources including television commercials, print publications, online display ads, social media ads, keyword search ads, e-newsletter ads, and a press release (the "Supplemental Publication Plan").  See Finegan Declaration (as defined below) at ¶¶ 4-5.

11.     On March 7, 2022, the Debtor published a combined notice of the Confirmation Hearing, Solicitation Procedures, Voting Deadline, and the deadline for submitting objections to the confirmation of the Plan (the "Objection Deadline") in *The Wall Street Journal* (the "Publication Notice").  Id. at ¶ 30, Ex. G.  Further, as part of the Noticing Program (as defined in the Finegan Declaration), the Debtor published the Publication Notice in each of *People Magazine*, *Parade Magazine*, the *Toledo Blade*, *Mealey's Litigation Report*: *Asbestos* and *Mealey's Asbestos Bankruptcy Report*.  Id. at ¶¶ 30-33, Exs. G-H.

12.     The Publication Notice and certain Supplemental Publication Plan materials stated the following in bold-font letters: "**The Plan contains certain releases, exculpations, and injunctions in furtherance of the Plan.  The Plan also contains a channeling injunction that permanently channels all Asbestos Claims against the Debtor and each other Protected Party to a trust established pursuant to section 524(g) of the Bankruptcy Code.  In addition, the Plan contains an injunction that permanently enjoins the pursuit of any claim against or**

5

**interest in the Debtor, the Reorganized Debtor, the Asbestos Trust or any of their respective property to the extent that such claim or interest has been discharged, released, waived, settled, or deemed satisfied in accordance with the Plan (other than the enforcement of any right pursuant to the Plan) . . . .**"  See id. at Exs. G-H; see also Solicitation Procedures Order, Ex. E.  The Publication Notice also instructed such parties to "read the Plan and Disclosure Statement carefully for details about how the Plan, if approved, will affect your rights."  See Solicitation Procedures Order, Ex. E.

13.     In accordance with the Solicitation Procedures Order, the Debtor solicited votes from the Voting Class, i.e., Holders of Claims in Class 3 (Asbestos Claims), the only Class of Claims entitled to vote to accept or reject the Plan.  See Affidavits of Service; Voting Declaration (as defined below).  The Debtor did not solicit votes to accept or reject the Plan from Holders of Claims or Equity Interests in Classes 1, 2, 4, 5, 6, and 7, each of which are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

14.     On April 1, 2022, the Debtor, with the support of the other Plan Proponents, filed the *Second Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 1286].

15.     On April 1, 2022, the Debtor filed the Plan Supplement containing the following: (a) the Schedule of Assumed Contracts; (b) the form of Amended Organizational Documents; (c) the form of Asbestos Records Cooperation Agreement; (d) the form of Payment Note; (e) the form of Pledge Agreement; (f) the identity of the individuals who will act as the directors and officers or managers of the Reorganized Debtor; and (g) the identity of the individuals who will serve on the Asbestos Trust Advisory Committee.  See Docket No. 1295.

US-DOCS\130474138.9

16.     On April 18, 2022, the Debtor filed the *Notice of Filing of Amended Plan Supplement for the Second Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code* containing the amended Schedule of Assumed Contracts.  See Docket No. 1315.

17.     On April 21, 2022, the Balloting Agent filed the *Declaration of Jeanne C. Finegan APR Regarding Plan Noticing Program* [Docket No. 1322] (as amended, supplemented, or modified from time to time, and including all exhibits and supplements thereto, the "Finegan Declaration"), which, among other things, provided details regarding the Debtor's Noticing Program.

18.     On April 21, 2022, the Debtor filed the *Notice of Filing of Revised Schedule and Exhibits to Plan* [Docket No. 1330] containing the following: (a) a revised Asbestos Trust Agreement; (b) a revised list of all current and former Affiliates of O-I Glass (other than the Debtor) and any of such Affiliates' successors or assigns; and (c) a revised list of Consent Decrees, Covenants, and Agreements.

19.     On April 25, 2022, the Balloting Agent filed the *Declaration of James Daloia of Kroll Restructuring Administration LLC in Support of Confirmation of the Second Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 1331] (the "Voting Declaration"), indicating that the solicitation of votes, processing of Ballots, and tabulation of votes were conducted in accordance with the Solicitation Procedures Order.  The Voting Declaration certified that the Voting Class voted to accept the Plan by 99.993% in number of Claims and 99.997% in amount of Claims voting, and voted to reject the Plan by 0.007% in number of Claims and 0.003% in amount of Claims voting.  See Voting Decl. ¶ 8, Ex. A.

20.     On May 2, 2022, the United States Trustee held and concluded a meeting of creditors pursuant to section 341(a) of the Bankruptcy Code.  See Docket No. 1340.

21.     On May 5, 2022, the United States Trustee filed the *United States Trustee's Objection to the Second Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code*, in which the United States Trustee asked the Bankruptcy Court to deny confirmation of the Plan.  See Docket No. 1347.

22.     On May 11, 2022, the Future Claimants' Representative filed the *Declaration of James L. Patton, Jr. in Support of Confirmation of the Second Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 1362] (the "Patton Declaration").

23.     On May 11, 2022, the Debtor filed the (i) *Debtor's (a) Memorandum of Law in Support of Confirmation of the Second Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code and (b) Reply to the UST Objection to Confirmation of the Plan* [Docket No. 1355] (the "Confirmation Memorandum"); (ii) *Declaration of David J. Gordon in Support of Confirmation of the Second Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 1356] (the "Gordon Declaration"); (iii) *Declaration of Tony Simion in Support of Confirmation of the Second Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 1357] (the "Simion Declaration); and (iv) *Declaration of Randolph L. Burns in Support of Confirmation of the Second Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 1358] (the "Burns Declaration").

24.     On May 13, 2022, the Future Claimants' Representative filed the *Declaration of Thomas Vasquez, Ph.D. in Support of Confirmation of Second Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 1369] (the "Vasquez Declaration" and, together with the Confirmation Memorandum, the Voting Declaration, the Gordon Declaration, the Simion Declaration, the Burns Declaration, the Finegan Declaration, and the Patton Declaration, the "Confirmation Submissions").

25.     The Bankruptcy Court has reviewed the Plan, the Disclosure Statement, the Plan Supplement, the Confirmation Submissions, and the other papers before it in connection with the Plan; heard the statements of counsel in support of confirmation, as reflected in the record; and considered all evidence presented at and in connection with the Confirmation Hearing.

### B.     THE DEBTOR'S CORPORATE STRUCTURE AND HISTORY OF ASBESTOS LIABILITIES

### 1.     Corporate Structure and the Prepetition Restructuring Transaction

26.     The Debtor is a Delaware limited liability company and a wholly-owned subsidiary of O-I Glass (collectively with all of its subsidiaries, the "Company"), a public company organized under the laws of the State of Delaware.  The Debtor has a single, wholly-owned subsidiary, Meigs Investments, LLC ("Meigs"), which is also a Delaware limited liability company.  The Debtor and Meigs are headquartered in Perrysburg, Ohio.

27.     The Debtor is the successor-by-merger to Owens-Illinois, Inc. ("Old O-I"), which previously served as the ultimate parent of the Debtor and its Affiliates.  See Burns Decl. ¶ 4.  On December 26 and 27, 2019, the Debtor undertook a series of transactions pursuant to section 251(g) of the Delaware General Corporation Law (collectively, and as further defined in the Plan, the "Prepetition Restructuring Transaction").  As part of the Prepetition Restructuring Transaction,

Old O-I merged with and into the Debtor, with the Debtor remaining as the surviving entity in such transaction.

28.     In connection with the Prepetition Restructuring Transaction, among other things, the Debtor and O-I Glass entered into (a) the Support Agreement requiring O-I Glass to provide funding for all "Permitted Uses", without any corresponding repayment obligation by the Debtor, and (b) the Services Agreement, pursuant to which O-I Glass agreed to provide the Debtor with corporate and administrative services necessary to operate the Debtor's business and support its operations.  See Gordon Decl. ¶ 4.

### 2.     History of Asbestos Liabilities

29.     For a period of time ending in 1958, Old O-I manufactured commercial quantities of certain products under the "Kaylo" brand, which were primarily pipe covering and block insulation products.  See Burns Decl. ¶ 4.  Kaylo products contained either chrysotile or amosite asbestos fibers, depending on the year of manufacture, and had specific industrial applications.  Id.

30.     In April 1953, Old O-I entered into a five-year sales agreement covering Kaylo products with Owens Corning Fiberglas Corporation ("Owens Corning"), which then began distributing Kaylo products.  Id. at ¶ 6.  Owens Corning purchased the Kaylo business in its entirety from Old O-I in April 1958, and Old O-I did not manufacture or sell any Kaylo products thereafter. Id.  No other entities within the Company were ever involved in the production or sale of Kaylo products.  Id.

31.     As of the Petition Date, the Debtor had been named as a defendant in personal injury and/or wrongful death or property damage actions seeking recovery for damages allegedly caused by the sale of, manufacture of, presence of, or exposure to, asbestos or asbestos-containing products.  Prior to the Petition Date, the Debtor was annually subject to hundreds of new claims

and lawsuits alleging personal injuries and death from exposure to Kaylo-related asbestos, and the Debtor was also aware of approximately 850-900 asbestos-related personal injury lawsuits pending against it as of the Petition Date asserting liability for damages caused by its legacy asbestos-related liabilities.  See Burns Decl. at ¶ 7.

32.     Most Asbestos Claims were historically presented to the Debtor through a variety of administrative claims-handling agreements.  Id. at ¶ 8.

33.     As of September 30, 2019, the Debtor had resolved over 400,000 Asbestos Claims, and had incurred gross expense of approximately $5 billion for asbestos-related costs.  Id. at ¶ 10. Prior to the Petition Date, the Debtor settled or otherwise exhausted all insurance that might cover Asbestos Claims.  Id.  As such, the Debtor could only rely on Company cash flows to satisfy asbestos-related claims and expenses.  Id.

34.     The Debtor initiated chapter 11 proceedings on January 6, 2020 to utilize section 524(g) of the Bankruptcy Code to establish and fund a trust that would provide for the fair and equitable treatment of all current and future asbestos-related claims and demands.

## C.     THE MEDIATION

35.     On February 16, 2021, the Debtor, O-I Glass, the Asbestos Claimants Committee, and the Future Claimants' Representative sought Bankruptcy Court approval to commence a formal, non-binding mediation of their disputes conducted by Kenneth Feinberg and the Hon. Layn R. Phillips (the "Mediators").  See Docket Nos. 718.  The Bankruptcy Court granted the parties' request [Docket No. 721], appointed the Mediators, and mediation commenced on February 23, 2021.  At the conclusion of the mediation, the Debtor, O-I Glass, the Asbestos Claimants Committee, and the Future Claimants' Representative reached agreement on the material terms of a consensual plan of reorganization for the Debtor that would create a trust pursuant to section

524(g) of the Bankruptcy Code to which all Asbestos Claims (including Demands) would be channeled.  See Docket No. 802.

36.     A key aspect of the mediation was that the Debtor, the Asbestos Claimants Committee, and the Future Claimants' Representative ultimately agreed that the methodology for estimating Asbestos Claims (including Demands) was through review and analysis of the Debtor's historical tort system settlements and verdicts.  The mediation, which ultimately resulted in the Plan Settlement (as defined in the Disclosure Statement) centered around this settlement approach to estimating Paddock's asbestos liabilities (including Demands), and involved extensive negotiations supported by settlement-based analyses from experts retained by counsel to the Debtor, the Asbestos Claimants Committee, and the Future Claimants' Representative.  See Gordon Decl. at ¶ 12; Patton Decl. at ¶ 19.

37.     The use of historical settlement and verdict data, that the Debtor and its Affiliates did not move for an injunction or temporary restraining order staying claims against its Affiliates, and that the Debtor and its Affiliates did not engage in aggressive litigation tactics, were critical components that ultimately led to a successful settlement among the Plan Proponents.

38.     The Debtor is likely to be subject to substantial Demands for payment arising out of the same or similar conduct or events that gave rise to current Asbestos Claims, and all such Demands are subject to the Asbestos Channeling Injunction.  See id. at ¶¶ 35-36.  Pursuit of Demands outside the procedures prescribed by the Plan Settlement, Plan, and the Asbestos Trust Distribution Procedures is likely to threaten the Plan's purpose to deal equitably with Asbestos Claims (including Demands).  See id. at ¶¶ 37-38.

39.     The Plan Settlement, the principal terms of which were included in the *Certification of Counsel Regarding Successful Mediation* filed on April 26, 2021 [Docket No. 802] and which

is incorporated into and implemented through the Plan, provides for, among other things, (a) payment of Asbestos Claims by the Asbestos Trust pursuant to the Asbestos Trust Documents (specifically, the Asbestos Trust Agreement and Asbestos Trust Distribution Procedures), (b) indemnification by O-I Glass of the Reorganized Debtor pursuant to the terms of the O-I Glass Indemnification Agreements, and (c) an appropriate resolution settling and releasing any and all objections and claims against O-I Glass and the other Non-Debtor Affiliates related to, among other things, the Prepetition Restructuring Transaction.

### D. KEY PROVISIONS OF THE PLAN

### 1. The Asbestos Trust

40. The Plan establishes the Asbestos Trust under section 524(g) of the Bankruptcy Code, and the Asbestos Trust shall assume on the Effective Date all liabilities, obligations, and responsibilities of the Debtor for all Asbestos Claims (including, but not limited to, Demands). The Asbestos Trust shall constitute a "qualified settlement fund" under section 468 of the Internal Revenue Code. The Asbestos Trust will be funded by the contribution of the Asbestos Trust Assets, including the Asbestos Trust Contributions (which includes the Paddock Trust Contribution and the O-I Glass Trust Contribution) and all other assets, rights, and benefits assigned, transferred, or conveyed to the Asbestos Trust in connection with the Plan or any Plan Documents, and all proceeds of the foregoing. Specifically, the O-I Glass Contribution includes (a) the O-I Glass Trust Contribution; (b) indemnification by O-I Glass of the Reorganized Debtor from and against all Covered Claims and Environmental Claims or Causes of Action, in each case pursuant to and to the extent set forth in the Covered Claims Indemnification Agreement and the Environmental Claims or Causes of Action Indemnification Agreement, as applicable; and (c) the fulfillment of the Support Request. See Plan §§1.1 and 8.3 (definition of "O-I Glass Contribution").

13

41.     The Asbestos Trust, by the exercise of rights granted under the Plan, would be entitled to own, if specified contingencies occur, a majority of the voting shares of the Reorganized Debtor.  See Plan §§ 8.2(a)(v), and 11.1(e)(7).  The Asbestos Trust will use the Asbestos Trust Assets to resolve and pay Asbestos Claims in accordance with the Asbestos Trust Agreement [see Plan Ex. A] and the Asbestos Trust Distribution Procedures [see Plan Ex. B], and in such a way as to provide reasonable assurance that the Asbestos Trust will value, and be in a financial position to pay, Asbestos Claims in substantially the same manner, and to otherwise comply in all respects with the requirements of a trust set forth in section 524(g)(2)(B) of the Bankruptcy Code.  See Plan § 8.3(b).  Further, the Asbestos Trust is to use its assets and income to pay Asbestos Trust Expenses.  See id. § 2.2(b).

### 2.     The Asbestos Channeling Injunction

42.     Section 10.3 of the Plan contains an injunction that will channel all Asbestos Claims (including Demands) to the Asbestos Trust (as referenced and more fully defined in the Plan, the "Asbestos Channeling Injunction").  Specifically, Section 10.3 of the Plan provides in pertinent part that pursuant to section 524(g) of the Bankruptcy Code, from and after the Effective Date, the sole recourse of any Holder of an Asbestos Claim or Demand on account of such Asbestos Claim or Demand shall be to the Asbestos Trust pursuant to Section 10.3 of the Plan and the Asbestos Trust Distribution Procedures, and such Holder shall have no right whatsoever at any time to assert its Asbestos Claim or Demand against any Protected Party or any property or interest in property of any Protected Party.  Further, on and after the Effective Date, all present and future Holders of Asbestos Claims and Demands shall be permanently and forever stayed, restrained, barred, and enjoined from taking any actions for the purpose of, directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Asbestos Claim or Demand other than from the Asbestos Trust pursuant to the Asbestos Trust Documents.  See Plan § 10.3.

###### 3.      Releases by the Debtor, the Reorganized Debtor, and Holders of Claims

43.      The Plan provides for (a) a release by the Debtor and its Estate, the Reorganized Debtor, and any Entity seeking to exercise the rights of the Estate of the Released Parties and (b) a Third-Party Release (as defined herein) by certain Releasing Parties of the Released Parties.  See Plan §§ 10.5-10.6.

44.      The Releasing Parties include: (a) all Holders of Claims that vote to accept the Plan; (b) all Holders of Claims that are presumed to accept the Plan and fail to timely object to the releases provided for in Section 10.6 of the Plan, other than (1) Holders of Environmental Claims or Causes of Action that are Governmental Authorities and (2) the United States; (c) all Holders of Claims entitled to vote on the Plan and who vote against the Plan and do not opt-out of the releases provided for in the Plan; and (d) all Holders of Claims entitled to, but do not, vote for or against the Plan and do not opt-out of the releases provided for in the Plan.  For the avoidance of doubt, (1) Holders of Environmental Claims or Causes of Action that are Governmental Authorities and (2) the United States are not Releasing Parties.  See Plan § 1.1 (definition of "Releasing Parties").

45.      Further, Holders of Claims and Equity Interests in the Unimpaired Classes (i.e., Classes 1, 2, 4, 5, 6, and 7) and Holders of Unclassified Claims (i.e., Administrative Expense Claims, Professional Fee Claims, and Priority Tax Claims) are not entitled to vote on the Plan and are deemed to grant the Third-Party Release (as defined herein) set forth in Section 10.6 of the Plan, unless such Holders timely filed an objection to the Third-Party Release (which objection shall be deemed to be an opt-out from the Third-Party Release) no later than the Objection Deadline in accordance with the procedures set forth in the Solicitation Procedures Order.  No Holders of Claims or Equity Interests in the Unimpaired Classes or Holders of Unclassified Claims opted out of the Third-Party Release.

46.     The Released Parties include: (a) the Debtor; (b) the Non-Debtor Affiliates; and (c) to the fullest extent permitted by applicable law, any Representatives of the foregoing Entities. See Plan § 1.1 (definition of "Released Party").

### 4.     Treatment of Non-Asbestos Claims

47.     Under the Plan, Holders of Allowed Claims in Class 1 (Other Priority Claims), Class 2 (Secured Claims), Class 4 (General Unsecured Claims), Class 5 (Environmental Claims or Causes of Action), and Class 6 (Intercompany Claims), as well as Holders of Equity Interests in Class 7 (Paddock Equity Interests), are Unimpaired and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. See Plan § 3.1.

### E.     ACCEPTANCE OF THE PLAN

48.     As more fully detailed in the Voting Declaration, the Voting Class voted to accept the Plan as follows:

| CLASS | ACCEPT THE PLAN | | REJECT THE PLAN | |
|---|---|---|---|---|
| | Percentage of Total Dollar Amount | Percentage of Number of Votes | Percentage of Total Dollar Amount | Percentage of Number of Votes |
| **Class 3 – Asbestos Claims** | **99.997%** | **99.993%** | **0.003%** | **0.007%** |

See Voting Decl. ¶ 8, Ex. A.  The Voting Declaration reflected, among other things, that 69,171 votes[3] were properly cast by Holders of Class 3 - Asbestos Claims.  Id.  The Voting Declaration

---

[3]     As provided for in the Voting Declaration, the Balloting Agent received certain untimely votes and if the Debtor waived the timeliness requirement and included these late Ballots, the voting results would be 69,708 (99.993%) accepting claims in the amount of $771,173,900.00 (99.997%) and 5 (0.007%) rejecting claims in the amount of $19,602.00 (0.003%).   Additionally, the Balloting Agent counted as valid votes certain Ambiguous Votes (as defined in the Voting Declaration) and if these votes had instead been treated as defective and not counted in the final vote tabulation, the voting results would be 19,961 (99.975%) accepting claims in the amount of $305,194,800.00 (99.994%) and 5 (0.025%) rejecting claims in the amount of $19,602.00 (0.006%).  See Voting Decl. ¶¶ 12-14.

also reflected that six (6) opt outs were received from Holders of Class 3 – Asbestos Claims.  Id. at Ex. C.

### F. COMPLIANCE WITH THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE

#### 1. Section 1129(a)(1) – Compliance of the Plan with Applicable Provisions of the Bankruptcy Code

49.     The Plan complies with all applicable provisions of the Bankruptcy Code, as required by section 1129(a)(l) of the Bankruptcy Code, including sections 1122 and 1123 of the Bankruptcy Code.

#### 2. Sections 1122 and 1123(a)(1)-(4) – Classification and Treatment of Claims and Equity Interests

50.     Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan designates Classes of Claims and Equity Interests, which are classified for all purposes, including voting, confirmation, and Distributions pursuant to the Plan.[4]  In accordance with section 1122(a) of the Bankruptcy Code, Article III of the Plan classifies each Claim against and Equity Interest in the Debtor into separate Classes containing only substantially similar Claims and Equity Interests.  The Plan contains seven (7) Classes of Claims against and Equity Interests in the Debtor.  Valid business, factual, and legal reasons exist for the separate classification of such Classes of Claims and Equity Interests.  Such classification is proper under section 1122(a) of the Bankruptcy Code because such Classes of Claims and Equity Interests have differing rights among each other and against the Debtor's assets or differing interests in the Debtor.

---

[4]     Pursuant to section 1123(a)(1) of the Bankruptcy Code, certain claims, including Administrative Expense Claims, Professional Fee Claims, and Priority Tax Claims, are not required to be classified.  Sections 2.2 and 2.3 of the Plan describe the treatment under the Plan of such Claims.

51.     Pursuant to section 1123(a)(2) of the Bankruptcy Code, <u>Article III</u> of the Plan specifies all Classes of Claims and Equity Interests that are not Impaired under the Plan and specifies all Classes of Claims and Equity Interests that are Impaired under the Plan.

52.     Pursuant to section 1123(a)(3) of the Bankruptcy Code, <u>Article III</u> of the Plan specifies the treatment of all Claims and Equity Interests under the Plan.

53.     Pursuant to section 1123(a)(4) of the Bankruptcy Code, <u>Article III</u> of the Plan also provides the same treatment for each Claim or Equity Interest within a particular Class, unless the Holder of a Claim or Equity Interest agrees to less favorable treatment of its Claim or Equity Interest.

54.     Specifically, Asbestos Claims were placed in a single Voting Class and were accorded the same treatment under the Plan, regardless of whether claimants hold Claims, Demands or Causes of Action under the Plan (which defines "<u>Asbestos Claim</u>" to consist of General Asbestos Claims and Indirect Asbestos Claims, both of which include Claims, Demands, and Causes of Action).  <u>See</u> Plan § 1.1 (definition of "<u>Asbestos Claim</u>").  The Plan therefore complies with sections 1122 and 1123(a)(1)-(4) of the Bankruptcy Code.

**3.     Section 1123(a)(5) - Adequate Means for Implementation of the Plan**

55.     In accordance with section 1123(a)(5) of the Bankruptcy Code, the Plan, including <u>Articles VIII</u>, <u>IX</u>, and <u>X</u>, and the various documents and agreements set forth in the Plan Supplement provide for various means for the Plan's implementation, including, among other things: (a) the vesting of the property of the Debtor's Estate in the Reorganized Debtor (except for any other property of the Debtor distributed pursuant to the Plan) (Plan § 9.2); (b) the effectiveness of the Amended Organizational Documents that will govern the Reorganized Debtor and the appointment of the individuals who will act as the officers and the directors or managers of the Reorganized Debtor, as identified in the Plan Supplement (Plan § 8.2(b)); (c) the issuance of the

18

Support Request to O-I Glass pursuant to the Support Agreement to the extent necessary to ensure that, as of the Effective Date, the Debtor shall be able to fully fund the Professional Fee Escrow Account and shall hold no less than $10 million in Cash as of the Effective Date in Net Reserve Funds (Plan § 8.5); (d) the vesting of authority in the appropriate officers, members or managers, or directors of the Debtor or Reorganized Debtor, as applicable, to execute, deliver, file, and record such contracts, instruments, releases, indentures, certificates, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan (Plan § 8.9); (e) the implementation of the various discharges, releases, injunctions, indemnifications, and exculpations provided under the Plan, including those set forth in Article X of the Plan; (f) the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases to which the Debtor is a party (Plan §§ 7.1-7.6); (g) the making of the Asbestos Trust Contributions to the Asbestos Trust (Plan §§ 8.2-8.3); (h) the entry into and effectiveness of the O-I Glass Indemnification Agreements (Plan §§ 8.2 and 8.10); (i) the termination of the Support Agreement and the Services Agreement (Plan § 8.2); and (j) the creation of the Asbestos Trust, the transfer of Asbestos Trust Assets to the Asbestos Trust, the vesting in the Asbestos Trust of the Asbestos Trust Assets, the channeling of all Asbestos Claims to the Asbestos Trust, the assumption of liabilities and responsibility for Asbestos Claims by the Asbestos Trust, the effectiveness of the Asbestos Claims Indemnification Agreement, the appointment of the Asbestos Trustees and the Asbestos Trust Advisory Committee, and the resolution of Asbestos Claims in accordance with the Asbestos Trust Agreement and Asbestos Trust Distribution Procedures (Plan §§ 8.2-8.3).

US-DOCS\130474138.9

4.      **Section 1123(a)(6) – Prohibition Against the Issuance of Nonvoting Equity Securities**

56.     The Plan provides that the Amended Organizational Documents will, among other things, prohibit the issuance of nonvoting equity securities as required under section 1123(a)(6) of the Bankruptcy Code.  The Amended Organization Documents, filed with the Plan Supplement, reflect this prohibition.  See Plan Supplement, Ex. A [Docket No. 1295].

5.      **Section 1123(a)(7) – Selection of Directors and Officers in a Manner Consistent with the Interests of Creditors and Equity Interest Holders and Public Policy**

57.     On the Effective Date, the Debtor's officers and managers will be replaced by the individuals identified in Exhibit G to the Plan Supplement.  See Plan Supplement, Ex. G [Docket No. 1295].  Section 1123(a)(7) of the Bankruptcy Code does not apply to the selection of the Asbestos Trust Advisory Committee and the Asbestos Trustees.  Notwithstanding the foregoing, the Plan and Plan Supplement also provide for the nomination of nine (9) individuals to serve as the initial members of the Asbestos Trust Advisory Committee.  See Plan § 8.3(g); Plan Supplement, Ex. C.  The initial members will be (a) Matthew Bergman of Bergman, Draper, Oslund, Udo; (b) Christopher R. Guinn of Simmons Hanly Conroy; (c) Lisa Nathanson Busch of Weitz & Luxenberg P.C.; (d) John Cooney of Cooney & Conway; (e) Beth Gori of The Gori Law Firm; (f) Peter Kraus of Waters & Kraus LLP; (g) Marcus Raichle, Jr. of Maune Raichle Hartley French & Mudd, LLC; (h) Audrey Raphael of Levy Konigsberg LLP; and (i) Chris Thoron of the O'Brien Law Firm.  See id.  Successor members will be appointed as provided in the Asbestos Trust Agreement.  See Plan § 8.3.

58.     In addition, Section 8.3(d) of the Plan provides for the nomination and appointment of the initial Asbestos Trustees, who will be (a) LeAnne Jackson, (b) Allen Schwartz, and (c) Hon. George Silver.  See Plan § 8.3(d).  Such appointments shall be effective as of the Effective Date.

Any subsequent trustees will be appointed in accordance with the terms of the Asbestos Trust Agreement.  See id.  Mr. Patton, who has served as the Future Claimants' Representative in the Chapter 11 Case, will continue to serve as the Post-Effective Date Future Claimants' Representative, pursuant to the terms of the Asbestos Trust Agreement.  See id. at § 8.3(e).

59.     The selection of the Reorganized Debtor's officers and managers as set forth herein, the Plan and Plan Supplement, is consistent with the interests of Holders of Claims and Equity Interests and public policy.

**6.     Section 1123(a)(8) – Individual Debtor**

60.     Section 1123(a)(8) of the Bankruptcy Code is inapplicable to the Chapter 11 Case. The Debtor is not an individual, as such term is used in the Bankruptcy Code.

**7.     Section 1123(b)(1) – Impairment of Claims and Interests**

61.     In accordance with section 1123(b)(l) of the Bankruptcy Code, Article III of the Plan impairs or leaves Unimpaired, as the case may be, each Class of Claims and Equity Interests.

**8.     Section 1123(b)(2) – Assumption, Assumption and Assignment, or Rejection of Executory Contracts and Unexpired Leases**

62.     In accordance with section 1123(b)(2) of the Bankruptcy Code, Article VII of the Plan provides, among other things, that the Debtor will reject, as of the Effective Date, any and all Executory Contracts to which the Debtor is a party, except for: (a) any Executory Contracts specifically listed on the Schedule of Assumed Contracts (see Plan Supplement, Ex. F [Docket No. 1295], as amended, see Docket No. 1315, Ex. 1); (b) any Executory Contracts previously rejected, assumed, or assumed and assigned pursuant to a Final Order entered on or before the Effective Date; or (c) any Executory Contract subject to a motion to reject, assume, or assume and assign pending as of the Effective Date.

63.     <u>Article VII</u> of the Plan further provides, among others, (a) that the Debtor may amend the Schedule of Assumed Contracts to delete therefrom, or add thereto, any Executory Contract until the Effective Date; (b) that the Debtor shall be deemed to reject the Support Agreement and the Services Agreement as of the Effective Date and that all obligations by and between the parties to the Support Agreement and Services Agreement shall, and shall be deemed to, terminate upon the making of the O-I Glass Contribution; and (c) the consequences of rejection of Executory Contracts and the cure of any defaults under each Executory Contract to be assumed. The Debtor shall File a notice of any amendments to the Schedule of Assumed Contracts and shall serve any such notice on the parties to the Executory Contract(s) affected thereby.  In accordance with foregoing, the Debtor Filed a notice of amendments to the Schedule of Assumed Contacts [see <u>Docket No. 1315</u>] and served such notice on the parties affected thereby.  <u>See</u> Affidavit of Service [<u>Docket No. 1333</u>].

> **9.**     **Section 1123(b)(3) – Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action**

64.     **Compromise and Settlement.**  Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan Settlement constitutes a good faith compromise and settlement of all claims, Causes of Action and controversies included therein, including but not limited to claims and Causes of Actions released pursuant to <u>Section 10.5</u> of the Plan (the "<u>Debtor Release</u>").  But for the various compromises and contributions embodied in the Plan Settlement, causes of action may have been asserted that would have resulted in, at minimum, costly and time-consuming litigation surrounding the Prepetition Restructuring Transaction.  The amount of the O-I Glass Trust Contribution settles and resolves any potential causes of action surrounding the Prepetition Restructuring Transaction.  Additionally, the commitment that the O-I Glass

Contribution shall be made to the Asbestos Trust upon the Effective Date remedies any risk to the Holders of Asbestos Claims and Demands of non-payment of any current or future judgments.

65.     The compromises and settlements embodied in the Plan Settlement are the product of extensive arm's length negotiation and represent a reasonable resolution of the Causes of Action released and/or settled pursuant thereto, preserve value by enabling the Debtor to avoid extended, costly litigation that could delay the Debtor's emergence from chapter 11, and are in the best interests of the Debtor and its Estate.  Significant value has been provided to the Debtor and its Estate by or on behalf of the Released Parties in consideration for the Debtor Release.

66.     **Retained Causes of Action.**  Section 9.3 of the Plan provides that, with the exception of those claims released by the Debtor pursuant to Section 10.5 of the Plan, transferred to the Asbestos Trust pursuant to Section 8.3 of the Plan, or otherwise governed by the terms of the O-I Glass Indemnification Agreements, in accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtor, as successor in interest to the Debtor and its Estate, shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing), all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, accruing to, or that are property of, the Debtor and its Estate pursuant to the Bankruptcy Code or any statute or legal theory, including any rights, claims, and Causes of Action against third parties based upon, attributable to, or arising out of Allowed Claims, in its sole and absolute discretion, without the necessity for Bankruptcy Court approval under Bankruptcy Rule 9019, and the Reorganized Debtor shall retain and may enforce all defenses and counterclaims to all Claims asserted against the Debtor or its Estate, including, but not limited to, setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.  From and after the Effective Date, the Asbestos Trust and/or the Reorganized Debtor, as appropriate based on the assets and liabilities

23

retained or owned by each respectively, shall be authorized to compromise any controversies on such terms as each may determine, in its sole discretion, to be appropriate, without notice to any other party or approval of or notice to the Bankruptcy Court.  Notwithstanding anything in Section 9.3 of the Plan to the contrary, neither the Debtor nor the Reorganized Debtor shall have any rights to pursue any Avoidance Actions against (i) any person on account of a payment or other transfer received from the Debtor as compensation for, or otherwise related to, an Asbestos Claim or (ii) any Protected Party.

67.     Additionally, Section 8.3(i) of the Plan provides that, in accordance with section 1123(b) of the Bankruptcy Code, except as provided in Section 10.5 of the Plan, on the Effective Date, all claims, defenses, rights and Causes of Action of the Debtor and the Reorganized Debtor relating to Asbestos Claims shall be transferred and assigned to the Asbestos Trust.  The Asbestos Trust will retain and may enforce such claims, defenses, rights, and Causes of Action and shall retain and may enforce all defenses and counterclaims to all Claims or Demands asserted against the Asbestos Trust, including without limitation, setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code; provided, however, that no such claims, defenses, Causes of Action, or counterclaims may be asserted against any Protected Party.  The Asbestos Trust shall be deemed to be the appointed representative of the Debtor and Reorganized Debtor with respect to the rights and defenses related to Asbestos Claims, and may pursue, litigate, compromise, and settle any rights, claims, or Causes of Action transferred to it, as appropriate.

68.     The provisions in the Plan regarding the retention or transfer to the Asbestos Trust of Causes of Action are appropriate and in the best interests of the Debtor, its Estate, and its creditors.

24

69.     **Debtor Release**.  The Debtor Release constitutes an essential and critical provision of the Plan and forms an integral part of the agreement among the Plan Proponents embodied in the Plan.  Under Section 10.5 of the Plan, the Debtor and its Estate settles, compromises, and releases the Released Parties from "any and all claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action and liabilities which any of the Debtor, the Reorganized Debtor, or the Estate is entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, whether direct, indirect, or derivative, based upon, attributable to, or in any manner arising out of, in whole or in part, any act, omission, transaction, event, occurrence, or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) (other than the rights under this Plan, the Plan Documents, and the contracts, instruments, releases and other agreements or documents delivered or to be delivered hereunder)."  See Plan § 10.5(a).  The Debtor Release includes any claims arising out of or relating to the Prepetition Restructuring Transaction.

70.     The Debtor Release, which includes by reference each of the related provisions, including Sections 10.5 and 10.7, and definitions contained in the Plan, is: (a) within the jurisdiction of the Bankruptcy Court pursuant to 28 U.S.C. §§ 157 and 1334; (b) given in exchange for the good and valuable consideration provided by the Released Parties, which includes the O-I Glass Contribution; (c) the product of good-faith, arm's-length negotiations among the Debtor, the other Plan Proponents, and the Debtor's other constituents; (d) a good-faith settlement and compromise of the Claims released by such releases; (e) in the best interests of the Debtor, its Estate, and its stakeholders; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; (h) appropriate in scope; and (i) a bar to the Debtor or its Estate, or

any party seeking to do so on behalf of or through the Debtor or its Estate, asserting any Claim or Cause of Action released pursuant to such release.  The Debtor Release appropriately offers protection to parties that participated constructively in the Debtor's restructuring efforts.  Such protections from liability facilitated the participation of the Debtor's stakeholders in the negotiations and compromises that led to the Plan.

71.     Pursuant to the Plan Settlement, O-I Glass or its affiliate will (i) pay $601.5 million in cash to the Asbestos Trust on the Effective Date; (ii) fund any Support Request issued by the Debtor in advance of the Effective Date; and (iii) indemnify the Reorganized Debtor for all Non-Asbestos Claims, in consideration for the protection of itself and the other Released Parties and Protected Parties, as applicable, by the Debtor Release, Asbestos Channeling Injunction, and the Third-Party Release.  Because this global resolution motivates the specific terms of the Plan, funding of the Asbestos Trust Assets and provision of the other noted consideration depends on confirmation of the Plan as proposed.

72.     Given the $601.5 million cash payment from O-I Glass and O-I Glass's agreement to enter into the O-I Glass Indemnification Agreements, the Debtor Release and injunctions incorporated into the Plan in support thereof represent a valid exercise of the Debtor's authority to settle any claims against O-I Glass and the other Released Parties on behalf of the Debtor and its Estate, and to bind creditors to the outcome of that settlement, particularly in light of the direct participation of the Asbestos Claimants Committee and the Future Claimants' Representative in the mediation and settlement negotiations that resulted in the Plan Settlement, and which the Asbestos Claimants Committee and the Future Claimants' Representative support.  See U.S. Bank. Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion), 426 B.R. 114, 143 (Bankr. D. Del. 2010); Gordon Decl. at ¶ 12; Patton Decl. at ¶¶ 17-20.

73.     For the reasons set forth in more detail in the Confirmation Memorandum, the Debtor Release and inclusion of the Protected Parties within the scope of the Asbestos Channeling Injunction also satisfy each of the five <u>Master</u> <u>Mortgage</u> factors.  <u>See</u>, <u>e.g.</u>, <u>In re Zenith Elecs.</u> <u>Corp.</u>, <u>241 B.R. 92, 110</u> (Bankr. D. Del. 1999) (citing <u>In re Master Mortgage Inv. Fund, Inc</u>., <u>168</u> <u>B.R. 930,935</u> (Bankr. W.D. Mo. 1994)), <u>appeal dismissed</u>, <u>250 B.R. 207</u> (D. Del. 2000).  <u>First</u>, O-I Glass and the other Released Parties share an identity of interest with the Plan Proponents.  The negotiation and finalization of the Plan Settlement by the Debtor and O-I Glass (on behalf of itself and the other Released Parties) unified the Debtor and the Released Parties in a joint effort to obtain approval of, and to implement, the Plan and the Asbestos Channeling Injunction.  Certain other Released Parties hold indemnification rights against the Debtor.  <u>Second</u>, O-I Glass, on behalf of itself and the other Released Parties, has made a substantial contribution of assets to the reorganization.  <u>See</u> Gordon Decl. at ¶ 30.  <u>Third</u>, approval of the Debtor Release and supporting injunctions are integral conditions to the consummation of the Plan and O-I Glass would not have agreed to settle and contribute over $600 million without such protections.  <u>See</u> <u>id</u>. at ¶¶ 28, 30-31.  <u>Fourth</u>, the Plan has been overwhelmingly accepted, with over 99% of creditors holding Asbestos Claims voting in favor of the Plan.  <u>See</u> Voting Decl. at ¶ 38.  No other creditor has objected.  The Asbestos Claimants Committee and Future Claimants' Representative actively negotiated and support the Plan, including the releases contained therein.  <u>See</u> Patton Decl. ¶¶ 17-20.  <u>Fifth</u>, the Plan provides for Distributions to all Classes of Claims affected by the Debtor Release and supporting injunctions.  The O-I Glass Contribution will fund the Asbestos Trust, which will establish a 100% Payment Percentage for Asbestos Claims, and supports the Unimpaired treatment of all other Classes under the Plan.  <u>See</u> Gordon Decl. ¶ 32; Patton Declaration ¶ 46.

74.     The injunction contained in <u>Section 10.5(b)</u> of the Plan (the "<u>Debtor Release</u> <u>Injunction</u>") supplements and effectuates the Debtor Release by permanently enjoining third parties from pursuing any claims or causes of action against the Released Parties that have been released by the Debtor, including any claims arising out of or relating to the Prepetition Restructuring Transaction.

75.     The scope of the Debtor Release is appropriately tailored under the facts and circumstances of the Chapter 11 Case.  In light of, among other things, the value provided by the Released Parties to the Debtor's Estate and the critical nature of the Debtor Release to the Plan and the Plan Settlement, the Debtor Release and the Debtor Release Injunction are approved.

76.     **Third-Party Release**.  The third-party release set forth in <u>Section 10.6</u> of the Plan (the "<u>Third-Party Release</u>") constitutes an essential provision of the Plan and forms an integral part of the agreement among the Plan Proponents embodied in the Plan.  The Third-Party Release is: (a) fully consensual on the part of the Releasing Parties, as all Holders of Claims were given an opportunity to opt-out of such releases; (b) within the jurisdiction of the Bankruptcy Court pursuant to <u>28 U.S.C. §§ 157</u> and <u>1334</u>; <u>(c)</u> given and made after due notice and opportunity for hearing; and (d) among others, a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to such release.

77.     The injunction contained in <u>Section 10.6(b)</u> of the Plan (the "<u>Third-Party Release</u> <u>Injunction</u>") supplements and effectuates the Third-Party Release by permanently enjoining Releasing Parties from pursuing any claims or causes of action against the Released Parties that they have released.

78.     The scope of the Third-Party Release in the Plan is appropriately tailored to the facts and circumstances of the Chapter 11 Case given that it expressly excludes: (a) Holders of

Environmental Claims or Causes of Action that are Governmental Authorities; (b) the United States; (c) all Holders of Claims entitled to vote on the Plan and who vote against the Plan and opt-out of the releases provided for in the Plan; (d) all Holders of Claims entitled to, but do not, vote for or against the Plan and opt-out of the releases provided for in the Plan; and (e) with respect to Unimpaired Claims, all Holders of Unimpaired Claims (including Unclassified Claims) that timely filed an objection, in accordance with the Solicitation Procedures Order, to the Third-Party Release.  Further, all parties received due and adequate notice of the Third-Party Release and the opportunity to opt-out of the Third-Party Release.  In light of the consensual nature of the Third-Party Release, the Third-Party Release and Third-Party Release Injunction are approved.

79.     **Exculpation**.  The exculpation provisions set forth in <u>Section 10.4</u> of the Plan (the "<u>Exculpation</u>") are approved.  The Exculpation is appropriate under applicable law because it (a) was proposed in good faith, (b) is an integral element of the Plan, and (c) is appropriately limited in scope, as it (i) will have no effect on the liability of any Person or Entity that results from any such act or omission that is determined by a Final Order to have constituted criminal acts, actual fraud, gross negligence, or willful misconduct and (ii) is limited only to estate fiduciaries acting in their capacity as such.

80.     **Discharge Injunction and Injunction Related to Releases**.  The injunctive provisions set forth in <u>Sections 10.2</u> (the "<u>Discharge Injunction</u>") and <u>10.7</u> of the Plan (the "<u>Plan Release Injunction</u>") are essential to the Plan and are necessary to implement the Plan and to preserve and enforce the Debtor Release and the Third-Party Release under <u>Sections 10.5</u> and <u>10.6</u> of the Plan, respectively.  The Discharge Injunction and Plan Release Injunction are appropriately tailored to achieve those purposes.  Accordingly, the Discharge Injunction and Plan Release Injunction are approved.

US-DOCS\130474138.9

81.     As discussed herein, the Plan Proponents have provided sufficient notice regarding the Asbestos Channeling Injunction, the Debtor Release, the Third-Party Release, the Debtor Release Injunction, the Third-Party Release Injunction, the Plan Release Injunction, and the Discharge Injunction.

**10.     Section 1123(b)(4) – Sale of Substantially All Assets**

82.     Section 1123(b)(4) of the Bankruptcy Code is inapplicable to the Chapter 11 Case. The Plan does not provide for the sale of all or substantially all of the Debtor's property.

**11.     Section 1123(b)(5) – Modification of the Rights of Holders of Claims and Interests**

83.     Article III of the Plan modifies or leaves unaffected, as the case may be, the rights of Holders of each Class of Claims and Equity Interests, as set forth therein.

**12.     Section 1123(b)(6) – Other Provisions Not Inconsistent with Applicable Provisions of the Bankruptcy Code**

84.     The Plan includes additional appropriate provisions that are not inconsistent with the applicable provisions of the Bankruptcy Code, including provisions: (a) governing Distributions under the Plan on account of Non-Asbestos Claims (Plan §§ 5.1 - 5.14); (b) establishing procedures for resolving Disputed Non-Asbestos Claims (Plan §§ 6.1 - 6.4); (c) governing implementation of the Plan (Plan §§ 8.1- 8.10); (d) governing the effect of confirmation (Plan §§ 9.1 - 9.5); (e) governing the injunctions, releases, and discharge to be effected by the Plan (Plan §§ 10.1 - 10.10); and (f) regarding retention of jurisdiction by the Bankruptcy Court and District Court over certain matters after the Effective Date (Plan §§ 12.1 - 12.3).

**13.     Section 1123(c) – Individual Debtor Requirement**

85.     The Debtor is not an individual, and therefore, section 1123(c) of the Bankruptcy Code is inapplicable to the Chapter 11 Case.

**14.      Section 1123(d) – Cure of Defaults**

86.      The Plan satisfies section 1123(d) of the Bankruptcy Code.  Section 7.3 of the Plan
provides that any monetary defaults under each Executory Contract to be assumed pursuant to the
Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the
Cure Claim in Cash on the later of (a) the Effective Date or (b) the date on which such Cure Claim
is Allowed, or on such other terms as the parties to any such Executory Contract may otherwise
agree.

**15.      Section 1129(a)(2) – The Plan Proponents' Compliance with Applicable Provisions of the Bankruptcy Code**

87.      The Plan Proponents have complied with all applicable provisions of the
Bankruptcy Code, as required by section 1129(a)(2) of the Bankruptcy Code, including sections
1122, 1123, 1124, 1125, 1126, and 1128 of the Bankruptcy Code and Bankruptcy Rules 3017 and
3018.  The Plan Proponents, and each of their respective members, officers, directors, managers,
shareholders, representatives, advisors, attorneys, financial advisors, or agents, as applicable, have
acted in "good faith," within the meaning of section 1125(e) of the Bankruptcy Code.  The Plan
therefore complies with section 1129(a)(2) of the Bankruptcy Code.

**16.      Section 1129(a)(3) and Section 1125(e) – Proposal and Solicitation of the Plan in Good Faith and not by any Means Forbidden by Law**

88.      The procedures by which the Ballots for acceptance or rejection of the Plan were
solicited and tabulated were fair, properly conducted, and in accordance with sections 1125 and
1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, and the Solicitation Procedures
Order.  The Debtor, as well as its directors, managers, officers, agents, members, and professionals,
acting in such capacity, have acted in "good faith" in soliciting acceptances of the Plan, as required
by section 1125(e) of the Bankruptcy Code, and have not procured this Confirmation Order by
fraud or other means forbidden by law.

89.     On the Solicitation Date, and in compliance with the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures Order (including the Solicitation Procedures), and as evidenced by the Affidavits of Service, the Balloting Agent (a) effectuated service of the appropriate Solicitation Packages, including the Plan, the Disclosure Statement and all exhibits thereto, to Holders of Claims in the Voting Class or their attorneys, (b) served a copy of the Confirmation Hearing Notice and Notice of Non-Voting Status to Known Holders of Claims in certain of the Unimpaired Classes (i.e., Classes 1, 2, 4, and 5) and to the Known Holders of Unclassified Claims (as defined in the Solicitation Procedures Motion), and (c) served counterparties to Executory Contracts who do not have scheduled Claims or Claims based upon filed Proofs of Claim with the Contract/Lease Notice.  See Affidavits of Service.  In addition, on April 18, 2022, the Debtor filed and served the *Supplemental Notice to Certain Contract and Lease Counterparties* [Docket No. 1314] on certain additional counterparties to Executory Contracts who may not have received the initial Contract/Lease Notice.  See Affidavit of Service [Docket No. 1333].

90.     Further, the Debtor and the Balloting Agent effectuated the Supplemental Publication Plan, which included providing supplemental notice by means of (a) television commercials, (b) print publications, (c) online display ads, (d) social media ads, (e) keyword search ads, (f) e-newsletter ads, and (g) a press release, which collectively served over 463 million impressions (i.e., opportunities to see the notice message) in the U.S. and the U.S. Territories.  See Finegan Decl. ¶ 4.  The Supplemental Publication Plan was extensive in its reach, having reached an estimated 87% of the target audience (i.e., potential asbestos claimants and heirs, aged 35 and older), on average 3.1 times, and also reached 80% of all adults over the age of 18 (which may include younger heirs) on average 3 times.  Id.  The Debtor's designated restructuring website,

PaddockVote.com, received more than 119,000 visits from users and provided potential Holders of Asbestos Claims with instructions on how to cast a vote on the Plan, and notice of the Objection Deadline, the Asbestos Channeling Injunction, the Debtor Release, and the Third-Party Release, among other things.  See id. at ¶¶ 4-5.

91.    The Plan Proponents proposed the Plan in good faith and not by any means forbidden by law, as required by section 1129(a)(3) of the Bankruptcy Code, based on the totality of the circumstances surrounding the filing of the Chapter 11 Case, the terms of the Plan, the process leading to the formulation of the Plan, and the solicitation of votes on the Plan.  The full record of the Chapter 11 Case, taken as a whole, demonstrates that the Plan has been proposed with the legitimate purpose of forming and establishing the Asbestos Trust pursuant to section 524(g) of the Bankruptcy Code to process and pay Asbestos Claims pursuant to the Asbestos Trust Agreement and Asbestos Trust Distribution Procedures.

92.    The Plan allows the Debtor to reorganize by providing a permanent resolution of all Asbestos Claims against the Debtor by channeling all such Asbestos Claims to the Asbestos Trust.  The Plan also provides the Reorganized Debtor with a capital structure and resources sufficient to allow the Reorganized Debtor to satisfy its plan-related obligations and with sufficient liquidity and capital resources to conduct its business following emergence from the Chapter 11 Case.  Moreover, the Plan itself and the arm's-length negotiations among the Debtor, the Asbestos Claimants Committee, and the Future Claimants' Representative leading to the Plan's formulation, as well as the support of O-I Glass, the sole Equity Interest Holder of the Debtor, for the Plan, provide independent evidence of the Plan Proponents' good faith in proposing the Plan.

### 17.    Section 1129(a)(4) – Court Approval of Certain Payments as Reasonable

93.     In accordance with section 1129(a)(4) of the Bankruptcy Code, the payments for services or costs and expenses in or in connection with the Chapter 11 Case, or in connection with the Plan and incidental to the Chapter 11 Case, including Claims for professional fees that have been or will be paid by the Debtor, have been authorized by order of the Bankruptcy Court or are otherwise permitted under the Bankruptcy Code.  Section 2.2(c) of the Plan requires Holders of Professional Fee Claims to File no later than the Professional Fee Claims Bar Date and serve on (a) counsel to the Reorganized Debtor or the Debtor, as applicable, and (b) the United States Trustee, an application for final allowance of compensation and reimbursement of expenses for services rendered on or before the Effective Date.  Further, pursuant to Section 2.2(c) of the Plan, from and after the Effective Date, the Reorganized Debtor shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the legal, professional or other fees and expenses related to the implementation and consummation of the Plan incurred by the Reorganized Debtor following the Effective Date.

94.     In connection with the foregoing, pursuant to Section 2.2(c) of the Plan, the Fee Examiner appointed under the Fee Examiner Order shall continue to act in such capacity unless and until all final Professional Fee Claims have been adjudicated by order of the Bankruptcy Court, and the Reorganized Debtor shall be responsible to pay the fees and expenses incurred by the Fee Examiner in rendering services after the Effective Date relating thereto.

95.     Further, Section 12.1(g) of the Plan provides that the Bankruptcy Court will retain jurisdiction after the Effective Date to hear and determine all required applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan.

US-DOCS\130474138.9

18. **Section 1129(a)(5) – Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy**

96.     In compliance with section 1129(a)(5)(A)(i) of the Bankruptcy Code, the Debtor has disclosed the identity and affiliations of the proposed officers and directors or managers of the Reorganized Debtor in the Plan Supplement filed with the Bankruptcy Court on April 1, 2022. See Plan Supplement, Ex. G [Docket No. 1295].  Specifically, Messrs. Scott W. Gedris, John W. Reynolds, III, David J. Gordon, and Randolph L. Burns are expected to serve as officers and directors or managers of the Reorganized Debtor.  Accordingly, the Debtor has satisfied the requirements of section 1129(a)(5)(A)(i) of the Bankruptcy Code.

97.     The proposed managers of the Reorganized Debtor were selected in consultation with the Asbestos Claimants Committee and the Future Claimants' Representative, who, together with the Debtor and O-I Glass, each support Messrs. Gedris, Reynolds, III, Gordon, and Burns serving as the officers and directors or managers of the Reorganized Debtor as consistent with the interests of Holders of Claims and Equity Interests and with public policy.  The Reorganized Debtor will benefit from the familiarity of the proposed managers with the Debtor's reorganization and business going forward, which is consistent with the interests of Holders of Claims and Equity Interests and with public policy, and therefore satisfies section 1129(a)(5)(A)(ii) of the Bankruptcy Code.  Further, the nature of compensation proposed for any insiders of the Debtor for services to the Reorganized Debtor has been disclosed in the Chapter 11 Case, thereby satisfying section 1129(a)(5)(B) of the Bankruptcy Code.  See Plan Supplement, Ex. G [Docket No. 1295].  The Debtor also disclosed the identity of the initial Asbestos Trustees and initial members of the Asbestos Trust Advisory Committee.  See Plan §§ 8.3(d) and (g); Plan Supplement, Ex. C.  The Plan therefore satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code and no party-in-interest has alleged to the contrary in the Chapter 11 Case.

19.    **Section 1129(a)(6) – Approval of Rate Changes**

98.    The Debtor's current business does not involve the establishment of rates over which any regulatory commission has or will have jurisdiction after Confirmation, and therefore section 1129(a)(6) of the Bankruptcy Code does not apply to the Plan.

20.    **Section 1129(a)(7) - Best Interests of Holders of Claims and Interests**

99.    The Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code. The evidence in support of the Plan that was proffered or adduced at the Confirmation Hearing, including the Confirmation Submissions, the liquidation analysis attached to the Disclosure Statement as Exhibit D, and the facts and circumstances of the Chapter 11 Case: (a) is reasonable, persuasive and credible as of the dates such evidence was prepared, presented, or proffered; (b) utilizes reasonable and appropriate methodologies and assumptions; (c) has not been controverted by other evidence; and (d) establishes that all Holders of Allowed Claims or Equity Interests in each Class have either accepted the Plan or will receive or retain under the Plan on account of such Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtor were liquidated, on the Effective Date, under chapter 7 of the Bankruptcy Code.

100.    Under the Plan, each Class other than Class 3 (Asbestos Claims) is deemed to accept the Plan. Therefore, the Plan satisfies section 1129(a)(7)(A)(i) as to all Holders in Classes 1, 2, 4, 5, 6, and 7. Further, 99.993% of Holders in Class 3 voted to accept the Plan, and the Plan therefore satisfies section 1129(a)(7)(A)(i) as to those Holders as well. See Voting Decl. ¶ 8. As to the remaining 0.007% of Holders of Class 3 Claims who did not vote to accept the Plan, the Plan satisfies section 1129(a)(7)(A)(ii) because the Plan provides for the substantial payment of Asbestos Claims by the Asbestos Trust, which is not less than the amount that Holders of Asbestos

Claims would so receive or retain if the Debtor were liquidated under chapter 7 on the Effective Date.[5]

101.    Absent confirmation of the Plan, and if the Debtor's Chapter 11 Case were to be converted to a chapter 7 proceeding, the Debtor would continue to be faced with the significant cost and expense of addressing an unquantified volume of Asbestos Claims.  Further, a Chapter 7 trustee may have been forced to litigate with O-I Glass over, among other things, the extent and timing of funding available under the Support Agreement.

102.    In contrast, the Plan provides definitive access to funding for the Debtor's creditors and is the result of the extensively negotiated settlements incorporated into the Plan.  With the Asbestos Trust Assets, the Asbestos Trust will be adequately funded to administer, investigate, resolve, and if necessary, litigate Asbestos Claims in accordance with the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures so that, as a result of the oversight and management of the Asbestos Trust, all Holders of such Claims and Demands can be treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such Claims and Demands as they arise over the life of the Asbestos Trust.  The Plan is intended to transfer all present and future costs relating to Asbestos Claims, whether such cost relates to the actual damages that are or could be assessed on account of such Asbestos Claims or the administrative or advisory burden related to the processing and management of such Asbestos Claims.  The Asbestos Trust Assets vested in the Asbestos Trust represent an aggregate value that reflects funding for the payment of Asbestos Claims, as well as funding for Asbestos Trust Expenses, which term includes any

---

[5]    As stated in the Liquidation Analysis attached as Exhibit D to the Disclosure Statement, Asbestos Claims in Class 3 remain unliquidated, contingent or disputed, and the aggregate amount of such Claims is unknown.  The Debtor does not have sufficient information to estimate the amount of these Claims for purposes of this analysis, and therefore, no value has been assigned to Class 3, and no recovery value is therefore projected.  Pursuant to the Plan, the Asbestos Trust Assets are projected to pay Asbestos Claims in full.

necessarily related cost of administration, investigation, reconciliation, and litigation.   The

Asbestos Claimants Committee and the Future Claimants' Representative both support the Plan

and the settlements contained therein, and no other party in interest has proposed or pursued an

alternative reorganization plan for the Debtor.

**21.      Section 1129(a)(8) – Acceptance of the Plan by Each Impaired Class**

103.    Pursuant to section 1129(a)(8) of the Bankruptcy Code, all Classes of Claims and

Equity Interests have either voted to accept the Plan or are Unimpaired and deemed to accept the

Plan.  Specifically, Holders of Class 3 – Asbestos Claims are Impaired and were entitled to vote

on the Plan.  That Class of Impaired Claims voted by more than seventy-five percent (75%) in

number and two-thirds in amount to accept the Plan.  See Voting Decl. ¶ 8.  Additionally, Class 1

– Other Priority Claims, Class 2 – Secured Claims, Class 4 – General Unsecured Claims, Class 5

– Environmental Claims or Causes of Action, Class 6 – Intercompany Claims, and Class 7 –

Paddock Equity Interests are Unimpaired under the Plan and are, therefore, deemed to accept the

Plan.

**22.      Section 1129(a)(9) – Treatment of Claims Entitled to Priority Pursuant to
          Section 507(a) of the Bankruptcy Code**

104.    The Plan also meets the requirements set forth in section 1129(a)(9) of the

Bankruptcy Code regarding the payment of Administrative Expense Claims, Priority Tax Claims,

and Other Priority Claims.  Section 2.2 of the Plan provides that, subject to this Confirmation

Order and Sections 2.2(b)-(d) of the Plan and unless otherwise agreed by the Debtor and the Holder

of an Allowed Administrative Expense Claim, each Holder of an Allowed Administrative Expense

Claim shall receive Cash equal to the unpaid portion of such Allowed Administrative Expense

Claim on or as soon as practicable after the latest of (a) the Effective Date, (b) the date the

Administrative Expense Claim becomes Allowed, and (c) the date the Allowed Administrative

Expense Claim becomes due and payable in the ordinary course of business, consistent with past practice and in accordance with the terms and conditions of any orders or agreement governing, instruments evidencing, or other documents establishing such liabilities.  Any Administrative Expense Claim that is not a Statutory Fee that is Disputed as of the time for payment set forth herein that ultimately becomes Allowed shall be paid on or as soon as reasonably practicable after the date such Administrative Expense Claim becomes Allowed.  As of the Effective Date, the Reorganized Debtor, in its sole and absolute discretion, may settle Administrative Expense Claims in the ordinary course of business without further Bankruptcy Court approval.  A claimant's receipt of the Allowed amount of its Administrative Expense Claim shall be in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, on the date such payment is received.

105.    With regard to Priority Tax Claims, <u>Section 2.3</u> of the Plan provides that, except to the extent that a Holder of an Allowed Priority Tax Claim has been paid by the Debtor prior to the Effective Date on account of such Priority Tax Claim or such Holder and the Debtor agree to a different treatment with respect thereto, each Holder of an Allowed Priority Tax Claim shall, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, receive in full satisfaction, settlement, and discharge of such Allowed Priority Tax Claim payment in Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim plus Postpetition Interest (if any, and only to the extent owed under contract or as a matter of applicable non-bankruptcy law), on the latest of: (a) the Effective Date; (b) the date such Priority Tax Claim becomes Allowed, or as soon thereafter as is practicable; and (c) the date such Allowed Priority Tax Claim becomes due and payable under applicable non-bankruptcy law.

106.    With regard to Other Priority Claims, <u>Section 3.2</u> of the Plan provides that, except to the extent a Holder of an Allowed Other Priority Claim has been paid prior to the Effective Date

or agrees to a different treatment, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement, and discharge of, and in exchange for such Other Priority Claim, Cash in an amount equal to the unpaid portion of such Allowed Other Priority Claim plus Postpetition Interest thereon (if any, and only to the extent owed under contract or as a matter of applicable non-bankruptcy law) on the later of: (a) the Effective Date; and (b) the date the Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as practicable.  All Allowed Other Priority Claims not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms of the Plan.

**23.**     **Section 1129(a)(10) – Acceptance By at Least One Impaired, Non-Insider Class**

107.     As evidenced by the Voting Declaration, at least one Class of Claims that is Impaired under the Plan has voted to accept the Plan, determined without including the acceptance by any insider with respect to the Debtor.  Specifically, Class 3 – Asbestos Claims has voted to accept the Plan.

**24.**     **Section 1129(a)(11) – Feasibility of the Plan**

108.     The Plan satisfies section 1129(a)(11) of the Bankruptcy Code.  The information provided in the Disclosure Statement (a) is persuasive and credible, (b) has not been controverted by other evidence, and (c) together with the record of the Chapter 11 Case and the evidence presented at the Confirmation Hearing, establishes that the Plan is feasible and provides adequate and appropriate means for its implementation, thereby satisfying the requirements of section 1129(a)(11) of the Bankruptcy Code.

109.     Pursuant to the Plan and the Asbestos Trust Agreement, as applicable, on the Effective Date, the Reorganized Debtor, the Asbestos Trustees, the Post-Effective Date Future Claimants' Representative, and the Asbestos Trust Advisory Committee will establish the

Asbestos Trust under section 524(g) of the Bankruptcy Code to process and pay Asbestos Claims pursuant to the Asbestos Trust Distribution Procedures attached as Exhibit B to the Plan. The Asbestos Trust will be funded by the Debtor pursuant to the Paddock Trust Contribution and O-I Glass pursuant to the O-I Glass Trust Contribution.

110.    The Asbestos Trust Contribution is both necessary and sufficient to address the costs to defend, resolve, and litigate, if necessary, any and all Asbestos Claims channeled to the Asbestos Trust, as well as to satisfy any judgment resulting from such litigation or a compromised amount that as a result of good-faith, arms-length negotiation is determined by the parties to such litigation to represent a reasonable resolution in light of the anticipated costs and risks attendant to ongoing litigation. The size of the Asbestos Trust Contribution is sufficient for satisfying the aggregate costs of, among other things, (a) directing the processing, liquidation, and payment of all compensable Asbestos Claims (whether liquidated by way of judgment or consensual good-faith resolution in lieu of judgment) in accordance with the Plan, the Asbestos Trust Agreement, the Asbestos Trust Distribution Procedures and the Confirmation Order; and (b) preserving, holding, managing, and maximizing the assets of the Asbestos Trust for use in paying and satisfying Asbestos Claims.

111.    The Asbestos Trust will be in a position to begin operating on the Effective Date, as the relevant governing Asbestos Trust Documents and other documents (i.e., the Asbestos Trust Agreement, the Asbestos Trust Distribution Procedures, the Asbestos Claims Indemnification Agreement, and the Asbestos Claimant Release) have been included as exhibits to the Plan and will go into effect upon the Effective Date. See Plan Exs. A-D. Further, the Asbestos Trust Bylaws shall be adopted by the Asbestos Trust after the Effective Date in accordance with the terms of the Asbestos Trust Agreement. The Asbestos Channeling Injunction will effectively redirect the

41

liabilities and responsibility of the Debtor for Asbestos Claims (including Demands) to the Asbestos Trust from and after the Effective Date, enabling the Reorganized Debtor to operate without further responsibility for such liabilities.

112.    The Plan provides that no later than three (3) Business Days prior to the Effective Date, the Debtor will issue a Support Request to O-I Glass pursuant to the Support Agreement to the extent necessary to ensure that, as of the Effective Date, the Debtor shall be able to fully fund the Professional Fee Escrow Account and shall hold no less than $10 million in Cash as of the Effective Date in Net Reserve Funds.  See Plan § 8.5.  The Net Reserve Funds shall be used for the sole purpose of (i) satisfying Claims which are Allowed Administrative Expense Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Secured Claims, and Allowed General Unsecured Claims, to the extent such Claims are not otherwise addressed or satisfied in accordance with the Plan, including the payment of any interest on such Claims that may be Allowed under the Plan or required to be paid by the Bankruptcy Code; and (ii) fulfilling any obligations under the Payment Note.  Id.

113.    The O-I Glass Indemnification Agreements shall contain terms governing O-I Glass's indemnification obligations in respect of any additional amounts necessary to satisfy Covered Claims and Environmental Claims or Causes of Action.  Id.  Any Net Reserve Funds remaining after (a) the satisfaction in full of Allowed Administrative Expense Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Secured Claims, and Allowed General Unsecured Claims, including the payment of any interest on such Claims that may be Allowed under the Plan or required to be paid by the Bankruptcy Code and (b) the fulfillment of all obligations under the Payment Note, shall be retained by the

Reorganized Debtor for general corporate purposes or returned to O-I Glass, as determined by the Reorganized Debtor.  Id.

### 25. Section 1129(a)(12) – Payment of Statutory Bankruptcy Fees

114.    Section 2.2(d) of the Plan provides that all Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtor on the Effective Date.  After the Effective Date, the Reorganized Debtor will pay any and all Statutory Fees when due and payable.  The Debtor will File all monthly and quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the United States Trustee.  After the Effective Date, the Reorganized Debtor will File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the United States Trustee, which reports shall include a separate schedule of disbursements made by the Reorganized Debtor during the applicable period, attested to by an authorized representative of the Reorganized Debtor.  The Debtor and the Reorganized Debtor shall remain obligated to pay Statutory Fees to the United States Trustee until the earliest of the Chapter 11 Case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.  The United States Trustee shall not be required to File any Administrative Expense Claim in the Chapter 11 Case, and shall not be treated as providing any release under the Plan.  See Plan § 2.2(d).

### 26. Section 1129(a)(13) – Retiree Benefits

115.    The Debtor does not have any continuing obligations in respect of retiree benefits, and therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Chapter 11 Case.

### 27. Section 1129(a)(14) – Domestic Support Obligations

116.    The Debtor is not required by a judicial or administrative order, or by statute, to pay any domestic support obligations, and therefore, section 1129(a)(14) of the Bankruptcy Code is inapplicable to the Chapter 11 Case.

### 28.    Section 1129(a)(15) – Individual Debtor Requirement

117.    The Debtor is not an individual, and therefore, section 1129(a)(15) of the Bankruptcy Code is inapplicable to the Chapter 11 Case.

### 29.    Section 1129(a)(16) – Nonbankruptcy Law Governing Transfers

118.    The Debtor is a moneyed, business, or commercial corporation or trust, and therefore, section 1129(a)(16) of the Bankruptcy Code is inapplicable to the Chapter 11 Case.

### 30.    Section 1129(b) – Confirmation of the Plan Over the Nonacceptance of an Impaired Class

119.    The Debtor does not seek to confirm the Plan over the non-acceptance of an Impaired Class, and therefore section 1129(b) of the Bankruptcy Code is inapplicable to the Chapter 11 Case.

### 31.    Section 1129(c) – Only One Plan

120.    The Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code. The Plan is the only chapter 11 plan filed in the Chapter 11 Case.

### 32.    Section 1129(d) – Purpose of Plan

121.    The principal purpose of the Plan is not avoidance of taxes or avoidance of the requirements of section 5 of the Securities Act of 1933. There has been no filing by any governmental unit alleging such principal purpose.

### 33.    Section 1129(e) – Small Business Case

122.    The Debtor's Chapter 11 Case does not constitute a small business case under the Bankruptcy Code, and therefore, section 1129(e) of the Bankruptcy Code is inapplicable to the Chapter 11 Case.

44

**34.    Satisfaction of Confirmation Requirements**

123.    As set forth above, the Plan complies in all respects with the applicable requirements of section 1129 of the Bankruptcy Code.

**G.    THE ASBESTOS TRUST AND THE ASBESTOS CHANNELING INJUNCTION COMPLY WITH SECTION 524(g) OF THE BANKRUPTCY CODE**

**1.    Requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code**

124.    In accordance with the requirements of section 524(g) of the Bankruptcy Code, the Plan provides that, as of the Effective Date, the Asbestos Trust "is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products[.]" See 11 U.S.C. § 524(g)(2)(B)(i)(I); Plan § 8.3(b).

125.    Specifically, the Asbestos Trust is to assume, on the Effective Date, all liabilities, obligations and responsibilities for Asbestos Claims (including, but not limited to, Demands) of the Debtor, which at the time of entry of this Confirmation Order has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.  See Plan § 8.3(b).  Further, the Plan states that in connection with the resolution of Asbestos Claims, the Asbestos Trust Distribution Procedures shall provide on the Effective Date, and shall not thereafter cease to provide, that all Holders of Asbestos Claims shall execute an Asbestos Claimant Release in favor of the Protected Parties as a precondition to receiving payment on account of their Asbestos Claims from the Asbestos Trust.  The Plan further provides that such release shall be substantially in the form attached to the Plan as Exhibit D.  Plan § 8.3(j) and Ex. D.

126.     In accordance with the requirements of section 524(g) of the Bankruptcy Code, the Plan provides that, as of the Effective Date, the Asbestos Trust shall "be funded in whole or in part by the securities of one or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments;" and "by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of" the Debtor. See 11 U.S.C. § 524(g)(2)(B)(i)(II)-(III); Plan § 8.3(c).

127.     Specifically, the Plan provides that the Asbestos Trust is to be funded with, in addition to $601.5 million in Cash, (a) the $8.5 million Payment Note, a security of the Debtor, which contains future payment obligations on the part of the Reorganized Debtor, and (b) the Pledge, which provides that in the event of an uncured Payment Default (as defined in the Payment Note) under the Payment Note, the Asbestos Trust is entitled to own 100% of the equity in the Reorganized Debtor.   See Plan §§ 8.2(a)-(b), and 1.1 (definitions of "Payment Note" and "Pledge").

128.     The Plan provides that, upon the Effective Date, all right, title, and interest in and to the Asbestos Trust Assets, and any proceeds thereof, will be transferred to, and vested in, the Asbestos Trust, free and clear of all Claims, Demands, Equity Interests, Encumbrances, and other interests of any Entity, without any further action of the Bankruptcy Court or any Entity, but subject to the provisions of Section 8.3 of the Plan.  See Plan § 8.3(c).

129.     In accordance with the requirements of section 524(g) of the Bankruptcy Code, the Plan further provides that, as of the Effective Date, the Asbestos Trust "is to use its assets or income to pay claims and demands[.]"  See 11 U.S.C. § 524(g)(2)(B)(i)(IV); Plan § 8.3.  Specifically, the Plan provides that the Asbestos Trust is to use its assets and income to pay Asbestos Claims (including, but not limited to Demands) in accordance with the Asbestos Trust Agreement and the

Asbestos Trust Distribution Procedures.  Plan § 8.3(b).  The Asbestos Trust also is to use its assets and income to pay Asbestos Trust Expenses.  Plan § 8.3(n).  None of the Plan Proponents, the Debtor's Estate, the Reorganized Debtor, nor any other Protected Party shall have any obligation to pay any Asbestos Trust Expenses or any other liabilities of the Asbestos Trust.  Id.  The Asbestos Trust shall promptly pay all Asbestos Trust Expenses incurred by the Reorganized Debtor for any and all liabilities, costs, or expenses as a result of taking any action on behalf of, and at the direction of, the Asbestos Trust.  Id.

### 2.      Requirements of Section 524(g)(2)(B)(ii) of the Bankruptcy Code

130.     The Debtor is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the Asbestos Channeling Injunction and the actual amounts, numbers, and timing of such future Demands cannot be determined.  See 11 U.S.C. § 524(g)(2)(B)(ii)(I)-(II).

131.     Specifically, as of September 30, 2019, the Debtor had disposed of over 400,000 Asbestos Claims, and had incurred gross asbestos-related expenses of approximately $5 billion. See Burns Decl. ¶ 10.  As of the Petition Date, the Debtor was aware that it had been named in approximately 850-900 pending asbestos-related personal injury lawsuits.  See id. at ¶ 7.  Over 69,000 claimants voted on the Plan, asserting they hold Asbestos Claims.  See generally Voting Decl.

132.     The pursuit of Asbestos Claims (including Demands) outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with future Asbestos Claims (including Demands).   See 11 U.S.C. § 524(g)(2)(B)(ii)(III).   Equitable treatment of Holders of Asbestos Claims and Future Demand Holders depends on all claimants being subject to the same rules and procedures as provided under the terms of the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures.  See Patton Decl. at ¶¶ 22, 37-38.  Without the

Asbestos Trust as provided by the Plan and the Asbestos Trust Distribution Procedures, Future Demand Holders would be forced to litigate their Claims in the tort system as they arise.  See id. at ¶ 37.  That could devolve into a race to the courthouse, with the result that the Debtor's limited resources would be consumed by those claimants who are first to file suit.  See id.  In such case, holders of earlier asserted Demands might be paid in full, while a risk would remain that holders of later Demands may be paid less than in full or go unsatisfied altogether.  See id.

133.    The terms of the Asbestos Channeling Injunction and the other injunctions contained in the Plan, including any provisions barring actions against third parties (including, for example, the Protected Parties) pursuant to section 524(g)(4)(A) of the Bankruptcy Code, are set forth in conspicuous language in the Plan and in the Disclosure Statement.  See 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa); Plan § 10.3; Disclosure Statement at Summary Section, Articles V-VI. Specifically, the Asbestos Channeling Injunction is to be implemented in accordance with the Plan and the Asbestos Trust.  The Asbestos Channeling Injunction is essential to the Plan and the Debtor's reorganization efforts.

134.    Further, a separate class or classes of the claimants whose claims are to be addressed by a trust described in section 524(g) has been established and has voted, by at least seventy-five percent (75%) of those voting, in favor of the Plan.  See 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).  Specifically, the Debtor designated in Class 3 a separate Class of claimants whose Claims are to be addressed by the Asbestos Trust.  Of the Holders of Asbestos Claims in Class 3 that voted, the vast majority, well over seventy-five percent (75%) in number and well over two-thirds in amount of such Asbestos Claims (using the values assigned to such Asbestos Claims solely for voting purposes pursuant to the Solicitation Procedures Order), voted to accept the Plan.  See Voting Decl. ¶ 8.

135.     Pursuant to: (a) the Asbestos Trust Distribution Procedures; (b) court order; or (c) otherwise, the Asbestos Trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Asbestos Claims or other comparable mechanisms, that provide reasonable assurance that the Asbestos Trust will value, and be in a financial position to pay, current and future Asbestos Claims in substantially the same manner regardless of the timing of the assertion of such Asbestos Claims.  See 11 U.S.C. § 524(g)(2)(B)(ii)(V).  Specifically, as set forth in Section 8.3 of the Plan, the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures, all Asbestos Claims shall be determined and paid pursuant to the terms of the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures regardless of when such Asbestos Claims are filed with the Asbestos Trust.  As of the Effective Date, the Asbestos Trust will have the sole and exclusive authority to satisfy or defend against all Asbestos Claims.

**3.      Extension of the Asbestos Channeling Injunction to Certain Third Parties**

136.     The Protected Parties under the Plan fall within the scope of sections 524(g)(3)(A) and 524(g)(4)(A)(ii).  Section 10.3 of the Plan provides that, in addition to protecting the Debtor and the Reorganized Debtor, the Asbestos Channeling Injunction will be extended to protect certain third parties.  The Plan identifies these non-Debtor Protected Parties as follows: (a) the Non-Debtor Affiliates; and (b) any Representative of any of the foregoing Entities, the Debtor, and the Reorganized Debtor.  See Plan § 1.1 (definition of "Protected Party").  Each of the Protected Parties is a past or present Affiliate of the Debtor, or of a predecessor in interest of the Debtor, and/or was involved in the management of the Debtor or a predecessor in interest of the Debtor, or served as an officer, director or employee of the Debtor or a predecessor in interest of the Debtor or a related party; and/or was involved in a transaction changing the corporate structure of the Debtor or in a loan or other financial transaction affecting the financial condition, of the

49

Debtor or a related party.  Further, any Claim against a Representative of any of the Non-Debtor Affiliates, the Debtor or the Reorganized Debtor that would implicate the Asbestos Channeling Injunction would necessarily be brought against such Representative solely in its capacity as a representative of another Protected Party, and therefore also falls within the scope of section 524(g)(4)(A)(ii).  Finally, the Protected Parties are identifiable from the terms of the Plan and Asbestos Channeling Injunction described therein.

### 4.    The Interests of Future Demand Holders Have Been Represented by the Future Claimants' Representative

137.    In accordance with section 524(g)(4)(B)(i) of the Bankruptcy Code, the Future Claimants' Representative, Mr. Patton, was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Asbestos Channeling Injunction for the purpose, among other things, of protecting the rights of Future Demand Holders.  Mr. Patton has extensive experience with asbestos litigation, including serving as the future claimants' representative in various bankruptcy cases involving alleged mass tort liability, and has represented the future claimants' representative in other bankruptcies.  Post-Effective Date, he will continue to represent those interests as the designated Post-Effective Date Future Claimants' Representative, pursuant to the Plan, this Confirmation Order, and the Asbestos Trust Agreement.

138.    The Future Claimants' Representative adequately protected the due process rights of Future Demand Holders in the Chapter 11 Case.  The Asbestos Trust will operate through mechanisms that provide reasonable assurance that the Asbestos Trust will value, and be in a financial position to pay, all Asbestos Claims (including Demands) in substantially the same manner.  The Asbestos Trust Documents, and the mechanisms, criteria and procedures therein for operating the Asbestos Trust and addressing Asbestos Claims, are fair and equitable with respect to Holders of Asbestos Claims and Future Demand Holders in light of the benefits to be provided

to the Asbestos Trust on behalf of the Debtor and the other Protected Parties.  Further, the Future Claimants' Representative fulfilled his responsibilities and fiduciary duties to his constituency pursuant to the applicable appointment order.

### 5. Contribution of Substantial Assets to the Asbestos Trust and Entry of the Asbestos Channeling Injunction with Respect to Future Demand Holders

139.    The Debtor and O-I Glass, via the Paddock Trust Contribution and O-I Glass Trust Contribution, respectively, on behalf of themselves and the other Protected Parties, are contributing substantial assets to the Asbestos Trust.  See Plan § 8.2.  The Plan Proponents, which include Mr. Patton as the Future Claimants' Representative, support confirmation of the Plan.  In light of the benefits provided, or to be provided, to the Asbestos Trust by or on behalf of each Protected Party, the Asbestos Channeling Injunction is fair and equitable to all Holders of Asbestos Claims (including Demands), and complies in all respects with section 524(g) of the Bankruptcy Code.

### H. NOTICE OF OBJECTIONS

140.    All parties have had a full and fair opportunity to litigate all issues raised in the objections to Confirmation of the Plan, or which might have been raised, and the objections have been fully and fairly litigated or resolved, including by agreed-upon reservations of rights as set forth in this Confirmation Order.

### I. THE DEBTOR'S BUSINESS AND THE REORGANIZED DEBTOR'S ONGOING BUSINESS

141.    As of the Petition Date, the Debtor's operations consisted of (a) managing its legacy environmental and asbestos liabilities, (b) owning and managing the Lapel Property and collecting rents on a lease of that property pursuant to the Ground Lease (each as defined in the Gordon Decl.), and (iii) owning and managing its subsidiary, Meigs.  See Gordon Decl. ¶¶ 5-6, 18.

142.     On and after the Effective Date, the Reorganized Debtor will continue to manage is legacy environmental liabilities and own the Lapel Property, collect rents on the lease thereof, and engage in other operations necessary to serving as a commercial lessor of such real property. See id.

143.     On and after the Effective Date, the Reorganized Debtor will also continue to own and manage, through Meigs, certain commercial real estate, which, as of the Effective Date, will consist of two commercial properties subject to long-term, triple net leases with a Chick-Fil-A restaurant (in Washington) and a McDonalds restaurant (in Maryland). See Gordon Decl ¶ 18. The Reorganized Debtor will also direct and manage Meigs in the engagement of activities required of the owner and landlord of such real property. These activities are expected to include, without limitation: (a) evaluating tenant risk; (b) periodically inspecting the restaurants and monitoring the tenant's financial performance; (c) collecting and distributing the rents; and (d) ongoing market review, to ensure that the brands operated by Meigs's tenants are performing profitably in their respective areas. Id. As a result of its cash on hand on the Effective Date, as well as its post-Effective Date operations, the Reorganized Debtor will be in a position to make any payments required by the Payment Note to the Asbestos Trust. See Disclosure Statement, Ex. E.

144.     The Plan does not provide for the liquidation of all or substantially all of the property of the Debtor. The Reorganized Debtor will operate as an ongoing business and continue in business, and confirmation of the Plan is not likely to be followed by the liquidation of the Reorganized Debtor or the need for its further financial reorganization.

## II.     CONCLUSIONS OF LAW

### A.     JURISDICTION AND VENUE

145.    The Bankruptcy Court and the District Court have jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Debtor is qualified to be a debtor under section 109 of the Bankruptcy Code.  Venue of the Chapter 11 Case in the United States Bankruptcy Court for the District of Delaware was proper as of the Petition Date, pursuant to 28 U.S.C. § 1408, and continues to be proper.  The Bankruptcy Court has jurisdiction to enter a final order with respect to confirmation, except to the extent section 524(g) of the Bankruptcy Code requires issuance or affirmance of this Confirmation Order by the District Court.

**B.    BURDEN OF PROOF**

146.    The Debtor has the burden of proving that the elements needed to satisfy sections 524(g) and 1129(a), respectively, of the Bankruptcy Code have been established by a preponderance of the evidence.  The Debtor has met that burden as found and determined herein.

**C.    SOLICITATION AND NOTICE**

147.    The Plan, the Disclosure Statement, the Solicitation Packages and all related materials were transmitted to and served on the parties listed in exhibits to the Affidavits of Service, and as set forth in the findings of fact above, such transmittal and service of the solicitation materials (a) fully complied with all applicable court orders and rules of procedure, and otherwise satisfied due process and (b) constituted good and sufficient notice of the Plan, the Confirmation Hearing, the Voting Deadline, and the Objection Deadline.

148.    The noticing process approved by, and provided in compliance with, the Solicitation Procedures Order, including the Publication Notice and the Supplemental Publication Plan, satisfied due process and constituted good and sufficient notice to known and unknown creditors of the Plan, the Confirmation Hearing, the Voting Deadline, and the Objection Deadline. Such notices were adequate and sufficient under the circumstances, were given in compliance with

Bankruptcy Rules 2002, 3017, and 3020 and the Solicitation Procedures Order and all other applicable court orders and rules of procedure, and no other or further notice is or shall be required. All creditors, equity holders, and other parties in interest had a full and fair opportunity to appear and be heard at the Confirmation Hearing.

149.     Specifically, adequate and sufficient notice of the Plan, including the releases, the exculpatory provisions, and the injunctions set forth in <u>Article X</u> of the Plan, and the Confirmation Hearing, as well as the Objection Deadline, has been given to all known and unknown creditors, including asbestos claimants.   The Noticing Program and Solicitation Procedures used for providing notice of the Plan, Confirmation Hearing, Voting Deadline, and Objection Deadline, are reasonably calculated under the circumstances to apprise Holders of Asbestos Claims of the Plan, Confirmation Hearing, Voting Deadline, and Objection Deadline, and to afford parties in interest, including Holders of Asbestos Claims, an opportunity to present their objections.  <u>See</u> Affidavits of Service; Publication Notice; <u>see generally</u> Finegan Declaration.

150.     As set forth in paragraphs 88-92 above and based upon the applicable Affidavits of Service, Finegan Declaration, and the Voting Declaration, votes for acceptance and rejection of the Plan were solicited in good faith, and the procedures by which the Ballots for acceptance or rejection of the Plan were solicited and tabulated were fair, properly conducted, and in compliance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, the Disclosure Statement, the Solicitation Procedures Order, all other applicable provisions of the Bankruptcy Code, and all other applicable rules, laws, and regulations.  <u>See</u> Affidavits of Service; Publication Notice; Finegan Declaration; Voting Declaration.

151.     Further, the Supplemental Publication Plan provided due, proper, adequate, timely, and sufficient notice of, among other things, the Chapter 11 Case, the Plan, the Voting Deadline,

the Objection Deadline, the Confirmation Hearing, the Solicitation Procedures, the releases, the exculpatory provisions, and the injunctions set forth in <u>Article X</u> of the Plan, including the Asbestos Channeling Injunction, in satisfaction of the requirements of Bankruptcy Rule 3016(c), to both known and unknown creditors, including Holders of Asbestos Claims.

152.    Further, the Debtor, the Asbestos Claimants Committee, the Future Claimants' Representative, and each of their respective members, officers, managers or directors, agents, representatives, and professionals, as applicable, among other parties involved with the negotiation and confirmation of the Plan, have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and the Bankruptcy Rules, in compliance with each of their respective activities relating to the solicitation of the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code and, accordingly, such parties are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

153.    The Disclosure Statement, Ballots and Confirmation Notices (as defined in the Solicitation Procedures Order) provided clear, conspicuous notice of the Debtor Release under <u>Section 10.5</u> of the Plan and of both the Third-Party Release under <u>Section 10.6</u> of the Plan and the process for opting out of or objecting to the Third-Party Release, as applicable.

154.    The release, injunction, indemnification, and exculpation provisions described in <u>Article X</u> of the Plan, including without limitation <u>Sections 10.2-10.7</u> and <u>10.10</u>, were adequately disclosed and explained in the Disclosure Statement, the Plan, and further on the Ballots and solicitation materials (including the Notice of Non-Voting Status) with respect to the Third-Party Release set forth in <u>Section 10.6</u> of the Plan; are otherwise approved by the Bankruptcy Court as appropriate pursuant to applicable law.

### D.    COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE

155.    Based on the findings of fact in paragraphs 49-123 above, the Plan complies in all respects with the applicable requirements of section 1129 of the Bankruptcy Code, including sections 1122 and 1123 thereof and all applicable provisions requiring that this Confirmation Order not be procured by fraud.

### E.    COMPLIANCE WITH BANKRUPTCY RULE 3016

156.    The Plan is dated and identifies the Plan Proponents as the parties submitting it, thereby satisfying Bankruptcy Rule 3016(a).  The Debtor appropriately filed the Disclosure Statement and the Plan with the Bankruptcy Court, thereby satisfying Bankruptcy Rule 3016(b). The Plan conspicuously identifies both the acts to be enjoined pursuant to the Discharge Injunction under Section 10.2 of the Plan, the Asbestos Channeling Injunction under Section 10.3 of the Plan, the Debtor Release Injunction, the Third-Party Release Injunction, and the Plan Release Injunction issued pursuant to Section 10.7 of the Plan, as well as the entities that are subject to, and protected by, those injunctions, thereby satisfying Bankruptcy Rule 3016(c).  The Plan therefore satisfies Bankruptcy Rule 3016.

### F.    COMPLIANCE WITH SECTION 524(g) OF THE BANKRUPTCY CODE

157.    The Plan comports with the Bankruptcy Code's requirements for issuance of an injunction to prohibit entities from taking legal action to recover, directly or indirectly, payment in respect of Asbestos Claims against the Reorganized Debtor, any other Protected Party, or any of their respective property.

158.    Based on the substantial number of asbestos-related personal injury lawsuits that had been asserted against the Debtor and its predecessor in the past and that remained unresolved on the Petition Date, as well as the long latency period for many asbestos-related diseases, the Debtor is likely to be subject to substantial Demands for payment arising out of the same or similar

56

conduct or events that gave rise to the Asbestos Claims.  All such Demands are subject to the Asbestos Channeling Injunction.  In light of the inherent uncertainties regarding such Demands, the actual amounts, numbers, and timing of such Demands cannot be determined with specificity.

159.    The pursuit of asbestos-related Demands against the Debtor, the Reorganized Debtor, or their property outside of the Plan and the Asbestos Trust Distribution Procedures would likely threaten the Plan's purpose to deal equitably with Asbestos Claims, including future asbestos-related Demands.

160.    Pursuant to: (a) the Asbestos Trust Agreement; (b) the Asbestos Trust Distribution Procedures; (c) court order; or (d) otherwise, the Asbestos Trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Asbestos Claims or other comparable mechanisms, that provide reasonable assurance that the Asbestos Trust will value, and be in a financial position to pay, current and future Asbestos Claims in substantially the same manner regardless of the timing of the assertion of such Asbestos Claims.

161.    Each Protected Party is identifiable from the terms of the Asbestos Channeling Injunction by name or as part of an identifiable group.  Identifying or describing each Protected Party in the Asbestos Channeling Injunction is fair and equitable with respect to persons that might subsequently assert Demands against each such Protected Party, in light of the benefits provided, or to be provided, to the Asbestos Trust by or on behalf of any such Protected Party.

162.    The extension of the Asbestos Channeling Injunction to third parties is consistent with one or more of subparagraphs (I)-(IV) of section 524(g)(4)(A)(ii) of the Bankruptcy Code, and is essential to the Plan and the Debtor's reorganization efforts.  Without limiting the preceding sentence, in light of the substantial asset contributions to be made on behalf of the Protected

57

Parties, entry of the Asbestos Channeling Injunction, and the naming of the Protected Parties therein, is fair and equitable with respect to persons that might subsequently assert future Asbestos Claims.

163.    The Paddock Trust Contribution and the O-I Glass Contribution are essential to the feasibility of the Plan and the successful reorganization of the Debtor, as they (a) provide a source of funding for the payment of Asbestos Claims (including, without limitation, Demands); (b) provide for the indemnification by O-I Glass of the Reorganized Debtor from and against all Covered Claims and Environmental Claims or Causes of Action; (c) justify the issuance of the Asbestos Channeling Injunction; and (d) justify the Debtor Release received by the Released Parties.

164.    The Future Claimants' Representative represents individuals who might subsequently assert Asbestos Claims (including Demands) against the Debtor.  The Future Claimants' Representative's experience and actions in the Chapter 11 Case, as summarized in paragraphs 137-138 above, evidence that he has properly understood his duties as Future Claimants' Representative and the nature of the interests he represents in the Chapter 11 Case.

165.    The Future Claimants' Representative acted to ensure that Future Demand Holders were treated fairly and equitably in the process of developing the Plan and Plan Documents, and the participation of the Future Claimants' Representative in the Chapter 11 Case satisfies the requirements of due process with respect to all Demands.  The Future Claimants' Representative has in all respects fulfilled his duties, responsibilities, and obligations as the futures representative in accordance with section 524(g) of the Bankruptcy Code.

166.    Further, the Asbestos Channeling Injunction with respect to such Demands is fair and equitable with respect to the Holders of future Asbestos Claims (including Demands) in light

of the Asbestos Trust Contributions and other benefits provided, or to be provided, to the Asbestos Trust.

167.     Based on the findings of fact herein and the foregoing conclusions of law, the Plan complies in all respects with the applicable requirements of section 524(g) of the Bankruptcy Code.

### G.     COMPLIANCE WITH 1123(a)(7) OF THE BANKRUPTCY CODE

168.     The manner of selection of the individuals who will act as the managers of the Reorganized Debtor, as set forth in the Plan and the Plan Supplement, the Amended Organizational Documents, and similar constituent documents, is consistent with the interests of Holders of Claims and the Holder of the Debtor's Equity Interests and with public policy, and thus satisfies section 1123(a)(7) of the Bankruptcy Code.

### H.     COMPLIANCE WITH SECTION 1141 OF THE BANKRUPTCY CODE

169.     The Bankruptcy Court hereby determines that, under section 1141(d) of the Bankruptcy Code, the Debtor is and shall be entitled to a discharge of liabilities and claims against it.  In reaching this determination, the Bankruptcy Court has considered section 1141(d)(3), which provides for denial of a discharge to a corporate debtor only if three criteria are met: (a) the plan provides for the liquidation of all or substantially all estate property, (b) the debtor does not engage in business after consummation of the plan, and (c) the debtor would be denied a discharge under section 727(a) if the case were a Chapter 7 case.   See 11 U.S.C. § 1141(d)(3).   However, the Bankruptcy Court hereby determines that (i) the Plan does not provide for the liquidation of all or substantially all Estate property and (ii) the Debtor will engage in business after the consummation of the Plan, thus negating two of the three requirements for denial of a discharge.

### I.     BOOKS AND RECORDS

170.     Pursuant to Section 8.3(l) of the Plan, on the Effective Date, the Asbestos Records Cooperation Agreement shall become effective, and the Asbestos Records shall be treated in

accordance therewith.   Without limiting the foregoing, the Asbestos Records Cooperation Agreement provides, among other things, that the Reorganized Debtor will transfer to the Asbestos Trust certain books and records of the Debtor that pertain directly to Asbestos Claims that have been asserted against the Debtor.  The transfer of these materials is essential to implementation of the Asbestos Trust and the preservation of its assets.  Moreover, preservation of any privilege relating to materials transferred to the Asbestos Trust is necessary to ensure that the Asbestos Trust is able to defend effectively against Asbestos Claims.  The transfer of books and records from the Debtor or Reorganized Debtor, as applicable, to the Asbestos Trust shall not waive or invalidate any applicable privilege pertaining to such books and records, and the Reorganized Debtor shall retain the right to assert any applicable privilege with respect to such books and records.

### J.     GOOD FAITH NEGOTIATION, IMPLEMENTATION AND CONSUMMATION

171.    The Debtor, O-I Glass, the Asbestos Claimants Committee, and the Future Claimants' Representative participated in good faith in negotiating, at arm's length, the Plan and all contracts, instruments, releases, agreements, and documents related to or necessary to implement, effectuate, and consummate the Plan, including each of the Asbestos Claims Indemnification Agreement, the Covered Claims Indemnification Agreement, the Environmental Claims or Causes of Action Indemnification Agreement, the Asbestos Claimant Release, the Amended Organizational Documents of the Reorganized Debtor and all agreements and releases to be executed and delivered in connection with the Asbestos Trust, including the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures.  The Debtor, the Asbestos Claimants Committee, the Future Claimants' Representative, and O-I Glass also participated in good faith in each of the actions taken to bring about, and in satisfying each of the conditions precedent to, confirmation and consummation of the Plan.  In so determining, the Bankruptcy Court has

considered, among other things, the totality of the circumstances surrounding the filing of the Chapter 11 Case, the record of this proceeding and the Plan and all related pleadings, exhibits, statements, and comments regarding Confirmation.

### K.   PLAN MODIFICATIONS (11 U.S.C. § 1127)

172.   Subsequent to solicitation, the Debtor made certain modifications to the Plan as evidenced in the *Second Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 1286].  All such modifications since the entry of the Solicitation Procedures Order are consistent with all of the provisions of the Bankruptcy Code, including sections 1122, 1123, 1125, and 1127 of the Bankruptcy Code, nor has any party objected to such modifications.  After the Voting Deadline passed the Debtor made certain modifications to the Plan as evidenced in the *Third Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 1400].  None of the aforementioned modifications is material or adversely affects the treatment of any Holder of a Claim or Equity Interest under the Plan.  Accordingly, pursuant to section 1127(a) of the Bankruptcy Code, none of the modifications require additional disclosure under section 1125 of the Bankruptcy Code or re-solicitation of votes under section 1126 of the Bankruptcy Code.  Moreover, Bankruptcy Rule 3019 is satisfied because the Plan modifications do not "adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification."  Prior notice regarding the substance of any modifications to the Plan, together with the filing with the Bankruptcy Court of the Plan as modified, and the disclosure of the Plan modifications on the record at or prior to the Confirmation Hearing (including in the Disclosure Statement) constitute due and sufficient notice of any and all such Plan modifications.  Further, in accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, each Holder of a Claim who voted to accept the Plan or who is conclusively presumed to have accepted the Plan

is deemed to have accepted the Plan as modified by the Plan modifications. No Holder of a Claim shall be permitted to change its vote as a consequence of the Plan modifications unless otherwise agreed to by the Holder of the Claim and the Debtor and such change is approved by the Bankruptcy Court in accordance with Bankruptcy Rule 3018(a). The modifications to the Plan are hereby approved, pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. The Plan as modified shall constitute the Plan submitted for Confirmation.

**NOW THEREFORE, THE BANKRUPTCY COURT HEREBY ORDERS, ADJUDGES AND DECREES THAT:**

**III.   GENERAL PROVISIONS REGARDING CONFIRMATION OF THE PLAN AND APPROVAL OF PLAN DOCUMENTS**

**A.   CONFIRMATION OF THE PLAN**

173.    The Plan, a copy of which is attached hereto as <u>Exhibit A</u>, along with each of its provisions (whether or not specifically approved herein) and all operative exhibits and schedules thereto, including those filed with the Plan Supplement, is CONFIRMED pursuant to section 1129 of the Bankruptcy Code. The provisions of the Plan and this Confirmation Order are non-severable and mutually dependent. The provisions of the Plan and of this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each. Notwithstanding the foregoing, if there is any direct conflict between the terms of the Plan or any exhibit thereto and the terms of this Confirmation Order, the terms of this Confirmation Order shall control with respect to that direct conflict and any such term(s) of this Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence. The terms of the Plan and the operative exhibits and schedules thereto shall be effective and binding as of the Effective Date.

174.    The combination of direct and publication notice described in the Solicitation Procedures Order, the Finegan Declaration, and herein provides "good and sufficient notice" and

"satisfies the requirements of due process with respect to all known and unknown creditors" and the procedures by which the Ballots for acceptance or rejection of the Plan were solicited and tabulated in accordance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, and the Solicitation Procedures Order.

**B.  CONDITIONS TO EFFECTIVE DATE**

175.  Nothing in this Confirmation Order alters in any way the provisions of Sections 11.2 and 11.3 of the Plan, which include provisions regarding (a) the conditions precedent to the Effective Date of the Plan and (b) the waiver of any such conditions.  If a condition to the occurrence of the Effective Date set forth in Section 11.2 of the Plan cannot be satisfied (except the condition set forth in Section 11.2(f) of the Plan), and the occurrence of such condition is not waived in whole or in part, by mutual agreement of the Plan Proponents (which agreement shall not be unreasonably withheld), or by order of the Bankruptcy Court as set forth in Section 11.3 of the Plan, then the Plan shall be deemed null and void.

**C.  EFFECTS OF CONFIRMATION**

176.  In accordance with section 1141(a) of the Bankruptcy Code, subject to occurrence of the Effective Date as provided in Section 11.2 of the Plan, and notwithstanding any otherwise applicable law, immediately upon the entry of this Confirmation Order, the terms of the Plan and this Confirmation Order shall be binding upon and inure to the benefit of the Debtor, the Reorganized Debtor, any entity acquiring property under the Plan, and any Holders of Claims, Demands, or Equity Interests (irrespective of whether such Claims or Equity Interests are Impaired under the Plan or whether the Holders of such Claims or Equity Interests have accepted the Plan).

177.  The failure to reference or discuss any particular provision of the Plan in this Confirmation Order shall have no effect on the validity, binding effect, and enforceability of such

provision and such provision shall have the same validity, binding effect, and enforceability as every other provision of the Plan.

178.     All transfers of assets of the Debtor contemplated under the Plan shall be free and clear of any and all Liens, Claims, Encumbrances, and other interests of any Entity, except as otherwise provided for in the Plan, the Plan Documents, or this Confirmation Order.  This includes, as set forth in <u>Section 9.2</u> of the Plan, the property of the Estate of the Debtor (except for any property of the Debtor distributed or otherwise transferred pursuant to the Plan), which will vest in the Reorganized Debtor on the Effective Date.  From and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, and dispose of property free and clear of any restrictions imposed under or by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court.  Without limiting the generality of the foregoing, the Reorganized Debtor may, without application to, or approval by, the Bankruptcy Court, pay professional fees and expenses that the Reorganized Debtor may incur on and after the Effective Date.

179.     All transfers of property by the Debtor under the Plan (a) are or will be legal, valid, and effective transfers of property; (b) vest or will vest the transferee with good title to such property; (c) do not and will not constitute avoidable transfers under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law; and (d) do not and will not subject the transferee to any liability by reason of any such transfers under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, any laws purporting to impose successor or transferee liability.

**D.     APPROVAL, MODIFICATION, AND EXECUTION OF PLAN DOCUMENTS AND PLAN SUPPLEMENT**

180.     The Plan and all operative exhibits and schedules thereto, substantially in the form as they exist at the time of the entry of this Confirmation Order, including, without limitation, the

documents contained or referred to in the Plan Supplement and any amendments, modifications, and supplements thereto, and all documents and agreements related thereto (including all exhibits and attachments thereto and documents referred to therein), documents relating to the Asbestos Trust, and each of the other operative Plan Documents, are approved.  All relevant parties are authorized, without further action by the Bankruptcy Court, to enter into, effectuate, and perform any and all obligations under such Plan Documents, notwithstanding that the efficacy of such documents may be subject to the occurrence of the Effective Date or another date thereafter.  The Asbestos Trust and the other parties thereto shall execute and deliver the Asbestos Claims Indemnification Agreement attached as Exhibit C to the Plan.

181.    The execution, delivery and performance of and under the Plan Documents by the Reorganized Debtor, are authorized.  Unless the provisions of the documents contained or referred to in the Plan Supplement provide otherwise, until such documents are finalized and executed, without further order or authorization of the Bankruptcy Court, the Debtor, the Reorganized Debtor and their successors are authorized and empowered to modify the Plan Documents to the extent set forth in Section 12.2 of the Plan.  Once finalized and executed, and upon the Effective Date, the documents comprising or contemplated by the Plan Supplement and all other documents contemplated by the Plan shall constitute legal, valid, binding and authorized obligations of the respective parties thereto, enforceable in accordance with their terms subject to any amendments, modifications and supplements thereto without approval of the Bankruptcy Court and, to the extent applicable, shall create, as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests purported to be created thereby.

182.    Pursuant to Section 12.2 of the Plan, between the Confirmation Date and the Effective Date, the Plan Proponents, upon mutual agreement, which agreement shall not be

unreasonably withheld, may remedy any defects or omissions or reconcile any inconsistencies in the Plan Documents for the purpose of implementing the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan, so long as the interests of the Holders of Allowed Claims and other applicable parties-in-interest are not adversely affected thereby; provided, however, that the Plan Proponents may not modify Section 8.10 of the Plan or modify in any material way the form of Environmental Claims or Causes of Action Indemnification Agreement between the Confirmation Date and the Effective Date without Filing a notice containing any proposed changes and serving such notice on any affected Governmental Authorities and providing at least ten (10) Business Days to object prior to the Effective Date.

183.     On and after the Effective Date, the authority to amend, modify or supplement the Plan Documents, other than the Plan, will be as provided in such Plan Documents.

184.     Notwithstanding anything in Section 12.2 of the Plan, there shall be no modification to the Plan made at any time that would (i) reduce or eliminate any of the protections provided in the Plan, or in the releases provided in the Plan or under the Asbestos Channeling Injunction, to the Protected Parties or the Released Parties, as applicable, without the consent of the Debtor and O-I Glass, or (ii) modify or be inconsistent with the terms of the Plan Settlement accepted by the Debtor, the Asbestos Claimants Committee, and the Future Claimants' Representative in connection with the parties' court-approved mediation, as documented at Docket No. 802 of the Chapter 11 Case, without the consent of each of the Plan Proponents.

## IV.     APPROVAL OF EXECUTORY CONTRACT PROVISIONS

185.     As set forth in Section 7.1 of the Plan, as of the Effective Date, the Debtor shall be deemed to have rejected any and all Executory Contracts to which the Debtor is a party except for: (a) any Executory Contracts specifically listed on the Schedule of Assumed Contracts; (b) any Executory Contracts previously rejected, assumed, or assumed and assigned pursuant to a Final

Order entered on or before the Effective Date; or (c) any Executory Contract subject to a motion to reject, assume, or assume and assign pending as of the Effective Date. Further, the Debtor may amend the Schedule of Assumed Contracts to delete therefrom, or add thereto, any Executory Contract until the Effective Date. The Debtor shall File notice of any such amendment and shall serve any such notice on the parties to the Executory Contract(s) affected thereby.

186.    All Executory Contracts assumed or assumed and assigned by the Debtor during the Chapter 11 Case or under the Plan shall remain in full force and effect for the benefit of the Reorganized Debtor or the assignee thereof notwithstanding any provision in such contract (including those provisions described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables or requires termination of such contract or lease.

187.    Notwithstanding anything to the contrary in the Plan, the Debtor shall be deemed to reject the Support Agreement and the Services Agreement as of the Effective Date. Notwithstanding anything to the contrary in the Plan (including, but not limited to Section 7.2 of the Plan), all obligations by and between the parties to the Support Agreement and Services Agreement shall, and shall be deemed to, terminate upon the making of the O-I Glass Contribution.

188.    Notwithstanding any provision to the contrary in the Plan, regardless of whether any administrative claims processing agreement entered into prior to the Petition Date between Old O-I, on the one hand, and a law firm or attorney, on the other hand, may be an Executory Contract, the only rights to payment that will survive occurrence of the Effective Date under any such agreement are the rights of Holders of Asbestos Claims, which rights are provided for in Section 5.2 of the Asbestos Trust Distribution Procedures, and for the avoidance of doubt, no law firm or attorney may assert any claim or cause of action against any Protected Party on or after the

Effective Date on account of any such administrative claims processing agreement.  Any Claim arising from the rejection of, or entitled to payment in connection with the assumption of, an Executory Contract that is not an administrative claims processing agreement is classified and shall be treated as a General Unsecured Claim against the Debtor unless such Claim would otherwise fall within the definitions of General Asbestos Claim and/or Indirect Asbestos Claim.

189.    **BWAY Corporation**.  Notwithstanding anything to the contrary in paragraphs 62 and 185 herein, in Article VII of the Plan, or in the Schedule of Assumed Contracts, any and all Executory Contracts by and between BWAY Corporation, its affiliates or their respective predecessors and Paddock Enterprises, LLC or its predecessors, including all guarantees made by Paddock Enterprises, LLC or its predecessors in connection therewith that relate to: (i) the property located south of U.S. Highway 84, 1.5 miles west of the center of Homerville, Georgia, and designated as Hazardous Site Inventory ("HSI") Site No. 10032, (ii) the Arivec Chemicals Site in Douglasville, Georgia, and designated as HSI Site No. 10123, or (iii) the Asset Purchase Agreement, dated December 19, 1988, between Owens-Illinois Group, Inc., BS Holdings Corporation, BW-Morrow Plastics, Inc. and BW Plastics, Inc. or the Stock Purchase Agreement, dated December 19, 1988, between Owens-Illinois Group, Inc. and BS Holdings Corporation shall be deemed to be assumed by the Debtor as of the Effective Date and any Cure Claim amounts on account of such Executory Contracts shall be classified as General Unsecured Claims and shall "pass through" the Plan in accordance with the treatment set forth more fully in Sections 3.2(d) and 6.2 of the Plan and the Reorganized Debtor shall have and retain any and all rights and defenses the Debtor had prior to the Effective Date with respect to any such Claims; provided that any amounts that may be classified as a Cure Claim or Environmental Claim or Cause of Action shall be classified as the latter.  For the avoidance of doubt, any executory contract listed in the Schedule

of Assumed Contracts which the Debtor or its predecessors are not party to, or which has not been previously assigned to the Debtor or its predecessors, is not deemed assigned to the Debtor or Reorganized Debtor by inclusion of such executory contract on the Schedule of Assumed Contracts.

## V.   CLAIMS MATTERS

### A.   GENERAL ADMINISTRATIVE EXPENSE CLAIMS

190.    Pursuant to Section 2.2(a) of the Plan, except with respect to Administrative Expense Claims that are Statutory Fees and subject to this Confirmation Order and the Plan, unless otherwise agreed by the Debtor and the Holder of an Allowed Administrative Expense Claim, each Holder of an Allowed Administrative Expense Claim shall receive Cash equal to the unpaid portion of such Allowed Administrative Expense Claim on or as soon as practicable after the latest of (a) the Effective Date, (b) the date the Administrative Expense Claim becomes Allowed, and (c) the date the Allowed Administrative Expense Claim becomes due and payable in the ordinary course of business, consistent with past practice and in accordance with the terms and conditions of any orders or agreement governing, instruments evidencing, or other documents establishing such liabilities; provided, however that any Administrative Expense Claim that is not a Statutory Fee that is Disputed as of the time for payment set forth herein that ultimately becomes Allowed shall be paid on or as soon as reasonably practicable after the date such Administrative Expense Claim becomes Allowed.  As of the Effective Date, the Reorganized Debtor, in its sole and absolute discretion, may settle Administrative Expense Claims in the ordinary course of business without further Bankruptcy Court approval.  A claimant's receipt of the Allowed amount of its Administrative Expense Claim shall be in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, on the date such payment is received.

### B.    BAR DATE FOR PROFESSIONAL FEE CLAIMS

191.    Pursuant to Section 2.2(c)(i) of the Plan, all Professionals or other Entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) and/or section 1103 of the Bankruptcy Code for services rendered on or before the Effective Date (including, without limitation, any compensation requested by any Professional or any other Entity for making a substantial contribution in the Chapter 11 Case) shall File no later than the Professional Fee Claims Bar Date and serve on (a) counsel to the Reorganized Debtor or the Debtor, as applicable, and (b) the United States Trustee, an application for final allowance of compensation and reimbursement of expenses for services rendered on or before the Effective Date; provided, however, that, notwithstanding a Professional's Filing of such final application, Professionals may, subject to Section 9.1 of the Plan, continue to request and receive compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) and/or section 1103 of the Bankruptcy Code for services rendered after the Effective Date.  For the avoidance of doubt, the Professional Fee Claims Bar Date shall not apply to and shall have no effect on any Professional Fee Claim for services rendered post-Effective Date pursuant to Section 9.1 of the Plan.  Objections to Professional Fee Claims must be Filed and served on (a) counsel to the Reorganized Debtor or the Debtor, as applicable, (b) the United States Trustee, (c) the requesting Professionals or other Entities, and (d) the Fee Examiner, no later than twenty (20) days after the Professional Fee Claims Bar Date.

192.    Pursuant to Section 2.2(c)(ii) of the Plan, on or before the Effective Date, the Debtor shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Escrow Amount for all Professionals, the members of the Asbestos Claimants Committee, and the Future Claimants' Representative.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals, the members of the Asbestos Claimants Committee, and the Future

Claimants' Representative.  Such funds in the Professional Fee Escrow Account shall not constitute property of the Debtor's Estate or property of the Reorganized Debtor while they remain in the Professional Fee Escrow Account.  The amount of Professional Fee Claims owing to the Professionals, the members of the Asbestos Claimants Committee, and the Future Claimants' Representative as of the Effective Date shall be paid in Cash to such Professionals, members of the Asbestos Claimants Committee, and the Future Claimants' Representative from funds held in the Professional Fee Escrow Account, without interest or other earnings therefrom, as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order.  To the extent that the funds held in the Professional Fee Escrow Account are not sufficient to satisfy all Allowed Professional Fee Claims in full, the Reorganized Debtor shall pay such additional Allowed amounts in Cash, without interest or other earnings therefrom, as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order.  When all Allowed Professional Fee Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the Reorganized Debtor.

## VI.   MATTERS RELATING TO IMPLEMENTATION OF THE PLAN

### A.   ACTIONS IN FURTHERANCE OF THE PLAN

193.   The Debtor and the Plan Proponents and all other parties-in-interest are authorized to implement the Plan in accordance with its terms.

194.   Pursuant to sections 1123 and 1142 of the Bankruptcy Code, section 303 of the Delaware General Corporation Law, any applicable provisions of the Delaware Limited Liability Company Act in 1992, and any comparable provisions of the business corporation law of any other state, as applicable (collectively, the "Reorganization Effectuation Statutes"), without further action by the Bankruptcy Court or the equity holder or managers/directors of the Debtor or the Reorganized Debtor, all matters provided for under the Plan involving the corporate structure of

the Debtor or the Reorganized Debtor, or any corporate action to be taken by, or required of the Debtor or the Reorganized Debtor, shall be authorized, approved, and deemed to have occurred and be effective as provided in the Plan.

195.    The Debtor and the Reorganized Debtor, and all other parties, including all Holders of Claims entitled to receive Distributions under the Plan, shall execute any and all documents and instruments that must be executed under or in connection with the Plan in order to implement the terms of the Plan or to effectuate the Distributions under the Plan, and all such entities shall be bound by the terms and provisions of all documents executed and delivered by them in connection with the Plan and the Plan Documents.

196.    To the extent that, under applicable non-bankruptcy law, any of the foregoing actions would otherwise require the consent or approval of the equity holder, managers or directors of the Debtor or the Reorganized Debtor, this Confirmation Order shall, pursuant to sections 1123(a)(5) and 1142 of the Bankruptcy Code and the Reorganization Effectuation Statutes, constitute such consent or approval, and such actions are deemed to have been taken by unanimous action of the equity holder, manager, or directors, as the case may be, of the Debtor or the Reorganized Debtor.

197.    In addition to the authority to execute and deliver, adopt, or amend, as the case may be, the contracts, instruments, releases, and other agreements, including, without limitation, the Plan Documents, specifically granted in this Confirmation Order, the Debtor and the Reorganized Debtor are authorized and empowered, without further action in the Bankruptcy Court or further action or consent by its equity holder or managers or directors, to take any and all such actions as any of the officers, members, managers or directors of the Debtor or the Reorganized Debtor may

determine are necessary or appropriate to implement, effectuate, and consummate the Plan, this Confirmation Order, the Plan Documents, or the transactions contemplated thereby or hereby.

198.    To the extent any approval of the Bankruptcy Court is required for either of the Debtor or the Plan Proponents to enter into any of the Plan Documents, or to take any actions thereunder, or to consummate any of the transactions contemplated thereby, such approvals are hereby granted.

199.    The approvals and authorizations specifically set forth in this Confirmation Order are non-exclusive and are not intended to limit the authority of the Debtor or the Reorganized Debtor or any officer thereof to take any and all actions necessary or appropriate to implement, effectuate, and consummate the Plan, this Confirmation Order, the Plan Documents, or the transactions contemplated thereby or hereby.

**B.      MANAGER(S) OR DIRECTOR(S) AND OFFICER(S) OF THE REORGANIZED DEBTOR**

200.    The appointment of the individuals who will serve as the officers and the directors or managers of the Reorganized Debtor as of the Effective Date, in accordance with Section 8.6 of the Plan, is hereby approved.

**C.      THE ASBESTOS TRUST**

**1.      Creation of the Asbestos Trust**

201.    On the Effective Date, the Asbestos Trust shall be created in accordance with the terms and conditions of the Plan, the Plan Documents, the Asbestos Trust Agreement, and section 524(g) of the Bankruptcy Code.  The Asbestos Trust and the Asbestos Trustees thereof are authorized and empowered to receive the Asbestos Trust Assets pursuant to, among others, Sections 8.2 and 8.3 of the Plan.

202.     Pursuant to the Reorganization Effectuation Statutes, as applicable, and other appropriate provisions of applicable state laws governing corporations or other legal entities and section 1142(b) of the Bankruptcy Code, without further action by the Bankruptcy Court or the managers or directors or the equity holder of the Debtor or further notice to any Entities, the Debtor is authorized and directed to execute, deliver, and perform its obligations under the Asbestos Trust Agreement and to execute, deliver, file, record, and implement all such other contracts, instruments, agreements, or documents and take all such other actions as any of its directors or officers may determine are necessary, appropriate or desirable in connection therewith.   The Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures, as in effect on the Effective Date, shall be substantially in the forms attached to the Plan as Exhibit A and Exhibit B, respectively.

203.     On the Effective Date, except as otherwise provided in the Plan, this Confirmation Order, or another order of the Bankruptcy Court in the Chapter 11 Case, all right, title, and interest in and to the Asbestos Trust Assets and any proceeds or causes of action thereunder shall be automatically transferred and assigned to, and indefeasibly vested in, the Asbestos Trust free and clear of all Claims, Liens, Encumbrances, and other interests of any Entity without any further action of any Entity.

## 2.     Funding of the Asbestos Trust

204.     The Asbestos Trust shall be created and funded in accordance with Sections 8.2 and 8.3 of the Plan.  Notwithstanding Section 8.3 of the Plan or any provision in the Plan or this Confirmation Order, the Debtor is entitled to transfer any portion of the Asbestos Trust Assets (including all right, title, and interest in and to the Asbestos Trust Assets) to the Asbestos Trust, free and clear of all Claims, Demands, Equity Interests, Encumbrances, and other interests of any

74

Entity, without any further action of the Bankruptcy Court or any Entity, on the Effective Date or as soon thereafter as reasonably practicable.

### 3.      Transfer of Claims and Demands to the Asbestos Trust

205.      Subject to the terms and conditions of and as set forth in <u>Article VIII</u> of the Plan, in consideration for the property transferred to the Asbestos Trust, on the Effective Date, all liabilities, obligations, and responsibilities relating to all present and future Asbestos Claims, including, without limitation, Demands, shall be transferred and channeled to the Asbestos Trust and shall be satisfied solely by the Asbestos Trust Assets.  The Asbestos Trust shall have no liability for any Claims other than Asbestos Claims, and no Claims other than Asbestos Claims shall be transferred and channeled to the Asbestos Trust.

### 4.      Transfer of Rights and Defenses to the Asbestos Trust

206.      With the exception of those claims released by the Debtor pursuant to <u>Section 10.5</u> of the Plan, on the Effective Date all claims, defenses, rights and Causes of Action of the Debtor and Reorganized Debtor relating to Asbestos Claims shall be transferred and assigned to the Asbestos Trust.  In accordance with section 1123(b) of the Bankruptcy Code, the Asbestos Trust shall retain and may enforce such claims, defenses, rights, and Causes of Action and shall retain and may enforce all defenses and counterclaims to all Claims or Demands asserted against the Asbestos Trust, including, but not limited to, setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that no such claims, defenses, Causes of Action, or counterclaims may be asserted against any Protected Party.  The Asbestos Trust shall be deemed to be the appointed representative of the Debtor and Reorganized Debtor as to Asbestos Claims, and may pursue, litigate, compromise, and settle any rights, claims, or Causes of Action transferred to it, as appropriate.

### 5.      Institution and Maintenance of Legal and Other Proceedings

207.    From and after the Effective Date, the Asbestos Trust shall be empowered and entitled, in its sole and absolute discretion and at its own expense, to pursue, compromise, or settle all legal actions and other proceedings related to any asset, liability, or responsibility of the Asbestos Trust that is not released pursuant to the Plan.

### 6.    Appointment of the Asbestos Trustees

208.    The appointments of LeAnne Jackson, Allen Schwartz, and Hon. George Silver as the initial Asbestos Trustees are hereby approved.  The aforementioned Asbestos Trustees shall be appointed on the Effective Date, and shall thereafter serve in accordance with the terms of the Plan and the Asbestos Trust Agreement.  For purposes of performing the duties and fulfilling the obligations under the Asbestos Trust Agreement and the Plan, each of the Asbestos Trustees shall be deemed to be a party in interest within the meaning of section 1109(b) of the Bankruptcy Code. All subsequent Asbestos Trustees shall be appointed in accordance with the terms of the Asbestos Trust Agreement.

### 7.    Appointment of the Asbestos Trust Advisory Committee Members

209.    The appointments of (a) Matthew Bergman of Bergman, Draper, Oslund, Udo; (b) Christopher R. Guinn of Simmons Hanly Conroy; (c) Lisa Nathanson Busch of Weitz & Luxenberg P.C.; (d) John Cooney of Cooney & Conway; (e) Beth Gori of The Gori Law Firm; (f) Peter Kraus of Waters & Kraus LLP; (g) Marcus Raichle, Jr. of Maune Raichle Hartley French & Mudd, LLC; (h) Audrey Raphael of Levy Konigsberg LLP; and (i) Chris Thoron of the O'Brien Law Firm as the initial members of the Asbestos Trust Advisory Committee are hereby approved. As of the Effective Date, the initial members of the Asbestos Trust Advisory Committee shall serve in accordance with the terms of the Asbestos Trust Agreement.  Successor members of the Asbestos Trust Advisory Committee will be appointed as provided in the Asbestos Trust Agreement.

### 8.    Appointment of Post-Effective Date Future Claimants' Representative

210.    Effective on the Effective Date, James L. Patton, Jr. shall be discharged from his duties as the Future Claimants' Representative, and on the same date, Mr. Patton shall be appointed as the Post-Effective Date Future Claimants' Representative.  The Post-Effective Date Future Claimants' Representative shall have the functions, duties, and rights provided in, and shall serve in accordance with, the Asbestos Trust Agreement.  In addition, the Post-Effective Date Future Claimants' Representative also may, at his option, participate in any: (a) appeal of this Confirmation Order; (b) hearing on a Professional Fee Claim; and (c) adversary proceeding pending on the Effective Date to which the Future Claimants' Representative was a party.  Successor Post-Effective Date Future Claimants' Representatives will be appointed as provided in the Asbestos Trust Agreement.

### 9.    Appointment of Delaware Trustee

211.    In accordance with Section 8.3(f) of the Plan, Wilmington Trust, National Association will serve as the initial Delaware Trustee by agreement of the Asbestos Claimants Committee and the Future Claimants' Representative.  All subsequent Delaware Trustees shall be appointed in accordance with the terms of the Asbestos Trust Agreement.

### 10.    The Asbestos Claimants Committee and the Future Claimants' Representative

212.    In accordance with Section 9.1 of the Plan, effective on the Effective Date, the Asbestos Claimants Committee shall be dissolved automatically, whereupon its members, Professionals, and agents shall be released and discharged from any further authority, duties, obligations and responsibilities in the Chapter 11 Case and under the Bankruptcy Code. Notwithstanding the foregoing, the Asbestos Claimants Committee may, at its option and without taking any action or seeking or receiving any approval, continue to serve and function after the Effective Date for the purposes of participating in any: (a) appeal of any order entered in the

Chapter 11 Case, including without limitation this Confirmation Order; (b) hearing on a Professional Fee Claim; (c) adversary proceeding pending on the Effective Date to which the Asbestos Claimants Committee was a participant; and/or (d) motions or other actions seeking enforcement or implementation of the provisions of the Plan or this Confirmation Order, in which the Asbestos Claimants Committee or Future Claimants' Representative, as applicable, is a participant as of the Effective Date.   To the extent that the Asbestos Claimants Committee determines to continue to serve and function after the Effective Date pursuant to the preceding sentence, the Asbestos Claimants Committee shall dissolve upon the termination of all (a) appeals of any orders entered in the Chapter 11 Case, including without limitation this Confirmation Order; (b) hearings on a Professional Fee Claim; (c) adversary proceedings pending on the Effective Date to which the Asbestos Claimants Committee was a participant; and/or (d) motions or other actions seeking enforcement or implementation of the provisions of the Plan or this Confirmation Order, in which the Asbestos Claimants Committee or Future Claimants' Representative, as applicable, is a participant as of the Effective Date.

213.    In addition, effective as of the Asbestos Claimants Committee's dissolution, the Asbestos Trust Advisory Committee shall succeed to, and exclusively hold, the attorney-client privilege and any other privilege held by the Asbestos Claimants Committee and shall enjoy the work product protections that were applicable or available to the Asbestos Claimants Committee before its dissolution.

## 11.    Payment of Fees and Expenses of the Future Claimants' Representative and Asbestos Claimants Committee

214.    The Reorganized Debtor shall pay, in accordance with any applicable fee and expense procedures promulgated during the Chapter 11 Case and with Section 2.2(c) and subject to Section 8.3(k) of the Plan: (i) the reasonable and documented fees and expenses incurred by the

Future Claimants' Representative, the Asbestos Claimants Committee, and their respective Professionals through the Effective Date and (ii) the reasonable and documented fees and expenses incurred by the Asbestos Claimants Committee, the Post-Effective Date Future Claimants' Representative, and their respective Professionals following the Effective Date (if any) in connection with participating in any: (a) appeal of any order entered in the Chapter 11 Case, including without limitation this Confirmation Order; (b) hearing on a Professional Fee Claim; (c) adversary proceeding pending on the Effective Date to which the Asbestos Claimants Committee or Future Claimants' Representative, as applicable, was a participant; and/or (d) motions or other actions seeking enforcement or implementation of the provisions of the Plan or this Confirmation Order pending on the Effective Date to which the Asbestos Claimants Committee or Future Claimants' Representative, as applicable, was a participant.  All reasonable and necessary post-Effective Date fees and expenses of the professionals retained by the Asbestos Trust Advisory Committee and the Post-Effective Date Future Claimants' Representative (except as provided in the preceding sentence) shall be paid exclusively by the Asbestos Trust in accordance with the terms of the Asbestos Trust Agreement, and the Reorganized Debtor shall not be liable for any such fees and expenses.  The parties shall attempt to resolve any dispute regarding the payment of such fees and expenses in good faith, and if they shall fail to resolve such dispute, they shall submit the dispute to the Bankruptcy Court for resolution.

### 12.   Asbestos Claimant Release

215.    As set forth in <u>Section 8.3(j)</u> of the Plan, in connection with the resolution of Asbestos Claims, the Asbestos Trust Distribution Procedures shall provide on the Effective Date, and shall not thereafter cease to provide, that all Holders of Asbestos Claims shall execute an Asbestos Claimant Release as a precondition to receiving payment on account of their Asbestos Claims from the Asbestos Trust.  The Asbestos Claimant Release shall be substantially in the form

attached to the Plan as Exhibit D.  The Asbestos Trustees may modify the provisions of the Asbestos Claimant Release with the consent of the Asbestos Trust Advisory Committee and the Post-Effective Date Future Claimants' Representative; provided, however, that no such change shall be inconsistent with the terms of the Plan or this Confirmation Order and/or modify in any way the releases and injunctions contained in the Plan or this Confirmation Order.

### 13.    Asbestos Trust Indemnification

216.    As set forth in Section 8.3(k) of the Plan, the Asbestos Trust shall, pursuant to the Asbestos Trust Agreement, indemnify and hold harmless each of the Protected Parties, against any liability arising out of any Asbestos Claim or any violation of the Asbestos Channeling Injunction by any Entity, as and to the extent provided in the Asbestos Claims Indemnification Agreement.

### 14.    Asbestos Records Cooperation Agreement

217.    The Asbestos Records Cooperation Agreement filed with the Plan Supplement [see Docket No. 1295, Ex. B], and all terms and conditions therein, including without limitation any provision relating to the Debtor's transfer of Asbestos Records to the Asbestos Trust and the preservation of any privilege or immunity attaching to any Asbestos Records being transferred and/or shared under the Asbestos Records Cooperation Agreement, is approved.

218.    The Debtor is authorized, pursuant to section 363(b) of the Bankruptcy Code, to enter into the Asbestos Records Cooperation Agreement and to transfer to the Asbestos Trust all Asbestos Records contemplated thereunder.

### D.    ENVIRONMENTAL CLAIMS OR CAUSES OF ACTION

219.    Environmental Claims or Causes of Action shall be treated in accordance with Section 8.10 of the Plan.  Without limitation to Section 8.10 of the Plan, notwithstanding any provision in the Plan, the Environmental Claims or Causes of Action Indemnification Agreement, the Plan Supplement, this Confirmation Order or other related Plan Documents, nothing discharges

or releases the Debtor, the Reorganized Debtor, or any non-debtor from any Environmental Claims or Causes of Action or impairs the ability of any Holder of an Environmental Claim or Cause of Action to pursue such Environmental Claim or Cause of Action against the Debtor, Reorganized Debtor or any non-debtor; provided, however, that nothing in the foregoing statement shall limit or otherwise derogate from the releases contained in Section 10.5 of the Plan.

### E.    EXEMPTIONS FROM TAXATION

220.    Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, pledge or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan shall be exempt from all stamp, transfer, or similar taxes, as provided in section 1146(a).

### F.    DISTRIBUTION RECORD DATE

221.    The Distribution Record Date for the purposes of determining an entitlement to receive Distributions under the Plan on account of Allowed Non-Asbestos Claims shall be the same as the Confirmation Date.

222.    As set forth in Section 5.2 of the Plan, except as otherwise provided in a Final Order, the transferees of Non-Asbestos Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date shall be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date; provided, that, except as otherwise provided in Section 5.6 of the Plan, the Debtor shall only be obligated to remit distributions to Holders of Non-Asbestos Claims as they appear on the Debtor's books and records as of the Distribution Record Date.

81

223.    As set forth in <u>Section 5.3</u> of the Plan, except as otherwise provided in the Plan, any Distributions and deliveries to be made under <u>Article V</u> of the Plan on account of Allowed Non-Asbestos Claims shall be made in accordance with <u>Article II</u> or <u>Section 3.2</u> of the Plan, as applicable.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on, or as soon as reasonably practicable after, the next succeeding Business Day, but shall be deemed to have been completed as of the required date, and no interest shall accrue or be payable on any such payment on the basis that such payment was not actually made on the required date.

### G.    ISSUANCE OF NEW INSTRUMENTS

224.    All instruments to be issued under the Plan (if any) shall upon issuance be duly authorized and validly issued, fully paid, and non-assessable, and any conditions precedent to issuance shall be deemed satisfied.

## VII.    APPROVAL OF THE DISCHARGES, EXCULPATION, INJUNCTIONS, INDEMNIFICATIONS AND RELEASES PROVIDED FOR UNDER THE PLAN

### A.    DISCHARGE OF CLAIMS AGAINST THE DEBTOR AND REORGANIZED DEBTOR

225.    Except as specifically provided in the Plan or in this Confirmation Order, pursuant to sections 524 and 1141(d)(1)(A) of the Bankruptcy Code, confirmation of the Plan shall discharge the Debtor and the Reorganized Debtor on the Effective Date from any and all Claims of any nature whatsoever, including, without limitation, all Claims and liabilities that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code whether or not: (a) a Proof of Claim based on such Claim was Filed under section 501 of the Bankruptcy Code, or such Claim was listed on any of the Schedules; (b) such Claim is or was allowed under section 502 of the Bankruptcy Code; or (c) the Holder of such

Claim has voted on or accepted the Plan.  Except as otherwise specifically provided for in the Plan, as of the Effective Date, the rights provided in the Plan to Holders of Claims and Equity Interests shall be in exchange for and in complete satisfaction, settlement and discharge of all Claims (including, without limitation, Asbestos Claims) against, Liens on, and Equity Interests in the Debtor and all of its assets and properties.

## B.    THE DEBTOR'S DISCHARGE INJUNCTION

226.    As set forth in Section 10.2 of the Plan, the Plan provides for the Discharge Injunction, which is hereby approved and authorized and which shall take effect as of the Effective Date:

*Except as specifically provided in the Plan or this Confirmation Order, all Entities who have held, hold or may hold Claims against the Debtor are permanently enjoined, on and after the Effective Date, from: (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Reorganized Debtor, or their respective property with respect to such Claim, other than to enforce any right to a Distribution pursuant to the Plan; (b) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, or their respective property with respect to such Claim, other than as permitted pursuant to (a) above; (c) creating, perfecting, or enforcing any Encumbrance of any kind against the Debtor, the Reorganized Debtor, or their respective property with respect to such Claim; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to the Debtor or against the property or interests in property of the Debtor, with respect to such Claim; and/or (e) commencing or continuing any action, in any manner and in any place in the world, against the Debtor, the Reorganized Debtor, or their respective property that does not comply with or is inconsistent with the provisions of the Plan or this Confirmation Order.  The foregoing injunction shall extend to the successors of the Debtor (including, without limitation, the Reorganized Debtor) and its properties and interests in property. The discharge provided in this provision shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim.*

## C.    ASBESTOS CHANNELING INJUNCTION

227.    As set forth in Section 10.3 of the Plan, the Plan provides for the Asbestos Channeling Injunction that shall channel all current Asbestos Claims and future Demands to the

83

Asbestos Trust.  The following Asbestos Channeling Injunction is hereby approved and authorized and shall take effect as of the Effective Date:

> *__Terms__.  Pursuant to section 524(g) of the Bankruptcy Code, from and after the Effective Date the sole recourse of any Holder of an Asbestos Claim or Demand on account of such Asbestos Claim or Demand shall be to the Asbestos Trust pursuant to __Section 10.3__ of the Plan and the Asbestos Trust Distribution Procedures, and such Holder shall have no right whatsoever at any time to assert its Asbestos Claim or Demand against any Protected Party or any property or interest in property of any Protected Party.  On and after the Effective Date, all present and future Holders of Asbestos Claims and Demands shall be permanently and forever stayed, restrained, barred and enjoined from taking any actions for the purpose of, directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Asbestos Claim or Demand other than from the Asbestos Trust pursuant to the Asbestos Trust Documents, including, but not limited to, the following:*

> > i. *commencing, conducting, or continuing in any manner, directly, indirectly or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party or any property or interests in property of any Protected Party;*

> > ii. *enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party;*

> > iii. *creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party;*

> > iv. *setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and*

> > v. *proceeding in any manner in any place with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Asbestos Trust, except in conformity and compliance with the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures.*

84

*Reservations.*  *This Asbestos Channeling Injunction shall not stay, restrain, bar, or enjoin:*

     **i.**     *the rights of Holders of Asbestos Claims (including Demands) to the treatment accorded to Class 3 as described in the Plan, including without limitation the right to assert Asbestos Claims (including Demands) against the Asbestos Trust in accordance with the Asbestos Trust Distribution Procedures;*

     **ii.**     *the rights of Entities to assert any Claim, debt, obligation, or liability for payment of Asbestos Trust Expenses against the Asbestos Trust; and*

     **iii.**     *the rights of Entities to assert any Claim, debt, obligation, or liability for payment against an Entity that is not a Protected Party unless otherwise enjoined by order of the Bankruptcy Court (including but not limited to the Confirmation Order).*

*Modifications.* *There shall be no modification, dissolution, or termination of the Asbestos Channeling Injunction, which shall be a permanent injunction.*

*Non-Limitation of Asbestos Channeling Injunction. Nothing in the Asbestos Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Asbestos Channeling Injunction issued in connection with the Plan or the Asbestos Trust's assumption of all liabilities and responsibility for the Asbestos Claims.*

*Any Protected Party may enforce the Asbestos Channeling Injunction as a defense to any Claim brought against such Protected Party that is enjoined under the Plan as to such Protected Party and may seek to enforce such injunction in a court of competent jurisdiction.*

**D.**     **EXCULPATION**

228.     **As set forth in <u>Section 10.4</u> of the Plan, none of the Exculpated Parties shall have or incur any liability to any Entity for any act or omission taken or to be taken on or after the Petition Date through and including the Effective Date in connection with, related to, or arising out of: (a) the Chapter 11 Case; (b) negotiation, formulation and preparation of the Plan and the other Plan Documents, and any of the terms and/or settlements and compromises reflected in the Plan and the other Plan Documents; (c) pursuit of confirmation of the Plan; (d) consummation of the Plan, or administration of the Plan or the property to be distributed under the Plan or the Asbestos Trust Distribution Procedures; or (e) the**

releases and injunctions contained in the Plan, except for any liability that results from such Entity's criminal acts, actual fraud, willful misconduct, or gross negligence as determined by a Final Order, and, in all respects, the Debtor, the Reorganized Debtor, and each of the other Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities in and under the Chapter 11 Case, the Plan and the Plan Documents.

E.      RELEASES BY THE DEBTOR AND ITS ESTATE AND RELATED INJUNCTION

229.      As set forth in Section 10.5(a) of the Plan, except as otherwise expressly provided in the Plan or this Confirmation Order, on the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, the Reorganized Debtor, and any Entity seeking to exercise the rights of the Estate, in each case, whether individually or collectively, including, without limitation, any successor to the Debtor or any Estate representative appointed or selected pursuant to the applicable provisions of the Bankruptcy Code, shall, and shall be deemed to, irrevocably, completely and forever release, waive and discharge unconditionally the Released Parties from any and all claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action and liabilities which any of the Debtor, the Reorganized Debtor, or the Estate is entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, whether direct, indirect, or derivative, based upon, attributable to, or in any manner arising out of, in whole or in part, any act, omission, transaction, event, occurrence, or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) (other than the rights under the Plan, the Plan

Documents, and the contracts, instruments, releases and other agreements or documents delivered or to be delivered thereunder).

230.     As set forth in <u>Section 10.5(b)</u> of the Plan, except as provided in the Plan or this Confirmation Order, the Debtor, the Reorganized Debtor, and any Entity seeking to exercise the rights of the Estate, in each case, whether individually or collectively, including, without limitation, any successor to the Debtor or any Estate representative appointed or selected pursuant to the applicable provisions of the Bankruptcy Code, are permanently enjoined from taking any actions on account of or based upon any and all Claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action and liabilities released pursuant to Section 10.5 of the Plan, including but not limited to the following: (a) commencing or continuing any action or other proceeding against the Released Parties or their respective property; (b) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Released Parties or their respective property; (c) creating, perfecting or enforcing any Encumbrance against the Released Parties or their respective property; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to the Released Parties or against their respective property; and (e) commencing or continuing any action, in any manner and in any place in the world, against the Released Parties that does not comply with or is inconsistent with the provisions of the Plan or this Confirmation Order.

## F.     RELEASES BY HOLDERS OF CLAIMS

231.     As set forth in <u>Section 10.6</u> of the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Releasing Parties shall be deemed to irrevocably and forever release, waive, and discharge all claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action,

losses, and liabilities whatsoever against the Released Parties, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, based in whole or in part upon any act, omission, event, transaction, occurrence, or any other circumstance taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating or connected to the Debtor, the Estate, the Debtor's assets and properties, the conduct of the Debtor's (or any predecessor's) businesses, the Prepetition Restructuring Transaction, the Chapter 11 Case, the Plan (including the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated by the Plan), the Plan Documents, or the Reorganized Debtor, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Case or the negotiation, formulation, preparation or implementation thereof, the pursuit of confirmation of the Plan, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the Distribution of property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing (other than the rights under the Plan, the Plan Documents, and the contracts, instruments, releases and other agreements or documents delivered or to be delivered thereunder), including, for the avoidance of doubt, any and all Causes of Action that the Holder of an Asbestos Claim, the Asbestos Claimants Committee, the Asbestos Trust, or the Future Claimants' Representative did or could have commenced against any current or former officer, manager, or director of the Debtor (in such capacity) that is based upon, related to, or arising from any acts or omissions of such officer, manager, or director occurring prior to the Effective Date on account of such

Asbestos Claim, to the fullest extent permitted under section 524(g) of the Bankruptcy Code and applicable law (as now in effect or subsequently extended), other than Claims or Causes of Action arising out of any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted a criminal act, actual fraud, gross negligence or willful misconduct.

### G. THE PLAN RELEASE INJUNCTION

232. **As set forth in __Section 10.7__ of the Plan, except as otherwise provided in the Plan, this Confirmation Order shall permanently enjoin (the "__Plan Release Injunction__") the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any of the following released pursuant to the Plan: Claims, commitments, obligations, suits, judgments, damages, Demands, debts, claims, causes of action and liabilities (collectively, the "__Enjoined Matters__").**

### H. WAIVER OF CALIFORNIA CIVIL CODE TO THE EXTENT APPLICABLE

233. As set forth in __Section 10.8__ of the Plan, though the Debtor does not believe that California law is applicable to the Plan, nevertheless, in an abundance of caution, the Debtor hereby affirms that it understands and waives the effect of section 1542 of the California Civil Code to the extent that such section is applicable to the Debtor or its Estate.

### I. INDEMNIFICATION OBLIGATIONS

234. As set out in __Section 10.10__ of the Plan, for purposes of the Plan, the obligations of the Debtor to indemnify and reimburse Persons who are or were managers or officers of the Debtor prior to or following the Petition Date against and for any obligations as provided in the Debtor's organizational documents, bylaws, applicable state law, or other agreement, or any combination of the foregoing, shall survive confirmation of the Plan, remain unaffected thereby, and not be

discharged in accordance with section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Petition Date.  Such obligations shall be assumed by the Reorganized Debtor on the Effective Date, and the Reorganized Debtor shall be indemnified by O-I Glass on account of such obligations pursuant to the Covered Claims Indemnification Agreement.  In furtherance of the foregoing, the Reorganized Debtor shall use its commercially reasonable efforts to maintain or procure, as of the Effective Date, insurance for the benefit of such managers and officers, at levels satisfactory to the Reorganized Debtor.

### J.    RESERVATION FOR SEC

235.    As set forth in Section 10.11 of the Plan, notwithstanding any language to the contrary contained in the Disclosure Statement, Plan, and/or this Confirmation Order, no provision of the Plan or this Confirmation Order shall (i) preclude the United States Securities and Exchange Commission ("SEC") from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair, or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debtor person or entity in any forum.

### K.    GOVERNMENTAL UNITS

236.    As set forth in Section 10.12 of the Plan, nothing in the Plan, Plan Documents, or this Confirmation Order discharges, releases, precludes or enjoins: (i) any Unimpaired claim or liability to a governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit"); (ii) any liability to a Governmental Unit that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (iii) any Claim of a Governmental Unit arising on or after the Effective Date; (iv) any liability to a Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the Effective Date; (v) any liability to a Governmental Unit on the part of any non-Debtor; or (vi) any liability of any debtor, non-debtor,

or any other person or entity under criminal laws of any Governmental Unit.  Nothing in the Plan, Plan Documents, or this Confirmation Order authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law; provided, however, that nothing in this paragraph shall limit or supervene (v) Section 10.2 (as to Claims), (w) Section 10.3, (x) Section 10.5, (y) Section 10.6, or (z) Section 10.7 (as to Enjoined Matters) of the Plan; provided further that the only injunctive effect of Section 10.7 of the Plan on the United States shall be to enforce the releases contained in Section 10.5 of the Plan.  Nothing in this paragraph shall diminish the scope of any exculpation provided under Section 10.4 of the Plan.  Nothing in the Plan, Plan Documents, or this Confirmation Order shall impair any valid setoff or recoupment rights of any Governmental Authority.  Nothing in the Plan, Plan Documents, or this Confirmation Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Confirmation Order or to adjudicate any defense asserted under this Confirmation Order.

### L.    TERM OF INJUNCTIONS AND AUTOMATIC STAY

### 1.    Injunctions and/or Stays in Existence Immediately Prior to Confirmation

237.    Pursuant to Section 9.4 of the Plan, all of the injunctions and/or stays in existence immediately prior to the Confirmation Date provided for in or in connection with the Chapter 11 Case, whether pursuant to section 105, 362, or any other provision of the Bankruptcy Code, the Bankruptcy Rules or other applicable law, shall remain in full force and effect until the injunctions set forth in the Plan become effective pursuant to a Final Order.  For the avoidance of doubt, upon effectiveness of the injunctions set forth in the Plan, the automatic stay imposed by section 362 of the Bankruptcy Code shall be terminated.  In addition, on and after the Confirmation Date, the

Debtor may seek such further orders as it may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

## 2. Injunctions Provided for in the Plan or Confirmation Order

238. Each of the injunctions contained in the Plan or this Confirmation Order shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided in the Plan or this Confirmation Order.

## VIII. THE THIRD-PARTY RELEASE PROVISION IN THE PLAN IS CONSENSUAL AND IS APPROPRIATE UNDER THIRD CIRCUIT LAW

239. The Third-Party Release under Section 10.6 of the Plan provides the non-Debtor Releasing Parties with the opportunity to opt-out of the Third-Party Release and is therefore consensual as to the non-Debtor Releasing Parties.

240. The non-Debtor Releasing Parties were given due and adequate notice of the Third-Party Release pursuant to the Solicitation Procedures Order, including by way of the Debtor's dissemination of the Solicitation Packages and the Publication Notice, and through the Debtor's implementation of the Supplemental Publication Plan, all of which were approved by the Bankruptcy Court and contained disclosures regarding the Third-Party Release and the mechanism for opting out of such release.

241. As such, the non-Debtor Releasing Parties were thereby provided sufficient notice and opportunity to elect to opt-out of the Third-Party Release (whether through making the appropriate opt-out election on a Ballot or otherwise objecting to the Third-Party Release, as applicable). See Solicitation Procedures Order [Docket No. 1216]; see also Docket Nos. 1244, 1253, and 1269; Finegan Decl. at Exs. G-I.

242. The Debtor also provided Holders of Unclassified Claims and Unimpaired Claims in Classes 1, 2, 4, and 5 with the Notice of Non-Voting Status pursuant to the Solicitation

Procedures Order, which included, among other things, the proposed Third-Party Release and prominent instructions that such release would be binding on all Holders of Unimpaired Claims if such Holders did not timely object to the Third-Party Release.  See Solicitation Procedures Order, Ex. F [Docket No. 1216].

243.    In addition, the Disclosure Statement, Ballots and Confirmation Notices (as defined in the Solicitation Procedures Order)—which were included in the Debtor's solicitation materials—provided clear, conspicuous notice of both the Third-Party Release and the process for opting out of or objecting to the Third-Party Release, as applicable.  See Solicitation Procedures Order, Ex. F [Docket No. 1216].  All non-Debtor Releasing Parties therefore received appropriate notice and opportunity to opt-out of and/or object to the Third-Party Release.  As such, the Third-Party Release is consensual as to the non-Debtor Releasing Parties.

## IX.    RESERVATION OF RIGHTS REGARDING THE UNITED STATES

244.    For the avoidance of doubt, and notwithstanding any provision to the contrary in the Plan, this Confirmation Order, the Plan Supplement or any other related documents, the United States is not a Releasing Party and affirmatively opts-out of any releases, injunctions or exculpatory provisions as the Plan or other applicable law may allow.

## X.    RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT

245.    Unless otherwise explicitly provided in any Plan Document, pursuant to sections 105(a) and 1142 of the Bankruptcy Code and notwithstanding the entry of this Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court and, to the extent applicable, the District Court, shall, on and after the Effective Date, to the fullest extent permitted by law, retain and have jurisdiction over all matters arising out of and related to the Chapter 11 Case and the Plan and all provisions under Section 12.1 of the Plan, including, among other things, jurisdiction to: (a) hear and determine any and all objections to and proceedings

involving the allowance, estimation, classification, and subordination of Claims that have been or properly should have been brought in the Bankruptcy Court (other than Asbestos Claims) or Equity Interests; (b) hear and determine all objections to the termination of the Asbestos Trust; (c) hear and determine such other matters that may be set forth in or arise in connection with the Plan, this Confirmation Order, the Asbestos Channeling Injunction, the Asbestos Trust Agreement, the Asbestos Trust Distribution Procedures, or the O-I Glass Indemnification Agreements; (d) enter such orders as are necessary to interpret, implement and enforce the releases and injunctions described herein, including, if necessary, in connection with application of the protections afforded by section 524 of the Bankruptcy Code and/or the Plan to the Protected Parties; (e) hear and determine any proceeding that involves the validity, application, construction, enforceability, or modification of the Asbestos Channeling Injunction; and (f) hear and determine matters related to any fee disputes under Section 9.1 of the Plan.

## XI.  NOTICE OF ENTRY OF CONFIRMATION ORDER AND EFFECTIVE DATE

246.    Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c), the Reorganized Debtor is authorized and directed to file and serve, within fourteen (14) days after the occurrence of the Effective Date, a notice of the occurrence of the Effective Date, which shall include notice of (i) the bar date for Professional Fee Claims, established by the Plan and this Confirmation Order; (ii) the issuance of the Discharge Injunction, the Asbestos Channeling Injunction, the Debtor Release Injunction, the Third-Party Release Injunction, and the Plan Release Injunction; (iii) the Effective Date; (iv) affirmance of this Confirmation Order by the District Court; and (v) notice of substantial consummation of the Plan, substantially in the form of Exhibit B attached hereto and incorporated herein by reference (the "Notice of Effective Date"), on all parties that received notice of the Confirmation Hearing, including, without limitation, the various counsel to Holders of Asbestos Claims; provided, however, that the Reorganized Debtor is authorized and directed to

serve the Notice of Effective Date directly on those Holders of Asbestos Claims that received Solicitation Packages directly from the Debtor pursuant to the terms of the Solicitation Procedures Order.

## XII.   NO JUST CAUSE FOR DELAY

247.   The Bankruptcy Court determines that there is no just cause for delay, and that this Confirmation Order shall take effect immediately upon entry, notwithstanding anything to the contrary in Bankruptcy Rules 3020(e) or 7062(a).

## XIII.   REPORT AND RECOMMENDATION TO THE DISTRICT COURT

248.   To the extent required under 28 U.S.C. § 157(d), the Bankruptcy Court hereby reports to the District Court and recommends that the District Court enter an order issuing and affirming the Asbestos Channeling Injunction set forth in the Plan and paragraph 227 (Asbestos Channeling Injunction) of this Confirmation Order and adopting the Findings of Fact and Conclusions of Law set forth herein with respect to compliance with the requirements of section 524(g), pursuant to section 524(g)(3) of the Bankruptcy Code.

## XIV.   RECORDATION

**THIS ORDER IS HEREBY DECLARED TO BE IN RECORDABLE FORM AND SHALL BE ACCEPTED BY ANY RECORDING OFFICER FOR FILING AND RECORDING PURPOSES WITHOUT FURTHER OR ADDITIONAL ORDERS, CERTIFICATIONS, OR OTHER SUPPORTING DOCUMENTS.**

**Dated: May 26th, 2022**
**Wilmington, Delaware**

**LAURIE SELBER SILVERSTEIN**
**UNITED STATES BANKRUPTCY JUDGE**

US-DOCS\130474138.9

## Exhibit A

Plan of Reorganization

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

                                                  :

In re:                                            :        Chapter 11

                                                  :

PADDOCK ENTERPRISES, LLC                          :        Case No. 20-10028 (LSS)

                                                  :

Debtor.[1]                                        :

                                                  :

------------------------------------------------------- x

## THIRD AMENDED PLAN OF REORGANIZATION FOR PADDOCK ENTERPRISES, LLC UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**LATHAM & WATKINS LLP**

Jeffrey E. Bjork (admitted *pro hac vice*)
Kimberly A. Posin (admitted *pro hac vice*)
Helena G. Tseregounis (admitted *pro hac vice*)
Christina M. Craige (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763

-and-

George A. Davis (admitted *pro hac vice*)
Christopher J. Kochman (admitted *pro hac vice*)
Brian S. Rosen (admitted *pro hac vice*)
Jonathan J. Weichselbaum (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

**RICHARDS, LAYTON & FINGER, P.A.**

John H. Knight (No. 3848)
Michael J. Merchant (No. 3854)
Brendan J. Schlauch (No. 6115)
Sarah Silveira (No. 6580)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

*Counsel to the Debtor and Debtor-in-Possession*

---

[1]   The last four digits of the Debtor's federal tax identification number are 0822.  The Debtor's mailing address is One Michael Owens Way, Perrysburg, Ohio 43551.

**CAPLIN & DRYSDALE, CHARTERED**

Kevin C. Maclay, Esq. (admitted *pro hac vice*)
Todd E. Phillips, Esq. (admitted *pro hac vice*)
Kevin M. Davis, Esq. (admitted *pro hac vice*)
One Thomas Circle, NW, Suite 1100
Washington, D.C. 20005
Tel: (202) 862-5000
Fax: (202) 429-3301

*Counsel to the Official Committee of Asbestos Personal Injury Claimants*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Sharon M. Zieg (No. 4196)
Sara Beth A.R. Kohut (No. 4137)
Rodney Square 1000
North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Counsel to the Future Claimants' Representative*

Dated: May 24, 2022
Wilmington, Delaware

**CAMPBELL & LEVINE, LLP**

Marla R. Eskin (No. 2989)
Mark T. Hurford (No. 3299)
222 Delaware Avenue, Suite 1620
Wilmington, DE 19801
Telephone: (302) 426-1900
Fax: (302) 426-9947

**MORRIS NICHOLS ARSHT & TUNNELL LLP**

Derek C. Abbott (No. 3376)
Brett S. Turlington (No. 6705)
1201 North Market Street, Suite 1600
Wilmington, DE 19801

Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel to O-I Glass, Inc.*

*This Plan provides for an "Asbestos Channeling Injunction" pursuant to section 524(g) of the Bankruptcy Code.  For a description of the causes of action to be enjoined and the identities of the entities that would be subject to, and protected by, the injunction, see Article X of this Plan.*

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS AND INTERPRETATIONS ..........................................................1

    1.1    Capitalized Terms.........................................................................................1
    1.2    Ancillary Documents.................................................................................18

ARTICLE II. ADMINISTRATIVE EXPENSE AND PRIORITY TAX CLAIMS....................18

    2.1    Summary ...................................................................................................18
    2.2    Administrative Expense Claims .................................................................18
    2.3    Priority Tax Claims ...................................................................................21

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
    INTERESTS...........................................................................................................21

    3.1    Summary ...................................................................................................21
    3.2    Treatment and Classification of Claims and Equity Interests ...................22
    3.3    Elimination of Vacant Classes ..................................................................25
    3.4    Special Provision Governing Claims .........................................................25

ARTICLE IV. ACCEPTANCE OR REJECTION OF PLAN.....................................................25

    4.1    Presumed Acceptance of the Plan ............................................................25
    4.2    Voting Class ..............................................................................................25
    4.3    Class Acceptance Requirement ................................................................25
    4.4    Issuance of Asbestos Channeling Injunction.............................................26

ARTICLE V. DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF NON-
    ASBESTOS CLAIMS............................................................................................26

    5.1    Distributions .............................................................................................26
    5.2    Record Date for Holders of Non-Asbestos Claims ...................................26
    5.3    Date of Distributions .................................................................................26
    5.4    Postpetition Interest on Non-Asbestos Claims..........................................26
    5.5    Means of Cash Payment ............................................................................26
    5.6    Delivery of Distributions...........................................................................27
    5.7    Full Benefit of Distributions.....................................................................27
    5.8    Undeliverable Distributions and Unclaimed Property. ..............................27
    5.9    Prepayment of Non-Asbestos Claims........................................................27
    5.10   Fractional Cents.........................................................................................28
    5.11   Setoff and Recoupment .............................................................................28
    5.12   Surrender of Cancelled Instruments or Securities .....................................28
    5.13   De Minimis Distributions..........................................................................28
    5.14   Compliance with Tax Requirements and Allocations ................................28

i

# TABLE OF CONTENTS
### (Continued)

Page

ARTICLE VI. PROCEDURES FOR RESOLVING AND TREATING DISPUTED
NON-ASBESTOS CLAIMS.................................................................................29

6.1   Disputed Non-Asbestos Claims.....................................................................29
6.2   Treatment of Disputed Non-Asbestos Claims................................................29
6.3   Estimation of Non-Asbestos Claims ............................................................29
6.4   Payments and Distributions with Respect to Disputed Non-Asbestos
Claims.........................................................................................................30

ARTICLE VII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ........................................................................................................30

7.1   General Treatment.......................................................................................30
7.2   Preexisting Obligations to the Debtor under Executory Contracts .................31
7.3   Cure of Defaults .........................................................................................31
7.4   Rejection of Executory Contracts and Consequences Thereof ......................31
7.5   Nonoccurrence of Effective Date .................................................................31
7.6   Consent Decrees, Covenants, and Agreements .............................................32

ARTICLE VIII. MEANS FOR IMPLEMENTATION OF THE PLAN .......................................32

8.1   Generally ...................................................................................................32
8.2   Transactions on the Effective Date ..............................................................32
8.3   The Asbestos Trust......................................................................................33
8.4   Amended Organizational Documents ...........................................................36
8.5   Net Reserve Funds......................................................................................36
8.6   Corporate Governance of Reorganized Debtor .............................................36
8.7   Operations of the Debtor Between Confirmation and the Effective Date..........36
8.8   Corporate Action ........................................................................................36
8.9   Effectuating Documents; Further Transactions .............................................37
8.10  Environmental Claims or Causes of Action ..................................................37

ARTICLE IX. EFFECT OF CONFIRMATION ........................................................................38

9.1   Dissolution of Asbestos Claimants Committee; Discharge of the Future
Claimants' Representative............................................................................38
9.2   Vesting of Assets.........................................................................................39
9.3   Preservation of Certain Causes of Action, Rights to Settle Claims and
Compromise Controversies, and Defenses....................................................40
9.4   Terms of Injunction and Automatic Stay ......................................................40
9.5   No Successor Liability .................................................................................41

ARTICLE X. RELEASES, INJUNCTIONS AND INDEMNIFICATION OF CLAIMS ...........41

10.1  Discharge of Debtor ...................................................................................41
10.2  Debtor's Discharge Injunction .....................................................................41

US-DOCS\123556013.57

# TABLE OF CONTENTS
### (Continued)

Page

| | | |
|---|---|---|
| 10.3 | Asbestos Channeling Injunction | 42 |
| 10.4 | Exculpation | 43 |
| 10.5 | Releases by Debtor and Its Estate and Related Injunction | 44 |
| 10.6 | Releases by Holders of Claims | 44 |
| 10.7 | Injunction Related to Releases | 45 |
| 10.8 | Certain Waivers | 45 |
| 10.9 | Disallowed Claims | 46 |
| 10.10 | Indemnification Obligations | 46 |
| 10.11 | Reservation for SEC | 46 |
| 10.12 | Governmental Units | 46 |

ARTICLE XI. CONDITIONS PRECEDENT TO CONFIRMATION AND
CONSUMMATION OF THE PLAN ...................................................47

| | | |
|---|---|---|
| 11.1 | Conditions Precedent to Confirmation of the Plan | 47 |
| 11.2 | Conditions Precedent to the Effective Date of the Plan | 51 |
| 11.3 | Waiver of Conditions Precedent | 52 |
| 11.4 | Failure to Achieve the Effective Date | 52 |

ARTICLE XII. JURISDICTION OF BANKRUPTCY COURT ...............................52

| | | |
|---|---|---|
| 12.1 | Retention of Jurisdiction | 52 |
| 12.2 | Modification of Plan | 55 |
| 12.3 | Consent to Jurisdiction | 56 |

ARTICLE XIII. MISCELLANEOUS PROVISIONS ...............................................56

| | | |
|---|---|---|
| 13.1 | Governing Law | 56 |
| 13.2 | Notices | 56 |
| 13.3 | Exhibits and Schedules; Conflicts | 58 |
| 13.4 | Exemption from Transfer Taxes | 58 |
| 13.5 | Recordable Order | 58 |
| 13.6 | Binding Effect | 58 |
| 13.7 | Severability | 58 |
| 13.8 | Further Assurances | 58 |
| 13.9 | Further Authorizations | 58 |
| 13.10 | General Statements | 59 |
| 13.11 | Entire Agreement | 59 |
| 13.12 | 2002 Notice Parties | 59 |

## TABLE OF CONTENTS
(Continued)

## EXHIBITS AND SCHEDULES

Exhibit A          Asbestos Trust Agreement
Exhibit B          Asbestos Trust Distribution Procedures
Exhibit C          Asbestos Claims Indemnification Agreement
Exhibit D          Asbestos Claimant Release
Exhibit E          Covered Claims Indemnification Agreement
Exhibit F          Environmental Claims or Causes of Action Indemnification Agreement

Schedule 1.1(a)    Governmental Authorities
Schedule 1.1(b)    Non-Debtor Affiliates
Schedule 7.6       Consent Decrees, Covenants, and Agreements

US-DOCS\123556013.57

## INTRODUCTION

The Plan Proponents respectfully propose the following plan of reorganization pursuant to sections 524(g) and 1121(a) of the Bankruptcy Code:

## ARTICLE I.

## DEFINITIONS AND INTERPRETATIONS

In this Plan, the definitions provided in this Article I shall apply.  Unless otherwise specified, all Article or Exhibit references in this Plan are to the respective Article of or Exhibit to this Plan, as the same may be amended or modified from time to time.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender will include the masculine, feminine, and neuter.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular Article, subsection or clause.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Plan.  The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Rule 9006(a) of the Bankruptcy Rules will apply.  If the date on which a transaction may occur pursuant to this Plan will occur on a day that is not a Business Day, then such transaction will instead occur on the next succeeding Business Day.

1.1     **Capitalized Terms**.  The capitalized terms used herein have the respective meanings set forth below.  Any term that is not otherwise defined in this Section 1.1, but that is defined elsewhere in this Plan, the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in this Plan, the Bankruptcy Code or Bankruptcy Rules, as applicable.

 **"Administrative Expense Claim"** means any unpaid Claim for costs and expenses of administration during the Chapter 11 Case pursuant to sections 363, 364(c)(1), 365, 503(b) or 507(a)(2), 507(b) of the Bankruptcy Code other than Professional Fee Claims, including, without limitation: (a) any actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estate and operating the businesses of the Debtor; (b) Claims pursuant to section 503(b)(9) of the Bankruptcy Code, if any; and (c) all fees and charges assessed against the Estate under section 1930, chapter 123, of title 28 of the United States Code.

**"Affiliate"** shall have the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

**"Allowed"** means, when used with respect to (x) any Covered Claim, including, without limitation, Administrative Expense Claims, and any Professional Fee Claim, and (y) any Environmental Claim or Cause of Action for which (i) a Proof of Claim has been Filed or (ii) a written agreement has been entered into whereby the Holder of an Environmental Claim or Cause of Action and the Debtor or Reorganized Debtor, as applicable, agree to treat such Environmental Claim or Cause of Action as under the provisions of Article VI, such Claim or portion thereof: (a) (i) that is not subject to continuing dispute by the Debtor or Reorganized Debtor in accordance

1

with applicable law and (ii) as to which either a proof of such Claim has been Filed, the Debtor has scheduled such Claim as liquidated, undisputed and non-contingent or, with respect to a Professional Fee Claim, application for payment has been properly and timely Filed; or (b) that is allowed (i) pursuant to the terms of a Final Order, (ii) pursuant to the terms of an agreement by and among the Holder(s) of such Claim and the Debtor (or Reorganized Debtor, as the case may be), or (iii) expressly under the terms of the Plan; *provided*, *however*, that for the purposes of determining the status (*i.e.*, Allowed, Disputed or Disallowed) of a Professional Fee Claim prior to the expiration of the period fixed for filing objections to the allowance or disallowance of such Claim, any such Claim which has not been previously allowed or disallowed by a Final Order of the Bankruptcy Court shall be deemed a Disputed Claim, unless such Claim is specifically identified by the Debtor in the Plan or other filing with the Bankruptcy Court as being an Allowed Claim.  For the avoidance of doubt, Environmental Claims or Causes of Action not included in subsection (y) shall be treated as contemplated under <u>Section 8.10</u>.  For the further avoidance of doubt, Covered Claims that "pass through" or are otherwise reinstated under this Plan shall be neither Allowed nor Disallowed, and the Reorganized Debtor shall retain all claims and defenses thereto, subject to the O-I Glass Indemnification Agreements, as applicable. Notwithstanding anything to the contrary herein, no Non-Asbestos Claim or Professional Fee Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the Debtor or Reorganized Debtor. "Allow" and "Allowance" shall have correlative meanings.  Unless otherwise provided in the Plan or a Final Order, the Allowed amount of any Non-Asbestos Claim or Professional Fee Claim shall not include interest or penalties accruing on such Claim from and after the Petition Date.

**"Amended Organizational Documents"** means the amended and restated organizational document(s) of the Reorganized Debtor, which shall be substantially in the form contained in the Plan Supplement.

**"Asbestos Channeling Injunction"** means the injunction provided for in <u>Section 10.3</u> of this Plan.

**"Asbestos Claim"** means each of (a) a General Asbestos Claim, and (b) an Indirect Asbestos Claim.  Notwithstanding any other provision of this Plan, Environmental Claims or Causes of Action of the United States or any State are not Asbestos Claims under this Plan.

**"Asbestos Claimant Release"** means a general release of all Asbestos Claims against the Protected Parties and the Asbestos Trust and its related parties, which shall be in substantially the form attached as <u>Exhibit D</u> hereto and shall be in form and substance acceptable to the Debtor, the Asbestos Claimants Committee, and the Future Claimants' Representative.

**"Asbestos Claimants Committee"** means the official committee of asbestos personal injury claimants appointed in the Chapter 11 Case, as such committee may be reconstituted from time to time.

**"Asbestos Claims Indemnification Agreement"** means that certain agreement, which shall be substantially in the form attached as <u>Exhibit C</u> hereto, whereby the Asbestos Trust shall indemnify and hold harmless the Reorganized Debtor, the Non-Debtor Affiliates and the Representatives of the Debtor, Reorganized Debtor, and the Non-Debtor Affiliates in respect of any liability, obligation, fee, judgment, settlement, or expense, including, without limitation, legal

fees and expenses, arising from or incurred in connection with any action based upon, attributable to, or arising out of an Asbestos Claim or any violation of the Asbestos Channeling Injunction by any Entity.

**"Asbestos Containing Products"** means asbestos-containing products, equipment, components, parts, improvements to real property, or materials engineered, designed, marketed, manufactured, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, or distributed by, or in any other way made available, or present at any premises owned, leased, occupied or operated by, the Debtor (including, without limitation, any of the Debtor's direct or indirect predecessors), including without limitation any of those products manufactured, sold, or distributed by, or in any other way made available, or present at any premises owned, leased, occupied or operated by, Old O-I.

**"Asbestos Records"** shall have the meaning ascribed to it in the Asbestos Records Cooperation Agreement.

**"Asbestos Records Cooperation Agreement"** means the cooperation agreement with respect to Asbestos Records entered into on or before the Effective Date, substantially in the form attached to the Plan Supplement.

**"Asbestos Trust"** means the asbestos trust established pursuant to section 524(g) of the Bankruptcy Code and in accordance with this Plan, the Confirmation Order, and the Asbestos Trust Agreement, which trust shall constitute a "qualified settlement fund" under section 468B of the Internal Revenue Code.

**"Asbestos Trust Advisory Committee"** means the Asbestos Trust advisory committee established pursuant to the terms of this Plan and the Asbestos Trust Agreement and identified in the Plan Supplement.

**"Asbestos Trust Agreement"** means the agreement, which agreement shall be substantially in the form attached as Exhibit A hereto, to be dated as of the Effective Date, by and among the Reorganized Debtor, the Asbestos Trustees, the Delaware Trustee, the Post-Effective Date Future Claimants' Representative, and the Asbestos Trust Advisory Committee, governing the creation and the terms of the Asbestos Trust.

**"Asbestos Trust Assets"** means, collectively: (a) the Asbestos Trust Contributions; (b) all other assets, rights, and benefits assigned, transferred or conveyed to the Asbestos Trust in connection with this Plan or any Plan Documents; and (c) all proceeds of the foregoing.

**"Asbestos Trust Bylaws"** means the Asbestos Trust Bylaws to be adopted by the Asbestos Trust after the Effective Date, as such bylaws may be amended or modified from time to time in accordance with the terms of the Asbestos Trust Agreement.

**"Asbestos Trust Contributions"** means, collectively, the Paddock Trust Contribution and the O-I Glass Trust Contribution.

**"Asbestos Trust Distribution Procedures"** means the trust distribution procedures for the Asbestos Trust, which shall be substantially in the form attached as Exhibit B hereto, and such

additional procedures as may subsequently be adopted by the Asbestos Trust, which provide for the resolution, liquidation, and satisfaction of Asbestos Claims.

"**Asbestos Trust Documents**" means, collectively: (a) the Asbestos Trust Agreement; (b) the Asbestos Trust Distribution Procedures; (c) the Asbestos Trust Bylaws; (d) the Asbestos Records Cooperation Agreement; and (e) any other agreements, instruments and documents governing the establishment and administration of the Asbestos Trust, as the same may be amended or modified from time to time, in accordance with the terms thereof.

"**Asbestos Trust Expenses**" means any of the liabilities, costs, or expenses incurred by or on behalf of the Asbestos Trust (other than liabilities to Holders of Asbestos Claims in respect of such Claims), in carrying out the terms of the Asbestos Trust Agreement.

"**Asbestos Trustees**" means the individual or individuals set forth in the Asbestos Trust Agreement and appointed to serve as the trustees for the Asbestos Trust in accordance with the terms of the Plan and the Asbestos Trust Agreement, and any successor trustees thereto appointed in accordance with the Asbestos Trust Agreement.

"**Avoidance Action**" means any action commenced, or that may be commenced, before or after the Effective Date pursuant to sections 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code.

"**Ballot**" means each of the ballots and/or master ballots upon which Holders of Asbestos Claims entitled to vote shall, among other things, indicate their acceptance or rejection of this Plan in accordance with this Plan and the procedures governing the solicitation process, and which must be actually received by the Balloting Agent on or before the Voting Deadline.

"**Balloting Agent**" means Prime Clerk LLC.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended from time to time, as applicable to the Chapter 11 Case.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware or such other court (other than the District Court) as may have jurisdiction over the Chapter 11 Case.

"**Bankruptcy Rules**" means, collectively: (a) the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code; (b) the Federal Rules of Civil Procedure, as applicable to the Chapter 11 Case or any proceedings therein; and (c) the local rules of the Bankruptcy Court, all as amended from time to time and applicable to the Chapter 11 Case. When used to reference specific rules, such term shall mean the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code.

"**Business Day**" means any day other than a Saturday, a Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"**Cash**" means legal tender of the United States of America or the equivalent thereof.

"**Cause of Action**" means any action, including any Avoidance Action, cause of action, liability, obligation, account, controversy, right to legal remedy, right to equitable remedy, right to payment, suit, debt, sum of money, damage, judgment, Claim or Demand whatsoever, whether known or unknown, now or in the future, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, whether alleged, asserted or assertable directly, indirectly or derivatively, in law, equity, admiralty, or otherwise, arising under any applicable law, regulation, or similar governmental pronouncement.

"**Chapter 11 Case**" means the case under Chapter 11 of the Bankruptcy Code commenced by the Debtor on the Petition Date in the Bankruptcy Court under Case No. 20-10028 (LSS).

"**Claim**" shall have the meaning ascribed to such term in section 101(5) of the Bankruptcy Code as it pertains to "claims" against the Debtor.

"**Class**" means a category of Holders of Claims or Equity Interests described in Article III of this Plan.

"**Confirmation Date**" means the earlier of (a) the date on which the order of the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code is affirmed by the District Court or (b) the date on which the Confirmation Order is entered by the District Court.

"**Confirmation Hearing**" means the hearing(s) held by the Bankruptcy Court and/or District Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of the Plan, as such hearing(s) may be adjourned or continued from time to time.

"**Confirmation Order**" means (a) the order of the District Court confirming the Plan under section 1129 of the Bankruptcy Code or (b) collectively, the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code and the order of the District Court affirming such order, which in either case shall contain the Asbestos Channeling Injunction.

"**Covered Claims**" means all Professional Fee Claims and Non-Asbestos Claims that are not Environmental Claims or Causes of Action.

"**Covered Claims Indemnification Agreement**" means the Covered Claims Indemnification Agreement, substantially in the form attached hereto as Exhibit E, by and among the Reorganized Debtor and O-I Glass, effective as of the Effective Date, pursuant to which O-I Glass agrees to indemnify, defend, pay the defense costs for, and hold harmless the Reorganized Debtor from and against all Covered Claims and associated costs, expenses, actions, Causes of Action, suits, controversies, damages, demands, debts, liabilities or obligations of any nature, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, liquidated or unliquidated, matured or not matured, contingent or direct, whether arising at common law, in equity or under any statute, all as more specifically and to the extent set forth in such Covered Claims Indemnification Agreement.

"**Cure Claim**" means a Claim based upon the Debtor's monetary default(s) under an Executory Contract existing as of the time such Executory Contract is assumed by the Debtor pursuant to section 365 of the Bankruptcy Code.

"**Debtor**" or "**Paddock**" means Paddock Enterprises, LLC, a Delaware limited liability company.

"**Delaware Trustee**" means the Entity appointed in accordance with Section 8.3(e) to serve as the "Delaware Trustee" in accordance with the terms of the Plan and the Asbestos Trust Agreement.

"**Demand**" shall have the meaning ascribed to such term in section 524(g) of the Bankruptcy Code.

"**Disallowed**" means, when used with respect to a Non-Asbestos Claim or a Professional Fee Claim against the Debtor, such Claim that: (a) is denied, dismissed, expunged, overruled, or disallowed in whole or in part (but solely to the extent of such disallowance) by Final Order; (b) has been reclassified, expunged, subordinated or estimated by a Final Order of the Bankruptcy Court; (c) is unenforceable to the extent provided in section 502(b) of the Bankruptcy Code; or (d) where the Holder of such Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such Person, Entity or transferee has paid the amount, or turned over any such property, for which such Person, Entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code.  In each case a Disallowed Claim or a Disallowed Equity Interest is disallowed only to the extent of disallowance, reclassification, expungement, subordination, or estimation.  For the avoidance of doubt, (y) Covered Claims that "pass through" or are otherwise reinstated under this Plan shall be neither Allowed nor Disallowed, and the Reorganized Debtor shall retain all claims and defenses thereto, subject to the O-I Glass Indemnification Agreements, as applicable, and (z) Environmental Claims or Causes of Action shall be treated as contemplated under Section 8.10.

"**Disclosure Statement**" means the written disclosure statement that relates to this Plan, as the same may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to this Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules, and any other applicable law.

"**Disputed**" means, with respect to any Non-Asbestos Claim or Professional Fee Claim, such Claim that (a) is neither Allowed nor Disallowed under this Plan or a Final Order unless such Claim is deemed to "pass through" or is otherwise reinstated under this Plan (including, for the avoidance of doubt and without any limitation, any Environmental Claim or Cause of Action as to which no Proof of Claim has been Filed), nor deemed Allowed under sections 502, 503 or 1111 of the Bankruptcy Code; (b) any party in interest has interposed a timely objection or request for estimation (including, without limitation as contemplated in Article VI), and such objection or request for estimation has not been withdrawn or resolved by a Final Order or by agreement; or (c) is listed on the Schedules as disputed, contingent, or unliquidated.  Notwithstanding the foregoing, Environmental Claims or Causes of Action other than Filed Proofs of Claim shall be considered neither disputed nor undisputed for purposes of the Plan and shall be treated as provided in Section 8.10.

US-DOCS\123556013.57

"**Distribution**" means one or more payments or distributions under this Plan of: (a) Cash; (b) property; or (c) other interest in property, as applicable, to the Holders of Allowed Non-Asbestos Claims or the Asbestos Trust.

"**Distribution Record Date**" means the record date for determining an entitlement to receive Distributions under this Plan on account of Allowed Non-Asbestos Claims, which date shall be the Confirmation Date.

"**District Court**" means the United States District Court for the District of Delaware.

"**Effective Date**" means the date, as determined by the Debtor, on which all conditions to consummation of this Plan set forth in Section 11.2 have been satisfied or waived in accordance with Section 11.3.

"**Encumbrance**" means, with respect to any property (whether real or personal, or tangible or intangible), any mortgage, Lien, pledge, charge, security interest, assignment, or encumbrance of any kind or nature in respect of such property, including, without limitation, any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction, to secure payment of a debt or performance of an obligation.

"**Enjoined Matters**" shall have the meaning ascribed to it in Section 10.7 of this Plan.

"**Entity**" means an entity as defined in section 101(15) of the Bankruptcy Code.

"**Environmental Claim or Cause of Action**"  means any Claim or Cause of Action or other legal obligation of any kind, including, but not limited to, any investigatory or remedial action or obligation as well as any liability for investigatory costs, remedial costs, removal costs, response costs, oversight costs, assessment costs, or natural resources damages, operation and maintenance costs, fines, fees, or penalties, against the Debtor arising under any applicable Environmental Law, any other federal, state, local or foreign statute, regulation or similar requirement having the force and effect of law, or judicial or administrative order or determination or common law, concerning public health or safety, workplace health and safety, or pollution or protection of the environment (including all those pertaining to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, emission, control or cleanup of any hazardous materials, hazardous substances, hazardous wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, polychlorinated biphenyls, noise or radiation), or under any contract, environmental covenant, agreement, arrangement, lease, indenture, mortgage, deed of trust, evidence of indebtedness, license, guarantee, understanding, course of dealing or performance, instrument, bid, order, proposal, demand, offer or acceptance, consent decree, whether written or oral, *provided* that no Claim or Cause of Action that (a) falls within the definition of Asbestos Claim or (b) is related to (i) the post-Effective Date operations of the Reorganized Debtor or (ii) an asset owned by the Reorganized Debtor after the Effective Date for which neither the Debtor nor O-I Glass is liable under Environmental Law pre-Effective Date shall be an Environmental Claim or Cause of Action. Notwithstanding any other provision of this Plan, Environmental Claims or Causes of Action of the United States or any State are not Asbestos Claims under this Plan.

"**Environmental Claims or Causes of Action Indemnification Agreement**" means the Environmental Claims or Causes of Action Indemnification Agreement, substantially in the form attached hereto as Exhibit F, by and among the Reorganized Debtor and O-I Glass, effective as of the Effective Date.

"**Environmental Law**" means (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601, et seq.; (b) the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste Amendment of 1984, 42 U.S.C. §§ 6901, et seq.; (c) the Clean Air Act, 42 U.S.C. §§ 7401, et seq.; (d) the Clean Water Act of 1977, 33 U.S.C. §§ 1251, et seq.; (e) the Toxic Substances Control Act, 15 U.S.C. §§ 2601, et seq.; (f) the System Unit Resource Protection Act, 54 U.S.C. §§ 100721, et seq.; (g) all statutes, laws, rules, permits or regulations issued, enacted, or promulgated by any Governmental Authority or court (including the common law), as they may be amended from time to time, relating to the protection and/or prevention of harm, contamination or pollution of or to the environment (including ecological systems and living organisms including humans and the following media whether alone or in combination: air (including air within buildings), water (including water under or within land or in pipe or sewage systems), land, buildings and soil); and (h) ordinances, rules, regulations, orders, notices of violation, requests, demands, permits and requirements issued or promulgated by any Governmental Authority in connection with such statutes or laws.

"**Equity Interests**" means any equity securities (as defined in section 101(16) of the Bankruptcy Code) of the Debtor, including all of the outstanding membership interests in the Debtor, or any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights with respect thereto.

"**Estate**" means the estate created under section 541 of the Bankruptcy Code in the Chapter 11 Case.

"**Exculpated Parties**" means, collectively, (a) the Debtor's directors, officers and managers who served during any time between the Petition Date and the Effective Date of the Plan (each in their capacity as such); (b) the Debtor; (c) the Asbestos Claimants Committee and each of the members thereof, solely in his or her capacity as such; (d) the Future Claimants' Representative, solely in his capacity as such; (e) the professionals retained in this bankruptcy case by the Debtor, the Asbestos Claimants Committee, or the Future Claimants' Representative, including but not limited to financial advisors, attorneys, accountants, investment bankers, and consultants (collectively the "**Retained Professionals**"), and (f) solely as to conduct found by a court of competent jurisdiction to have been undertaken while acting as a fiduciary of the Debtor's Estate, the employees of the Debtor or other individuals providing similar services to the Debtor (other than the Debtor's directors, officers and managers), and the employees of the Retained Professionals, each solely in their capacities as such; and counsel to the individual members of the Asbestos Claimants Committee, each solely in their capacity as such, *provided however* that the Bankruptcy Court is not determining the fiduciary status of any employees of the Debtor or other individuals providing similar services to the Debtor (other than the Debtor's directors, officers and managers), or any employees of any of the Retained Professionals or counsel to the individual members of the Asbestos Claimants Committee.  Nothing herein shall shift the burden of the employees of the Debtor or other individuals providing similar services to the Debtor (other than

the Debtor's directors, officers and managers), and the employees of the Retained Professionals or counsel to the individual members of the Asbestos Claimants Committee, to establish that they were fiduciaries of the Debtor's Estate during the period of time between the Petition Date and the Effective Date of the Plan.

"**Exculpation**" means the exculpation provision set forth in Section 10.4 hereof.

"**Executory Contract**" means any unexpired lease or executory contract of the Debtor that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"**Federal Judgment Rate**" means the rate specified by 28 U.S.C. § 1961.

"**Fee Examiner**" means Diana Goldberg Adams (or any Bankruptcy Court-appointed successor), in her (or his) capacity as the fee examiner appointed pursuant to the Fee Examiner Order.

"**Fee Examiner Order**" means the *Order Appointing Fee Examiner* [Docket No. 400] (or any other Bankruptcy Court order appointing a fee examiner).

"**File**" or "**Filed**" or "**Filing**" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case; *provided*, that when used with respect to a Proof of Claim, shall not include a Proof of Claim for Environmental Claim or Cause of Action filed: (i) by a Governmental Authority that is withdrawn; or (ii) pursuant to 11 U.S.C. §§ 501(b) and (c) or Bankruptcy Rules 3004 and 3005.

"**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice; *provided*, *however*, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment.

"**Future Claimants' Representative**" means James L. Patton, Jr. (or any court-appointed alternative or successor), in his capacity as the court-appointed legal representative for all Future Demand Holders pursuant to section 524(g) of the Bankruptcy Code.

"**Future Demand Holder**" means an Entity that holds or might subsequently hold a Demand.

"**General Asbestos Claim**" means any Claim, Demand, or Cause of Action or any portion thereof against, or any debt, liability, or obligation of, the Debtor or any other Protected Party, arising in any jurisdiction around the world, whether now existing or hereafter arising, for, attributable to, arising out of, in connection with, based upon, or resulting from, directly or

indirectly, death, bodily injury, sickness, disease, or other personal or emotional injuries to Persons, whether relating to a single disease or injury, combination of diseases or injuries, or separately or subsequently arising disease or injury, whether in the nature of or sounding in tort, or under contract, warranty, employer liability, conspiracy, or any other theory of law, equity, or admiralty, whether based on statute, treaty, regulation, restatement or common law, whatsoever (including, without limitation, any Claim, Demand, or Cause of Action, whether direct, indirect or derivative, based upon a legal or equitable theory of liability in the nature of veil piercing, alter ego, successor liability, vicarious liability, mere continuation, fraudulent transfer or conveyance, or conspiracy, upon which any of the Non-Debtor Affiliates are liable or are alleged to be liable), to the extent arising, directly, indirectly or derivatively, from (i) (a) acts, omissions, business, premises, or operations of the Debtor or its direct or indirect predecessors; or (b) acts, omissions, business, premises, or operations of any other Entity (including, without limitation, the Debtor's direct or indirect predecessors) for whose acts, omissions, business, operations, or products the Debtor has liability or is alleged to have liability; and (ii) the sale of, manufacture of, presence of, or exposure to, any Asbestos Containing Products.

For the avoidance of doubt, "General Asbestos Claim" shall include, but shall not be limited to, any Claim, Demand, Cause of Action, allegation, debt, liability, or obligation described in the immediately preceding sentence that, directly, indirectly or derivatively, arises from or is based upon any acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, intentional, willful, or wanton misconduct of the Debtor or any other Entity for whose acts, omissions, business, operations, or products the Debtor has liability or is alleged to have liability (including, without limitation, any of the Debtor's direct or indirect predecessors), and any conduct for which the Debtor, or any other Entity for whose acts, omissions, business, operations, or products the Debtor has liability or is alleged to have liability (including, without limitation, any of the Debtor's direct or indirect predecessors), may be deemed to have strict liability under any applicable law, including claims, debts, obligations, or liabilities for compensatory damages (such as loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages) and punitive damages, but only to the extent any such liability or alleged liability is for, attributable to, arising out of, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, other personal or emotional injuries to Persons caused, or allegedly caused, directly or indirectly, by the sale of, manufacture of, presence of, or exposure to, any Asbestos Containing Products.

For purposes of this definition, "veil piercing, alter ego, successor liability, vicarious liability, mere continuation, fraudulent transfer or conveyance, or conspiracy" claims shall include, but shall not be limited to, (a) fraudulent transfer or fraudulent conveyance claims, or claims seeking to avoid and/or recover any transfers of property or void any transaction, under applicable non-bankruptcy law; (b) denuding the corporation claims; (c) single business enterprise or common enterprise claims; (d) claims that the Debtor was the predecessor to any Non-Debtor Affiliate; (e) claims that the Debtor was the mere instrumentality, agent, dominated or controlled party, or alter ego of any Non-Debtor Affiliate, or that any Non-Debtor Affiliate was the mere instrumentality, agent, dominated or controlled party, or alter ego of the Debtor; (f) claims that any Non-Debtor Affiliate was the mere continuation of the Debtor; (g) negligent provision of services claims; (h) claims that any Non-Debtor Affiliate, on the one hand, and the Debtor, on the other hand, conspired with one another, aided and abetted one another, or acted in concert with one another; and (i) any other Claims, Demands, or Causes of Action asserted derivatively against

any of the Non-Debtor Affiliates that belong to, or may be brought on behalf of or in the name of, the Debtor, whether or not included in the foregoing list, including, without limitation, any other such claim or cause of action against a Non-Debtor Affiliate.

Notwithstanding the foregoing, (i) any Claim, Demand, Cause of Action, allegation, debt, liability, or obligation described in this definition shall be a "General Asbestos Claim" only to the extent of a Protected Party's liability for that Claim, Demand, Cause of Action, allegation, debt, liability, or obligation and (ii) the term "General Asbestos Claim" shall not include (a) any Claim by any former employee of the Debtor (or any predecessor thereof) for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer; or (b) any Indirect Asbestos Claim.

"**General Unsecured Claim**" means a Claim against the Debtor that is not secured by a valid and enforceable Lien against property of the Debtor and that is not an Administrative Expense Claim, a Professional Fee Claim, a Priority Tax Claim, an Other Priority Claim, an Environmental Claim or Cause of Action, an Asbestos Claim, or an Intercompany Claim.

"**Governmental Authority**" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational governmental, legislative, administrative, or regulatory authority, agency, court, arbitration tribunal, board, department, commission or other governmental, or regulatory entity, including any competent governmental authority responsible for the determination, assessment or collection of taxes; including, but not limited to, those listed on Schedule 1.1(a) attached hereto.

"**Governmental Unit**" shall have the meaning ascribed to it in Section 10.12 of this Plan.

"**Holder**" means any Person or Entity that is the owner of record of a Claim or an Equity Interest, as applicable.

"**Impaired**" means a Claim or an Equity Interest, or a Class of Claims or Equity Interests, as appropriate, that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"**Indirect Asbestos Claim**" means any cross-claim, contribution claim, subrogation claim, reimbursement claim, indemnity claim, guaranty claim, or other similar indirect Claim, Demand, or Cause of Action, arising in any jurisdiction around the world, against any Protected Party, whether or not such Claim, Demand, or Cause of Action is or has been reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, and whether in the nature of or sounding in tort, or under contract or implied by law (as governed by the applicable non-bankruptcy law), statutory right, warranty, guaranty, contribution, joint liability, joint and several liability, vicarious liability, mere continuation, fraudulent transfer or conveyance, or conspiracy, upon which any of the Non-Debtor Affiliates are liable or are alleged to be liable), for, attributable to, arising out of, in connection with, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, other personal or emotional injuries

11

to Persons caused, or allegedly caused, directly or indirectly, by the sale of, manufacture of, presence of, or exposure to, Asbestos Containing Products.

For the avoidance of doubt, "Indirect Asbestos Claim" shall include, but shall not be limited to, any Claim, Demand, or Cause of Action described in the immediately preceding sentence that, directly, indirectly or derivatively, arises from or is based upon any acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, intentional, willful, or wanton misconduct of the Debtor or any other Entity (including, without limitation, the Debtor's direct or indirect predecessors) for whose acts, omissions, business, operations, or products the Debtor has liability or is alleged to have liability, and any conduct for which the Debtor, or any other Entity for whose acts, omissions, business, operations, or products the Debtor has liability or is alleged to have liability (including, without limitation, the Debtor's direct or indirect predecessors), may be deemed to have strict liability under any applicable law, including claims, debts, obligations, or liabilities for compensatory damages (such as loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages) and punitive damages, but only to the extent any such liability or alleged liability is for, attributable to, arising out of, in connection with, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, other personal or emotional injuries to Persons caused, or allegedly caused, directly or indirectly, by the sale of, manufacture of, presence of, or exposure to, asbestos from any Asbestos Containing Products.

Notwithstanding anything to the contrary in this definition, and for the avoidance of doubt, (i) any Claim, Demand, Cause of Action, allegation, debt, liability, or obligation described in this definition shall be a "Indirect Asbestos Claim" only to the extent of a Protected Party's liability for that Claim, Demand, Cause of Action, allegation, debt, liability, or obligation and (ii) an Indirect Asbestos Claim shall not include any claim for or otherwise relating to death, injury, or damages caused by asbestos or a product or material containing asbestos that is asserted by or on behalf of any injured individual, the estate, legal counsel, relative, assignee, or other representative of any injured individual, or an individual who claims injury or damages as a result of the injury or death of another individual regardless of whether such claim is seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative, or any other costs or damages, or any legal, equitable or other relief whatsoever, including pursuant to a settlement, judgment, or verdict.

"**Intercompany Claim**" means any Claim held by an Affiliate of the Debtor against the Debtor.

"**Known**" means, where such Entity's or Person's information (1) is listed on: (a) the Debtor's books and records, (b) the claims register maintained in the Chapter 11 Case, or (c) the Schedules or (2) is otherwise furnished to the Debtor.

"**Lien**" has the meaning ascribed to such term in section 101(37) of the Bankruptcy Code.

"**Meigs**" means Meigs Investments, LLC, a Delaware limited liability company and a wholly-owned subsidiary of the Debtor.

"**Net Reserve Funds**" means no less than $10 million in Cash to be set aside by the Debtor on the Effective Date.

"**Non-Asbestos Claim**" means any Claim against the Debtor that is not an Asbestos Claim or a Professional Fee Claim.

"**Non-Debtor Affiliates**" means O-I Glass, O-I Group, Meigs, and all current and former Affiliates of O-I Glass other than the Debtor that are identified in Schedule 1.1(b) attached hereto (as may be amended and/or supplemented through the Effective Date with the consent of the Asbestos Claimants Committee and Future Claimants' Representative (with such consent not to be unreasonably withheld or delayed)), and any of such Affiliates' successors or assigns, solely in their capacities as such. After the Effective Date, the Reorganized Debtor or O-I Glass may amend and/or supplement Schedule 1.1(b) to include any additional current or former Affiliates with: (i) the consent of the Asbestos Trust Advisory Committee and the Post-Effective Date Future Claimants' Representative (with such consent not to be unreasonably withheld or delayed), or (ii) the approval of the Bankruptcy Court; *provided that*, any amended Schedule 1.1(b) will be Filed.

"**Notice of Non-Voting Status**" means a notice, substantially in the form attached as Exhibit F to the Solicitation Procedures Order, to be provided by the Debtor to Known Holders of (a) Claims in Classes 1, 2, 4, and 5 and (b) Unclassified Claims (as defined in the Solicitation Procedures Motion), which, among other things, notifies such parties that they are not entitled to vote to accept or reject this Plan.

"**O-I Glass**" means O-I Glass, Inc., a publicly traded Delaware corporation and the direct parent of the Debtor, and any successor or assign thereof.

"**O-I Glass Cash**" means $601.5 million in Cash.

"**O-I Glass Contribution**" means, in the aggregate, the following contributions made on the Effective Date by O-I Glass or one or more of its Affiliates on behalf of O-I Glass and the other Non-Debtor Affiliates: (a) the O-I Glass Trust Contribution; (b) indemnification by O-I Glass of the Reorganized Debtor from and against all Covered Claims and Environmental Claims or Causes of Action, in each case pursuant to and to the extent set forth in the Covered Claims Indemnification Agreement and the Environmental Claims or Causes of Action Indemnification Agreement, as applicable; and (c) the fulfillment of the Support Request.

"**O-I Glass Indemnification Agreements**" means the Covered Claims Indemnification Agreement and the Environmental Claims or Causes of Action Indemnification Agreement.

"**O-I Glass Trust Contribution**" means, in the aggregate, the following contributions made on the Effective Date to the Asbestos Trust by O-I Glass or one or more of its Affiliates, on behalf of O-I Glass and the other Non-Debtor Affiliates: (a) the O-I Glass Cash; and (b) the Pledge.

"**O-I Group**" means Owens-Illinois Group, Inc., a Delaware corporation that is a subsidiary of O-I Glass and is the direct or indirect holder of all of O-I Glass's subsidiaries other than the Debtor and Meigs.

"**Old O-I**" means Owens-Illinois, Inc., of which the Debtor became the successor-by-merger in connection with the Prepetition Restructuring Transaction.

"**Other Priority Claim**" means any Claim entitled to priority pursuant to section 507 of the Bankruptcy Code other than an Administrative Expense Claim, a Professional Fee Claim, a Secured Claim, or a Priority Tax Claim.

"**Paddock Trust Contribution**" means the Payment Note.

"**Payment Default**" means the failure by the Reorganized Debtor to pay the Payment Note in full on or before the fifth anniversary of the Effective Date.

"**Payment Note**" means a note, substantially in the form included in the Plan Supplement, issued to the Asbestos Trust by the Reorganized Debtor as obligor in the principal amount of $8.5 million.  The Payment Note will (a) beginning on the third anniversary of the Effective Date, bear interest at a rate equal to 1.75% plus the U.S. Prime Rate (as published in the *Wall Street Journal* on the date set forth in the note) per annum on the amount of the unpaid principal, (b) mature on the fifth anniversary of the Effective Date, (c) be secured by the Pledge, and (d) provide for payment in full of the principal amount of the Payment Note on or before the Payment Note's maturity date.  The Payment Note may be prepaid, in whole or in part, at any time after the Effective Date, without penalty or premium.  Pursuant to the Payment Note and the Pledge Agreement, upon the occurrence of a Payment Default, the Asbestos Trust may, upon written notice to the Reorganized Debtor and O-I Glass, foreclose on the Pledge.  During the period in which the Payment Default has occurred and is continuing, interest will accrue at a rate equal to 3.75% plus the U.S. Prime Rate (as published in the *Wall Street Journal* on the date that the Payment Default occurs) per annum on the amount of the unpaid principal.  A Payment Default shall not provide a basis for the Asbestos Trust or any other party in interest to contend that a material breach of this Plan has occurred or that any Protected Party is no longer entitled to the protections provided to such Protected Party pursuant to this Plan, including without limitation the protections of the Asbestos Channeling Injunction, the related indemnification by the Asbestos Trust, and the settlement of the Estate's claims.

"**Person**" means a person as defined in section 101(41) of the Bankruptcy Code.

"**Petition Date**" means January 6, 2020, the date on which the Debtor Filed its petition for relief commencing the Chapter 11 Case.

"**Plan**" means this *Third Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code*, including any supplements and exhibits hereto, either in its present form or as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof.

"**Plan Documents**" means, collectively, (a) this Plan, (b) the Disclosure Statement, (c) all of the exhibits attached to this Plan and the Disclosure Statement, (d) the Plan Supplement and all documents and agreements contained therein, (e) the Asbestos Trust Documents, and (e) any other document necessary to implement this Plan.

"**Plan Proponents**" means, collectively, the Debtor, the Asbestos Claimants Committee, the Future Claimants' Representative, and O-I Glass.

14

"**Plan Supplement**" means the supplement to this Plan to be Filed with the Bankruptcy Court on or before the date that is seven (7) calendar days prior to the earlier of (a) the Voting Deadline or (b) the deadline to object to confirmation of this Plan, unless otherwise ordered by the Bankruptcy Court.

"**Pledge**" means a pledge of one hundred percent (100%) of the Equity Interests in the Reorganized Debtor in favor of the Asbestos Trust, which shall secure the Payment Note, as set forth in and pursuant to the Pledge Agreement.

"**Pledge Agreement**" means an agreement, substantially in the form included in the Plan Supplement, by and between the Asbestos Trust and O-I Glass, to secure the payment of the Payment Note through the Pledge.

"**Post-Effective Date Future Claimants' Representative**" means the Future Claimants' Representative or such other Person appointed by the Bankruptcy Court and identified in the Asbestos Trust Agreement (or any alternative or successor appointed as provided in the Asbestos Trust Agreement), in his or her capacity as the legal representative of Future Demand Holders subsequent to the Effective Date pursuant to section 524(g) of the Bankruptcy Code.

"**Postpetition Interest**" means: (a) with respect to General Unsecured Claims and Other Priority Claims, postpetition interest at the Federal Judgment Rate in effect on the applicable Petition Date; (b) with respect to Priority Tax Claims, interest consistent with section 511 of the Bankruptcy Code; and (c) with respect to Secured Claims, postpetition interest at the applicable contract rate or, if none, at the Federal Judgment Rate in effect on the Petition Date.

"**Prepetition Restructuring Transaction**" means the corporate restructuring completed pursuant to section 251(g) of the Delaware General Corporation Law in December 2019, as a result of which, among other things, (i) Old O-I ceased to exist for corporate purposes under Delaware law and two new entities were created: (a) the Debtor, into which Old O-I merged, and (b) O-I Glass, which became the new publicly traded parent; (ii) certain assets of Old O-I, which became assets of the Debtor as a matter of law upon the merger, were distributed as a dividend to O-I Glass; (iii) certain obligations of Old O-I, which became obligations of the Debtor by operation of Delaware law upon the merger, were assumed by O-I Glass; and (iv) the Debtor and O-I Glass entered into the Support Agreement and the Services Agreement.

"**Priority Tax Claim**" means any Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

"**Professional**" means any Person retained or to be compensated in the Chapter 11 Case pursuant to section 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, including, without limitation, any professional retained by the Debtor, the Asbestos Claimants Committee and/or the Future Claimants' Representative.

"**Professional Fee Claim**" means any Claim of (i) a Professional for allowance of compensation and/or reimbursement of costs and expenses pursuant to sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, or (ii) the Future Claimants' Representative or a member of the Asbestos Claimants Committee for reimbursement of costs and

expenses, in each case incurred in the Chapter 11 Case on or before the Effective Date, or, pursuant to Section 9.1 herein, after the Effective Date.

**"Professional Fee Claims Bar Date"** means the date that is forty-five (45) days after the Effective Date.

**"Professional Fee Escrow Account"** means an account funded by the Debtor in an amount equal to or greater than the Professional Fee Escrow Amount and maintained on and after the Effective Date solely for the purpose of paying Allowed and unpaid Professional Fee Claims and Allowed and unpaid fees and expenses of the Balloting Agent under section 156 of the Bankruptcy Code.

**"Professional Fee Escrow Amount"** means the aggregate amount of all fees, costs and expenses accrued and incurred by (a) Professionals, (b) the Future Claimants' Representative, (c) members of the Asbestos Claimants Committee, and (d) the Balloting Agent under section 156 of the Bankruptcy Code through the Effective Date as estimated in good faith and in accordance with Section 2.2(c).

**"Proof of Claim"** means any proof of claim Filed with the Bankruptcy Court or the Balloting Agent pursuant to section 501 of the Bankruptcy Code and Rule 3001 or 3002 of the Bankruptcy Rules that asserts a Claim against the Debtor.

**"Protected Party"** means each of the following: (a) the Debtor; (b) the Reorganized Debtor; (c) the Non-Debtor Affiliates; and (d) any Representative of any of the foregoing Entities.

**"Released Party"** means each of the following: (a) the Debtor; (b) the Non-Debtor Affiliates; and (c), to the fullest extent permitted by applicable law, any Representatives of the foregoing Entities.

**"Releasing Parties"** means, collectively, (a) all Holders of Claims that vote to accept this Plan; (b) all Holders of Claims that are presumed to accept this Plan and fail to timely object to the releases provided for in Section 10.6 of this Plan, other than (1) Holders of Environmental Claims or Causes of Action that are Governmental Authorities and (2) the United States; (c) all Holders of Claims entitled to vote on this Plan and who vote against this Plan and do not opt out of the releases provided for in this Plan; and (d) all Holders of Claims entitled to, but do not, vote for or against this Plan and do not opt out of the releases provided for in this Plan. For the avoidance of doubt, (1) Holders of Environmental Claims or Causes of Action that are Governmental Authorities and (2) the United States are not Releasing Parties.

**"Reorganized Paddock"** or **"Reorganized Debtor"** means the Debtor, or any successor thereto by merger, consolidation, or otherwise, on and after the Effective Date.

**"Representative"** means with respect to any Person, such Person's (a) predecessors, successors, permitted assigns, subsidiaries, and controlled affiliates, (b) current and former officers, directors, and managers, principals, members, employees, financial advisors, attorneys, accountants, investment bankers, consultants, experts, and other professionals, and (c) respective heirs, executors, and estates, in each case solely in their capacity as such.

"**Schedule of Assumed Contracts**" means the schedule of Executory Contracts to be assumed by the Debtor, which schedule shall be Filed with the Plan Supplement, as may be amended, modified or supplemented pursuant to the terms hereof.

"**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs of the Debtor as Filed with the Bankruptcy Court on February 11, 2020 and February 27, 2020 [Docket Nos. 97, 116] in accordance with section 521 of the Bankruptcy Code, as such schedules and statements may be amended or supplemented from time to time.

"**Secured Claim**" means a Claim, other than an Intercompany Claim, that is: (a) secured by a valid, duly perfected, non-avoidable Lien, mortgage, security interest, or other Encumbrance on or in an interest of the Estate in property, to the extent of the value, as of the Effective Date or such other date as is established by the Bankruptcy Court, of the Holder's interest in the Estate's interest in such property, as determined by a Final Order of the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code or as otherwise agreed in writing by the Debtor and the Holder of the applicable Claim; or (b) secured by the amount of any valid, non-avoidable rights of setoff of the Holder thereof under section 553 of the Bankruptcy Code.

"**Services Agreement**" means that certain Services Agreement, dated as of December 27, 2019, by and between the Debtor and O-I Glass, as may be amended, restated, modified or supplemented from time to time prior to the Effective Date.

"**Solicitation Procedures**" means the procedures, attached as Exhibit A to the Solicitation Procedures Order, concerning solicitation of this Plan.

"**Solicitation Procedures Motion**" means the Motion for Entry of Order (I) Approving Disclosure Statement and Form and Manner of Notice of Hearing Thereon; (II) Establishing Solicitation Procedures; (III) Approving Forms of Ballots; (IV) Approving Form, Manner, and Scope of Confirmation Notices; (V) Establishing Certain Deadlines in Connection with Approval of Disclosure Statement and Confirmation of Plan; and (VI) Granting Related Relief, Filed on January 26, 2022 [Docket No. 1163].

"**Solicitation Procedures Order**" means the Order (I) Approving Disclosure Statement and Form and Manner of Notice of Hearing Thereon; (II) Establishing Solicitation Procedures; (III) Approving Forms of Ballots; (IV) Approving Form, Manner, and Scope of Confirmation Notices; (V) Establishing Certain Deadlines in Connection with Approval of Disclosure Statement and Confirmation of Plan; and (VI) Granting Related Relief, entered by the Bankruptcy Court on February 17, 2022 [Docket No. 1216].

"**Statutory Fees**" means all fees and charges assessed against the Estate under section 1930, chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

"**Support Agreement**" means that certain Support Agreement, dated as of December 27, 2019, by and between the Debtor and O-I Glass, as may be amended, restated, modified or supplemented from time to time prior to the Effective Date.

"**Support Request**" shall have the meaning ascribed to it in Section 8.5 of this Plan.

17

"**Unimpaired**" means a Claim or an Equity Interest, or a Class of Claims or Equity Interests, as appropriate, that is not Impaired under the Plan.

"**United States Trustee**" or "**UST**" means the United States Trustee appointed under section 581 of title 28 of the United States Code to serve in the District of Delaware.

"**Voting Deadline**" means the date established by the Bankruptcy Court as the deadline for the return of Ballots for voting on the Plan, which is April 8, 2022, at 4:00 p.m. (Prevailing Eastern Time), except that to the extent the Debtor has extended such deadline to a subsequent date (with the consent of the other Plan Proponents, with such consent not to be unreasonably withheld, conditioned or delayed), the Voting Deadline shall mean such date as extended.

"**Voting Record Date**" means February 16, 2022.

**1.2** **Ancillary Documents**. Each of the schedules and exhibits to this Plan, the Disclosure Statement, and the schedules and exhibits to the Disclosure Statement, the Plan Supplement, and the schedules and exhibits to the Plan Supplement are an integral part of this Plan, and are hereby incorporated by reference and made a part of this Plan, including, without limitation, the Asbestos Trust Documents.

## ARTICLE II.

## ADMINISTRATIVE EXPENSE AND PRIORITY TAX CLAIMS

**2.1** **Summary**. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, and Priority Tax Claims described below have not been classified and are excluded from those Classes of Claims and Equity Interests described in Article III of this Plan.

**2.2** **Administrative Expense Claims**.

(a)  General Administrative Expense Claims.

Except with respect to Administrative Expense Claims that are Statutory Fees and subject to the Confirmation Order and this Plan, unless otherwise agreed by the Debtor and the Holder of an Allowed Administrative Expense Claim, each Holder of an Allowed Administrative Expense Claim shall receive Cash equal to the unpaid portion of such Allowed Administrative Expense Claim on or as soon as practicable after the latest of (a) the Effective Date, (b) the date the Administrative Expense Claim becomes Allowed, and (c) the date the Allowed Administrative Expense Claim becomes due and payable in the ordinary course of business, consistent with past practice and in accordance with the terms and conditions of any orders or agreement governing, instruments evidencing, or other documents establishing such liabilities; *provided*, *however* that any Administrative Expense Claim that is not a Statutory Fee that is Disputed as of the time of payment set forth herein that ultimately becomes Allowed shall be paid on or as soon as reasonably practicable after the date such Administrative Expense Claim becomes Allowed. As of the Effective Date, the Reorganized Debtor, in its sole and absolute discretion, may settle Administrative Expense Claims in the ordinary course of business without further Bankruptcy Court approval. A claimant's receipt of the Allowed amount of its Administrative Expense Claim

shall be in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, on the date such payment is received.

        (b)      Asbestos Trust Expenses.

As of the Effective Date, liability for all Asbestos Trust Expenses incurred thereafter shall automatically, and without further act, deed or court order, be assumed by the Asbestos Trust and resolved in accordance with the terms, provisions and procedures of the Asbestos Trust Agreement.

        (c)      Professional Fee Claims.

          (i)      *Final Fee Applications.*

All Professionals or other Entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) and/or section 1103 of the Bankruptcy Code for services rendered on or before the Effective Date (including, without limitation, any compensation requested by any Professional or any other Entity for making a substantial contribution in the Chapter 11 Case) shall File no later than the Professional Fee Claims Bar Date and serve on (a) counsel to the Reorganized Debtor or the Debtor, as applicable, and (b) the United States Trustee, an application for final allowance of compensation and reimbursement of expenses for services rendered on or before the Effective Date; *provided*, *however*, that, notwithstanding a Professional's Filing of such final application, Professionals may, subject to <u>Section 9.1</u> herein, continue to request and receive compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) and/or section 1103 of the Bankruptcy Code for services rendered after the Effective Date.  For the avoidance of doubt, the Professional Fee Claims Bar Date shall not apply to and shall have no effect on any Professional Fee Claim for services rendered post-Effective Date pursuant to <u>Section 9.1</u> herein.  Objections to Professional Fee Claims must be Filed and served on (a) counsel to the Reorganized Debtor or the Debtor, as applicable, (b) the United States Trustee, (c) the requesting Professionals or other Entities, and (d) the Fee Examiner, no later than twenty (20) days after the Professional Fee Claims Bar Date.

          (ii)     *Professional Fee Escrow Account*

On or before the Effective Date, the Debtor shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Escrow Amount for all Professionals, the members of the Asbestos Claimants Committee, and the Future Claimants' Representative.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals, the members of the Asbestos Claimants Committee, and the Future Claimants' Representative.  Such funds in the Professional Fee Escrow Account shall not constitute property of the Debtor's Estate or property of the Reorganized Debtor while they remain in the Professional Fee Escrow Account. The amount of Professional Fee Claims owing to the Professionals, the members of the Asbestos Claimants Committee, and the Future Claimants' Representative as of the Effective Date shall be paid in Cash to such Professionals, members of the Asbestos Claimants Committee, and the Future Claimants' Representative from funds held in the Professional Fee Escrow Account, without interest or other earnings therefrom, as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order.  To the extent that the funds held in the Professional Fee Escrow Account are not sufficient to satisfy all Allowed Professional Fee Claims in full, the

Reorganized Debtor shall pay such additional Allowed amounts in Cash, without interest or other earnings therefrom, as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order.  When all Allowed Professional Fee Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the Reorganized Debtor.

(iii)     <em>Professional Fee Escrow Amount</em>

The Professionals, the members of the Asbestos Claimants Committee, and the Future Claimants' Representative shall estimate their aggregate fees, costs and expenses accrued and incurred prior to and as of the Confirmation Date, along with an estimate of all fees, costs and expenses to be incurred through and including the Effective Date, and shall deliver such estimates to the Debtor no later than seven (7) days after entry of the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code; *provided*, *however*, that (i) the failure of any Professional, member of the Asbestos Claimants Committee, or the Future Claimants' Representative to provide such estimate shall not prejudice their respective rights to request or receive compensation or reimbursement of expenses and (ii) such estimates shall not be considered an admission or limitation with respect to the fees and expenses of such Professional, member of the Asbestos Claimants Committee, or the Future Claimants' Representative or a cap on the Allowed amount of any Professional Fee Claim.  If a Professional, member of the Asbestos Claimants Committee, or the Future Claimants' Representative does not provide such estimates, the Debtor may estimate the unbilled fees and expenses of such Professional, member of the Asbestos Claimants Committee, or the Future Claimants' Representative.  The total amount so estimated shall comprise the "Professional Fee Escrow Amount."

(iv)     <em>Post-Effective Date Fees and Expenses of the Reorganized Debtor Professionals.</em>

Except as otherwise specifically provided in this Plan, from and after the Effective Date, the Reorganized Debtor shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the legal, professional or other fees and expenses related to the implementation and consummation of this Plan incurred by the Reorganized Debtor following the Effective Date.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(v)     <em>Fee Examiner</em>

The Fee Examiner appointed under the Fee Examiner Order shall continue to act in such capacity unless and until all final Professional Fee Claims have been adjudicated by order of the Bankruptcy Court, and the Reorganized Debtor shall be responsible to pay the fees and expenses incurred by the Fee Examiner in rendering services after the Effective Date.

20

(d)     Payment of Statutory Fees.

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtor on the Effective Date.  After the Effective Date, the Reorganized Debtor shall pay any and all Statutory Fees when due and payable.  The Debtor shall File all monthly and quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the United States Trustee.  After the Effective Date, the Reorganized Debtor shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the United States Trustee, which reports shall include a separate schedule of disbursements made by the Reorganized Debtor during the applicable period, attested to by an authorized representative of the Reorganized Debtor.  The Debtor and the Reorganized Debtor shall remain obligated to pay Statutory Fees to the United States Trustee until the earliest of the Chapter 11 Case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.  The United States Trustee shall not be required to File any Administrative Expense Claim in the Chapter 11 Case, and shall not be treated as providing any release under this Plan.

**2.3**    **Priority Tax Claims.**  Except to the extent that a Holder of an Allowed Priority Tax Claim has been paid by the Debtor prior to the Effective Date on account of such Priority Tax Claim or such Holder and the Debtor agree to a different treatment with respect thereto, each Holder of an Allowed Priority Tax Claim shall, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, receive in full satisfaction, settlement, and discharge of such Allowed Priority Tax Claim payment in Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim plus Postpetition Interest (if any, and only to the extent owed under contract or as a matter of applicable non-bankruptcy law), on the latest of: (a) the Effective Date; (b) the date such Priority Tax Claim becomes Allowed, or as soon thereafter as is practicable; and (c) the date such Allowed Priority Tax Claim becomes due and payable under applicable non-bankruptcy law.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

**3.1**    **Summary**.  Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Equity Interests in the Debtor.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of the Class, and a Claim or Equity Interest is classified in a different Class to the extent the Claim or Equity Interest qualifies within the description of such other Classes.  The categories of Claims and Equity Interests listed below are classified for all purposes, including voting, confirmation, and Distributions pursuant to this Plan.  A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim/Equity Interest | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| 1. | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2. | Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3. | Asbestos Claims | Impaired | Entitled to Vote |
| 4. | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 5. | Environmental Claims or Causes of Action | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 6. | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 7. | Paddock Equity Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

**3.2**    Treatment and Classification of Claims and Equity Interests.

(a)    **Class 1 – Other Priority Claims**.

(i)    *Classification*:  Class 1 consists of Other Priority Claims.

(ii)    *Treatment*:  Except to the extent a Holder of an Allowed Other Priority Claim has been paid prior to the Effective Date or agrees to a different treatment, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement, and discharge of, and in exchange for such Other Priority Claim, Cash in an amount equal to the unpaid portion of such Allowed Other Priority Claim plus Postpetition Interest thereon (if any, and only to the extent owed under contract or as a matter of applicable non-bankruptcy law) on the later of: (a) the Effective Date; and (b) the date the Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as practicable.  All Allowed Other Priority Claims not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

22

(iii)   *Voting*:  Class 1 is Unimpaired under this Plan.  Each Holder of an Other Priority Claim is deemed to have accepted this Plan and is therefore not entitled to vote to accept or reject this Plan.

(b)   **Class 2 – Secured Claims**.

(i)   *Classification*:  Class 2 consists of Secured Claims.

(ii)   *Treatment*:  All Allowed Secured Claims in Class 2 will be treated pursuant to one of the following alternatives: (i) payment in full in Cash plus Postpetition Interest (if any, and only to the extent owed under contract or as a matter of applicable non-bankruptcy law) in accordance with section 506(a) of the Bankruptcy Code on the later of: (a) the Effective Date and (b) the date the Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as practicable; (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code; (iii) such other treatment as the Debtor or Reorganized Debtor and the Holder shall agree; or (iv) such other treatment as may be necessary to render such Claim Unimpaired.  The failure of the Debtor or any other party in interest to file an objection, prior to the Effective Date, with respect to any Secured Claim that is reinstated under this Plan shall be without prejudice to the rights of the Reorganized Debtor or any other party in interest to contest or otherwise defend against such Secured Claim in an appropriate forum when and if such Secured Claim is sought to be enforced.  Any amount that the Debtor may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated Allowed Secured Claim shall be paid in full, in Cash, on, or as soon as practicable after, the latest of: (a) the Effective Date, (b) the date on which such Secured Claim becomes an Allowed Secured Claim, (c) the date such Secured Claim becomes due and payable according to its terms, or (d) such other date as mutually may be agreed to by and between the Holder of such Secured Claim and the Debtor or Reorganized Debtor.

(iii)   *Voting*:  Class 2 is Unimpaired under this Plan.  Each Holder of a Secured Claim is deemed to have accepted this Plan and is therefore not entitled to vote to accept or reject this Plan.

(c)   **Class 3 – Asbestos Claims**.

(i)   *Classification*:  Class 3 consists of all Asbestos Claims.

(ii)   *Treatment*:  As of the Effective Date, liability for all Asbestos Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Asbestos Trust in accordance with, and to the extent set forth in, Article VIII and Article X below, the applicable Plan Documents and the Confirmation Order.  Each Asbestos Claim shall be resolved in accordance with the terms, provisions and procedures of the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures. The Asbestos Trust shall be funded in accordance with the provisions of

Section 8.3 below.  The sole recourse of a Holder of an Asbestos Claim on account of such Asbestos Claim shall be to the Asbestos Trust, and each such Holder shall have no right whatsoever at any time to assert its Asbestos Claim against any Protected Party.

(iii)    *Voting*:  Class 3 is Impaired under this Plan.  Each Holder of an Asbestos Claim is entitled to vote to accept or reject this Plan.

(d)    **Class 4 – General Unsecured Claims**.

(i)    *Classification*:  Class 4 consists of all General Unsecured Claims.

(ii)    *Treatment*:  General Unsecured Claims that have neither been Allowed nor Disallowed as of the Effective Date shall pass through this Plan and the Chapter 11 Case and be reinstated as described in Section 6.2. Except to the extent a Holder of an Allowed General Unsecured Claim agrees to different treatment of such General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall be paid in full plus Postpetition Interest (if any, and only to the extent owed under contract or as a matter of applicable non-bankruptcy law) in Cash, on, or as soon as practicable after the later of: (a) the Effective Date, (b) the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, (c) the date such General Unsecured Claim becomes due and payable according to its terms, or (d) such other date as mutually may be agreed to by and between the Holder of such General Unsecured Claim and the Debtor or Reorganized Debtor.

(iii)    *Voting*:  Class 4 is Unimpaired under this Plan.  Each Holder of a General Unsecured Claim is deemed to have accepted this Plan and is therefore not entitled to vote to accept or reject this Plan.

(e)    **Class 5 – Environmental Claims or Causes of Action**

(i)    *Classification*:  Class 5 consists of all Environmental Claims or Causes of Action.

(ii)    *Treatment*:  Each Environmental Claim or Cause of Action shall pass through this Plan and the Chapter 11 Case as provided in Section 8.10.

(iii)    *Voting*:  Class 5 is Unimpaired under this Plan.  Each Holder of an Environmental Claim or Cause of Action is deemed to have accepted this Plan and is therefore not entitled to vote to accept or reject this Plan.

(f)    **Class 6 – Intercompany Claims**.

(i)    *Classification*:  Class 6 consists of all Intercompany Claims.

(ii)    *Treatment*:  Each Intercompany Claim shall be reinstated and shall have all legal, equitable, and contractual rights to which each such Intercompany Claim entitles the Holder of such Intercompany Claim.

US-DOCS\123556013.57

(iii) *Voting*:  Class 6 is Unimpaired under this Plan.  Each Holder of an Intercompany Claim in Class 6 is deemed to have accepted this Plan and is therefore not entitled to vote to accept or reject this Plan.

(g) **Class 7 – Paddock Equity Interests**.

(i) *Classification*:  Class 7 consists of all Paddock Equity Interests.

(ii) *Treatment*:  On the Effective Date, the Equity Interests in the Debtor shall be reinstated.

(iii) *Voting*:  Class 7 is Unimpaired under this Plan.  Each Holder of a Paddock Equity Interest in Class 7 is deemed to have accepted this Plan and is therefore not entitled to vote to accept or reject this Plan.

**3.3    Elimination of Vacant Classes.**  Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a claim temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, will be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**3.4    Special Provision Governing Claims.**  Nothing under this Plan shall affect the Debtor's or Reorganized Debtor's rights in respect of any Unimpaired or reinstated Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims.  Upon indemnification of any claims pursuant to either of the O-I Glass Indemnification Agreements, O-I Glass shall be subrogated to all of the defenses, rights, claims and Causes of Action of the Reorganized Debtor in respect of Covered Claims and Environmental Claims or Causes of Action.

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF PLAN

**4.1    Presumed Acceptance of the Plan.**  Class 1 (Other Priority Claims), Class 2 (Secured Claims), Class 4 (General Unsecured Claims), Class 5 (Environmental Claims or Causes of Action), Class 6 (Intercompany Claims), and Class 7 (Paddock Equity Interests) are Unimpaired under this Plan and are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, solicitation of votes of Holders of Claims and Equity Interests in Class 1, Class 2, Class 4, Class 5, Class 6, and Class 7 is not required.

**4.2    Voting Class.**  Class 3 is Impaired and entitled to vote under this Plan.  The Holders of Claims in Class 3 as of the Voting Record Date are entitled to vote to accept or reject this Plan.

**4.3    Class Acceptance Requirement**.  Acceptance of this Plan shall be determined in accordance with sections 524(g) and 1126 of the Bankruptcy Code and the terms of the Solicitation Procedures Order, as applicable.

US-DOCS\123556013.57

**4.4     Issuance of Asbestos Channeling Injunction.**  The Bankruptcy Court shall be asked to issue the Asbestos Channeling Injunction if this Plan has been accepted by at least two-thirds (2/3) in amount of those Holders of Class 3 Claims actually voting on this Plan, in accordance with section 1126(c) of the Bankruptcy Code, and seventy-five percent (75%) in number of those Holders of Class 3 Claims actually voting on this Plan, in accordance with section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.

## ARTICLE V.

## DISTRIBUTIONS UNDER THE PLAN
## ON ACCOUNT OF NON-ASBESTOS CLAIMS

**5.1     Distributions**.  Other than with respect to payments to be made on account of Asbestos Claims and Asbestos Trust Expenses from the Asbestos Trust and subject to Section 8.10 herein, the Reorganized Debtor shall make all Distributions required to be made under this Plan as provided under this Article V.  All payments to be made by the Asbestos Trust shall be made in accordance with the terms of the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures.  If and to the extent that there are Disputed Non-Asbestos Claims against the Debtor, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VI.

**5.2     Record Date for Holders of Non-Asbestos Claims**.  Except as otherwise provided in a Final Order, the transferees of Non-Asbestos Claims that are transferred pursuant to Rule 3001 of the Bankruptcy Rules on or prior to the Distribution Record Date shall be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date; *provided*, that, except as otherwise provided in Section 5.6 herein, the Debtor shall only be obligated to remit distributions to Holders of Non-Asbestos Claims as they appear on the Debtor's books and records as of the Distribution Record Date.

**5.3     Date of Distributions**.  Except as otherwise provided herein, any Distributions and deliveries to be made hereunder on account of Allowed Non-Asbestos Claims shall be made in accordance with Article II or Section 3.2 of this Plan, as applicable.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on, or as soon as reasonably practicable after, the next succeeding Business Day, but shall be deemed to have been completed as of the required date, and no interest shall accrue or be payable on any such payment on the basis that such payment was not actually made on the required date.

**5.4     Postpetition Interest on Non-Asbestos Claims**.  Except as otherwise provided for in this Plan (including Section 3.2 of this Plan), the Plan Documents or the Confirmation Order, or any contract, instrument, release, settlement or other agreement entered into in connection with this Plan, or unless required by applicable non-bankruptcy law, interest accruing on or after the Petition Date on account of any Non-Asbestos Claim or Professional Fee Claim shall not be paid.

**5.5     Means of Cash Payment**.  At the option of the Debtor or Reorganized Debtor, as applicable, any Cash payment to be made hereunder may be made by a check, automatic clearing house (ACH) or wire transfer or as otherwise required or provided in any applicable agreement.

26

**5.6    Delivery of Distributions.**  All Distributions to Holders of an Allowed Non-Asbestos Claim shall be made at the address for each such Holder as indicated on (a) such Holder's Proof of Claim, if applicable, (b) a notice Filed by such Holder with the Bankruptcy Court, if applicable, or (c) if neither (a) nor (b) are available, the Debtor's Schedules, or any more current address that is contained in the Debtor's books and records.

**5.7    Full Benefit of Distributions**.  Distributions under this Plan on account of Allowed Non-Asbestos Claims shall not be subject to levy, garnishment, attachment or similar legal process, so that each Holder of an Allowed Non-Asbestos Claim shall have and receive the benefit of the Distributions in the manner set forth in this Plan.  Neither the Debtor nor the Reorganized Debtor shall incur any liability whatsoever on account of any Distributions under this Plan except where such Distributions are found by Final Order to have been made with gross negligence, willful misconduct, or fraud.

**5.8    Undeliverable Distributions and Unclaimed Property**.

(a)    **Failure to Present Checks**.  Checks issued by the Debtor or Reorganized Debtor in respect of Distributions on Allowed Non-Asbestos Claims shall be null and void if not presented for payment within one hundred and eighty (180) days after the date of issuance thereof.  Requests for reissuance of any check shall be made in writing to the Debtor or Reorganized Debtor by the Holder of the Allowed Non-Asbestos Claim to whom such check originally was issued on or before the expiration of the one hundred and eighty (180) day period following the date of issuance of such check.  All funds held on account of a check voided in accordance with this <u>Section 5.8</u> shall be returned to the Reorganized Debtor and the Claim of any Holder to such Distributions shall be discharged and forever barred.

(b)    **Failure to Claim Undeliverable Distributions**.  In the event that any Distribution to any Holder on account of a Non-Asbestos Claim is returned as undeliverable, no Distribution to such Holder on account of a Non-Asbestos Claim shall be made unless and until the Reorganized Debtor has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest; *provided*, *however*, that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from the date the Distribution was returned.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtor and be returned to the Reorganized Debtor (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Non-Asbestos Claim of any Holder to such property or interest in property shall be forever barred.  Nothing contained in this Plan shall require the Debtor or Reorganized Debtor to attempt to locate any Holder of an Allowed Non-Asbestos Claim.

**5.9    Prepayment of Non-Asbestos Claims**.  Except as otherwise provided in this Plan, the Plan Documents, or the Confirmation Order, the Debtor or the Reorganized Debtor shall have the right to prepay, without penalty, all or any portion of an Allowed Non-Asbestos Claim at any time; *provided*, that any such prepayment shall not violate or otherwise prejudice the relative priorities among the Classes of Claims or otherwise violate the terms of this Plan.

**5.10    Fractional Cents**.  No payment of fractional cents will be made pursuant to this Plan.  Whenever any payment of a fraction of a cent under this Plan would otherwise be required, the actual Distribution made will reflect a rounding of such fraction to the nearest whole penny (up or down), with fractions of more than half a penny being rounded up and fractions of half of a penny or less being rounded down.

**5.11    Setoff and Recoupment**.  The Debtor or Reorganized Debtor, as applicable, may, but shall not be required to, set off and/or recoup against any Non-Asbestos Claim (for purposes of determining the Allowed amount of such Claim on which a Distribution shall be made), any claims of any nature whatsoever that the Debtor or Reorganized Debtor, as applicable, may have against the Holder of such Claim, and the failure to do so shall not constitute a waiver or release by the Debtor or Reorganized Debtor of any such claims that the Debtor or Reorganized Debtor may have against the Holder of such Claim.

**5.12    Surrender of Cancelled Instruments or Securities**.  As a condition precedent to receiving any Distribution on account of its Allowed Non-Asbestos Claim, each Holder of a Non-Asbestos Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled, except to the extent otherwise provided herein.

**5.13    De Minimis Distributions**.  If an interim Distribution under this Plan to the Holder of an Allowed Non-Asbestos Claim would be less than $25.00 USD, the Reorganized Debtor may reserve such Distribution to the next subsequent Distribution made to such Holder.

**5.14    Compliance with Tax Requirements and Allocations.**  In connection with this Plan and all Distributions hereunder, including with respect to the implementation and administration of the Asbestos Trust Agreement, the Debtor and Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed on them by any federal, state or local taxing authority, and all Distributions pursuant to this Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in this Plan to the contrary, the Debtor or Reorganized Debtor shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under this Plan, except for any Distribution to be made to the Asbestos Trust, to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions including tax certification forms, or establishing any other mechanisms the Debtor or Reorganized Debtor believes are reasonable and appropriate.  No Holder of an Allowed Non-Asbestos Claim shall effectuate any withholding with respect to the cancellation or satisfaction of such Allowed Claim under this Plan.  The Reorganized Debtor shall be authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all taxable periods of the Debtor ending after the Petition Date through and including the Effective Date.

For tax purposes, Distributions in full or partial satisfaction of Allowed Non-Asbestos Claims shall be allocated first to the principal amount of such Claims, with any excess allocated to unpaid interest that accrued on such Claims.

US-DOCS\123556013.57

## ARTICLE VI.

## PROCEDURES FOR RESOLVING AND TREATING DISPUTED NON-ASBESTOS CLAIMS

**6.1      Disputed Non-Asbestos Claims**.  All Disputed Non-Asbestos Claims against the Debtor shall be subject to the provisions of this Article VI; *provided*, *however*, Article VI shall not apply to Environmental Claims or Causes of Action except those included in any (i) Filed Proofs of Claim or (ii) written agreements whereby the Holder thereof and the Debtor or Reorganized Debtor, as applicable, agree to treat such Environmental Claim or Cause of Action as under the provisions of Article VI.   All Asbestos Claims shall be resolved and paid by the Asbestos Trust in accordance with Section 8.3 below, the Asbestos Trust Agreement, and the Asbestos Trust Distribution Procedures.  Only the Asbestos Trust will have the right to object to and/or resolve Asbestos Claims.   All Asbestos Claims must be submitted solely to the Asbestos Trust in accordance with the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures. Professional Fee Claims shall be determined and, if Allowed, paid in accordance with Section 2.2(c) of this Plan.  Administrative Expense Claims shall also be subject to Section 2.2(a) of this Plan.

**6.2      Treatment of Disputed Non-Asbestos Claims**.  A Non-Asbestos Claim (whether or not a Proof of Claim has been Filed on behalf of such Claim) shall only become an Allowed Claim to the extent such Claim satisfies the definition of "Allowed" in Section 1.1 of this Plan.

No bar date has been established in the Chapter 11 Case for the filing of Non-Asbestos Claims, and Holders of Non-Asbestos Claims are not required to, and should not, File Proofs of Claim in the Chapter 11 Case on account of such Non-Asbestos Claims; *provided* however that the Debtor or the Reorganized Debtor, as applicable, reserves all rights to (i) object to any Non-Asbestos Claim for which a Proof of Claim is Filed; (ii) otherwise dispute, object to, or assert any defense with respect to a Non-Asbestos Claim; or (iii) request that the Bankruptcy Court adjudicate any dispute with respect to any Non-Asbestos Claim, subject to Section 3.4 and Section 8.10 hereof and the terms of the O-I Glass Indemnification Agreements, as applicable.

After the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses the Debtor had prior to the Effective Date with respect to any Non-Asbestos Claim that has not been Allowed, and any General Unsecured Claim or Environmental Claim or Cause of Action that has neither been Allowed nor Disallowed as of the Effective Date will be "reinstated" or "pass through" as if the Chapter 11 Case had not been commenced and shall survive the Effective Date of the Plan with all parties reserving their rights with respect thereto, and the Reorganized Debtor shall retain the authority to object, prosecute any pending objection, litigate, settle or otherwise compromise any such Claim, subject in all respects to Section 3.4 and Section 8.10 hereof and the terms of the O-I Glass Indemnification Agreements, as applicable.

**6.3      Estimation of Non-Asbestos Claims**.  Subject in all respects to Section 3.4 and Section 8.10 hereof and the O-I Glass Indemnification Agreements, as applicable, the Debtor or Reorganized Debtor, as the case may be, may (i) request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Non-Asbestos Claim for any reason pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor previously objected to

29

such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate such Claim at any time, including, without limitation, during the pendency of litigation concerning any objection to any Non-Asbestos Claim or of any appeal relating thereto and (ii) shall be authorized to settle, compromise, withdraw or litigate to judgment such objections without further approval of the Bankruptcy Court.  For the avoidance of doubt, this Section 6.3 does not apply to Environmental Claims or Causes of Action except solely for those included in any (i) Filed Proofs of Claim or (ii) written agreements whereby the Holder thereof and the Debtor or Reorganized Debtor, as applicable, agree to treat such Environmental Claim or Cause of Action as under the provisions of Article VI.

**6.4     Payments and Distributions with Respect to Disputed Non-Asbestos Claims**.  Notwithstanding any other provision hereof, no payments or Distributions shall be made with respect to all or any portion of a Non-Asbestos Claim unless and until any  objections to such Claim have been settled or withdrawn or have been determined by Final Order or agreement.  To the extent that a Disputed Non-Asbestos Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Non-Asbestos Claim becomes a Final Order, the Reorganized Debtor shall provide to the Holder of such Claim the Distribution or payment (if any) on account of such Non-Asbestos Claim to which such Holder is entitled under this Plan as of the Effective Date.  For the avoidance of doubt, this Section 6.4 does not apply to Environmental Claims or Causes of Action except solely for those included in any (i) Filed Proofs of Claim or (ii) written agreements whereby the Holder thereof and the Debtor or Reorganized Debtor, as applicable, agree to treat such Environmental Claim or Cause of Action as under the provisions of Article VI.

## ARTICLE VII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**7.1     General Treatment**.  Except as otherwise provided herein, as of the Effective Date, the Debtor shall be deemed to have rejected any and all Executory Contracts to which the Debtor is a party except for: (a) any Executory Contracts specifically listed on the Schedule of Assumed Contracts; (b) any Executory Contracts previously rejected, assumed, or assumed and assigned pursuant to a Final Order entered on or before the Effective Date; or (c) any Executory Contract subject to a motion to reject, assume, or assume and assign pending as of the Effective Date.

The Debtor may amend the Schedule of Assumed Contracts to delete therefrom, or add thereto, any Executory Contract until the Effective Date.  The Debtor shall File notice of any such amendment and shall serve any such notice on the parties to the Executory Contract(s) affected thereby.  The fact that any contract or lease is listed on the Schedule of Assumed Contracts shall not constitute or be construed to constitute an admission that such contract or lease is an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code or that the Debtor or any successor in interest to the Debtor (including the Reorganized Debtor) has any liability thereunder.

30

Notwithstanding anything to the contrary herein, the Debtor shall be deemed to reject the Support Agreement and the Services Agreement as of the Effective Date. Notwithstanding anything to the contrary herein (including, but not limited to Section 7.2), all obligations by and between the parties to the Support Agreement and Services Agreement shall, and shall be deemed to, terminate upon the making of the O-I Glass Contribution.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections or assumptions, as the case may be, pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

**7.2    Preexisting Obligations to the Debtor under Executory Contracts.**  Except as otherwise set forth in Section 7.1 herein, rejection or repudiation of any Executory Contract pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtor under such contracts or leases, to the extent such obligations continue under the terms of such contracts or leases or under applicable law.  The Debtor expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued performance from counterparties to rejected or repudiated Executory Contracts, to the extent afforded by applicable law.

**7.3    Cure of Defaults**.  Any monetary defaults under each Executory Contract to be assumed pursuant to this Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the later of (a) the Effective Date or (b) the date on which such Cure Claim is Allowed, or on such other terms as the parties to any such Executory Contract may otherwise agree.  In the event of a dispute regarding: (a) the existence or amount of the Cure Claim; (b) the ability of the Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract to be assumed; or (c) any other matter pertaining to assumption, the payments required by section 365(b)(1) of the Bankruptcy Code in respect of Cure Claims shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

**7.4    Rejection of Executory Contracts and Consequences Thereof**.  Regardless of whether any administrative claims processing agreement entered into prior to the Petition Date between Old O-I, on the one hand, and a law firm or attorney, on the other hand, may be an Executory Contract, the only rights to payment that will survive occurrence of the Effective Date under any such agreement are the rights of holders of Asbestos Claims, which rights are provided for in Section 5.2 of the Asbestos Trust Distribution Procedures, and for the avoidance of doubt, no law firm or attorney may assert any claim or cause of action against any Protected Party on or after the Effective Date on account of any such administrative claims processing agreement.  Any Claim arising from the rejection of an Executory Contract that is not an administrative claims processing agreement is classified and shall be treated as a General Unsecured Claim against the Debtor unless such Claim would otherwise fall within the definition of General Asbestos Claim and/or Indirect Asbestos Claim.

**7.5    Nonoccurrence of Effective Date.**  In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts pursuant to section 365(d)(4) of the Bankruptcy Code.

US-DOCS\123556013.57

**7.6** **Consent Decrees, Covenants, and Agreements**. Nothing in this Plan, the Plan Documents, or the Confirmation Order shall alter any obligations of the Reorganized Debtor under the consent decrees, covenants, and agreements that are listed on Schedule 7.6 attached hereto or any defenses of the Reorganized Debtor thereto that may exist under non-bankruptcy law.

## ARTICLE VIII.

## MEANS FOR IMPLEMENTATION OF THE PLAN

**8.1** **Generally**. Except as otherwise provided in the Plan Documents, on and after the Confirmation Date, the Debtor shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable it to implement the provisions of this Plan without the need for any further state or local regulatory approvals or approvals by any non-Debtor parties, and without any requirement for further action by the Debtor, its board of managers, its equity-holder, or any other Person or Entity, including, without limitation, the creation of the Asbestos Trust and the preparations for the transfer of the Asbestos Trust Assets to the Asbestos Trust. From and after the Effective Date, the Reorganized Debtor shall continue to manage the operations of Meigs, and shall be governed pursuant to the Amended Organizational Documents and other applicable governing documents.

**8.2** **Transactions on the Effective Date**.

(a)    On the Effective Date, the following shall be deemed for all purposes to have occurred simultaneously:

(i)    the establishment of the Asbestos Trust;

(ii)    the effectiveness of the Covered Claims Indemnification Agreement;

(iii)    the effectiveness of the Environmental Claims or Causes of Action Indemnification Agreement;

(iv)    the termination of the Support Agreement and the Services Agreement;

(v)    the making of the Asbestos Trust Contributions to the Asbestos Trust;

(vi)    the vesting in the Asbestos Trust of the Asbestos Trust Assets, as more fully described in, and subject to the conditions set forth in, Section 8.3 below;

(vii)    the channeling of all Asbestos Claims (including, but not limited to, Demands, and asbestos-related Causes of Action) to the Asbestos Trust; and

(viii)    the effectiveness of the Asbestos Claims Indemnification Agreement.

32

(b)     Also on the Effective Date, but after the occurrence of the events in each of Section 8.2(a)(i) through 8.2(a)(viii) herein, the following events shall be deemed for all purposes to have occurred simultaneously:

(i)     the effectiveness of the Amended Organizational Documents of the Reorganized Debtor;

(ii)     the appointment of the individual(s) who will act as the officers and the directors or managers of the Reorganized Debtor, as identified in the Plan Supplement; and

(iii)     any Distributions required to be made on the Effective Date (or as soon thereafter as is reasonably practicable).

(c)     Unless the Plan or the Confirmation Order provide otherwise, actions required to be taken on the Effective Date or as soon thereafter as is reasonably practicable shall be deemed to have been made on the Effective Date.

**8.3     The Asbestos Trust**.

(a)     Creation of the Asbestos Trust.  On the Effective Date, the Asbestos Trust shall be created in accordance with the Plan Documents, the Asbestos Trust Documents, and section 524(g) of the Bankruptcy Code.

(b)     Purpose of the Asbestos Trust.  The purpose of the Asbestos Trust shall be to assume all liabilities and responsibility for all Asbestos Claims, and, among other things, to direct the processing, liquidation, and payment of all Asbestos Claims in accordance with this Plan, the Asbestos Trust Agreement, the Asbestos Trust Distribution Procedures, and the Confirmation Order.  The Asbestos Trust is intended to qualify at all times as a qualified settlement fund within the meaning of section 468B of the Internal Revenue Code.  The Asbestos Trust shall use the Asbestos Trust Assets to resolve and pay Asbestos Claims in accordance with the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures and in such a way as to provide reasonable assurance that the Asbestos Trust will value, and be in a financial position to pay, Asbestos Claims in substantially the same manner, and to otherwise comply in all respects with the requirements of a trust set forth in section 524(g)(2)(B) of the Bankruptcy Code.

(c)     Asbestos Trust Assets.  On the Effective Date, by virtue of confirmation of the Plan, all right, title, and interest in and to the Asbestos Trust Assets will be transferred to, and vested in, the Asbestos Trust, free and clear of all Claims, Demands, Equity Interests, Encumbrances, and other interests of any Entity, without any further action of the Bankruptcy Court or any Entity, but subject to the remaining provisions of this Section 8.3.

(d)     Appointment of Asbestos Trustees.  On the Effective Date, the Bankruptcy Court shall appoint the individuals designated by the Asbestos Claimants Committee and Future Claimants' Representative and identified in the Asbestos Trust Agreement to serve

as the initial Asbestos Trustees. Such appointments shall be effective as of the Effective Date. The Asbestos Claimants Committee and Future Claimants' Representative have designated LeAnne Jackson, Allen Schwartz, and Hon. George Silver to serve as the initial Asbestos Trustees. All subsequent Asbestos Trustees shall be appointed in accordance with the terms of the Asbestos Trust Agreement. For purposes of performing the duties and fulfilling the obligations under the Asbestos Trust Agreement and this Plan, the Asbestos Trustees shall be deemed to be a party or parties in interest within the meaning of section 1109(b) of the Bankruptcy Code.

(e)     Appointment of Post-Effective Date Future Claimants' Representative. On the Effective Date, James L. Patton, Jr. shall be appointed, pursuant to this Plan, the Confirmation Order, and the Asbestos Trust Agreement, as the Post-Effective Date Future Claimants' Representative. The Post-Effective Date Future Claimants' Representative shall have the functions, duties, and rights provided in, and shall serve in accordance with, the Asbestos Trust Agreement. In addition to the foregoing, the Post-Effective Date Future Claimants' Representative also may, at his (or her) option, participate in any: (a) appeal of the Confirmation Order; (b) hearing on a Professional Fee Claim; and (c) adversary proceeding pending on the Effective Date to which the Future Claimants' Representative was a party. Successor Post-Effective Date Future Claimants' Representatives will be appointed as provided in the Asbestos Trust Agreement.

(f)     Appointment of Delaware Trustee. Wilmington Trust, National Association has been selected to serve as the initial Delaware Trustee by agreement of the Asbestos Claimants Committee and the Future Claimants' Representative. Wilmington Trust, National Association will be identified as the initial Delaware Trustee in the Asbestos Trust Agreement or the Plan Supplement and will be appointed as such pursuant to the Confirmation Order. All subsequent Delaware Trustees shall be appointed in accordance with the terms of the Asbestos Trust Agreement.

(g)     Appointment of Asbestos Trust Advisory Committee Members. The Asbestos Claimants Committee has nominated Matthew Bergman of Bergman, Draper, Oslund, Udo; Christopher R. Guinn of Simmons Hanly Conroy; Lisa Nathanson Busch of Weitz & Luxenberg P.C.; John Cooney of Cooney & Conway; Beth Gori of The Gori Law Firm; Peter Kraus of Waters & Kraus LLP; Marcus Raichle, Jr. of Maune Raichle Hartley French & Mudd, LLC; Audrey Raphael of Levy Konigsberg LLP; and Chris Thoron of the O'Brien Law Firm as the initial members of the Asbestos Trust Advisory Committee. The Confirmation Order shall constitute an order of the Bankruptcy Court appointing the initial members of the Asbestos Trust Advisory Committee. The Asbestos Trust Advisory Committee shall have the functions, duties, and rights provided in, and shall serve in accordance with, the Asbestos Trust Agreement. Successor members of the Asbestos Trust Advisory Committee will be appointed as provided in the Asbestos Trust Agreement.

(h)     Transfer of Asbestos Claims and Demands to the Asbestos Trust. In consideration for the property transferred to the Asbestos Trust, on the Effective Date, all liabilities, obligations, and responsibilities relating to all present and future Asbestos Claims, including, without limitation, Demands, shall be transferred and channeled to the Asbestos Trust and shall be satisfied solely by the Asbestos Trust Assets. The Asbestos

34

Trust shall have no liability for any Claims other than Asbestos Claims, and no Claims other than Asbestos Claims shall be transferred and channeled to the Asbestos Trust.

(i)      Transfer of Rights and Defenses Related to Asbestos Claims.  With the exception of those claims released by the Debtor pursuant to Section 10.5 of this Plan, on the Effective Date all claims, defenses, rights and Causes of Action of the Debtor and Reorganized Debtor relating to Asbestos Claims shall be transferred and assigned to the Asbestos Trust.  In accordance with section 1123(b) of the Bankruptcy Code, the Asbestos Trust shall retain and may enforce such claims, defenses, rights, and Causes of Action and shall retain and may enforce all defenses and counterclaims to all Claims or Demands asserted against the Asbestos Trust, including, but not limited to, setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code; *provided*, *however*, that no such claims, defenses, Causes of Action, or counterclaims may be asserted against any Protected Party.  The Asbestos Trust shall be deemed to be the appointed representative of the Debtor and Reorganized Debtor as to Asbestos Claims, and may pursue, litigate, compromise, and settle any rights, claims, or Causes of Action transferred to it, as appropriate.

(j)      Asbestos Claimant Release.  In connection with the resolution of Asbestos Claims, the Asbestos Trust Distribution Procedures shall provide on the Effective Date, and shall not thereafter cease to provide, that all Holders of Asbestos Claims shall execute an Asbestos Claimant Release as a precondition to receiving payment on account of their Asbestos Claims from the Asbestos Trust.  The Asbestos Claimant Release shall be substantially in the form attached hereto as Exhibit D.  The Asbestos Trustees may modify the provisions of the Asbestos Claimant Release with the consent of the Asbestos Trust Advisory Committee and the Post-Effective Date Future Claimants' Representative; *provided*, *however*, that no such change shall be inconsistent with the terms of this Plan or the Confirmation Order and/or modify in any way the releases and injunctions contained in this Plan or the Confirmation Order.

(k)      Asbestos Trust Indemnification.  The Asbestos Trust shall, pursuant to the Asbestos Trust Agreement, indemnify and hold harmless each of the Protected Parties, against any liability arising out of any Asbestos Claim or any violation of the Asbestos Channeling Injunction by any Entity, as and to the extent provided in the Asbestos Claims Indemnification Agreement.

(l)      Books and Records.   On the Effective Date, the Asbestos Records Cooperation Agreement shall become effective, and the Asbestos Records shall be treated in accordance therewith.

(m)      Institution and Maintenance of Legal and Other Proceedings.  From and after the Effective Date, the Asbestos Trust shall be empowered and entitled, in its sole and absolute discretion and at its own expense, to pursue, compromise or settle all legal actions and other proceedings related to any asset, liability, or responsibility of the Asbestos Trust that is not released pursuant to this Plan.

(n)      Asbestos Trust Expenses.  The Asbestos Trust shall pay all Asbestos Trust Expenses from the Asbestos Trust Assets.  Neither the Debtor, the Debtor's Estate, the Reorganized Debtor, nor any other Protected Party shall have any obligation to pay any

Asbestos Trust Expenses or any other liabilities of the Asbestos Trust.  The Asbestos Trust shall promptly pay all Asbestos Trust Expenses incurred by the Debtor or Reorganized Debtor for any and all liabilities, costs, or expenses as a result of taking any action on behalf of, and at the direction of, the Asbestos Trust.

**8.4**     **Amended Organizational Documents.**  The Amended Organizational Documents shall contain such provisions as are necessary to satisfy the provisions of this Plan and, to the extent necessary, to prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code.   Notwithstanding the foregoing, the Amended Organizational Documents may be amended after the Effective Date as permitted by applicable law.  Except as otherwise provided herein, such Amended Organizational Documents shall contain indemnification provisions applicable to the officers and employees of the Reorganized Debtor and such other Entities as may be deemed appropriate in the discretion of the Reorganized Debtor and will provide for the authorization and issuance of the Reorganized Debtor's Equity Interests.

**8.5**     **Net Reserve Funds**.  No later than three (3) Business Days prior to the Effective Date, the Debtor shall issue a support request (the "**Support Request**") to O-I Glass pursuant to the Support Agreement to the extent necessary to ensure that, as of the Effective Date, the Debtor shall be able to fully fund the Professional Fee Escrow Account and shall hold no less than $10 million in Cash as of the Effective Date in Net Reserve Funds.  The Net Reserve Funds shall be used for the sole purpose of (i) satisfying Claims which are Allowed Administrative Expense Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Secured Claims, and Allowed General Unsecured Claims, to the extent such Claims are not otherwise addressed or satisfied in accordance with this Plan, including the payment of any interest on such Claims that may be Allowed under this Plan or required to be paid by the Bankruptcy Code; and (ii) fulfilling any obligations under the Payment Note.  The O-I Glass Indemnification Agreements shall contain terms governing O-I Glass's indemnification obligations in respect of any additional amounts necessary to satisfy Covered Claims and Environmental Claims or Causes of Action.  Any Net Reserve Funds remaining after (i) the satisfaction in full of Allowed Administrative Expense Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Secured Claims, and Allowed General Unsecured Claims, including the payment of any interest on such Claims that may be Allowed under this Plan or required to be paid by the Bankruptcy Code and (ii) the fulfillment of all obligations under the Payment Note, shall be retained by the Reorganized Debtor for general corporate purposes or returned to O-I Glass, as determined by the Reorganized Debtor.

**8.6**     **Corporate Governance of Reorganized Debtor**.  On the Effective Date, (a) the current officers and managers of the Debtor shall be deemed to resign their respective positions by operation of this Plan and (b) the individual(s) identified in the Plan Supplement shall be appointed to serve as the officers and the directors or managers of the Reorganized Debtor.

**8.7**     **Operations of the Debtor Between Confirmation and the Effective Date**.  The Debtor shall continue to operate as a debtor and debtor-in-possession during the period from the Confirmation Date through and until the Effective Date.

**8.8**     **Corporate Action**.  All matters provided for under this Plan involving the corporate structure of the Debtor or Reorganized Debtor, or any corporate action to be taken by,

36

or required of the Debtor or Reorganized Debtor, shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the equity-holders, managers or directors of such entity.

**8.9    Effectuating Documents; Further Transactions**.   Any officer, member or manager of or director of the Debtor or Reorganized Debtor, as the case may be, shall be, and hereby is, authorized to execute, deliver, File, and record such contracts, instruments, releases, indentures, certificates, and other agreements or documents, and take such other actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan. The Secretary or other appropriate officer of the Debtor is hereby authorized to certify or attest to any of the foregoing, if necessary.

The Debtor or Reorganized Debtor, and all other parties, including all Holders of Claims entitled to receive Distributions under this Plan, shall execute any and all documents and instruments that must be executed under or in connection with this Plan in order to implement the terms of this Plan or to effectuate the Distributions under this Plan, *provided that* such documents and instruments are reasonably acceptable to such party or parties.

**8.10    Environmental Claims or Causes of Action.**   No bar date has been established in the Chapter 11 Case for the filing of Environmental Claims or Causes of Action, and Holders of Environmental Claims or Causes of Action are not required to, and should not, File Proofs of Claim in the Chapter 11 Case on account of such Environmental Claims or Causes of Action. The Debtor, the Reorganized Debtor, and O-I Glass, as applicable, reserve the right to object to any Environmental Claims or Causes of Action for which a Proof of Claim is Filed, *provided*, *however*, that the Debtor or Reorganized Debtor, as applicable, reserves the right to agree to the allowance of any Environmental Claim of Cause of Action Filed in the Chapter 11 Case.

Pursuant to the Environmental Claims or Causes of Action Indemnification Agreement and this Plan, O-I Glass will indemnify, defend, pay the defense costs for, and hold harmless the Reorganized Debtor from and against any Environmental Claims or Causes of Action and associated costs, expenses, actions, suits, controversies, damages, demands, debts, liabilities or obligations of any nature as set forth in and to the extent provided under the Environmental Claims or Causes of Action Indemnification Agreement.   Any Governmental Authority asserting any Environmental Claim or Cause of Action shall be an express third party beneficiary of the Environmental Claims or Causes of Action Indemnification Agreement as set forth in the Environmental Claims or Causes of Action Indemnification Agreement, and, subject to the Debtor's and Reorganized Debtor's rights to object to any Filed Proof of Claim, the Reorganized Debtor and O-I Glass shall have no authority to modify the rights of express third party beneficiaries in any manner whatsoever.   Unless otherwise objected to in the Bankruptcy Court in accordance with the prior sentence or Allowed pursuant to written agreement with the Debtor or Reorganized Debtor, each Environmental Claim or Cause of Action that Paddock agreed it was liable for under Section 2 of the Agreement and Plan of Merger dated December 26, 2019 shall pass through this Plan and shall be neither Allowed nor Disallowed for purposes of this Plan.   The Holder of any such Environmental Claim or Cause of Action shall retain all legal, equitable, and contractual rights to which such Environmental Claim or Cause of Action entitles such Holder, subject to the rights of the Debtor, the Reorganized Debtor and, as set forth in the Environmental Claims or Causes of Action Indemnification Agreement, O-I Glass, pursuant to the Environmental

Claims or Causes of Action Indemnification Agreement and this Plan, to contest or otherwise defend against such Environmental Claim or Cause of Action in any court of competent jurisdiction when and if such Environmental Claim or Cause of Action is sought to be enforced. Notwithstanding any provision in this Plan, the Environmental Claims or Causes of Action Indemnification Agreement, the Plan Supplement, the Confirmation Order or other related Plan documents, nothing discharges or releases the Debtor, the Reorganized Debtor, or any non-debtor from any Environmental Claims or Causes of Action or impairs the ability of any Holder of an Environmental Claim or Cause of Action to pursue such Environmental Claim or Cause of Action against the Debtor, Reorganized Debtor or any non-debtor; *provided, however*, that nothing in the foregoing statement shall limit or otherwise derogate from the releases contained in <u>Section 10.5</u> of this Plan. Environmental Claims or Causes of Action shall be, subject to any applicable legal or equitable rights or defenses of the Debtor or Reorganized Debtor under applicable non-bankruptcy law, paid, treated, determined and administered in the ordinary course of business as if the Chapter 11 Case were never filed. All Environmental Claims or Causes of Action shall survive the Chapter 11 Case as if it had not been commenced and be determined in the ordinary course of business, including in the manner and, subject to <u>Section 4.8</u> of the Environmental Claims or Causes of Action Indemnification Agreement, by the administrative or judicial tribunals in which such rights, claims, liabilities, defenses or Causes of Action would have been resolved or adjudicated if the Chapter 11 Case had not been commenced; *provided, that* nothing in the Plan Documents shall alter any legal or equitable rights or defenses of the Debtor or the Reorganized Debtor under non-bankruptcy law with respect to any such claim, liability, or Cause of Action.

Pursuant to the Environmental Claims or Causes of Action Indemnification Agreement, the Reorganized Debtor shall have control over the performance of any work or obligations, if any, related to any Environmental Claims or Causes of Action.

For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan Documents, no party shall have any recourse against the Asbestos Trustees or against Asbestos Trust Assets on account of any Environmental Claims or Causes of Action.


# ARTICLE IX.

## EFFECT OF CONFIRMATION

**9.1    Dissolution of Asbestos Claimants Committee; Discharge of the Future Claimants' Representative**. Effective on the Effective Date, the Asbestos Claimants Committee shall be dissolved automatically, whereupon its members, Professionals, and agents shall be released and discharged from any further authority, duties, obligations and responsibilities in the Chapter 11 Case and under the Bankruptcy Code. Notwithstanding the foregoing, the Asbestos Claimants Committee may, at its option and without taking any action or seeking or receiving any approval, continue to serve and function after the Effective Date for the purposes of participating in any: (a) appeal of any order entered in the Chapter 11 Case, including without limitation the Confirmation Order; (b) hearing on a Professional Fee Claim; (c) adversary proceeding pending on the Effective Date to which the Asbestos Claimants Committee was a participant; and/or (d) motions or other actions seeking enforcement or implementation of the provisions of the Plan or

the Confirmation Order, in which the Asbestos Claimants Committee or Future Claimants' Representative, as applicable, is a participant as of the Effective Date.  To the extent that the Asbestos Claimants Committee determines to continue to serve and function after the Effective Date pursuant to the preceding sentence, the Asbestos Claimants Committee shall dissolve upon the termination of all (a) appeals of any orders entered in the Chapter 11 Case, including without limitation the Confirmation Order; (b) hearings on a Professional Fee Claim; (c) adversary proceedings pending on the Effective Date to which the Asbestos Claimants Committee was a participant; and/or (d) motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order, in which the Asbestos Claimants Committee or Future Claimants' Representative, as applicable, is a participant as of the Effective Date.

In addition, effective as of the Asbestos Claimants Committee's dissolution, the Asbestos Trust Advisory Committee shall succeed to, and exclusively hold, the attorney-client privilege and any other privilege held by the Asbestos Claimants Committee and shall enjoy the work product protections that were applicable or available to the Asbestos Claimants Committee before its dissolution.

Effective on the Effective Date, the Future Claimants' Representative shall be discharged from his duties in such capacity, whereupon the Future Claimants' Representative and his Professionals and agents shall be released and discharged from any further authority, duties, obligations and responsibilities in the Chapter 11 Case and under the Bankruptcy Code.

The Reorganized Debtor shall pay, in accordance with any applicable fee and expense procedures promulgated during the Chapter 11 Case and with Section 2.2(c) and subject to Section 8.3(k) above: (i) the reasonable and documented fees and expenses incurred by the Future Claimants' Representative, the Asbestos Claimants Committee, and their respective Professionals through the Effective Date and (ii) the reasonable and documented fees and expenses incurred by the Asbestos Claimants Committee, the Post-Effective Date Future Claimants' Representative, and their respective Professionals following the Effective Date (if any) in connection with participating in any: (a) appeal of any order entered in the Chapter 11 Case, including without limitation the Confirmation Order; (b) hearing on a Professional Fee Claim; (c) adversary proceeding pending on the Effective Date to which the Asbestos Claimants Committee or Future Claimants' Representative, as applicable, was a participant; and/or (d) motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order pending on the Effective Date to which the Asbestos Claimants Committee or Future Claimants' Representative, as applicable, was a participant.  All reasonable and necessary post-Effective Date fees and expenses of the professionals retained by the Asbestos Trust Advisory Committee and the Post-Effective Date Future Claimants' Representative (except as provided in the preceding sentence) shall be paid exclusively by the Asbestos Trust in accordance with the terms of the Asbestos Trust Agreement, and the Reorganized Debtor shall not be liable for any such fees and expenses.  The parties shall attempt to resolve any dispute regarding the payment of such fees and expenses in good faith, and if they shall fail to resolve such dispute, they shall submit the dispute to the Bankruptcy Court for resolution.

**9.2     Vesting of Assets**.  Pursuant to section 1141(b) of the Bankruptcy Code, except as otherwise provided in this Plan (including but not limited to Section 7.1), the Plan Documents or the Confirmation Order, the property of the Debtor's Estate (except for any other property of the

Debtor distributed pursuant to this Plan) shall vest in the Reorganized Debtor on the Effective Date free and clear of any and all Liens, Claims, Encumbrances and other interests of any Entity. From and after the Effective Date, the Reorganized Debtor may operate its businesses and may use, acquire, and dispose of property free of any restrictions imposed under or by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court. Without limiting the generality of the foregoing, the Reorganized Debtor may, without application to, or approval by, the Bankruptcy Court, pay professional fees and expenses that the Reorganized Debtor may incur after the Effective Date.

  **9.3**  **Preservation of Certain Causes of Action, Rights to Settle Claims and Compromise Controversies, and Defenses**. With the exception of those claims released by the Debtor pursuant to <u>Section 10.5</u> of this Plan, transferred to the Asbestos Trust pursuant to <u>Section 8.3</u> of this Plan, or otherwise governed by the terms of the O-I Glass Indemnification Agreements, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor, as successor in interest to the Debtor and its Estate, shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing), all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, accruing to, or that are property of, the Debtor and its Estate pursuant to the Bankruptcy Code or any statute or legal theory, including any rights, claims, and Causes of Action against third parties based upon, attributable to, or arising out of Allowed Claims, in its sole and absolute discretion, without the necessity for Bankruptcy Court approval under Bankruptcy Rule 9019, and the Reorganized Debtor shall retain and may enforce all defenses and counterclaims to all Claims asserted against the Debtor or its Estate, including, but not limited to, setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code. From and after the Effective Date, the Asbestos Trust and/or the Reorganized Debtor, as appropriate based on the assets and liabilities retained or owed by each respectively, shall be authorized to compromise any controversies on such terms as each may determine, in its sole discretion, to be appropriate, without notice to any other party or approval of or notice to the Bankruptcy Court. Notwithstanding anything in this <u>Section 9.3</u> to the contrary, neither the Debtor nor the Reorganized Debtor shall have any rights to pursue any Avoidance Actions against (i) any person on account of a payment or other transfer received from the Debtor as compensation for, or otherwise related to, an Asbestos Claim or (ii) any Protected Party.

  **9.4**  **Terms of Injunction and Automatic Stay**. All of the injunctions and/or stays in existence immediately prior to the Confirmation Date provided for in or in connection with the Chapter 11 Case, whether pursuant to section 105, 362, or any other provision of the Bankruptcy Code, the Bankruptcy Rules or other applicable law, shall remain in full force and effect until the injunctions set forth in this Plan become effective pursuant to a Final Order, and shall continue to remain in full force and effect thereafter as and to the extent provided by this Plan, the Confirmation Order, or by their own terms. For the avoidance of doubt, upon effectiveness of the injunctions set forth in this Plan, the automatic stay imposed by section 362 of the Bankruptcy Code shall be terminated. In addition, on and after the Confirmation Date, the Debtor may seek such further orders as it may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

  Each of the injunctions contained in this Plan or the Confirmation Order shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided in this Plan or the Confirmation Order.

US-DOCS\123556013.57

**9.5    No Successor Liability**.  Except as otherwise expressly provided in this Plan (including, for the avoidance of doubt, <u>Section 8.10</u> and those provisions of the Plan providing for the reinstatement and/or pass-through of Claims), the Debtor, the Reorganized Debtor, the other Protected Parties, and the Asbestos Trust do not, nor shall they be deemed to, assume, agree to perform, pay, or indemnify creditors for any liabilities or obligations of the Debtor relating to or arising out of the operations of, or assets of, the Debtor whether arising prior to or resulting from actions, events, or circumstances occurring or existing at any time prior to the Confirmation Date. None of the Reorganized Debtor, the other Protected Parties, or the Asbestos Trust is, or shall be, a successor to the Debtor by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Reorganized Debtor and the Asbestos Trust shall assume the obligations specified expressly in this Plan and the Confirmation Order.

## ARTICLE X.

## RELEASES, INJUNCTIONS AND INDEMNIFICATION OF CLAIMS

**10.1    Discharge of Debtor**.  Except as specifically provided in this Plan or in the Confirmation Order, pursuant to sections 524 and 1141(d)(1)(A) of the Bankruptcy Code, confirmation of this Plan shall discharge the Debtor and the Reorganized Debtor on the Effective Date from any and all Claims of any nature whatsoever, including, without limitation, all Claims and liabilities that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code whether or not: (a) a Proof of Claim based on such Claim was Filed under section 501 of the Bankruptcy Code, or such Claim was listed on any of the Schedules; (b) such Claim is or was allowed under section 502 of the Bankruptcy Code; or (c) the Holder of such Claim has voted on or accepted this Plan.  Except as otherwise specifically provided for in this Plan, as of the Effective Date, the rights provided in this Plan to Holders of Claims and Equity Interests shall be in exchange for and in complete satisfaction, settlement and discharge of all Claims (including, without limitation, Asbestos Claims) against, Liens on, and Equity Interests in the Debtor and all of its assets and properties.

**10.2    Debtor's Discharge Injunction.  Except as specifically provided in this Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims against the Debtor are permanently enjoined, on and after the Effective Date, from: (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Reorganized Debtor, or their respective property with respect to such Claim, other than to enforce any right to a Distribution pursuant to this Plan; (b) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, or their respective property with respect to such Claim, other than as permitted pursuant to (a) above; (c) creating, perfecting, or enforcing any Encumbrance of any kind against the Debtor, the Reorganized Debtor, or their respective property with respect to such Claim; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to the Debtor or against the property or interests in property of the Debtor, with respect to such Claim; and/or (e) commencing or continuing any action, in any manner and in any place in the world, against the Debtor, the Reorganized Debtor, or their respective property that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order.  The foregoing injunction shall**

extend to the successors of the Debtor (including, without limitation, the Reorganized Debtor) and its properties and interests in property. The discharge provided in this provision shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim.

10.3  **Asbestos Channeling Injunction**.

(a)  **Terms**. Pursuant to section 524(g) of the Bankruptcy Code, from and after the Effective Date the sole recourse of any Holder of an Asbestos Claim or Demand on account of such Asbestos Claim or Demand shall be to the Asbestos Trust pursuant to this Section 10.3 and the Asbestos Trust Distribution Procedures, and such Holder shall have no right whatsoever at any time to assert its Asbestos Claim or Demand against any Protected Party or any property or interest in property of any Protected Party. On and after the Effective Date, all present and future Holders of Asbestos Claims and Demands shall be permanently and forever stayed, restrained, barred and enjoined from taking any actions for the purpose of, directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Asbestos Claim or Demand other than from the Asbestos Trust pursuant to the Asbestos Trust Documents, including, but not limited to, the following:

(i)  commencing, conducting, or continuing in any manner, directly, indirectly or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party or any property or interests in property of any Protected Party;

(ii)  enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party;

(iii)  creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party;

(iv)  setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and

(v)  proceeding in any manner in any place with regard to any matter that is within the scope of the matters designated by this Plan to be subject to resolution by the Asbestos Trust, except in conformity and compliance with the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures.

(b)     **Reservations**.   This Asbestos Channeling Injunction shall not stay, restrain, bar, or enjoin:

(i)     the rights of Holders of Asbestos Claims (including Demands) to the treatment accorded to Class 3 as described in this Plan, including without limitation the right to assert Asbestos Claims (including Demands) against the Asbestos Trust in accordance with the Asbestos Trust Distribution Procedures;

(ii)    the rights of Entities to assert any Claim, debt, obligation, or liability for payment of Asbestos Trust Expenses against the Asbestos Trust; and

(iii)   the rights of Entities to assert any Claim, debt, obligation, or liability for payment against an Entity that is not a Protected Party unless otherwise enjoined by order of the Bankruptcy Court (including but not limited to the Confirmation Order).

(c)     **Modifications**.   There shall be no modification, dissolution, or termination of the Asbestos Channeling Injunction, which shall be a permanent injunction.

(d)     **Non-Limitation of Asbestos Channeling Injunction**.   Nothing in the Asbestos Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Asbestos Channeling Injunction issued in connection with this Plan or the Asbestos Trust's assumption of all liabilities and responsibility for the Asbestos Claims.

(e)     Any Protected Party may enforce the Asbestos Channeling Injunction as a defense to any Claim brought against such Protected Party that is enjoined under this Plan as to such Protected Party and may seek to enforce such injunction in a court of competent jurisdiction.

**10.4    Exculpation**.  None of the Exculpated Parties shall have or incur any liability to any Entity for any act or omission taken on or after the Petition Date through and including the Effective Date in connection with, related to, or arising out of: (a) the Chapter 11 Case; (b) negotiation, formulation and preparation of this Plan and the other Plan Documents, and any of the terms and/or settlements and compromises reflected in this Plan and the other Plan Documents; (c) pursuit of confirmation of this Plan; (d) consummation of this Plan, or administration of this Plan or the property to be distributed under this Plan or the Asbestos Trust Distribution Procedures; or (e) the releases and injunctions contained in this Plan, except for any liability that results from such Entity's criminal acts, actual fraud, willful misconduct, or gross negligence as determined by a Final Order, and, in all respects, the Debtor, the Reorganized Debtor, and each of the other Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities in and under the Chapter 11 Case, this Plan and the Plan Documents.

**10.5**    **Releases by Debtor and Its Estate and Related Injunction.**

(a)    **Except as otherwise expressly provided in this Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, the Reorganized Debtor, and any Entity seeking to exercise the rights of the Estate, in each case, whether individually or collectively, including, without limitation, any successor to the Debtor or any Estate representative appointed or selected pursuant to the applicable provisions of the Bankruptcy Code, shall, and shall be deemed to, irrevocably, completely and forever release, waive and discharge unconditionally the Released Parties from any and all claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action and liabilities which any of the Debtor, the Reorganized Debtor, or the Estate is entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, whether direct, indirect, or derivative, based upon, attributable to, or in any manner arising out of, in whole or in part, any act, omission, transaction, event, occurrence, or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) (other than the rights under this Plan, the Plan Documents, and the contracts, instruments, releases and other agreements or documents delivered or to be delivered hereunder).**

(b)    **Except as provided in this Plan or the Confirmation Order, the Debtor, the Reorganized Debtor, and any Entity seeking to exercise the rights of the Estate, in each case, whether individually or collectively, including, without limitation, any successor to the Debtor or any Estate representative appointed or selected pursuant to the applicable provisions of the Bankruptcy Code, are permanently enjoined from taking any actions on account of or based upon any and all Claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action and liabilities released pursuant to this <u>Section 10.5</u>, including but not limited to the following: (a) commencing or continuing any action or other proceeding against the Released Parties or their respective property; (b) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Released Parties or their respective property; (c) creating, perfecting or enforcing any Encumbrance against the Released Parties or their respective property; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to the Released Parties or against their respective property; and (e) commencing or continuing any action, in any manner and in any place in the world, against the Released Parties that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order.**

**10.6    Releases by Holders of Claims.  As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Releasing Parties shall be deemed to irrevocably and forever release, waive, and discharge all claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action, losses, and liabilities whatsoever against the Released Parties, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing**

or hereinafter arising, in law, equity, contract, tort or otherwise, based in whole or in part upon any act, omission, event, transaction, occurrence, or any other circumstance taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating or connected to the Debtor, the Estate, the Debtor's assets and properties, the conduct of the Debtor's (or any predecessor's) businesses, the Prepetition Restructuring Transaction, the Chapter 11 Case, this Plan (including the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated by this Plan), the Plan Documents, or the Reorganized Debtor, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Case or the negotiation, formulation, preparation or implementation thereof, the pursuit of confirmation of this Plan, the administration and implementation of this Plan, the solicitation of votes with respect to this Plan, the Distribution of property under this Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing (other than the rights under this Plan, the Plan Documents, and the contracts, instruments, releases and other agreements or documents delivered or to be delivered hereunder), including, for the avoidance of doubt, any and all Causes of Action that the Holder of an Asbestos Claim, the Asbestos Claimants Committee, the Asbestos Trust, or the Future Claimants' Representative did or could have commenced against any current or former officer, manager, or director of the Debtor (in such capacity) that is based upon, related to, or arising from any acts or omissions of such officer, manager, or director occurring prior to the Effective Date on account of such Asbestos Claim, to the fullest extent permitted under section 524(g) of the Bankruptcy Code and applicable law (as now in effect or subsequently extended), other than Claims or Causes of Action arising out of any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted a criminal act, actual fraud, gross negligence or willful misconduct.

**10.7    Injunction Related to Releases.  Except as otherwise provided in this Plan, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any of the following released pursuant to this Plan: Claims, commitments, obligations, suits, judgments, damages, Demands, debts, claims, causes of action and liabilities (collectively, the "Enjoined Matters").**

**10.8    Certain Waivers**.  Although the Debtor does not believe that California law is applicable to this Plan, nevertheless, in an abundance of caution, the Debtor hereby understands and waives the effect of section 1542 of the California Civil Code to the extent that such section is applicable to the Debtor or the Estate.  Section 1542 of the California Civil Code provides:

> §1542.  A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

**THE DEBTOR AGREES TO ASSUME THE RISK OF ANY AND ALL UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF**

**ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS WHICH ARE RELEASED BY THIS PLAN, AND THE DEBTOR HEREBY WAIVES AND RELEASES ALL RIGHTS AND BENEFITS WHICH IT OR THE ESTATE MIGHT OTHERWISE HAVE UNDER THE AFOREMENTIONED SECTION 1542 OF THE CALIFORNIA CIVIL CODE WITH REGARD TO THE RELEASE OF SUCH UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS.  TO THE EXTENT (IF ANY) ANY OTHER LAWS SIMILAR TO SECTION 1542 OF THE CALIFORNIA CIVIL CODE MAY BE APPLICABLE, THE DEBTOR WAIVES AND RELEASES ANY BENEFIT, RIGHT OR DEFENSE WHICH IT OR THE ESTATE MIGHT OTHERWISE HAVE UNDER ANY SUCH LAW WITH REGARD TO THE RELEASE OF UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS.**

**10.9    Disallowed Claims**.  On and after the Effective Date, the Debtor and the Estate shall be fully and finally discharged from any liability or obligation on all Disallowed Claims, and any order creating a Disallowed Claim that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.

**10.10    Indemnification Obligations**. For purposes of this Plan, the obligations of the Debtor to indemnify and reimburse Persons who are or were managers or officers of the Debtor prior to or following the Petition Date against and for any obligations as provided in the Debtor's organizational documents, bylaws, applicable state law, or other agreement, or any combination of the foregoing, shall survive confirmation of this Plan, remain unaffected thereby, and not be discharged in accordance with section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Petition Date.  Such obligations shall be assumed by the Reorganized Debtor on the Effective Date, and the Reorganized Debtor shall be indemnified by O-I Glass on account of such obligations pursuant to the Covered Claims Indemnification Agreement.  In furtherance of the foregoing, the Reorganized Debtor shall use its commercially reasonable efforts to maintain or procure, as of the Effective Date, insurance for the benefit of such managers and officers, at levels satisfactory to the Reorganized Debtor.

**10.11    Reservation for SEC**.  Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan, and/or the Confirmation Order, no provision of this Plan or the Confirmation Order shall (i) preclude the United States Securities and Exchange Commission ("**SEC**") from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair, or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debto**r** person or entity in any forum.

**10.12    Governmental Units**.  Nothing in this Plan, Plan Documents, or Confirmation Order discharges, releases, precludes or enjoins: (i) any Unimpaired claim or liability to a governmental unit as defined in <u>11 U.S.C. § 101(27)</u> ("**Governmental Unit**"); (ii) any liability to a Governmental Unit that is not a "claim" as defined in <u>11 U.S.C. § 101(5)</u> ("**Claim**"); (iii) any

Claim of a Governmental Unit arising on or after the Effective Date; (iv) any liability to a Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the Effective Date; (v) any liability to a Governmental Unit on the part of any non-Debtor; or (vi) any liability of any debtor, non-debtor, or any other person or entity under criminal laws of any Governmental Unit.  Nothing in this Plan, Plan Documents, or Confirmation Order authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law; *provided*, *however*, that nothing in this paragraph shall limit or supervene (v) Section 10.2 (as to Claims), (w) Section 10.3, (x) Section 10.5, (y) Section 10.6, or (z) Section 10.7 (as to Enjoined Matters) of this Plan; *provided further* that the only injunctive effect of Section 10.7 on the United States shall be to enforce the releases contained in Section 10.5 of the Plan.  Nothing in this paragraph shall diminish the scope of any exculpation provided under Section 10.4.  Nothing in this Plan, Plan Documents, or Confirmation Order shall impair any valid setoff or recoupment rights of any Governmental Authority.  Nothing in this Plan, Plan Documents, or Confirmation Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret the Confirmation Order or to adjudicate any defense asserted under the Confirmation Order.

## ARTICLE XI.

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

**11.1    Conditions Precedent to Confirmation of the Plan**.  Unless satisfied or waived pursuant to the provisions of Section 11.3 hereof, the following are conditions precedent to confirmation of this Plan.

(a)    The Bankruptcy Court shall have entered an order, acceptable in form and substance to the Plan Proponents, approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code;

(b)    All provisions, terms, and conditions hereof are approved in the Confirmation Order;

(c)    The Confirmation Order shall be entered in form and substance acceptable to the Debtor, the Asbestos Claimants Committee, the Future Claimants' Representative, and O-I Glass;

(d)    The Confirmation Order shall, among other things:

(1)    order that the Confirmation Order shall supersede any Bankruptcy Court orders issued prior to the Confirmation Date that may be inconsistent with the Confirmation Order;

(2)    authorize the implementation of this Plan in accordance with its terms;

47

(3)      approve the Asbestos Channeling Injunction set forth in this Plan;

(4)      provide that the Asbestos Trust shall receive the Payment Note and enter into the Pledge Agreement on the Effective Date;

(5)      provide that the Asbestos Trust and the other parties thereto shall execute and deliver the Asbestos Claims Indemnification Agreement;

(6)      provide that all transfers of assets of the Debtor contemplated under this Plan shall be free and clear of all Claims and Encumbrances against or on such assets;

(7)      except as otherwise provided in this Plan or Confirmation Order, provide that the assets revesting in the Reorganized Debtor shall be free and clear of all Liens, Claims and Encumbrances;

(8)      provide that any transfers effected or entered into, or to be effected or entered into, under this Plan shall be and are exempt under section 1146(a) of the Bankruptcy Code from any state, city or other municipal transfer taxes, mortgage recording taxes and any other stamp or similar tax;

(9)      provide that the transfers of property by the Debtor to the Reorganized Debtor (A) are or will be legal, valid, and effective transfers of property; (B) vest or will vest the Reorganized Debtor with good title to such property; (C) do not and will not constitute avoidable transfers under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law; and (D) do not and will not subject the Reorganized Debtor to any liability by reason of such transfer under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, any laws affecting or effecting successor or transferee liability;

(10)      provide that all Executory Contracts assumed or assumed and assigned by the Debtor during the Chapter 11 Case or under this Plan, if any, shall remain in full force and effect for the benefit of the Reorganized Debtor or the assignee thereof notwithstanding any provision in such contract (including those provisions described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables or requires termination of such contract or lease;

(11)      provide that any Executory Contract shall be deemed rejected as of the Effective Date to the extent set forth in, and consistent with, Article VII hereof;

(12)      require that as a condition to receiving any distributions of any kind from the Asbestos Trust, each holder of an Asbestos Claim execute an Asbestos Claimant Release;

(13)      approve in all respects the other settlements, transactions and agreements to be effected pursuant to this Plan, including, without limitation, the

48

Asbestos Trust Agreement, the Asbestos Trust Distribution Procedures, and the other Asbestos Trust Documents, and the releases of the Released Parties contained in this Plan; and

(14)     provide that O-I Glass and the Reorganized Debtor shall enter into the O-I Glass Indemnification Agreements.

(e)     In addition to the foregoing, the Confirmation Order shall contain the following findings of fact and conclusions of law, among others:

(1)     This Plan complies with all applicable provisions of the Bankruptcy Code, including, without limitation, those requiring that this Plan be proposed in good faith and that the Confirmation Order not be procured by fraud;

(2)     This Plan and its acceptance otherwise comply with sections 524(g) and 1126 of the Bankruptcy Code, and confirmation of this Plan is in the best interests of all creditors;

(3)     This Plan does not provide for the liquidation of all or substantially all of the property of the Debtor, the Reorganized Debtor will operate as an ongoing business and continue in business, and confirmation of this Plan is not likely to be followed by the liquidation of the Reorganized Debtor or the need for its further financial reorganization;

(4)     As of the Petition Date, the Debtor had been named as a defendant in personal injury, wrongful death or property damage actions seeking recovery for damages allegedly caused by the sale of, manufacture of, presence of, or exposure to, asbestos or asbestos-containing products;

(5)     Upon the Effective Date, the Asbestos Trust shall assume the liabilities of the Debtor with respect to Asbestos Claims (including, but not limited to, Demands);

(6)     The Asbestos Trust is to be funded by the contribution of the Asbestos Trust Assets, including the Asbestos Trust Contributions;

(7)     The Asbestos Trust, by the exercise of rights granted under this Plan, would be entitled to own, if specified contingencies occur, a majority of the voting shares of the Reorganized Debtor;

(8)     The Asbestos Trust is to use its assets and income to pay Asbestos Claims (including, but not limited to, Demands) and Asbestos Trust Expenses;

(9)     The Debtor is likely to be subject to substantial Demands for payment arising out of the same or similar conduct or events that gave rise to the Asbestos Claims, and all such Demands are subject to the Asbestos Channeling Injunction;

US-DOCS\123556013.57

(10)     The actual amounts, numbers, and timing of Demands cannot be determined;

(11)     Pursuit of Demands outside the procedures prescribed by this Plan and the Asbestos Trust Distribution Procedures is likely to threaten this Plan's purpose to deal equitably with Asbestos Claims and Demands;

(12)     This Plan separately classifies Asbestos Claims in Class 3, and at least two-thirds (2/3) in amount and seventy-five percent (75%) of the members in such Class that actually voted on this Plan have voted to accept this Plan;

(13)     The Asbestos Trust will have the sole and exclusive authority as of the Effective Date to satisfy or defend against all Asbestos Claims and Demands;

(14)     Pursuant to: (a) the Asbestos Trust Distribution Procedures; (b) court order; or (c) otherwise, the Asbestos Trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Asbestos Claims or other comparable mechanisms, that provide reasonable assurance that the Asbestos Trust will value, and be in a financial position to pay, current and future Asbestos Claims in substantially the same manner regardless of the timing of the assertion of such Asbestos Claims;

(15)     The Future Claimants' Representative was appointed by the Bankruptcy Court pursuant to section 524(g) of the Bankruptcy Code as part of the proceedings leading to the issuance of the Asbestos Channeling Injunction for the purpose, among other things, of protecting the interests of Future Demand Holders;

(16)     The Asbestos Channeling Injunction is to be implemented in accordance with this Plan and the Asbestos Trust;

(17)     The Asbestos Channeling Injunction is essential to this Plan and the Debtor's reorganization efforts;

(18)     The terms of the Asbestos Channeling Injunction and the other injunctions contained in this Plan, including any provisions barring actions against third parties, are set forth in this Plan and the Disclosure Statement;

(19)     The O-I Glass Contribution is essential to the feasibility of this Plan and the successful reorganization of the Debtor;

(20)     The O-I Glass Contribution constitutes a sufficient basis upon which to provide the Protected Parties with the protections afforded to them under this Plan, the Plan Documents, and the Confirmation Order;

(21)     In light of the benefits provided, or to be provided, to the Asbestos Trust by or on behalf of each Protected Party, the Asbestos Channeling Injunction is fair and equitable to all holders of current and future Asbestos Claims (including Demands); and

(22)     The releases received by the Debtor, the Representatives of the Debtor, and the Released Parties in exchange for the Paddock Trust Contribution and O-I Glass Contribution are essential to the global settlement of Asbestos Claims arising from the conduct or products of the Debtor and its predecessor, Old O-I, reflected in this Plan; and

(f)     The list of Non-Debtor Affiliates set forth on Schedule 1.1(b) attached hereto is acceptable to each of the Plan Proponents.

**11.2     Conditions Precedent to the Effective Date of the Plan**.  The following are conditions precedent to occurrence of the Effective Date that must be satisfied, unless waived in accordance with Section 11.3 below:

(a)     all conditions precedent to the Confirmation Date set forth in Section 11.1 shall have been satisfied or waived in accordance with Section 11.3 and shall continue to be satisfied or waived unless otherwise mutually agreed by the Debtor, the Asbestos Claimants Committee, the Future Claimants' Representative, and O-I Glass, and the Confirmation Date shall have occurred;

(b)     no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending;

(c)     no fact or circumstance shall exist that would prevent the Asbestos Channeling Injunction from coming into full force and effect immediately upon the occurrence of the Effective Date;

(d)     the Asbestos Claims Indemnification Agreement shall have been executed and delivered, and no fact or circumstance shall exist that prevents the Asbestos Claims Indemnification Agreement from being in full force and effect immediately upon the occurrence of the Effective Date;

(e)     the Covered Claims Indemnification Agreement shall have been executed and delivered, and no fact or circumstance shall exist that prevents the Covered Claims Indemnification Agreement from being in full force and effect immediately upon the occurrence of the Effective Date;

(f)     the Environmental Claims or Causes of Action Indemnification Agreement shall have been executed and delivered, and no fact or circumstance shall exist that prevents the Environmental Claims or Causes of Action Indemnification Agreement from being in full force and effect immediately upon the occurrence of the Effective Date;

(g)     the Asbestos Trust shall have been funded in accordance with Section 8.3(c);

(h)     the Debtor shall have received any Cash requested from O-I Glass pursuant to Section 8.5 above;

(i)     the list of Non-Debtor Affiliates set forth on Schedule 1.1(b) attached hereto is acceptable to each of the Plan Proponents;

(j)      all Plan Documents shall have been executed and delivered; and

(k)      all other actions, documents and agreements necessary to implement those provisions of this Plan to be effectuated on or prior to the Effective Date, in form and substance satisfactory to the Debtor, shall have been effected or executed and delivered.

**11.3    Waiver of Conditions Precedent**.  To the fullest extent permitted by law, any of the conditions precedent set forth in <u>Sections 11.1</u> and <u>11.2</u>, except <u>Section 11.1(d)(14)</u> and <u>Section 11.2(f)</u>, above may be waived or modified, in whole or in part, by mutual agreement of the Plan Proponents (which agreement shall not be unreasonably withheld), or by order of the Bankruptcy Court.  Any such waiver or modification may be effected at any time without leave or order of the Bankruptcy Court or District Court, and without any other formal action.

**11.4    Failure to Achieve the Effective Date**.  If each of the conditions to the Effective Date is not met or duly waived in accordance with <u>Section 11.3</u>, then upon motion by the Debtor, with the consent of O-I Glass, the Asbestos Claimants Committee, and the Future Claimants' Representative, which consent shall not be unreasonably withheld, and notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order shall be vacated by the Bankruptcy Court.  If (a) the Debtor revokes or withdraws this Plan, (b) the Confirmation Order is vacated, (c) the Confirmation Order does not become a Final Order, or (d) this Plan is confirmed and does not become effective for any other reason, then the rights of all parties in interest in the Chapter 11 Case are and shall be reserved in full.  In any such event, this Plan shall become null and void in all respects; any settlement or compromise embodied in this Plan, any assumption or rejection of Executory Contracts effected by this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and nothing contained in this Plan or the Confirmation Order, if previously entered, and no acts taken in preparation for consummation of this Plan, shall: (a) constitute or be deemed to constitute a waiver, release or settlement of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity, (b) prejudice in any manner the rights of the Debtor or any Entity in any further proceedings involving the Debtor, or (c) constitute an admission of any sort by the Debtor or any other Entity.

**ARTICLE XII.**

**JURISDICTION OF BANKRUPTCY COURT**

**12.1    Retention of Jurisdiction**.  Pursuant to sections 105(a) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court and, to the extent applicable, the District Court, shall, on and after the Effective Date, to the fullest extent permitted by law, retain and have exclusive jurisdiction over all matters arising out of and related to the Chapter 11 Case and this Plan, including, among other things, jurisdiction to:

(a)      hear and determine any and all objections to and proceedings involving the allowance, estimation, classification, and subordination of Claims that have been or properly should have been brought in the Bankruptcy Court (other than Asbestos Claims) or Equity Interests;

(b)      hear and determine all objections to the termination of the Asbestos Trust;

52

(c)     hear and determine such other matters that may be set forth in or arise in connection with this Plan, the Confirmation Order, the Asbestos Channeling Injunction, the Asbestos Trust Agreement, the Asbestos Trust Distribution Procedures, or the O-I Glass Indemnification Agreements;

(d)     hear and determine any proceeding that involves the validity, application, construction, enforceability, or modification of the Asbestos Channeling Injunction;

(e)     hear and determine any conflict or other issues that may arise in the Chapter 11 Case, including the interpretation, implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Case, and in the administration of the Asbestos Trust;

(f)     enter such orders as are necessary to interpret, implement and enforce the releases and injunctions described herein, including, if necessary, in connection with application of the protections afforded by section 524 of the Bankruptcy Code and/or this Plan to the Protected Parties;

(g)     hear and determine any and all applications for allowance of Professional Fee Claims and any other fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or this Plan;

(h)     enter such orders authorizing non-material modifications to this Plan as may be necessary to comply with section 468B of the Internal Revenue Code with respect to the Asbestos Trust;

(i)     hear and determine any applications pending on the Effective Date for the assumption, assumption and assignment, or rejection, as the case may be, of Executory Contracts, and to hear and determine and, if necessary, liquidate any and all Claims arising therefrom;

(j)     hear and determine any and all applications, Claims, Causes of Action, adversary proceedings, and contested or litigated matters that may be pending in the Chapter 11 Case on the Effective Date or commenced by the Reorganized Debtor or any other party in interest (including, without limitation, the Asbestos Trust) in the Chapter 11 Case subsequent to the Effective Date;

(k)     consider any modifications of this Plan, and remedy any defect or omission or reconcile any inconsistency or make any other necessary modifications in or to this Plan, the Asbestos Trust Documents or any order of the Bankruptcy Court, including the Confirmation Order, as may be necessary to carry out the purposes and intent of this Plan, to the extent authorized by the Bankruptcy Code and the Bankruptcy Rules; *provided*, that there shall be no modification made at any time that would reduce or eliminate any of the protections provided herein to the Protected Parties or releases provided hereunder;

(l)     hear and determine all controversies, suits, and disputes that may arise in connection with the interpretation, enforcement, or consummation of this Plan or any Entity's obligations hereunder and issue orders in aid of confirmation, consummation and

execution of this Plan to the extent authorized by section 1142 of the Bankruptcy Code, including, but not limited to, compelling the conveyance of property and other performance contemplated under the Plan and documents executed in connection herewith;

(m)    hear and determine all questions and disputes and enter such orders or judgments, including, but not limited to, injunctions, as are necessary to (i) enforce the title, rights and powers of the Reorganized Debtor and the Asbestos Trust and (ii) enable Holders of Claims to pursue their rights against any Entity that may be liable therefor pursuant to applicable law or otherwise, subject to the releases and injunctions contained herein;

(n)    hear and determine any proposed compromise and settlement of any Claim against or cause of action by or against the Debtor that has been or properly should have been brought in the Bankruptcy Court to the extent requested by the Reorganized Debtor;

(o)    hear and determine any timely objections to Administrative Expense Claims asserted or to Proofs of Claim Filed, both before and after the Confirmation Date, including any objections to the classification of any Claim, and to allow or disallow any Disputed Claim, in whole or in part;

(p)    hear and determine matters concerning state, local and federal taxes, tax refunds, tax attributes, tax benefits, and similar or related matters with respect to the Debtor, the Reorganized Debtor, or the Asbestos Trust arising on or prior to the Effective Date, arising on account of transactions contemplated by the Plan Documents, or relating to the period of administration of the Chapter 11 Case;

(q)    hear and determine such other matters as may be set forth in the Confirmation Order or other orders of the Bankruptcy Court, or which may arise in connection with this Plan, the Confirmation Order, or the Effective Date, as may be authorized under the provisions of the Bankruptcy Code or any other applicable law;

(r)    hear and determine all objections by the Asbestos Trust Advisory Committee or Post-Effective Date Future Claimants' Representative to any proposed amendment to Schedule 1.1(b) attached hereto;

(s)    hear and determine all controversies, suits, and disputes that may arise in connection with the interpretation, enforcement, or consummation of this Plan or any Entity's obligations hereunder, including, but not limited to, performance of the Debtor's duties under this Plan;

(t)    hear and determine all controversies, suits, and disputes regarding interpretation or enforcement of the Asbestos Claims Indemnification Agreement;

(u)    hear and determine all controversies, suits, and disputes regarding interpretation or enforcement of the O-I Glass Indemnification Agreements, except as set forth in the applicable O-I Glass Indemnification Agreement;

(v)    enforce remedies upon any default under this Plan;

(w)     hear and determine any other matter not inconsistent with the Bankruptcy Code;

(x)     hear and determine any claim that in any way challenges or is based on any provision in the Confirmation Order; and

(y)     enter a final decree closing the Chapter 11 Case.

If and to the extent that the Bankruptcy Court is not permitted under applicable law to exercise jurisdiction over any of the matters specified above, including, without limitation, the matter described in <u>Section 12.1(d)</u>, the reference to the "Bankruptcy Court" in the preamble to this <u>Section 12.1</u> shall be deemed to be a reference to the "District Court." Notwithstanding anything in this <u>Section 12.1</u> to the contrary, the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures shall govern the satisfaction of Asbestos Claims and the forum in which Asbestos Claims shall be determined.

**12.2    Modification of Plan**. Subject to the limitations contained in the Plan Documents, the Plan Proponents, upon mutual agreement, which agreement shall not be unreasonably withheld, may alter, amend, or modify this Plan or any Exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date and may include any such amended Exhibits in this Plan, provided that this Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtor shall have complied with section 1125 of the Bankruptcy Code, to the extent necessary. Further, the Plan Proponents, upon mutual agreement, which agreement shall not be unreasonably withheld, may alter, amend, or modify this Plan or any Exhibits thereto at any time after entry of the Confirmation Order and before this Plan's substantial consummation, provided that: (a) this Plan, as modified, altered, or amended, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and (b) the Bankruptcy Court, after notice and a hearing, confirms this Plan as modified, under section 1129 of the Bankruptcy Code, and finds that the circumstances warrant such modification. A Holder of a Claim that has accepted or rejected this Plan shall be deemed to have accepted or rejected, as the case may be, this Plan as modified, unless, within the time fixed by the Bankruptcy Court, if any, such Holder changes its previous acceptance or rejection, to the extent such Holder is afforded the opportunity to do so under section 1127(d) of the Bankruptcy Code.

Notwithstanding the prior paragraph, between the Confirmation Date and the Effective Date, the Plan Proponents, upon mutual agreement, which agreement shall not be unreasonably withheld, may remedy any defects or omissions or reconcile any inconsistencies in the Plan Documents for the purpose of implementing this Plan in such manner as may be necessary to carry out the purposes and intent of this Plan, so long as the interests of the Holders of Allowed Claims and other applicable parties-in-interest are not adversely affected thereby; *provided*, *however*, that the Plan Proponents may not modify <u>Section 8.10</u> or modify in any material way the form of Environmental Claims or Causes of Action Indemnification Agreement between the Confirmation Date and the Effective Date without Filing a notice containing any proposed changes and serving such notice on any affected Governmental Authorities and providing at least ten (10) Business Days to object prior to the Effective Date.

On and after the Effective Date, the authority to amend, modify or supplement the Plan Documents, other than the Plan, will be as provided in such Plan Documents.

Notwithstanding anything in this Section 12.2, there shall be no modification to this Plan made at any time that would (i) reduce or eliminate any of the protections provided herein, or in the releases provided hereunder or under the Asbestos Channeling Injunction, to the Protected Parties, without the consent of the Debtor and O-I Glass, or (ii) modify or be inconsistent with the terms of the settlement accepted by the Debtor, the Asbestos Claimants Committee, and the Future Claimants' Representative in connection with the parties' court-approved mediation, as documented at Docket No. 802 of this Chapter 11 Case, without the consent of each of the Plan Proponents.

**12.3    Consent to Jurisdiction**.    Upon default under this Plan, the Debtor, the Reorganized Debtor, the Asbestos Claimants Committee, the Asbestos Trust, the Asbestos Trustee(s), the Asbestos Trust Advisory Committee, the Future Claimants' Representative, and the Post-Effective Date Future Claimants' Representative, respectively, consent to the jurisdiction of the Bankruptcy Court, consent to the entry by the Bankruptcy Court of any Final Orders, and agree that the Bankruptcy Court shall be the preferred forum for all proceedings relating to any such default.

## ARTICLE XIII.

## MISCELLANEOUS PROVISIONS

**13.1    Governing Law**.    Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), or an Exhibit hereto, or an instrument, agreement or other document executed in connection with this Plan provides otherwise, the rights, duties and obligations arising under this Plan, and the instruments, agreements and other documents executed in connection with this Plan, shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Delaware without giving effect to the principles of conflicts of law thereof.

**13.2    Notices**.    To be effective, all notices, requests and demands to or upon the Debtor, or, as applicable, upon the Future Claimants' Representative and the Asbestos Claimants Committee, shall be in writing and, unless otherwise expressly provided herein, shall be addressed as follows and mailed by registered or certified mail, return receipt requested, and shall be deemed to have been duly given or made when actually delivered:

**If to the Debtor:**

Paddock Enterprises, LLC
One Michael Owens Way
Perrysburg, Ohio 43551
Attn: David J. Gordon, President and Chief Restructuring Officer
Telephone: (415) 738-8282
Email: dgordon@djoservicesllc.com

with copies (which alone will not constitute notice) to:

Latham & Watkins LLP
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Attn: Jeffrey E. Bjork, Esq.
    Kimberly A. Posin, Esq.
    Helena G. Tseregounis, Esq.
    Christina M. Craige, Esq.
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
Emails:  jeff.bjork@lw.com
    kim.posin@lw.com
    helena.tseregounis@lw.com
    chris.craige@lw.com

Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Attn: John H. Knight, Esq.
    Michael J. Merchant, Esq.
    Brendan J. Schlauch, Esq.
    Sarah Silveira, Esq.
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
Emails:  knight@rlf.com
    merchant@rlf.com
    schlauch@rlf.com
    silveira@rlf.com

**If to the Future Claimants' Representative:**

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
Attn: James L. Patton, Jr., Esq.
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:  jpatton@ycst.com

with a copy (which alone will not constitute notice) to:

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
Attn: Edwin J. Harron, Esq.
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:  eharron@ycst.com

**If to the Asbestos Claimants Committee:**

Caplin & Drysdale, Chartered
One Thomas Circle N.W., Suite 1100
Washington, D.C. 20005
Attn: Kevin C. Maclay, Esq.
Telephone:  (202) 862-5000
Facsimile:  (202) 429-3301
Emails: kmaclay@capdale.com

Campbell & Levine, LLC
222 Delaware Avenue, Suite 1620
Wilmington, Delaware 19801
Attn:  Mark T. Hurford, Esq.
Telephone:  (302) 426-1900
Facsimile:  (302) 426-9947
Emails:  Mhurford@camlev.com

57

**13.3    Exhibits and Schedules; Conflicts**.  All exhibits and schedules to this Plan, the Plan Supplement, and the exhibits and schedules to the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full herein. To the extent this Plan is inconsistent with the Disclosure Statement, the provisions of this Plan shall be controlling.  To the extent this Plan is inconsistent with the Confirmation Order, the provisions of the Confirmation Order shall be controlling.

**13.4    Exemption from Transfer Taxes**.  Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under this Plan, the creation of any mortgage, deed of trust, pledge or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan shall be exempt from all stamp, transfer, or similar taxes, as provided in section 1146(a).

**13.5    Recordable Order**.  Upon entry by the Bankruptcy Court, the Confirmation Order shall be deemed to be in recordable form, and shall be accepted by any recording officer for filing and recording purposes without further or additional orders, certifications, or other supporting documents.

**13.6    Binding Effect**.  The rights, benefits and obligations of any Entity named or referred to in this Plan, or whose actions may be required to effectuate the terms of this Plan, shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity (including, but not limited to, any trustee appointed for the Debtor under Chapters 7 or 11 of the Bankruptcy Code).  The Confirmation Order shall provide that the terms and provisions of this Plan and the Confirmation Order shall survive and remain effective after entry of any order which may be entered converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, and the terms and provisions of this Plan shall continue to be effective in the Chapter 11 Case or any superseding case under the Bankruptcy Code.

**13.7    Severability**.  After the Effective Date, any provision of this Plan, the Plan Documents, the Confirmation Order, or any of the Exhibits to this Plan that is determined to be prohibited, unenforceable, or invalid by a court of competent jurisdiction or any other governmental Entity with appropriate jurisdiction may be deemed ineffective as to any jurisdiction in which such provision is prohibited, unenforceable, or invalidated to the extent of such prohibition, unenforceability, or invalidation, without invalidating the effectiveness of the remaining provisions of this Plan, the Plan Documents, the Confirmation Order, and the Exhibits to this Plan or affecting the validity or enforceability of such provision and such remaining provisions in any other jurisdiction.

**13.8    Further Assurances**.  The Protected Parties, the Asbestos Trust, all Entities receiving Distributions under this Plan, and all other parties in interest shall, and shall be authorized to, from time to time, prepare, execute, and deliver any agreements or documents and take any other action consistent with the terms of this Plan as may be reasonably necessary to effectuate the provisions and intent of this Plan, with each such Entity to bear its own costs incurred after the Effective Date in connection therewith.

**13.9    Further Authorizations**.  Prior to the Effective Date, the Plan Proponents may seek such orders, judgments, injunctions, and rulings that they deem necessary to carry out further

the intentions and purposes of, and to give full effect to the provisions of, this Plan or any of the Plan Documents, and any costs incurred in connection therewith shall be borne by the Debtor's Estate.  On and after the Effective Date, the Reorganized Debtor and the Asbestos Trust may seek such orders, judgments, injunctions, and rulings that either of them deems necessary to carry out or further the intentions and purposes of, and to give full effect to the provisions of, this Plan or any of the Plan Documents, with each such Entity to bear its own costs in connection therewith.

13.10   **General Statements**.  Statements of a general nature set forth in this Plan shall not be construed to limit or restrict the specific provisions herein.

13.11   **Entire Agreement**.  The Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions, negotiations, understandings and documents.  No Entity shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter of the Plan Documents other than as expressly provided for in this Plan or the other Plan Documents or as may hereafter be agreed to by the affected parties in writing.

13.12   **2002 Notice Parties**.  After the Effective Date, the Reorganized Debtor is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed a renewed request after the Effective Date to receive documents pursuant to Bankruptcy Rule 2002, provided that a notice of the Effective Date is served on all parties who have Filed a request for notice under Bankruptcy Rule 2002 prior to the Effective Date, and such notice informs all such parties that they must File a renewed request after the Effective Date to receive documents pursuant to Bankruptcy Rule 2002 going forward.

Respectfully submitted, as of the date first set forth above,

Dated: May 24, 2022

**PADDOCK ENTERPRISES, LLC**

*/s/ David J. Gordon*
David J. Gordon
President and Chief Restructuring Officer

**O-I GLASS, INC.**

*/s/ Darrow A. Abrahams*
Darrow A. Abrahams
SVP, General Counsel & Corporate Secretary

**ASBESTOS CLAIMANTS COMMITTEE**

*/s/ Joseph Solazzo, III*
Joseph Solazzo, III
Committee Member

US-DOCS\123556013.57

**FUTURE CLAIMANTS' REPRESENTATIVE**

*/s/ James L. Patton, Jr.*
James L. Patton, Jr.
Future Claimants' Representative

60

## EXHIBIT A

**ASBESTOS TRUST AGREEMENT**

**OWENS-ILLINOIS ASBESTOS PERSONAL INJURY TRUST AGREEMENT**

# OWENS-ILLINOIS ASBESTOS PERSONAL INJURY TRUST AGREEMENT

## TABLE OF CONTENTS

**SECTION I AGREEMENT OF TRUST** ........................................................... **2**

    1.1    Creation and Name ................................................................ 2

    1.2    Purpose.................................................................................. 3

    1.3    Transfer of Assets ................................................................ 3

    1.4    Acceptance of Assets and Assumption of Liabilities ........... 4

**SECTION II POWERS AND TRUST ADMINISTRATION** ................................... **5**

    2.1    Powers .................................................................................. 5

    2.2    General Administration ........................................................ 9

    2.3    Claims Administration ......................................................... 14

    2.4    Medicare Reporting Obligations .......................................... 14

**SECTION III ACCOUNTS, INVESTMENTS, AND PAYMENTS** ....................... **16**

    3.1    Accounts ............................................................................... 16

    3.2    Investments .......................................................................... 16

    3.3    Source of Payments.............................................................. 19

**SECTION IV TRUSTEES; DELAWARE TRUSTEE** ........................................... **20**

    4.1    Number ................................................................................. 20

    4.2    Term of Service.................................................................... 20

    4.3    Appointment of Successor Trustees...................................... 22

    4.4    Liability of Trustees, Members of the TAC and the Post-Effective Date Future Claimants' Representative ................................... 23

    4.5    Compensation and Expenses of Delaware Trustee and Trustees........................ 23

    4.6    Indemnification .................................................................... 24

    4.7    Lien ...................................................................................... 26

4.8     Trustees' Employment of Experts; Delaware Trustee's Employment of
        Counsel ........................................................................................ 26

4.9     Trustees' Independence ................................................................. 26

4.10    Bond ............................................................................................. 27

4.11    Delaware Trustee .......................................................................... 27

**SECTION V TRUST ADVISORY COMMITTEE** ........................................ **29**

5.1     Members ....................................................................................... 29

5.2     Duties ............................................................................................ 29

5.3     Term of Office .............................................................................. 30

5.4     Appointment of Successor ........................................................... 30

5.5     TAC's Employment of Professionals ........................................... 32

5.6     Compensation and Expenses of the TAC ..................................... 33

5.7     Procedures for Consultation with and Obtaining the Consent of the TAC .......... 34

**SECTION VI THE POST-EFFECTIVE DATE FUTURE CLAIMANTS'
REPRESENTATIVE** .............................................................................. **36**

6.1     Duties ............................................................................................ 36

6.2     Term of Office .............................................................................. 37

6.3     Appointment of Successor ........................................................... 37

6.4     Post-Effective Date Future Claimants' Representative's Employment of
        Professionals ................................................................................ 38

6.5     Compensation and Expenses of the Post-Effective Date Future Claimants'
        Representative ............................................................................... 40

6.6     Procedures for Consultation with and Obtaining the Consent of the Post-
        Effective Date Future Claimants' Representative ......................... 41

**SECTION VII GENERAL PROVISIONS** .................................................... **44**

7.1     Irrevocability ................................................................................ 44

7.2     Term; Termination ........................................................................ 44

7.3     Amendments ................................................................................................. 46

7.4     Meetings ....................................................................................................... 47

7.5     Severability .................................................................................................. 47

7.6     Notices ......................................................................................................... 47

7.7     Successors and Assigns ................................................................................ 51

7.8     Limitation on Claim Interests for Securities Laws Purposes ................................ 51

7.9     Entire Agreement; No Waiver ....................................................................... 51

7.10    Headings ....................................................................................................... 52

7.11    Governing Law ............................................................................................. 52

7.12    Settlor's Representative and Cooperation ..................................................... 53

7.13    Dispute Resolution ....................................................................................... 53

7.14    Enforcement and Administration .................................................................. 54

7.15    Effectiveness ................................................................................................ 54

7.16    Counterpart Signatures ................................................................................ 54

## OWENS-ILLINOIS ASBESTOS PERSONAL INJURY TRUST AGREEMENT

This Owens-Illinois Asbestos Personal Injury Trust Agreement (this "**Asbestos Trust Agreement**"), dated the date set forth on the signature page hereof and effective as of _____, 2022 (the "**Effective Date**"), is entered into, pursuant to the Plan of Reorganization For Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code dated January 12, 2022(as it may be amended or supplemented, the "**Plan**"),[1] by Paddock Enterprises, LLC (the "**Debtor**" or the "**Settlor**"), the debtor whose chapter 11 case is administered and known as In re Paddock Enterprises, LLC, Case No. 20-10028 (LSS) in the United States Bankruptcy Court for the District of Delaware; the Post-Effective Date Future Claimants' Representative; the Asbestos Claimants Committee (the "**ACC**"); the Asbestos Trustees (the "**Trustees**"); Wilmington Trust, National Association (the "**Delaware Trustee**"); and the members of the Asbestos Trust Advisory Committee (the "**TAC**") identified on the signature page hereof; and

WHEREAS, the Debtor has reorganized under the provisions of chapter 11 of the Bankruptcy Code; and

WHEREAS, the Confirmation Order has been entered by the Bankruptcy Court and affirmed by the District Court; and

WHEREAS, the Plan provides, *inter alia*, for the creation of the Owens-Illinois Asbestos Personal Injury Trust (the "**Asbestos Trust**"); and

WHEREAS, pursuant to the Plan, the Asbestos Trust is to use its assets and income to satisfy Asbestos Claims; and

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference.  All capitalized terms not defined herein or defined in the Plan, but defined in the Bankruptcy Code or Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Rules, and such definitions are incorporated herein by reference.

- 1 -

WHEREAS, it is the intent of the Debtor, the Post-Effective Date Future Claimants' Representative, the ACC, the Trustees, the Delaware Trustee, and the TAC that the Asbestos Trust be administered, maintained, and operated at all times through mechanisms that provide reasonable assurance that the Asbestos Trust will provide fair and equitable treatment for and satisfy all Asbestos Claims pursuant to the provisions of the Owens-Illinois Asbestos Personal Injury Trust Distribution Procedures (the "**TDP**") that is attached hereto as Exhibit 1 in substantially the same manner, and in strict compliance with the terms of this Asbestos Trust Agreement; and

WHEREAS, all rights of the holders of Asbestos Claims arising under this Asbestos Trust Agreement and the TDP shall vest upon the Effective Date; and

WHEREAS, pursuant to the Plan, the Asbestos Trust is intended to qualify as a "qualified settlement fund" ("**Qualified Settlement Fund**") within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the "**QSF Regulations**"); and

WHEREAS, the Bankruptcy Court has determined that the Asbestos Trust and the Plan satisfy all the prerequisites for an injunction pursuant to section 524(g) of the Bankruptcy Code with respect to any and all Asbestos Claims, and such injunction has been entered in connection with the Confirmation Order;

NOW, THEREFORE, it is hereby agreed as follows:

## SECTION I
## AGREEMENT OF TRUST

**1.1**　**Creation and Name**. The Debtor as Settlor hereby creates a trust known as the "Owens-Illinois Asbestos Personal Injury Trust," which is the Asbestos Trust provided for and referred to in the Plan. The Trustees of the Asbestos Trust shall transact the business and affairs of the Asbestos Trust in the name of the Asbestos Trust, and references herein to the Asbestos

Trust shall include a Trustee or Trustees acting on behalf of the Asbestos Trust. It is the intention of the parties hereto that the trust created hereby constitute a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 et seq. (the "**Act**") and that this document, together with the Asbestos Trust Bylaws described herein, constitute the governing instruments of the Asbestos Trust. The Trustees and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State.

1.2    **Purpose**. The purpose of the Asbestos Trust is to assume all liabilities and responsibility for all Asbestos Claims, and, among other things to: (a) direct the processing, liquidation and payment of all Asbestos Claims in accordance with the Plan, the TDP, and the Confirmation Order; (b) preserve, hold, manage, and maximize the assets of the Asbestos Trust for use in paying and satisfying Asbestos Claims; and (c) qualify at all times as a Qualified Settlement Fund. The Asbestos Trust is to use the Asbestos Trust Assets to pay the holders of all Asbestos Claims in accordance with this Asbestos Trust Agreement and the TDP in such a way that such holders of Asbestos Claims are treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such claims, and to otherwise comply in all respects with the requirements of a trust set forth in section 524(g)(2)(B) of the Bankruptcy Code.

1.3    **Transfer of Assets**. Pursuant to, and in accordance with, Sections 8.2 and 8.3 of the Plan, the Asbestos Trust has received the Asbestos Trust Assets to fund the Asbestos Trust and settle or discharge all Asbestos Claims. In all events, the Asbestos Trust Assets will be transferred to the Asbestos Trust free and clear of any liens or other claims by the Debtor, Reorganized Debtor, any Non-Debtor Affiliate, any creditor, or other entity except as otherwise provided in the Plan. The Debtor, the Reorganized Debtor, and the Non-Debtor Affiliates shall also execute and deliver

such documents to the Asbestos Trust as the Trustees reasonably request to transfer and assign any Asbestos Trust Assets to the Asbestos Trust.

      **1.4**      <u>**Acceptance of Assets and Assumption of Liabilities**</u>.

      (a)      In furtherance of the purposes of the Asbestos Trust, the Asbestos Trust hereby expressly accepts the transfer to the Asbestos Trust of the Asbestos Trust Assets or any other transfers contemplated by the Plan in the time and manner as, and subject to the terms, contemplated in the Plan.

      (b)      In furtherance of the purposes of the Asbestos Trust, the Asbestos Trust expressly assumes all liabilities and responsibility for all Asbestos Claims, and the Debtor, the Reorganized Debtor, and the Non-Debtor Affiliates shall have no further financial or other responsibility or liability therefor. Except as otherwise provided in this Asbestos Trust Agreement and the TDP, the Asbestos Trust shall have all defenses, cross-claims, offsets, and recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights, regarding such claims that the Debtor or the Reorganized Debtor have or would have had under applicable law. Regardless of the foregoing, however, a claimant must meet otherwise applicable federal, state and foreign statutes of limitations and repose in order to receive a distribution from the Asbestos Trust, except as otherwise provided in Section 5.1(a)(2) of the TDP.

      (c)      No provision herein or in the TDP shall be construed or implemented in a manner that would cause the Asbestos Trust to fail to qualify as a Qualified Settlement Fund under the QSF Regulations.

      (d)      Nothing in this Asbestos Trust Agreement shall be construed in any way to limit (i) the scope, enforceability, or effectiveness of the Asbestos Channeling Injunction or (ii)

subject to the provisions of Section 1.4(b) above, the Asbestos Trust's assumption of all liability for Asbestos Claims.

(e)      In this Asbestos Trust Agreement and the TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

(f)      To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the Asbestos Trust (the "**Beneficial Owners**") shall be deemed to be the holders of Asbestos Claims; provided that (i) the holders of Asbestos Claims, as such Beneficial Owners, shall have only such rights with respect to the Asbestos Trust and its assets as are set forth in the TDP, and (ii) no greater or other rights, including upon dissolution, liquidation or winding up of the Asbestos Trust, shall be deemed to apply to the holders of Asbestos Claims in their capacity as Beneficial Owners.  This Section 1.4(f) is intended to modify the rights of the Beneficial Owners that may otherwise apply pursuant to the provisions of 12 Del. C. § 3805.

## SECTION II
## POWERS AND TRUST ADMINISTRATION

2.1      <u>Powers</u>.

(a)      The Trustees are and shall act as the fiduciaries to the Asbestos Trust in accordance with the provisions of this Asbestos Trust Agreement and the Plan. The Trustees shall, at all times, administer the Asbestos Trust and the Asbestos Trust Assets in accordance with the purposes set forth in Section 1.2 above. Subject to the limitations set forth in this Asbestos Trust Agreement, the Trustees shall have the power to take any and all actions that, in the judgment of the Trustees, are necessary or proper to fulfill the purposes of the Asbestos Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably

incidental thereto and not inconsistent with the requirements of Section 2.2 below, and any trust power now or hereafter permitted under the laws of the State of Delaware, including the Act.

(b)     Except as required by applicable law or otherwise specified herein, the Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)     Without limiting the generality of Section 2.1(a) above, and except as limited below, the Trustees shall have the power to:

(i)     receive and hold the Asbestos Trust Assets and exercise all rights with respect thereto, including the right to vote and sell any securities that are included in the Asbestos Trust Assets;

(ii)    invest the monies held from time to time by the Asbestos Trust;

(iii)   sell, transfer, or exchange any or all of the Asbestos Trust Assets at such prices and upon such terms as the Trustees may consider proper, consistent with the other terms of this Asbestos Trust Agreement;

(iv)    enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to permit the Asbestos Trust to operate;

(v)     pay liabilities and expenses of the Asbestos Trust (including any withholding or other tax liabilities) and file any tax returns associated with the Asbestos Trust, including any information reporting and withholding forms;

(vi)    establish such funds, reserves, and accounts within the Asbestos Trust estate, as deemed by the Trustees to be useful in carrying out the purposes of the Asbestos Trust;

(vii)    sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding;

(viii)    establish, supervise, and administer the Asbestos Trust in accordance with this Asbestos Trust Agreement and the TDP and the terms thereof;

(ix)    appoint such officers and hire such employees and engage such legal, financial, accounting, investment, auditing, and forecasting, and other consultants and agents as the business of the Asbestos Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of this Asbestos Trust Agreement;

(x)    pay employees, legal, financial, accounting, investment, auditing, and forecasting, and other consultants, advisors, and agents, including those engaged by the Asbestos Trust in connection with its alternative dispute resolution activities, reasonable compensation;

(xi)    compensate the Trustees, the Delaware Trustee, the TAC members, and the Post-Effective Date Future Claimants' Representative as provided below, and their employees, legal, financial, accounting, investment, and other advisors, consultants, independent contractors, and agents, and reimburse the Trustees, the Delaware Trustee, the TAC members, and the Post-Effective Date Future Claimants' Representatives all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xii)    execute and deliver such instruments as the Trustees consider proper in administering the Asbestos Trust;

- 7 -

(xiii)    enter into such other arrangements with third parties as are deemed by the Trustees to be useful in carrying out the purposes of the Asbestos Trust, provided such arrangements do not conflict with any other provision of this Asbestos Trust Agreement;

(xiv)    indemnify and hold harmless the Debtor, the Reorganized Debtor, the Non-Debtor Affiliates, and any Representatives of the Debtor, the Reorganized Debtor, and the Non-Debtor Affiliates as provided in Section 8.3(k) of the Plan and the Asbestos Claims Indemnification Agreement;

(xv)    in accordance with Section 4.6 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) (A) the Trustees, the Delaware Trustee, the members of the TAC, and the Post-Effective Date Future Claimants' Representative, and (B) the officers and employees of the Asbestos Trust, and any agents, advisors and consultants of the Asbestos Trust, the Trustees, the Delaware Trustee, the TAC, or the Post-Effective Date Future Claimants' Representative (those persons referenced in (B) are referred to herein as the "**Additional Indemnitees**"), to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and/or insure its directors, trustees, officers, employees, agents, advisors, and representatives; provided, however, that notwithstanding anything to the contrary provided herein, no party shall be indemnified in any way for any liability, expense, claim, damage, or loss for which he or she is liable under Section 4.4 below;

(xvi)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Asbestos Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment

managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 4.4 below;

(xvii)   consult with the TAC and the Post-Effective Date Future Claimants' Representative at such times and with respect to such issues relating to the conduct of the Asbestos Trust as the Trustees consider desirable; and

(xviii)  make, pursue (by litigation or otherwise), collect, compromise or settle, in the name of the Asbestos Trust, any claim, right, action, or cause of action included in the Asbestos Trust Assets, including, but not limited to, insurance recoveries, before any court of competent jurisdiction.

(d)   The Trustees shall not have the power to guarantee any debt of other persons.

(e)   The Trustees agree to take the actions of the Asbestos Trust required hereunder.

(f)   The Trustees shall give the TAC and the Post-Effective Date Future Claimants' Representative prompt notice of any act performed or taken pursuant to Sections 2.1(c)(i), (iii), (vii), or (xvi) above, and any act proposed to be performed or taken pursuant to Section 2.2(f) below.

**2.2**   **General Administration**.

(a)   The Trustees shall act in accordance with this Asbestos Trust Agreement. The Trustees shall adopt and act in accordance with Asbestos Trust Bylaws. To the extent not inconsistent with the terms of this Asbestos Trust Agreement, the Asbestos Trust Bylaws shall govern the affairs of the Asbestos Trust. In the event of any inconsistency between the Asbestos Trust Bylaws and this Asbestos Trust Agreement, this Asbestos Trust Agreement shall govern.

(b)     The Trustees shall (i) timely file such income tax and other returns and statements required to be filed and shall timely pay all taxes required to be paid by the Asbestos Trust, (ii) comply with all applicable reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of the Asbestos Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations, and (iv) take no action that could cause the Asbestos Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations.

(c)     The Trustees shall timely account to the Bankruptcy Court as follows:

(i)     The Trustees shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event within one hundred and twenty (120) days following the end of each fiscal year, an annual report (the "**Annual Report**") containing financial statements of the Asbestos Trust (including, without limitation, a balance sheet of the Asbestos Trust as of the end of such fiscal year and a statement of operations for such fiscal year) audited by a firm of independent certified public accountants selected by the Trustees and accompanied by an opinion of such firm as to the fairness of the financial statements' presentation of the cash and investments available for the payment of claims. The Trustees shall provide a copy of such Annual Report to the TAC and the Post-Effective Date Future Claimants' Representative when such reports are filed with the Bankruptcy Court.

(ii)     Simultaneously with the filing of the Annual Report, the Trustees shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of claims disposed of during the period covered

- 10 -

by the financial statements. The Trustees shall provide a copy of such report to the TAC and the Post-Effective Date Future Claimants' Representative when such report is filed.

(iii) All materials required to be filed with the Bankruptcy Court by this Section 2.2(c) shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court and shall be filed with the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**").

(d) The Trustees shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year. The budget and cash flow projections shall include a determination of the Maximum Annual Payment pursuant to Section 2.4 of the TDP, and the Claims Payment Ratio pursuant to Section 2.5 of the TDP. The Trustees shall provide a copy of the budget and cash flow projections to the TAC and the Future Claimants' Representative.

(e) The Trustees shall consult with the TAC and the Post-Effective Date Future Claimants' Representative (i) on the general implementation and administration of the Asbestos Trust; (ii) on the general implementation and administration of the TDP; and (iii) on such other matters as may be required under this Asbestos Trust Agreement or the TDP.

(f) The Trustees shall be required to obtain the consent of the TAC and the Post-Effective Date Future Claimants' Representative pursuant to the Consent Process set forth in Section 5.7(b) and 6.6(b) below, in addition to any other instances elsewhere enumerated, in order:

(i) to redetermine the Payment Percentage described in Section 2.3 of the TDP as provided in Section 4.2 of the TDP;

(ii)     to change the Claims Payment Ratio described in Section 2.5 of the TDP in the event that the requirements for such a change as set forth in said provision have been met;

(iii)     to change the Disease Levels, Scheduled Values and/or Medical/Exposure Criteria set forth in Section 5.3(a)(3) of the TDP, and/or the Average Values and/or Maximum Values set forth in Section 5.3(b)(3) and Section 5.4(a) of the TDP;

(iv)     to establish and/or to change the Claims Materials to be provided to holders of Asbestos Claims under Section 6.1 of the TDP;

(v)     to require that claimants provide additional kinds of medical evidence pursuant to Section 7.1 of the TDP;

(vi)     to change the form of the Asbestos Claimant Release to be provided pursuant to Section 7.8 of the TDP; provided, however, that no such change shall be inconsistent with the terms of the Plan or the Confirmation Order and/or modify in any way the releases and injunctions contained in the Plan or the Confirmation Order;

(vii)     to terminate the Asbestos Trust pursuant to Section 7.2 below;

(viii)     to change the compensation of the members of the TAC, the Post-Effective Date Future Claimants' Representative, the Delaware Trustee, or the Trustees, other than to reflect cost-of-living increases or changes approved by the Bankruptcy Court as otherwise provided herein;

(ix)     to take actions outside the ordinary course of business otherwise permitted by applicable law to minimize any tax on the Asbestos Trust Assets; provided that no such action prevents the Asbestos Trust from qualifying as a Qualified Settlement

- 12 -

Fund within the meaning of the QSF Regulations or requires an election for the Asbestos Trust to be treated as a grantor trust for tax purposes;

(x)     to adopt the Asbestos Trust Bylaws in accordance with Section 2.2(a) above or thereafter to amend the Asbestos Trust Bylaws in accordance with the terms thereof;

(xi)     to amend any provision of this Asbestos Trust Agreement or the TDP in accordance with the terms thereof, provided, however that no such amendment shall be inconsistent with the terms of the Plan or Confirmation Order;

(xii)     in the event the Asbestos Trust acquires any stock in the Reorganized Debtor, to vote such stock for purposes of appointing members of the Board of Managers of the Reorganized Debtor;

(xiii)     to acquire an interest in or to merge any claims resolution organization formed by the Asbestos Trust with another claims resolution organization that is not specifically created by this Asbestos Trust Agreement or the TDP, or to contract with another claims resolution organization or other entity that is not specifically created by this Asbestos Trust Agreement or the TDP, or permit any other party to join in any claims resolution organization that is formed by the Asbestos Trust pursuant to the Asbestos Trust Agreement or the TDP; provided that such merger, acquisition, contract or joinder shall not (a) subject the Reorganized Debtor or any successors in interest thereto, or any other Protected Party, to any risk of having any Asbestos Claim asserted against it or them, or (b) otherwise jeopardize the validity or enforceability of the Asbestos Channeling Injunction or any other injunction or release issued or granted in connection with the Plan and/or the Confirmation Order; and provided further that the terms of such merger will

- 13 -

require the surviving organization to make decisions about the allowability and value of claims in accordance with Section 2.1 of the TDP which requires that such decisions be based on the provisions of the TDP, or (c) cause the Asbestos Trust to fail to qualify as a Qualified Settlement Fund under the QSF Regulations; or

(xiv)   if and to the extent required by Section 6.5 of the TDP, to disclose any information, documents, or other materials to preserve, litigate, resolve, or settle coverage, or to comply with an applicable obligation under an insurance policy or settlement agreement pursuant to Section 6.5 of the TDP.

(g)    The Trustees shall meet with the TAC and the Post-Effective Date Future Claimants' Representative no less often than quarterly. The Trustees shall meet in the interim with the TAC and the Post-Effective Date Future Claimants' Representative when so requested by either.  Meetings may be held in person, by video conference, by telephone conference, or by a combination of the three.

(h)    The Trustees, upon notice from either the TAC or the Post-Effective Date Future Claimants' Representative, if practicable in view of pending business, shall at their next meeting with the TAC or the Post-Effective Date Future Claimants' Representative consider issues submitted by the TAC or the Post-Effective Date Future Claimants' Representative.  The Trustees shall keep the TAC and the Post-Effective Date Future Claimants' Representative reasonably informed regarding all aspects of the administration of the Asbestos Trust.

2.3    **Claims Administration**. The Trustees shall promptly proceed to implement the TDP.

2.4    **Medicare Reporting Obligations**.

(a)     The Asbestos Trust shall register as a Responsible Reporting Entity ("**RRE**") under the reporting provisions of Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Pub. L. 110-173) ("**MMSEA**") in order to fulfill the reporting requirements applicable to the funders of the Asbestos Trust.

(b)     The Asbestos Trust, acting as the RRE and reporting agent for its funders, shall, at its sole expense, timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated by the Asbestos Trust or with respect to contributions to the Asbestos Trust.  The Asbestos Trust, in its role as RRE and reporting agent, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.  The Asbestos Trust shall, on a quarterly basis, send written notice advising whether the Asbestos Trust has timely satisfied all of the reporting requirements under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated by the Asbestos Trust during the previous quarterly period to the Reorganized Debtor and each of the funders of the Asbestos Trust that are Protected Parties at the mailing address, email address, or fax number that each of the foregoing parties has most recently provided to the Asbestos Trust for the purposes of sending such notice.  The Asbestos Trust shall have no obligation to send such notice to any party that fails to first provide the Asbestos Trust with a mailing address, email address, or fax number to which the Asbestos Trust should send such notice.

The Trustee shall obtain prior to remittance of funds to claimants' counsel or to the claimant, if pro se, in respect of any Asbestos Claim a certification from the claimant to be paid

that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Asbestos Claim.

**SECTION III**
**ACCOUNTS, INVESTMENTS, AND PAYMENTS**

**3.1**    **Accounts**.

(a)    The Trustees may, from time to time, create such accounts and reserves within the Asbestos Trust estate as they may deem necessary, prudent, or useful in order to provide for the payment of expenses and payment of Asbestos Claims and may, with respect to any such account or reserve, restrict the use of monies therein and the earnings or accretions thereto.

(b)    The Trustees shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 3.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the assets held in each such account and the payments from each such account in the accounts to be filed with the Bankruptcy Court and provided to the TAC and the Post-Effective Date Future Claimants' Representative pursuant to Section 2.2(c)(i) above.

**3.2**    **Investments**. Investment of monies held in the Asbestos Trust shall be administered in the manner consistent with the standards set forth in the Uniform Prudent Investor Act, subject to the following limitations and provisions:

(a)    The Asbestos Trust may invest only in diversified equity portfolios whose benchmark is a broad equity market index such as, but not limited to, the S&P 500 Index, Russell 1000 Index, S&P ADR Index or MSCI EAFE Index. The Asbestos Trust shall not acquire, directly or indirectly, equity in any entity (other than the Reorganized Debtor or any successor to the Reorganized Debtor) or business enterprise if, immediately following such acquisition, the

- 16 -

Asbestos Trust would hold more than 5% of the equity in such entity or business enterprise. The Asbestos Trust shall not hold, directly or indirectly, more than 5% of the equity in any entity (other than the Reorganized Debtor, or any successor to the Reorganized Debtor) or business enterprise.

(b)     The Asbestos Trust shall not acquire or hold any long-term debt securities unless (i) such securities are vested in the Asbestos Trust on the Effective Date pursuant to the Plan, (ii) such securities are rated "Baa" or higher by Moody's, "BBB" or higher by Standard & Poor's ("**S&P**"), or have been given an equivalent investment grade rating by another nationally recognized statistical rating agency, or (iii) have been issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.  This restriction does not apply to any pooled investment vehicles where pooled assets receive an investment grade rating (i.e., "BBB" rating or above) by a nationally recognized rating agency.

(c)     The Asbestos Trust shall not acquire or hold for longer than ninety (90) days any commercial paper unless such commercial paper is rated "Prime-l" or higher by Moody's or "A-1" or higher by S&P, or has been given an equivalent rating by another nationally recognized statistical rating agency.

(d)     The Asbestos Trust shall not acquire any debt securities or other debt instruments issued by any entity if, following such acquisition, the aggregate market value of all such debt securities and/or other debt instruments issued by such entity held by the Asbestos Trust would exceed 5% of the then current aggregate value of the Asbestos Trust Assets.  There is no limitation on holding debt securities or other debt instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.

(e)     The Asbestos Trust shall not acquire or hold any certificates of deposit in an amount exceeding any federal insurance on such certificates of deposit unless all publicly held,

- 17 -

long-term debt securities, if any, of the financial institution issuing the certificate of deposit and the holding company, if any, of which such financial institution is a subsidiary, meet the standards set forth in Section 3.2(b) above.

(f)     The Asbestos Trust may acquire and hold any securities or instruments issued by the Reorganized Debtor or any successor to the Reorganized Debtor or obtained as proceeds of litigation or otherwise to resolve disputes, without regard to the limitations set forth in Subsections (a)-(e) above.

(g)     The Asbestos Trust shall not acquire or hold any repurchase obligations unless, in the opinion of the Trustees, they are adequately collateralized.

(h)     The Asbestos Trust may allow its investment managers to acquire prudently or hold derivative instruments, including, without limitation, options, futures and swaps in the normal course of portfolio management. Specifically, the Asbestos Trust may acquire or hold derivatives to help manage or mitigate portfolio risk, including, without limitation, interest rate risk and equity market risk. Using derivative instruments to leverage a portfolio to enhance returns (at a much greater risk to the portfolio) is prohibited.

(i)     The Asbestos Trust may lend securities on a short-term basis, subject to adequate, normal and customary collateral arrangements.

(j)     Notwithstanding (a) above, the Asbestos Trust may acquire and hold an equity interest in a claims resolution organization without limitation as to the size of the equity interest acquired and held if prior to such acquisition, the Asbestos Trust complies with the provisions of Section 2.2(f)(xiv) hereof with respect to the acquisition.

(k)     Notwithstanding anything to the contrary in Sections 3.2 (a) – (j) above, in order to reduce portfolio volatility and portfolio risk, the Asbestos Trust may acquire or hold Hedge

- 18 -

Funds (defined below).  The investments made by any Hedge Fund need not comply with the investment guidelines set forth in Sections 3.2 (a) – (j) and shall not be deemed acquired or held by the Asbestos Trust for purposes of this Section 3.2.  The Asbestos Trust shall not acquire an interest in a particular Hedge Fund if immediately following such acquisition, the aggregate market value of the Asbestos Trust's interest in such Hedge Fund would exceed 3% of the aggregate market value of the Asbestos Trust Assets.  The Asbestos Trust shall not hold an interest in a particular Hedge Fund, subject to the fund's redemption notice and liquidity terms, to the extent that the aggregate market value of the Asbestos Trust's interest in such Hedge Fund, would exceed 6% of the aggregate market value of the Asbestos Trust Assets.  The Asbestos Trust shall not acquire an interest in a Hedge Fund if immediately following such acquisition the aggregate market value of the Asbestos Trust's interest in all Hedge Funds would exceed 15% of the aggregate market value of the Asbestos Trust estate.  The Asbestos Trust shall not hold an interest in a Hedge Fund to the extent that the aggregate market value of the Asbestos Trust's interest in all Hedge Funds, subject to redemption notice and liquidity terms, would exceed 25% of the aggregate market value of the Asbestos Trust Assets.  A Hedge Fund is a single investment fund, with one or more investment strategies, and that invests in equities, fixed income instruments, convertible bonds, preferred stocks or such other instruments that, in the opinion of the manager(s), will fulfill the fund's investment strategy(ies).  In light of the investment objective of reducing volatility and risk, the Asbestos Trust shall hold or acquire only Hedge Funds that have little or minimal leverage and little or minimal exposure to illiquid investments.

### 3.3    <u>**Source of Payments**</u>.

(a)    All Asbestos Trust expenses and payments and all liabilities with respect to Asbestos Claims shall be payable solely by the Trustees out of the Asbestos Trust Assets.  Neither

(i) the Trustees, the Delaware Trustee, the TAC, or the Post-Effective Date Future Claimants' Representative, or any of their officers, agents, advisors, or employees, nor (ii) the Debtor, the Reorganized Debtor, or any other Protected Party shall be liable for the payment of any Asbestos Trust expense or any other liability of the Asbestos Trust, except to the extent explicitly provided for (a) in the Plan and (b) solely with respect to the Trustees, the Delaware Trustee, the TAC, the Post-Effective Date Future Claimants' representative and any of their officers, agents, advisors, or employees, the Plan Documents.

(b)     The Trustees shall include a reasonably detailed description of any payments made in accordance with this Section 3.3 in the Annual Report.

(c)     The Trustees, with the consent of the TAC and the Post-Effective Date Future Claimants' Representative, shall establish and implement billing guidelines applicable to the TAC, the Post-Effective Date Future Claimants' Representative, the Trustees, and their respective professionals that seek compensation from the Asbestos Trust.

### SECTION IV
### TRUSTEES; DELAWARE TRUSTEE

**4.1     Number**. In addition to the Delaware Trustee appointed pursuant to Section 4.11, there shall initially be three (3) Trustees who shall be those persons named on the signature page hereof.  The number of Trustees may be reduced as provided in Section 4.3(a) below.

**4.2     Term of Service**.

(a)     The initial Trustees named pursuant to Article 4.1 above shall serve staggered terms of one (1), two (2), and three (3) years shown on the signature pages hereof. Thereafter each term of service shall be three (3) years. The initial Trustees shall serve from the Effective Date until the earlier of (i) the end of his or her term, (ii) his or her death, (iii) his or her mandatory retirement at the end of the year in which the Trustee reaches the age of 72 (unless, and

- 20 -

for so long as, this mandatory retirement requirement is waived by agreement of the TAC and the Post-Effective Date Future Claimants' Representative), (iv) his or her resignation pursuant to Section 4.2(b) below, (v) his or her removal pursuant to Section 4.2(c) below, or (vi) the termination of the Asbestos Trust pursuant to Section 7.2 below.

   (b) A Trustee may resign at any time by written notice to the remaining Trustees, the TAC, and the Post-Effective Date Future Claimants' Representative. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

   (c) A Trustee may be removed (i) by unanimous vote of the remaining Trustees or (ii) at the recommendation of the TAC and the Post-Effective Date Future Claimants' Representative with the approval of the Bankruptcy Court, in the event that he or she becomes unable to discharge his or her duties hereunder due to accident or physical or mental deterioration, or for other good cause. Good cause shall be deemed to include, without limitation, any substantial failure to comply with the general administration provisions of Section 2.2 above, a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustees hereunder, or repeated non-attendance at scheduled meetings. Such removal shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

**4.3**     <u>Appointment of Successor Trustees</u>.

(a)     In the event of a vacancy in the position of a Trustee, whether by term expiration, death, retirement, resignation, or removal, the TAC and the Post-Effective Date Future Claimants' Representative shall determine whether to fill the vacancy or to reduce the number of Trustees.  If the TAC and the Post-Effective Date Future Claimants' Representative cannot agree on whether to fill the vacancy or reduce the number of Trustees, the remaining Trustees shall make the decision or, if the remaining Trustees cannot agree, the Bankruptcy Court shall make such decision.  If a decision is made to fill the vacancy, the TAC and the Post-Effective Date Future Claimants' Representative shall select the individual to fill the vacancy.  In the event that the TAC and the Post-Effective Date Future Claimants' Representative cannot agree on the successor Trustee, the remaining Trustees shall make the selection or, if the remaining Trustees cannot agree on the successor Trustees, the Bankruptcy Court shall make the selection.  Nothing shall prevent the reappointment of a Trustee for an additional term or terms, and there shall be no limit on the number of terms that a Trustee may serve.

(b)     Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustees.  No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)     Each successor Trustee shall serve until the earlier of (i) the end of a full term of three (3) years if the predecessor Trustee completed his or her term, (ii) the end of the remainder of the term of the Trustee whom he or she is replacing if said predecessor Trustee did not complete said term, (iii) his or her death, (iv) his or her mandatory retirement at the end of the

year in which the Trustee reaches the age of 72 (unless, and for so long as, this mandatory retirement requirement is waived by the agreement of the TAC and the Post-Effective Date Future Claimants' Representative), (v) his or her resignation pursuant to Section 4.2(b) above, (vi) his or her removal pursuant to Section 4.2(c) above, or (vii) the termination of the Asbestos Trust pursuant to Section 7.2 below.

**4.4**     **Liability of Trustees, Members of the TAC and the Post-Effective Date Future Claimants' Representative**. The Trustees, the members of the TAC and the Post-Effective Date Future Claimants' Representative shall not be liable to the Asbestos Trust, to any individual holding an Asbestos Claim, or to any other person, except for any act or omission by such party that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e) and shall be protected from personal liability to the fullest extent provided under Delaware law, and specifically as provided under 12 Del. C. § 3803.

**4.5**     **Compensation and Expenses of Delaware Trustee and Trustees**.

(a)     Each Trustee shall receive a retainer from the Asbestos Trust for his or her service as a Trustee in the amount of $60,000.00 per annum, which amount shall be payable in quarterly installments.  Hourly time, as described below, shall be billed and applied to the annual retainer.  Hourly time in excess of the annual retainer shall be paid by the Asbestos Trust.  For all time expended as a Trustee, including attending meetings, preparing for such meetings, and working on authorized special projects, a Trustee shall receive $600 per hour.  For all non-working travel time in connection with Asbestos Trust business, a Trustee shall receive the sum of $300 per hour.  All time shall be computed on a decimal hour basis.  Each Trustee shall record all hourly time to be charged to the Asbestos Trust on a daily basis.  The hourly compensation payable to the

- 23 -

Trustees shall be reviewed every year by the Trustees and, after consultation with the members of the TAC and the Post-Effective Date Future Claimants' Representative, appropriately adjusted by the Trustees for changes in the cost of living. The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(b)     The Trustees and the Delaware Trustee shall be promptly reimbursed from the Asbestos Trust Assets for all reasonable out-of-pocket costs and expenses incurred by the Trustees or the Delaware Trustee in connection with the performance of their duties hereunder.

(c)     The Asbestos Trust shall include a description of the amounts paid under this Section 4.5 in the Annual Report.

**4.6     <u>Indemnification</u>**.

(a)     The Asbestos Trust shall indemnify and defend the Trustees, the members of the TAC, the Post-Effective Date Future Claimants Representative, and the Delaware Trustee in the performance of their duties hereunder to the fullest extent that a statutory trust organized under the laws of the State of Delaware (after application of Section 7.11 below) is from time to time entitled to indemnify and defend such persons against any and all liabilities, expenses, claims, damages, or losses incurred by them in the performance of their duties hereunder or in connection with activities undertaken by them prior to the Effective Date in connection with the formation, establishment, or funding of the Asbestos Trust. The Asbestos Trust may indemnify any of the Additional Indemnitees in the performance of their duties hereunder to the fullest extent that a statutory trust organized under the laws of the State of Delaware (after the application of Section 7.11 below) is from time to time entitled to indemnify and defend such persons against any and all liabilities, expenses, claims, damages, or losses incurred by them in the performance of their duties hereunder or in connection with activities undertaken by them prior to the Effective Date in

- 24 -

connection with the formation, establishment or funding of the Asbestos Trust. Notwithstanding

the foregoing, no individual shall be indemnified or defended in any way for any liability, expense,

claim, damage, or loss for which he or she is ultimately liable under Section 4.4 above.

(b)     The Asbestos Trust shall indemnify and hold harmless the Debtor, the

Reorganized Debtor, the Non-Debtor Affiliates, and any Representatives of the Debtor, the

Reorganized Debtor, and the Non-Debtor Affiliates as provided in Section 8.3(k) of the Plan and

the Asbestos Claims Indemnification Agreement.

(c)     Reasonable expenses, costs and fees (including attorneys' fees and costs)

incurred by or on behalf of a Trustee, a member of the TAC, the Post-Effective Date Future

Claimants' Representative, the Delaware Trustee, or an Additional Indemnitee in connection with

any action, suit, or proceeding, whether civil, administrative or arbitrative, from which they are

indemnified by the Asbestos Trust pursuant to Section 4.6(a) above, shall be paid by the Asbestos

Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of

the Trustee, the member of the TAC, the Post-Effective Date Future Claimants' Representative,

the Delaware Trustee, or the Additional Indemnitee, to repay such amount in the event that it shall

be determined ultimately by final order that such Trustee, member of the TAC, Post-Effective Date

Future Claimants' Representative, Delaware Trustee, or Additional Indemnitee is not entitled to

be indemnified by the Asbestos Trust.

(d)     The Trustees may purchase and maintain reasonable amounts and types of

insurance on behalf of an individual who is or was a Trustee, member of the TAC, the Post-

Effective Date Future Claimants Representative, or Additional Indemnitee, including against

liability asserted against or incurred by such individual in that capacity or arising from his or her

status as a Trustee, TAC member, Post-Effective Date Future Claimants' Representative, an officer

or an employee of the Asbestos Trust, or an advisor, consultant, or agent of the Asbestos Trust, the TAC, or the Post-Effective Date Future Claimants' Representative.

4.7     **Lien**. The Trustees, the Delaware Trustee, the members of the TAC, the Post-Effective Date Future Claimants' Representative, and the Additional Indemnitees shall have a first priority lien upon the Asbestos Trust Assets to secure the payment of any amounts payable to them pursuant to Section 4.6 above.

4.8     **Trustees' Employment of Experts; Delaware Trustee's Employment of Counsel**.

(a)     The Trustees may, but shall not be required to, retain and/or consult with counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed by the Trustees to be qualified as experts on the matters submitted to them (the "**Trust Professionals**"), and in the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any such party deemed by the Trustees to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustees hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

(b)     The Delaware Trustee shall be permitted to retain counsel only in such circumstances as required in the exercise of its obligations hereunder and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

4.9     **Trustees' Independence**. The Trustees shall not, during the term of their service, hold a financial interest in, act as attorney or agent for, or serve as any other professional for the

Reorganized Debtor. Notwithstanding the foregoing, a Trustee may serve, without any additional compensation, other than the compensation to be paid by the Asbestos Trust pursuant to Section 4.5(a) above, as a manager of the Reorganized Debtor.  No Trustee shall act as an attorney for any person who holds an asbestos claim. For the avoidance of doubt, this Section shall not be applicable to the Delaware Trustee.

**4.10**   **Bond**. The Trustees and the Delaware Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**4.11**   **Delaware Trustee**.

(a)   There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law and shall act through one or more persons authorized to bind such entity. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 4.11, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.11(c) below. For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)   The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustees set forth herein. The Delaware Trustee shall be one of the trustees of the Asbestos Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities, and obligations of the Delaware Trustee shall be limited to (i) accepting legal process

- 27 -

served on the Asbestos Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act (acting solely at the written direction of the Trustees), and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.  The Delaware Trustee shall not be liable for any acts or omissions, except for such losses, damages, or expenses that have been finally adjudicated by a court of competent jurisdiction to have directly resulted from the Delaware Trustee's gross negligence or willful misconduct.  To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Asbestos Trust, the other parties hereto, or any beneficiary of the Asbestos Trust, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement.

(c)     The Delaware Trustee shall serve until such time as the Trustees remove the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustees in accordance with the terms of Section 4.11(d) below. The Delaware Trustee may resign at any time upon the giving of at least thirty (30) days' advance written notice to the Trustees; provided, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustees in accordance with Section 4.11(d) below. If the Trustees do not act within such 30-day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Trustees shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware

Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustees and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Asbestos Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this Asbestos Trust Agreement.

**SECTION V**
**TRUST ADVISORY COMMITTEE**

**5.1**   **Members**. The TAC shall consist of nine (9) members, who shall initially be the persons named on the signature page hereof.

**5.2**   **Duties**. The members of the TAC shall serve in a fiduciary capacity representing all holders of present Asbestos Claims. The TAC shall have no fiduciary obligations or duties to any party other than the holders of present Asbestos Claims.  The Trustees must consult with the TAC on matters identified in Section 2.2(e) above and in other provisions herein, and must obtain the consent of the TAC on matters identified in Section 2.2(f) above. Where provided in the TDP, certain other actions by the Trustees are also subject to the consent of the TAC.  Except for the duties and obligations expressed in this Trust Agreement and the documents referenced herein (including the TDP), there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the TAC.  To the extent that, at law or in equity, the TAC has duties (including fiduciary duties) and liabilities relating thereto to the Asbestos Trust, the other parties hereto, or any beneficiary of the Asbestos Trust, it is hereby understood and agreed

- 29 -

by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the TAC expressly set forth in this Trust Agreement and the documents referenced herein (including the TDP).

5.3     **Term of Office**.

(a)     The initial members of the TAC appointed in accordance with Section 5.1 above shall serve the staggered three-, four-, or five-year terms shown on the signature pages hereof. Thereafter, each term of office shall be five (5) years. Each member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b) below, (iii) his or her removal pursuant to Section 5.3(c) below, (iv) the end of his or her term as provided above, or (v) the termination of the Asbestos Trust pursuant to Section 7.2 below.

(b)     A member of the TAC may resign at any time by written notice to the other members of the TAC, the Trustees and the Post-Effective Date Future Claimants' Representative. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause. Such removal shall be made at the recommendation of the remaining members of the TAC with the approval of the Bankruptcy Court.

5.4     **Appointment of Successor**.

(a)     If, prior to the termination of service of a member of the TAC other than as a result of removal, he or she has designated in writing an individual to succeed him or her as a

member of the TAC, such individual shall be his or her successor. If such member of the TAC did

not designate an individual to succeed him or her prior to the termination of his or her service as

contemplated above, such member's law firm may designate his or her successor. If (i) a member

of the TAC did not designate an individual to succeed him or her prior to the termination of his or

her service and such member's law firm does not designate his or her successor as contemplated

above or (ii) he or she is removed pursuant to Section 5.3(c) above, his or her successor shall be

appointed by a majority of the remaining members of the TAC or, if such members cannot agree

on a successor, the Bankruptcy Court. Nothing in this Agreement shall prevent the reappointment

of an individual serving as a member of the TAC for an additional term or terms, and there shall

be no limit on the number of terms that a TAC member may serve.

      (b)    Each successor TAC member shall serve until the earlier of (i) the end of

the full term of five (5) years for which he or she was appointed if his or her immediate predecessor

member of the TAC completed his or her term, (ii) the end of the term of the member of the TAC

whom he or she replaced if his or her predecessor member did not complete such term, (iii) his or

her death, (iv) his or her resignation pursuant to Section 5.3(b) above, (v) his or her removal

pursuant to Section 5.3(c) above, or (vi) the termination of the Asbestos Trust pursuant to Section

7.2 below.

      (c)    No successor TAC member shall be liable personally for any act or

omission of his or her predecessor TAC member.  No successor TAC member shall have any duty

to investigate the acts or omissions of his or her predecessor TAC member.  No TAC member shall

be required to post any bond or other form of surety or security unless otherwise ordered by the

Bankruptcy Court.

**5.5**    <u>**TAC's Employment of Professionals**</u>.

(a)    The TAC may but is not required to retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, and financial and investment advisors, and such other parties deemed by the TAC to be qualified as experts on matters submitted to the TAC (the "**TAC Professionals**"). The TAC and the TAC Professionals shall at all times have complete access to the Asbestos Trust's officers, employees and agents, as well as to the Trust Professionals, and shall also have complete access to all information generated by them or otherwise available to the Asbestos Trust or the Trustees provided that any information provided by the Trust Professionals shall not constitute a waiver of any applicable privilege. In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of <u>12 Del. C. § 3806(e)</u>, the written opinion of or information provided by any TAC Professional or Trust Professional deemed by the TAC to be qualified as an expert on the particular matter submitted to the TAC shall be full and complete authorization and protection in support of any action taken or not taken by the TAC in good faith and in accordance with the written opinion of or information provided by the TAC Professional or Trust Professional.

(b)    The Asbestos Trust shall promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of legal counsel pursuant to this provision in connection with the TAC's performance of its duties hereunder. The Asbestos Trust shall also promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of any other TAC Professional pursuant to this provision in connection with the TAC's performance of its duties hereunder; provided, however, that (i) the TAC has first submitted to the Asbestos Trust a written request for such reimbursement setting forth (A) the reasons why the TAC desires to employ such

- 32 -

TAC Professional, and (B) the basis upon which the TAC seeks advice independent of the Trust Professionals to meet the need of the TAC for such expertise or advice, and (ii) the Asbestos Trust has approved the TAC's request for reimbursement in writing, which approval must not be unreasonably withheld, delayed, or denied. If the Asbestos Trust agrees to pay for the TAC Professional, such reimbursement shall be treated as an Asbestos Trust expense. If the Asbestos Trust declines to pay for the TAC Professional, it must set forth its reasons in writing. If the TAC still desires to employ the TAC Professional at the Asbestos Trust's expense, the TAC and/or the Trustees shall resolve their dispute pursuant to Section 7.13 below.

(c)      In the event that the TAC retains counsel in connection with any matter whether or not related to any claim that has been or might be asserted against the TAC and irrespective of whether the Trustees pay such counsel's fees and related expenses from the Asbestos Trust Assets, any communications between the TAC and such counsel shall be deemed to be within the attorney-client privilege and protected by 12 Del. C. § 3333, regardless of whether such communications are related to any claim that has been or might be asserted by or against the TAC and regardless of whether the Trustees pay such counsel's fees and related expenses from the Asbestos Trust Assets.

**5.6**      **Compensation and Expenses of the TAC**.

The members of the TAC shall not receive compensation from the Asbestos Trust for their services as TAC members. However, the members of the TAC shall also be reimbursed promptly for all reasonable out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder. Such reimbursement shall be deemed an Asbestos Trust expense. The Asbestos Trust shall include a description of the amounts paid under this Section 5.6 in the Annual

Report to be filed with the Bankruptcy Court and provided to the Post-Effective Date Future Claimants' Representative and the TAC pursuant to Section 2.2(c)(i).

**5.7**   **Procedures for Consultation with and Obtaining the Consent of the TAC**.

**(a)**   **Consultation Process**.

(i)     In the event the Trustees are required to consult with the TAC pursuant to Section 2.2(e) above or on other matters as provided herein, the Trustees shall provide the TAC with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustees shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the Asbestos Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustees are considering such matter, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustees.

(ii)     In determining when to take definitive action on any matter subject to the consultation procedures set forth in this Section 5.7(a), the Trustees shall take into consideration the time required for the TAC, if its members so wish, to engage and consult with its own independent financial or investment advisors as to such matter. In any event, the Trustees shall not take definitive action on any such matter until at least thirty (30) days after providing the TAC with the initial written notice that such matter is under consideration by the Trustees, unless such time period is waived by the TAC.

**(b)**   **Consent Process**.

(i)     In the event the Trustees are required to obtain the consent of the TAC pursuant to Section 2.2(f) above, the Trustees shall provide the TAC with a written

- 34 -

notice stating that their consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustees propose to take, and explaining in detail the reasons why the Trustees desire to take such action. The Trustees shall provide the TAC as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Trustees shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the Asbestos Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustees are considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustees.

(ii)    The TAC must consider in good faith and in a timely fashion any request for its consent by the Trustees, and must in any event advise the Trustees in writing of its consent or its objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustees, or within such additional time as the Trustees and the TAC may agree. The TAC may not withhold its consent unreasonably. If the TAC decides to withhold its consent, it must explain in detail its objections to the proposed action. If the TAC does not advise the Trustees in writing of its consent or its objections to the action within thirty (30) days of receiving notice regarding such request (or the additional time period agreed to by the Trustees and the TAC), the TAC's consent to the proposed actions shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 5.7(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustees and/or the TAC shall resolve their dispute pursuant to Section 7.13.

- 35 -

However, the burden of proof with respect to the validity of the TAC's objection and withholding of its consent shall be on the TAC.

## SECTION VI
## THE POST-EFFECTIVE DATE FUTURE CLAIMANTS' REPRESENTATIVE

**6.1** **Duties**. The initial Post-Effective Date Future Claimants' Representative shall be the individual identified on the signature pages hereto. He shall serve in a fiduciary capacity, representing the interests of the holders of future Asbestos Claims for the purpose of protecting the rights of such persons. The Post-Effective Date Future Claimants' Representative shall have no fiduciary obligations or duties to any party other than holders of future Asbestos Claims.  The Trustees must consult with the Post-Effective Date Future Claimants' Representative on matters identified in Section 2.2(e) above and on certain other matters provided herein, and must obtain the consent of the Post-Effective Date Future Claimants' Representative on matters identified in Section 2.2(f) above. Where provided in the TDP, certain other actions by the Trustees are also subject to the consent of the Post-Effective Date Future Claimants' Representative.  Except for the duties and obligations expressed in this Trust Agreement and the documents referenced herein (including the TDP), there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Post-Effective Date Future Claimants' Representative.   To the extent that, at law or in equity, the Post-Effective Date Future Claimants Representative has duties (including fiduciary duties) and liabilities relating thereto to the Asbestos Trust, the other parties hereto, or any beneficiary of the Asbestos Trust, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Post-Effective Date Future Claimants' Representative expressly set forth in this Trust Agreement and the documents referenced herein (including the TDP).

- 36 -

6.2     **Term of Office**.

(a)     The Post-Effective Date Future Claimants' Representative shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 6.2(b) below, (iii) his or her removal pursuant to Section 6.2(c) below, or (iv) the termination of the Asbestos Trust pursuant to Section 7.2 below.

(b)     The Post-Effective Date Future Claimants' Representative may resign at any time by written notice to the Trustees. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     The Post-Effective Date Future Claimants' Representative may be removed by the Bankruptcy Court in the event he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause.

(d)     No successor Post-Effective Date Future Claimants' Representative shall be liable personally for any act or omission of his or her predecessor.  No successor Post-Effective Date Future Claimants' Representative shall have any duty to investigate the acts or omissions of his or her predecessor.  No Post-Effective Date Future Claimants' Representative shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

6.3     **Appointment of Successor**. A vacancy caused by death or resignation shall be filled with an individual designated prior to the effective date of the resignation or the death by the resigning or deceased Post-Effective Date Future Claimants' Representative.  In the event the

US-DOCS\129026027.1

resigning or deceased Post-Effective Date Future Claimants' Representative did not designate a successor prior to his or her resignation or death, the vacancy shall be filled with an individual selected by the Trustees in consultation with the TAC.  A vacancy caused by removal of the Post-Effective Date Future Claimants' Representative shall be filled with an individual selected by the Trustees in consultation with the TAC.  In the event a majority of the Trustees cannot agree, the successor shall be chosen by the Bankruptcy Court.

**6.4** **Post-Effective Date Future Claimants' Representative's Employment of Professionals**.

(a) The Post-Effective Date Future Claimants' Representative may, but is not required to, retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, and financial and investment advisors, and such other parties deemed by the Post-Effective Date Future Claimants' Representative to be qualified as experts on matters submitted to the Post-Effective Date Future Claimants' Representative (the "**Post-Effective Date Future Claimants' Representative Professionals**"). The Post-Effective Date Future Claimants' Representative and the Post-Effective Date Future Claimants' Representative Professionals shall at all times have complete access to the Asbestos Trust's officers, employees and agents, as well as to the Trust Professionals, and shall also have complete access to all information generated by them or otherwise available to the Asbestos Trust or the Trustees provided that any information provided by the Trust Professionals shall not constitute a waiver of any applicable privilege. In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any Post-Effective Date Future Claimants' Representative Professional or Trust Professional deemed by the Post-Effective Date Future Claimants' Representative to be qualified as an expert on the particular

- 38 -

matter submitted to the Post-Effective Date Future Claimants' Representative shall be full and complete authorization and protection in support of any action taken, or not taken, by the Post-Effective Date Future Claimants' Representative in good faith and in accordance with the written opinion of or information provided by the Post-Effective Date Future Claimants' Representative Professional or Trust Professional.

(b)     The Asbestos Trust shall promptly reimburse, or pay directly if so instructed, the Post-Effective Date Future Claimants' Representative for all reasonable fees and costs associated with the Post-Effective Date Future Claimants' Representative's employment of legal counsel pursuant to this provision in connection with the Post-Effective Date Future Claimants' Representative's performance of his or her duties hereunder. The Asbestos Trust shall also promptly reimburse, or pay directly if so instructed, the Post-Effective Date Future Claimants' Representative for all reasonable fees and costs associated with the Post-Effective Date Future Claimants' Representative's employment of any other Post-Effective Date Future Claimants' Representative Professionals pursuant to this provision in connection with the Post-Effective Date Future Claimants' Representative's performance of his or her duties hereunder; provided, however, that (i) the Post-Effective Date Future Claimants' Representative has first submitted to the Asbestos Trust a written request for such reimbursement setting forth (A) the reasons why the Post-Effective Date Future Claimants' Representative desires to employ the Post-Effective Date Future Claimants' Representative Professional, and (B) the basis upon which the Post-Effective Date Future Claimants' Representative seeks advice independent of the Trust Professionals to meet the need of the Post-Effective Date Future Claimants' Representative for such expertise or advice, and (ii) the Asbestos Trust has approved the Post-Effective Date Future Claimants' Representative's request for reimbursement in writing, which approval must not be unreasonably

withheld, delayed, or denied. If the Asbestos Trust agrees to pay for the Post-Effective Date Future Claimants' Representative Professional, such reimbursement shall be treated as an Asbestos Trust expense. If the Asbestos Trust declines to pay for the Post-Effective Date Future Claimants' Representative Professional, it must set forth its reasons in writing. If the Post-Effective Date Future Claimants' Representative still desires to employ the Post-Effective Date Future Claimants' Representative Professional at the Asbestos Trust's expense, the Post-Effective Date Future Claimants' Representative and/or the Trustees shall resolve their dispute pursuant to Section 7.13 below.

(c)      In the event that the Post-Effective Date Future Claimants' Representative retains counsel in connection with any matter whether or not related to any claim that has been or might be asserted against the Post-Effective Date Future Claimants' Representative and irrespective of whether the Trustees pay such counsel's fees and related expenses from the Asbestos Trust Assets, any communications between the Post-Effective Date Future Claimants' Representative and such counsel shall be deemed to be within the attorney-client privilege and protected by 12 Del. C. § 3333, regardless of whether such communications are related to any claim that has been or might be asserted by or against the Post-Effective Date Future Claimants' Representative and regardless of whether the Trustees pay such counsel's fees and related expenses from the Asbestos Trust Assets

**6.5      Compensation and Expenses of the Post-Effective Date Future Claimants' Representative**. The Post-Effective Date Future Claimants' Representative shall receive compensation from the Asbestos Trust in the form of payment at the Post-Effective Date Future Claimants' Representative's normal hourly rate for services performed. The Asbestos Trust will promptly reimburse the Post-Effective Date Future Claimants' Representative for all reasonable

- 40 -

out-of-pocket costs and expenses incurred by the Post-Effective Date Future Claimants' Representative in connection with the performance of his or her duties hereunder. Such reimbursement or direct payment shall be deemed an Asbestos Trust expense. The Asbestos Trust shall include a description of the amounts paid under this Section 6.5 in the Annual Report to be filed with the Bankruptcy Court and provided to the Post-Effective Date Future Claimants' Representative and the TAC pursuant to Section 2.2(c)(i).

**6.6** **Procedures for Consultation with and Obtaining the Consent of the Post-Effective Date Future Claimants' Representative**.

      (a) **Consultation Process**.

      (i) In the event the Trustees are required to consult with the Post-Effective Date Future Claimants' Representative pursuant to Section 2.2(e) above or on any other matters specified herein, the Trustees shall provide the Post-Effective Date Future Claimants' Representative with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustees shall also provide the Post-Effective Date Future Claimants' Representative with such reasonable access to the Trust Professionals and other experts retained by the Asbestos Trust and its staff (if any) as the Post-Effective Date Future Claimants' Representative may reasonably request during the time that the Trustees are considering such matter, and shall also provide the Post-Effective Date Future Claimants' Representative the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustees.

      (ii) In determining when to take definitive action on any matter subject to the consultation process set forth in this Section 6.6(a), the Trustees shall take into

consideration the time required for the Post-Effective Date Future Claimants' Representative, if he or she so wishes, to engage and consult with his or her own, independent financial or investment advisors as to such matter. In any event, the Trustees shall not take definitive action on any such matter until at least thirty (30) days after providing the Post-Effective Date Future Claimants' Representative with the initial written notice that such matter is under consideration by the Trustees, unless such period is waived by the Post-Effective Date Future Claimants' Representative.

    **(b)**   **<u>Consent Process</u>.**

    (i)   In the event the Trustees are required to obtain the consent of the Post-Effective Date Future Claimants' Representative pursuant to Section 2.2(f) above, the Trustees shall provide the Post-Effective Date Future Claimants' Representative with a written notice stating that his or her consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustees propose to take, and explaining in detail the reasons why the Trustees desire to take such action. The Trustees shall provide the Post-Effective Date Future Claimants' Representative as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Trustees shall also provide the Post-Effective Date Future Claimants' Representative with such reasonable access to the Trust Professionals and other experts retained by the Asbestos Trust and its staff (if any) as the Post-Effective Date Future Claimants' Representative may reasonably request during the time that the Trustees are considering such action, and shall also provide the Post-Effective Date Future Claimants' Representative the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustees.

US-DOCS\129026027.1

(ii)    The Post-Effective Date Future Claimants' Representative must consider in good faith and in a timely fashion any request for his or her consent by the Trustees, and must in any event advise the Trustees in writing of his or her consent or objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustees, or within such additional time as the Trustees and the Post-Effective Date Future Claimants' Representative may agree. The Post-Effective Date Future Claimants' Representative may not withhold his or her consent unreasonably. If the Post-Effective Date Future Claimants' Representative decides to withhold consent, he or she must explain in detail his or her objections to the proposed action. If the Post-Effective Date Future Claimants' Representative does not advise the Trustees in writing of his or her consent or objections to the proposed action within thirty (30) days of receiving the notice from the Trustees regarding such consent (or the additional time period agreed to by the Trustees and the Post-Effective Date Future Claimants' Representative), the Post-Effective Date Future Claimants' Representative's consent shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 6.6(b), the Post-Effective Date Future Claimants' Representative continues to object to the proposed action and to withhold his or her consent to the proposed action, the Trustees and/or the Post-Effective Date Future Claimants' Representative shall resolve their dispute pursuant to Section 7.13. However, the burden of proof with respect to the validity of the Post-Effective Date Future Claimants' Representative's objection and withholding of his or her consent shall be on the Post-Effective Date Future Claimants' Representative.

**SECTION VII**
**GENERAL PROVISIONS**

    **7.1**    **Irrevocability**. To the fullest extent permitted by applicable law, the Asbestos Trust is irrevocable.

    **7.2**    **Term; Termination**.

    (a)    The term for which the Asbestos Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of this Section 7.2 set forth below.

    (b)    The Asbestos Trust shall automatically dissolve on the date (the "**Dissolution Date**") ninety (90) days after the first to occur of the following events:

    (i)    the date on which the Trustees decide to dissolve the Asbestos Trust because (A) all Asbestos Claims duly filed with the Asbestos Trust have been liquidated and paid to the extent provided in this Asbestos Trust Agreement and the TDP or have been disallowed, to the extent possible based upon the funds available through the Plan, (B) twelve (12) consecutive months have elapsed during which no new Asbestos Claim has been filed with the Asbestos Trust, (C) in the judgment of the Trustees, after consultation with the TAC and the Post-Effective Date Future Claimants' Representative, a *de minimis* number of Asbestos Claims are being filed with the Asbestos Trust at a *de minimi*s rate, or (D) in the judgment of the Trustees, after consultation with the TAC and the Post-Effective Date Future Claimants' Representative, the continued administration of the Asbestos Trust is uneconomic given the anticipated future costs of operating the Asbestos Trust compared to the amount of the anticipated future payments to holders of Asbestos Claims; or

    (ii)    if the Trustees have procured and have in place irrevocable insurance policies and have established claims handling agreements and other necessary

- 44 -

arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses of the Asbestos Trust in a manner consistent with this Asbestos Trust Agreement and the TDP, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a final order; or

(iii)    except as otherwise provided above in this Section 7.2(b), it is intended that the Asbestos Trust not be limited in duration with respect to any rule against perpetuities to the greatest extent permitted under Delaware law, but to the extent that any rule against perpetuities shall be deemed applicable to the Asbestos Trust, the date on which twenty-one (21) years less ninety-one (91) days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof.

(c)    On the Dissolution Date or as soon as reasonably practicable, after the wind-up of the Asbestos Trust's affairs by the Trustees and payment of all the Asbestos Trust's liabilities have been provided for as required by applicable law, including Section 3808 of the Act, all monies remaining in the Asbestos Trust estate shall be given to such organization(s) exempt from United States federal income tax under section 501(c)(3) of the Internal Revenue Code, which tax-exempt organization(s) shall be selected by the Trustees using their reasonable discretion; provided, however, that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on, or the relief of suffering of individuals suffering from asbestos related disorders, and (ii) the tax-exempt organization(s) shall not bear any relationship to the Reorganized Debtor within the meaning of section 468B(d)(3) of the Internal Revenue Code. Notwithstanding any contrary provision of the Plan and related documents, this Section 7.2(c) cannot be modified or amended.

- 45 -

(d)     Following the dissolution and distribution of the Asbestos Trust Assets, the Asbestos Trust shall terminate and the Trustees and the Delaware Trustee (acting solely at the written direction of the Trustees), or any one of them, shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the Asbestos Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Asbestos Trust Agreement, the existence of the Asbestos Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

**7.3**     __Amendments__. The Trustees, after consultation with the TAC and the Post-Effective Date Future Claimants' Representative, and subject to the unanimous consent of the TAC and the Post-Effective Date Future Claimants' Representative, may modify or amend this Asbestos Trust Agreement and the Asbestos Trust Bylaws. The Trustees, after consultation with the TAC and the Post-Effective Date Future Claimants' Representative, and subject to the consent of the TAC and the Post-Effective Date Future Claimants' Representative, may modify or amend the TDP; provided, however, that no amendment to the TDP shall be inconsistent with the provisions limiting amendments to that document provided therein.  Any modification or amendment made pursuant to this Section must be done in writing. Notwithstanding anything contained in this Asbestos Trust Agreement or the TDP to the contrary, neither this Asbestos Trust Agreement, the Asbestos Trust Bylaws, the TDP, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify (i) the applicability of section 524(g) of the Bankruptcy Code to the Plan and the Confirmation Order, (ii) the efficacy, enforceability, or scope of the Asbestos Channeling Injunction or any other injunction or release issued or granted in connection with the Plan, or (iii) the Asbestos Trust's Qualified Settlement Fund status under the QSF Regulations.  Any amendment affecting the rights, duties, immunities, or liabilities of the

Delaware Trustee shall require the Delaware Trustee's written consent. No amendment shall be made to this Trust Agreement or the Asbestos Claimant Release that would adversely affect any rights, duties, immunities, indemnification, or liabilities of the Reorganized Debtor or any other Protected Party provided pursuant to the Plan or Confirmation Order, including, without limitation, the scope and terms of the releases and injunctions provided in the Plan and Confirmation Order, without the advance written consent of the Reorganized Debtor and O-I Glass, Inc. or their respective successors or assigns.

**7.4     Meetings**. The Delaware Trustee shall not be required nor permitted to attend meetings relating to the Asbestos Trust.

**7.5     Severability**. Should any provision in this Asbestos Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Asbestos Trust Agreement.

**7.6     Notices**. Notices to persons asserting claims shall be given by first class mail, postage prepaid or by e-mail, at the address of such person, or, where applicable, such person's legal representative, in each case as provided on such person's claim form submitted to the Asbestos Trust with respect to his or her Asbestos Claim.

(a)     Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by e-mail or facsimile pursuant to the instructions listed below, or mailed by registered or certified mail, return receipt requested, postage prepaid, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

US-DOCS\129026027.1

To the Asbestos Trust through the Trustees:

    D. LeAnne Jackson, Esquire
    1590 Dinsmore Road
    Alpharetta, Georgia 30004
    Email:  luluelegante1@icloud.com

    Allen N. Schwartz, Esquire
    Kralovec, Jambois & Schwartz
    60 W. Randolph Street, 4th Floor
    Chicago, Illinois 6001
    Facsimile:  (312) 855-0068
    Email:  aschwartz@kjs-law.com

    The Hon. George J. Silver (Ret.)
    137 Riverside Drive
    Apartment 9D
    New York, New York 10024
    Email:  Guwsman@aol.com

    With copies to:

    [TO COME]

To the Delaware Trustee:

    Wilmington Trust, National Association
    1100 N. Market Street
    Wilmington, Delaware 19890-1625
    Attn:  Corporate Trust Administration/David Young
    Email:  dyoung@wilmingtontrust.com
    Phone:  (302) 636-5216
    Fax:  (302) 636-4149

To the TAC:

    Matthew P. Bergman, Esquire
    Bergman Draper Oslund, PLLC
    821 2nd Avenue, Suite 2100
    Seattle, Washington 98104
    E-mail:  matt@bergmanlegal.com

    Christopher R. Guinn, Esquire
    Simmons Hanly Conroy LLC
    One Court Street
    Alton, Illinois 60602
    E-mail:  cguinn@simmonsfirm.com

Lisa Nathanson Busch, Esquire
Weitz & Luxenberg, P.C.
700 Broadway, 8th Floor
New York, New York 10003
Facsimile: (212) 344-5461
E-mail: lbusch@weitzlux.com

John D. Cooney, Esquire
Cooney & Conway
120 N. LaSalle Street, 30th Floor
Chicago, Illinois 60602
Facsimile: (312) 236-3029
E-mail: jcooney@cooneyconway.com

Beth Gori, Esquire
The Gori Law Firm, P.C.
156 North Main Street
Edwardsville, Illinois 62025
E-mail: beth@gorilaw.com

Peter A. Kraus, Esquire
Waters Kraus
3141 Hood Street, Suite 700
Dallas, Texas 75219
E-mail: kraus@waterskraus.com

Marcus E. Raichle, Jr., Esquire
Maune Raichle Hartley French & Mudd
1015 Locust Street, Suite 1200
St. Louis, Missouri 63101
E-mail: mraichle@mrhfmlaw.com

Audrey Perlman Raphael, Esquire
Levy Konigsberg LLP
605 Third Avenue, 33rd Floor
New York, New York 10158
E-mail: araphael@levylaw.com

Christopher Thoron, Esquire
The O'Brien Law Firm, P.C.
815 Geyer Avenue
St. Louis, Missouri 63104
E-mail: thoron@obrienlawfirm.com

- 49 -

To the Post-Effective Date Future Claimants' Representative:

    James L. Patton, Esquire
    Future Claimants' Representative
    c/o Young Conaway Stargatt & Taylor, LLP
    Rodney Square
    1000 North King Street
    Wilmington, Delaware 19801
    Facsimile:  (302) 571-253
    E-mail: jpatton@ycst.com

    With a copy to:

    Edwin J. Harron, Esquire
    Young Conaway Stargatt & Taylor, LLP
    Rodney Square
    1000 North King Street
    Wilmington, Delaware 19801
    Facsimile:  (302) 571-253
    E-mail: eharron@ycst.com

To the Reorganized Debtor:

    Paddock Enterprises, LLC
    One Michael Owens Way
    Perrysburg, Ohio 43551
    Attn: David J. Gordon, President and Chief Restructuring Officer
    Telephone: (415) 738-8282
    Email: dgordon@djoservicesllc.com

With a copies to:

| | |
|---|---|
| Latham & Watkins LLP | Richards, Layton & Finger, P.A. |
| 355 South Grand Avenue, Suite 100 | One Rodney Square |
| Los Angeles, California 90071 | 920 N. King Street |
| Attn: Jeffrey E. Bjork, Esq. | Wilmington, Delaware 19801 |
|     Kimberly A. Posin, Esq. | Attn: John H. Knight, Esq. |
|     Helena G. Tseregounis, Esq. |     Michael J. Merchant, Esq. |
| Telephone:  (213) 485-1234 |     Brendan J. Schlauch, Esq. |
| Facsimile:  (213) 891-8763 |     Sarah Silveira, Esq. |
| Emails:  jeff.bjork@lw.com | Telephone:  (302) 651-7700 |
|     kim.posin@lw.com | Facsimile:  (302) 651-7701 |
|     helena.tseregounis@lw.com | Emails:  knight@rlf.com |
| |     merchant@rlf.com |
| |     schlauch@rlf.com |
| |     silveira@rlf.com |

(b)        All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

7.7      **Successors and Assigns**. The provisions of this Asbestos Trust Agreement shall be binding upon and inure to the benefit of the Debtor, the Asbestos Trust, the Trustees, and the Reorganized Debtor, and their respective successors and assigns, except that neither the Debtor, the Asbestos Trust, the Trustees, nor the Reorganized Debtor may assign or otherwise transfer any of its, or their, rights or obligations, if any, under this Asbestos Trust Agreement except, in the case of the Asbestos Trust and the Trustees, as contemplated by Section 2.1 above.

7.8      **Limitation on Claim Interests for Securities Laws Purposes**. Asbestos Claims, and any interests therein (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest; provided, however, that clause (a) of this Section 7.8 shall not apply to the holder of a claim that is subrogated to an Asbestos Claim as a result of its satisfaction of such Asbestos Claim.

7.9      **Entire Agreement; No Waiver**. The entire agreement of the parties relating to the subject matter of this Asbestos Trust Agreement is contained herein and in the documents referred to herein, and this Asbestos Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise

- 51 -

thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

     **7.10**   **Headings**. The headings used in this Asbestos Trust Agreement are inserted for convenience only and do not constitute a portion of this Asbestos Trust Agreement, nor in any manner affect the construction of the provisions of this Asbestos Trust Agreement.

     **7.11**   **Governing Law**.  The validity and construction of this Asbestos Trust Agreement and all amendments hereto and thereto shall be governed by laws of the State of Delaware, and the rights of all parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; provided, however, that the parties hereto intend that the provisions hereof shall control and there shall not be applicable to the Asbestos Trust, the Trustees, the Delaware Trustee, the TAC, the Post-Effective Date Future Claimants' Representative, or this Asbestos Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges; (b) affirmative requirements to post bonds for trustees, officers, agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of real or personal property; (d) fees or other sums payable to trustees, officers, agents or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or otherwise) in trust assets; (h) the ability of beneficial owners or other persons to

terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustees, the Delaware Trustee, the TAC, or the Post-Effective Date Future Claimants' Representative set forth or referenced in this Asbestos Trust Agreement.  Section 3540 of the Act shall not apply to the Asbestos Trust.

7.12    **Settlor's Representative and Cooperation**. The Debtor is hereby irrevocably designated as the Settlor, and it is hereby authorized to take any action required of the Settlor by the Trustees in connection with the Asbestos Trust Agreement. The Reorganized Debtor agrees to cooperate in implementing the goals and objectives of this Asbestos Trust Agreement.  If the Asbestos Trust requests that the Reorganized Debtor take any actions outside of the activities covered by the Asbestos Records Cooperation Agreement, the Asbestos Trust will reimburse the Reorganized Debtor for any reasonable expenses incurred by the Reorganized Debtor in taking such actions.

7.13    **Dispute Resolution**. Any disputes that arise under this Asbestos Trust Agreement or under the TDP among the parties hereto shall be resolved by submission of the matter to an alternative dispute resolution ("**ADR**") process mutually agreeable to the parties involved. Should any party to the ADR process be dissatisfied with the decision of the arbitrator(s), that party may apply to the Bankruptcy Court for a judicial determination of the matter. Any review conducted by the Bankruptcy Court shall be *de novo*. In any case, if the dispute arose pursuant to the consent provision set forth in Section 5.7(b) (in the case of the TAC) or Section 6.6(b) (in the case of the Post-Effective Date Future Claimants' Representative), the burden of proof shall be on the party or parties who withheld consent to show that the objection was valid. Should the dispute not be

resolved by the ADR process within thirty (30) days after submission, the parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court. If the Trustees determine that the matter in dispute is exigent and cannot await the completion of the ADR process, the Trustees shall have the discretion to elect out of the ADR process altogether or at any stage of the process and seek resolution of the dispute in the Bankruptcy Court.

7.14    **Enforcement and Administration**. The provisions of this Asbestos Trust Agreement and the TDP attached hereto shall be enforced by the Bankruptcy Court pursuant to the Plan. The parties hereby further acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction over the settlement of the accounts of the Trustees and over any disputes hereunder not resolved by alternative dispute resolution in accordance with Section 7.13 above.

7.15    **Effectiveness**. This Asbestos Trust Agreement shall not become effective until it has been executed and delivered by all the parties hereto and until the Effective Date of the Plan has occurred.

7.16    **Counterpart Signatures**. This Asbestos Trust Agreement may be executed in any number of counterparts and by different parties on separate counterparts (including by facsimile or portable document format (.pdf)), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Asbestos Trust Agreement as of the _____ day of _____, 2022.


**DEBTOR**

Paddock Enterprises, LLC


By: _____
Name:  David J. Gordon
Title:  President and Chief Restructuring Officer


**ASBESTOS TRUSTEES**                          **ASBESTOS CLAIMANTS' COMMITTEE**


_____        By: _____
Name:  D. LeAnne Jackson
Expiration Date of Initial Term:  _____
Anniversary of the date of this Asbestos           **DELAWARE TRUSTEE**
Trust Agreement
                                                   Wilmington Trust, National Association


                                                   By: _____
_____        Name: _____
Name:  Allen N. Schwartz             Title: _____
Expiration Date of Initial Term:  _____
Anniversary of the date of this Asbestos
Trust Agreement


_____
Name:  George J. Silver
Expiration Date of Initial Term:  _____
Anniversary of the date of this Asbestos
Trust Agreement

**ASBESTOS TRUST ADVISORY COMMITTEE**

_____
Name:  Matthew P. Bergman
Expiration Date of Initial Term: _____ Anniversary
of the date of this Asbestos Trust Agreement

_____
Name:  Christopher R. Guinn
Expiration Date of Initial Term:  _____ Anniversary
of the date of this Asbestos Trust Agreement

_____
Name:  Lisa Nathanson Busch
Expiration Date of Initial Term:  _____Anniversary
of the date of this Asbestos Trust Agreement

_____
Name:  John D. Cooney
Expiration Date of Initial Term:  _____ Anniversary
of the date of this Asbestos Trust Agreement

_____
Name:  Beth Gori
Expiration Date of Initial Term:  _____ Anniversary
of the date of this Asbestos Trust Agreement

_____
Name:  Peter A. Kraus
Expiration Date of Initial Term:  _____Anniversary
of the date of this Asbestos Trust Agreement

_____
Name:  Marcus E. Raichle, Jr.
Expiration Date of Initial Term:  _____  Anniversary
of the date of this Asbestos Trust Agreement


_____
Name:  Audrey Perlman Raphael
Expiration Date of Initial Term:  _____  Anniversary
of the date of this Asbestos Trust Agreement


_____
Name: Christopher Thoron
Expiration Date of Initial Term:  _____  Anniversary
of the date of this Asbestos Trust Agreement


**POST-EFFECTIVE DATE FUTURE
CLAIMANTS' REPRESENTATIVE**


_____
James L. Patton, Jr.

## <u>EXHIBIT B</u>

## ASBESTOS TRUST DISTRIBUTION PROCEDURES

**OWENS-ILLINOIS ASBESTOS PERSONAL INJURY
TRUST DISTRIBUTION PROCEDURES**

# OWENS-ILLINOIS ASBESTOS PERSONAL INJURY
## TRUST DISTRIBUTION PROCEDURES
### TABLE OF CONTENTS

Page

**SECTION 1 Introduction** ...................................................................................................**1**
    1.1    Purpose ...............................................................................................................1
    1.2    Interpretation .....................................................................................................1

**SECTION 2 Overview** .......................................................................................................**2**
    2.1    Asbestos Trust Goals .........................................................................................2
    2.2    Claims Liquidation Procedures ..........................................................................3
    2.3    Application of the Payment Percentage ..............................................................5
    2.4    Asbestos Trust's Determination of the Maximum Annual Payment and
          Maximum Available Payment ............................................................................6
    2.5    Claims Payment Ratio ........................................................................................9
    2.6    Indirect Asbestos Claims ..................................................................................12

**SECTION 3 TDP Administration** ....................................................................................**12**
    3.1    Asbestos Trust Advisory Committee and Post-Effective Date Future
          Claimants' Representative .................................................................................12
    3.2    Consent and Consultation Procedures ..............................................................12

**SECTION 4 Payment Percentage; Periodic Estimates** ...................................................**13**
    4.1    Uncertainty of the Debtor's Personal Injury Asbestos Liabilities .....................13
    4.2    Computation of Payment Percentage ................................................................13
    4.3    Applicability of the Payment Percentage ..........................................................15

**SECTION 5 Resolution of Asbestos Claims.** ....................................................................**18**
    5.1    Ordering, Processing and Payment of Asbestos Claims. ....................................18
          5.1(a)  Ordering of Asbestos Claims. ...............................................................18
                 5.1(a)(1)  Establishment of the FIFO Processing Queue ...........................18
                 5.1(a)(2)  Effect of Statutes of Limitations and Repose ...........................19
          5.1(b)  Payment of Asbestos Claims ................................................................20
    5.2    Resolution of Pre-Petition Liquidated Claims. ..................................................21
          5.2(a)  Processing and Payment ......................................................................21
          5.2(b)  Marshalling of Security........................................................................23
    5.3    Resolution of Unliquidated Asbestos Claims .....................................................24
          5.3(a)  Expedited Review Process. ...................................................................25
                 5.3(a)(1)  In General ...............................................................................25
                 5.3(a)(2)  Claims Processing Under Expedited Review ...........................26
                 5.3(a)(3)  Disease Levels, Scheduled Values and
                         Medical/Exposure Criteria ........................................................26
           5.3(b)  Individual Review Process. ...................................................................30
                 5.3(b)(1)  In General ...............................................................................30

i

|  |  | 5.3(b)(1)(A)  Review of Medical/Exposure Criteria ................. | 32 |
|  |  | 5.3(b)(1)(B)  Review of Liquidated Value ................................ | 33 |
|  |  | 5.3(b)(2)  Valuation Factors to Be Considered in Individual Review ................................................................................. | 34 |
|  |  | 5.3(b)(3)  Scheduled, Average and Maximum Values ............... | 36 |
| 5.4 | Categorizing Claims as Extraordinary and/or Exigent Hardship ........................ | | 36 |
|  | 5.4(a)  Extraordinary Claims ................................................................ | | 36 |
|  | 5.4(b)  Exigent Hardship Claims .......................................................... | | 40 |
| 5.5 | Secondary Exposure Claims ........................................................................ | | 40 |
| 5.6 | Indirect Asbestos Claims ............................................................................. | | 41 |
| 5.7 | Evidentiary Requirements ............................................................................ | | 44 |
|  | 5.7(a)  Medical Evidence .................................................................... | | 44 |
|  |  | 5.7(a)(1)  In General ................................................................ | 44 |
|  |  | 5.7(a)(1)(A)  Disease Levels I–IV ............................... | 44 |
|  |  | 5.7(a)(1)(B)  Disease Levels V–VIII .......................... | 45 |
|  |  | 5.7(a)(1)(C)  Exception to the Exception for Certain Pre-Petition Claims ................................................. | 46 |
|  |  | 5.7(a)(2)  Credibility of Medical Evidence .............................. | 46 |
|  | 5.7(b)  Exposure Evidence .................................................................. | | 47 |
|  |  | 5.7(b)(1)  In General ................................................................ | 47 |
|  |  | 5.7(b)(2)  Significant Occupational Exposure ......................... | 48 |
|  |  | 5.7(b)(3)  Debtor Exposure ..................................................... | 49 |
| 5.8 | Claims Audit Program .................................................................................. | | 49 |
| 5.9 | Second Disease Claims ................................................................................. | | 51 |
| 5.10 | Arbitration ................................................................................................... | | 52 |
|  | 5.10(a) Establishment of ADR Procedures ............................................ | | 52 |
|  | 5.10(b) Claims Eligible for Arbitration .................................................. | | 53 |
|  | 5.10(c) Limitations on and Payment of Arbitration Awards .................. | | 53 |
| 5.11 | Litigation ..................................................................................................... | | 54 |

| **SECTION 6 Claims Materials** ............................................................................. | | | **54** |
| 6.1 | Claims Materials ......................................................................................... | | 54 |
| 6.2 | Content of Claims Materials ........................................................................ | | 55 |
| 6.3 | Withdrawal or Deferral of Claims ............................................................... | | 55 |
| 6.4 | Filing Fees ................................................................................................... | | 56 |
| 6.5 | Confidentiality of Claimants' Submissions ................................................. | | 56 |

| **SECTION 7 General Guidelines for Liquidating and Paying Asbestos Claims** ................... | | | **57** |
| 7.1 | Showing Required ........................................................................................ | | 57 |
| 7.2 | Costs Considered ......................................................................................... | | 57 |
| 7.3 | Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity ........................................................................................ | | 58 |
| 7.4 | Punitive Damages ........................................................................................ | | 59 |
| 7.5 | Sequencing Adjustment ............................................................................... | | 59 |
|  | 7.5(a)  In General ............................................................................... | | 59 |
|  | 7.5(b)  Unliquidated Asbestos Claims ................................................ | | 60 |
|  | 7.5(c)  Pre-Petition Liquidated Claims ............................................... | | 60 |

7.6   Suits in the Tort System ..................................................................................61
7.7   Payment of Judgments for Money Damages ..................................................61
7.8   Releases ............................................................................................................62
7.9   Third-Party Services .......................................................................................63

**SECTION 8 Miscellaneous ..................................................................................63**
8.1   Amendments .....................................................................................................63
8.2   Severability ......................................................................................................64
8.3   Governing Law .................................................................................................64

iii

## OWENS-ILLINOIS ASBESTOS PERSONAL INJURY
## TRUST DISTRIBUTION PROCEDURES

The Owens-Illinois Asbestos Personal Injury Trust Distribution Procedures (the "**TDP**") contained herein provide for resolving all "Asbestos Claims." as defined in the Second Amended Plan of Reorganization For Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code dated April 1, 2022 (as it may be amended or supplemented, the "**Plan**"),[1] as provided in and required by the Plan and the Owens-Illinois Asbestos Personal Injury Trust Agreement (the "**Asbestos Trust Agreement**").  The Plan and Asbestos Trust Agreement establish the Owens-Illinois Asbestos Personal Injury Trust (the "**Asbestos Trust**").  The Asbestos Trustees of the Asbestos Trust (the "**Trustees**") shall implement and administer this TDP in accordance with the Asbestos Trust Agreement.

## SECTION 1

## Introduction

**1.1** **Purpose**.  This TDP has been adopted pursuant to the Asbestos Trust Agreement. It is designed to provide fair, equitable and substantially similar treatment for all Asbestos Claims that may presently exist or may arise in the future.

**1.2** **Interpretation**.  Except as expressly provided below, nothing in this TDP shall be deemed to create a substantive right for any claimant.  The rights and benefits provided herein to holders of Asbestos Claims shall vest in such holders as of the Effective Date.

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Plan and the Asbestos Trust Agreement.

## SECTION 2

## Overview

**2.1**   **Asbestos Trust Goals**.  The goal of the Asbestos Trust is to treat all claimants similarly and equitably in accordance with the requirements of Section 524(g) of the Bankruptcy Code.  This TDP furthers that goal by setting forth procedures for processing and paying the Debtor's several share with respect to the unpaid portion of the liquidated value of asbestos claims generally on an impartial, first-in-first-out ("**FIFO**") basis, with the intention of paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values paid by the Debtor's predecessor, Owens-Illinois, Inc. ("**Old O-I**") for substantially similar claims in the applicable tort system.[2]  To this end, the TDP establishes a schedule of eight asbestos-related diseases ("**Disease Levels**"), all of which have presumptive medical and exposure requirements ("**Medical/Exposure Criteria**"), seven of which have specific liquidated values ("**Scheduled Values**"), and five of which have anticipated average values ("**Average Values**") and caps on their liquidated values ("**Maximum Values**").  The Disease Levels, Medical/Exposure Criteria, Scheduled Values, Average Values and Maximum Values, which are set forth in Sections 5.3 and 5.4 below, have all been selected and derived with the intention of achieving a fair allocation of the Asbestos Trust funds as among claimants suffering from different disease processes in light of the best available information considering the domestic settlement history of Old O-I and the rights claimants would have in the applicable tort system absent the bankruptcy.  A claimant may not assert more than one claim hereunder subject to the provisions set forth in Section 5.9 below.

---

[2] References to "tort system" shall include both domestic and foreign tort systems and other foreign claims resolution systems, where appropriate.

2.2     **Claims Liquidation Procedures**.  Asbestos Claims shall generally be processed based on their place in the FIFO Processing Queue to be established pursuant to Section 5.1(a) below.  The Asbestos Trust shall take all reasonable steps to resolve Asbestos Claims as efficiently and expeditiously as possible at each stage of claims processing and arbitration, which steps may include, in the Asbestos Trust's sole discretion, conducting settlement discussions with claimants' representatives with respect to more than one claim at a time, provided that the claimants' respective positions in the FIFO Processing Queue are maintained and each claim is individually evaluated pursuant to the valuation factors set forth in Section 5.3(b)(2) below.  The Asbestos Trust shall also make every effort to resolve each year at least that number of Asbestos Claims required to exhaust the Maximum Annual Payment and the Maximum Available Payment for Category A and Category B claims, as those terms are defined below.

The Asbestos Trust shall, except as set forth below, liquidate all Asbestos Claims except Foreign Claims (as defined in Section 5.3(b)(1) below)[3] that meet the presumptive Medical/Exposure Criteria of Disease Levels I–V, VII and VIII under the Expedited Review Process described in Section 5.3(a) below.  Claims involving Disease Levels I–V, VII and VIII that do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may undergo the Asbestos Trust's Individual Review Process described in Section 5.3(b) below.  In such a case, notwithstanding that the claim does not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level, the Asbestos Trust can offer the claimant an amount up to the Scheduled Value of that Disease Level if the Asbestos Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the applicable tort system.

---

[3] For all purposes hereunder, Asbestos Claims of individuals exposed in Canada who were residents in Canada when such claims were filed shall be considered and treated as "domestic claims" (*i.e.*, non-Foreign Claims) with domestic settlement history.

Claimants holding Asbestos Claims involving Disease Levels IV, V, VII, and VIII may alternatively seek to establish a liquidated value for the claim that is greater than its Scheduled Value by electing the Asbestos Trust's Individual Review Process.  However, the liquidated value of an Asbestos Claim that undergoes the Individual Review Process for valuation purposes may be determined to be less than the Scheduled Value for the applicable Disease Level, and in any event shall not exceed the Maximum Value for the relevant Disease Level set forth in Section 5.3(b)(3) below, unless the claim qualifies as an Extraordinary Claim as defined in Section 5.4(a) below, in which case its liquidated value cannot exceed the maximum extraordinary value specified in Section 5.4(a) for such claims.  Level VI (Lung Cancer 2) claims and all Foreign Claims may be liquidated[4] only pursuant to the Asbestos Trust's Individual Review Process.

Based upon Old OI's domestic claims settlement history in light of applicable tort law, and current projections of present and future unliquidated Asbestos Claims, the Scheduled Values and Maximum Values set forth in Section 5.3(b)(3) have been established for each of the Disease Levels that are eligible for Individual Review of their liquidated values.  The Trustees shall use their best efforts to ensure that the Asbestos Trust processes claims such that over time the combination of domestic settlements at the Scheduled Values and those resulting from the Individual Review Process for those Disease Levels approximates the Average Values set forth in Section 5.3(b)(3) below for each such Disease Level.

All unresolved disputes over a claimant's medical condition, exposure history, and/or the validity or liquidated value of a claim shall be subject to binding or non-binding arbitration as set forth in Section 5.10 below, at the election of the claimant, under the ADR Procedures to be

---

[4] For purposes of this TDP, "liquidated" means approved and valued by the Asbestos Trust.

developed by the Asbestos Trust.  Asbestos Claims that are the subject of a dispute with the Asbestos Trust that cannot be resolved by non-binding arbitration may enter the tort system as provided in Sections 5.11 and 7.6 below.  However, if and when a claimant obtains a judgment in the tort system, the judgment shall be payable (subject to the Payment Percentage, Maximum Available Payment, and Claims Payment Ratio provisions set forth below) as provided in Section 7.7 below.

2.3     **Application of the Payment Percentage**.  After the liquidated value of an Asbestos Claim other than a claim involving Other Asbestos Disease (Disease Level I – Cash Discount Payment), as defined in Section 5.3(a)(3) below, is determined pursuant to the procedures set forth herein for Expedited Review, Individual Review, arbitration, or litigation in the tort system, as applicable, the claimant shall ultimately receive a pro-rata share of that value based on a Payment Percentage described in Section 4.2 below.  The Payment Percentage shall also apply to all Pre-Petition Liquidated Claims as provided in Section 5.2 below and to all sequencing adjustments paid pursuant to Section 7.5 below.

The initial Payment Percentage is 100% (the "**Initial Payment Percentage**").  The Initial Payment Percentage shall apply to all Asbestos Trust Voting Claims approved for payment by the Asbestos Trust subject to the provisions of Section 4.2 below.  The term "**Asbestos Trust Voting Claims**" includes (i) Pre-Petition Liquidated Claims as defined in Section 5.2(a) below; (ii) claims filed against Old O-I or the Debtor in the tort system or actually submitted to Old O-I or the Debtor pursuant to an administrative claims processing agreement prior to the Petition Date of January 6, 2020 (the "**Petition Date**"); and (iii) all asbestos claims filed against another defendant in the tort system prior to January 12, 2022, the date the initial Plan was filed with the Bankruptcy Court (the "**Plan Filing Date**"); provided, however, that (1) the holder of a claim

described in subsection (i), (ii) or (iii) above, or his or her authorized agent, actually voted to accept or reject the Plan pursuant to the voting procedures established by the Bankruptcy Court, unless such holder certifies to the satisfaction of the Trustees that he or she was prevented from voting in this proceeding as a result of circumstances resulting in a state of emergency affecting, as the case may be, the holder's residence, principal place of business or legal representative's place of business at which the holder or his or her legal representative receives notice and/or maintains material records relating to his or her Asbestos Trust Voting Claim; and provided further that (2) the claim was subsequently filed with the Asbestos Trust pursuant to Section 6.1 below by the Initial Claims Filing Date defined in Section 4.2 below.

The Payment Percentage may thereafter be adjusted from time to time by the Asbestos Trust with the consent of the Asbestos Trust Advisory Committee (the "**TAC**") and the Post-Effective Date Future Claimants' Representative to reflect then-current estimates of the Asbestos Trust's assets and its liabilities, as well as then-estimated value of then-pending and future Asbestos Claims.  Any adjustment to the Initial Payment Percentage shall be made only pursuant to Section 4.2 below.  If the Payment Percentage is increased over time, claimants whose claims were liquidated and paid in prior periods under the TDP shall receive additional payments only as provided in Section 4.2 below.  Because there is uncertainty in the prediction of both the number and severity of future Asbestos Claims, and the value of the Asbestos Trust's assets, no guarantee can be made of any particular Payment Percentage that will be applicable to an Asbestos Claim's liquidated value.

**2.4    Asbestos Trust's Determination of the Maximum Annual Payment and Maximum Available Payment**.  The Asbestos Trust shall model the cash flow, principal, and income year-by-year to be paid over its entire life to ensure that all present and future holders of

Asbestos Claims are compensated at the then applicable Payment Percentage.  In each year, based upon that model of the cash flow, the Asbestos Trust shall be empowered to pay out the portion of its funds payable for that year according to the model (the "**Maximum Annual Payment**").  The Asbestos Trust's aggregate distributions to all claimants for that year shall not exceed the Maximum Annual Payment.  The then applicable Payment Percentage and the Maximum Annual Payment figures are based on projections over the lifetime of the Asbestos Trust.  As noted in Section 2.3 above, if such long-term projections are revised, the applicable Payment Percentage may be adjusted accordingly, which would result in a new model of the Asbestos Trust's anticipated cash flow and a new calculation of the Maximum Annual Payment figures.

However, year-to-year variations in the Asbestos Trust's flow of claims or the value of its assets, including earnings thereon, will not mean necessarily that the long-term projections are inaccurate; they may simply reflect normal variations, both up and down, from the smooth curve created by the Asbestos Trust's long-term projections.  If, in a given year, however, asset values, including earnings thereon, are below projections, the Asbestos Trust may need to distribute less in that year than would otherwise be permitted based on the original Maximum Annual Payment derived from long-term projections.  Accordingly, the original Maximum Annual Payment for a given year may be temporarily decreased if the present value of the assets of the Asbestos Trust as measured on a specified date during the year is less than the present value of the assets of the Asbestos Trust projected for that date by the cash flow model described in the foregoing paragraph.  The Asbestos Trust shall make such a comparison whenever the Trustees become aware of any information that suggests that such a comparison should be made.  If the Asbestos Trust determines that as of the date in question, the present value of the Asbestos Trust's assets is

7

less than the projected present value of its assets for such date, then it will remodel the cash flow year-by-year to be paid over the life of the Asbestos Trust based upon the reduced value of the total assets as so calculated and identify the reduced portion of its funds to be paid for that year, which will become the Temporary Maximum Annual Payment (additional reductions in the Maximum Annual Payment can occur during the course of that year based upon subsequent calculations).  If in any year the Maximum Annual Payment was temporarily reduced as a result of an earlier calculation and, based upon a later calculation, the difference between the projected present value of the Asbestos Trust's assets and the actual present value of its assets has decreased, the Temporary Maximum Annual Payment shall be increased to reflect the decrease in the differential.  In no event, however, shall the Temporary Maximum Annual Payment exceed the original Maximum Annual Payment.  As a further safeguard, the Asbestos Trust's distribution to all claimants for the first nine months of a year shall not exceed 85% of the Maximum Annual Payment determined for that year.  If on December 31 of a given year, the original Maximum Annual Payment for such year is not in effect, the original Maximum Annual Payment for the following year shall be reduced proportionately.

In distributing the Maximum Annual Payment, the Asbestos Trust shall first allocate the amount in question to (a) outstanding Pre-Petition Liquidated Claims; (b) Asbestos Claims involving Disease Level I (Cash Discount Payment) that have been liquidated by the Asbestos Trust; and (c) Exigent Hardship Claims (as defined in Section 5.4(b) below).  Should the Maximum Annual Payment be insufficient to pay all such claims in full, they shall be paid in proportion to the aggregate value of each group of claims and the available funds allocated to each group of claims shall be paid to the maximum extent to claimants in the particular group based on their place in their respective FIFO Payment Queue.  Claims in any group for which

there are insufficient funds shall be carried over to the next year, and placed at the head of their FIFO Payment Queue.  If there is a decrease in the Payment Percentage prior to the payment of such claims, any such Claims shall nevertheless be entitled to be paid at the Payment Percentage that they would have been entitled to receive but for the application of the Maximum Annual Payment.  The remaining portion of the Maximum Annual Payment (the "**Maximum Available Payment**"), if any, shall then be allocated and used to satisfy all other liquidated Asbestos Claims, subject to the Claims Payment Ratio set forth in Section 2.5 below; provided, however, that if the Maximum Annual Payment is reduced during a year pursuant to the provisions above, the Maximum Available Payment shall be adjusted accordingly.  Claims in the groups described in (a), (b), and (c) above shall not be subject to the Claims Payment Ratio.

       **2.5**     **Claims Payment Ratio**.  Based upon Old O-I's domestic claims settlement history and an analysis of present and future Asbestos Claims, a Claims Payment Ratio has been determined which, as of the Effective Date, has been set at 93% for Category A claims, which consist of Asbestos Claims involving severe asbestosis, severe disabling pleural disease and malignancies (Disease Levels IV–VIII) and at 7% for Category B claims, which are Asbestos Claims involving non-malignant Asbestosis or Pleural Disease (Disease Levels II and III).

       In each year, after the determination of the Maximum Available Payment described in Section 2.4 above, 93% of that amount shall be available to pay Category A claims and 7% shall be available to pay Category B claims that have been liquidated since the Petition Date; except for claims which, pursuant to Section 2.4 above, are not subject to the Claims Payment Ratio.  If the Maximum Annual Payment is reduced during the year pursuant to the provisions of Section 2.4 above, the amounts available to pay Category A claims and Category B claims shall be recalculated based on the adjusted Maximum Available Payment.  In the event there are

9

insufficient funds in any year to pay the liquidated claims within either or both of the Categories, the available funds allocated to the particular Category shall be paid to the maximum extent to claimants in that Category based on their place in the FIFO Payment Queue described in Section 5.1(b) below, which shall be based upon the date of claim liquidation.  Claims for which there are insufficient funds allocated to the relevant Category shall be carried over to the next year where they shall be placed at the head of the FIFO Payment Queue.  If there is a decrease in the Payment Percentage prior to the payment of such claims, any Released Claims, as defined in Section 4.3 below, shall nevertheless be entitled to be paid at the Payment Percentage that they would have been entitled to receive but for the application of the Claims Payment Ratio.  If there are excess funds in either or both Categories, because there is an insufficient amount of liquidated claims to exhaust the respective Maximum Available Payment amount for that Category, then the excess funds for either or both Categories shall be rolled over and remain dedicated to the respective Category to which they were originally allocated.  During the first nine months of a given year, the Asbestos Trust's payments to claimants in a Category shall not exceed the amount of any excess funds that were rolled over for such Category from the prior year plus 85% of the amount that would otherwise be available for payment to claimants in such Category.

The 93%/7% Claims Payment Ratio and its rollover provision shall apply to all Asbestos Trust Voting Claims as defined in Section 2.3 above (except Pre-Petition Liquidated Claims, Other Asbestos Disease claims (Disease Level I – Cash Discount Payment), and Exigent Hardship Claims), and shall not be amended until the third anniversary of the date the Asbestos Trust first accepts for processing proof of claim forms and other materials required to file a claim with the Asbestos Trust.

In considering whether to make any amendments to the Claims Payment Ratio and/or its rollover provisions, the Trustees shall consider the reasons for which the Claims Payment Ratio and its rollover provisions were adopted, the domestic settlement histories that gave rise to its calculation, and the foreseeability or lack of foreseeability of the reasons why there would be any need to make an amendment.

In any event, no amendment to the Claims Payment Ratio may be made without the consent of the TAC and the Post-Effective Date Future Claimants' Representative.  The consent process set forth in Sections 5.7(b) and 6.6(b) of the Asbestos Trust Agreement shall apply in the event of any amendments to the Claims Payment Ratio.

Notwithstanding any other provision herein, if at the end of a calendar year commencing in 2028, there are excess funds in either Category A or Category B and insufficient funds in the other Category to pay such Category's claims, the Trustees may transfer up to a specified amount of excess funds (the "**Permitted Transfer Amount**" as defined below) to the Category with the shortfall; provided, however that the Trustees shall never transfer more than the amount of the receiving Category's shortfall.   The "Permitted Transfer Amount" shall be determined as follows:  (a) the Trustees shall first determine the cumulative amount allocated to the Category with excess funds based on the Claims Payment Ratio since the date the Asbestos Trust last calculated its Payment Percentage; (b) the Trustees shall then determine the cumulative amount that the Asbestos Trust estimated would be paid to the Category with excess funds since the date the Asbestos Trust last calculated its Payment Percentage; (c) the Trustees shall then subtract the amount determined in (b) from the amount determined in (a), and the difference between the two shall be referred to as the "Permitted Transfer Amount."   When deciding whether to make a transfer, the Trustees shall take into account any artificial failures of the processing queue that

11

may have impacted the amount of funds expended from either Category. The Trustees shall provide the TAC and the Post-Effective Date Future Claimants' Representative with the Permitted Transfer Amount calculation thirty (30) days prior to making a transfer.

2.6 **Indirect Asbestos Claims**. As set forth in Section 5.6 below, Indirect Asbestos Claims, if any, shall be subject to the same categorization, evaluation, and payment provisions of this TDP as all other Asbestos Claims.

## SECTION 3

## TDP Administration

3.1 **Asbestos Trust Advisory Committee and Post-Effective Date Future Claimants' Representative**. Pursuant to the Plan and the Asbestos Trust Agreement, the Asbestos Trust and this TDP shall be administered by the Trustees in consultation with the TAC, which represents the interests of holders of present Asbestos Claims, and the Post-Effective Date Future Claimants' Representative, who represents the interests of holders of Asbestos Claims that may be asserted in the future. The Trustees shall obtain the consent of the TAC and the Post-Effective Date Future Claimants' Representative on any amendments to this TDP pursuant to Section 8.1 below, and on such other matters as are otherwise required below or in Section 2.2(f) of the Asbestos Trust Agreement. If any other consents are required for an amendment pursuant to the provisions of Section 8.1 below, the Trustees shall also obtain those consents. The Trustees shall also consult with the TAC and the Post-Effective Date Future Claimants' Representative on such matters as are provided below or in Section 2.2(e) of the Asbestos Trust Agreement. The initial Trustees, the initial members of the TAC and the initial Post-Effective Date Future Claimants' Representative are identified in the Asbestos Trust Agreement.

3.2 **Consent and Consultation Procedures**. In those circumstances in which consultation or consent is required, the Trustees shall provide written notice to the TAC and the

Post-Effective Date Future Claimants' Representative of the specific amendment or other action that is proposed. The Trustees shall not implement such amendment nor take such action unless and until the parties have engaged in the consultation process described in Sections 5.7(a) and 6.6(a), or the consent process described in Sections 5.7(b) and 6.6(b), of the Asbestos Trust Agreement, respectively.

## SECTION 4

### Payment Percentage; Periodic Estimates

**4.1** **Uncertainty of the Debtor's Personal Injury Asbestos Liabilities**. As discussed above, there is inherent uncertainty regarding the Debtor's total asbestos-related tort liabilities, as well as the total value of the assets available to the Asbestos Trust to pay Asbestos Claims. Consequently, there is inherent uncertainty regarding the amounts that holders of Asbestos Claims shall receive. To seek to ensure substantially equivalent treatment of all present and future Asbestos Claims, the Trustees must determine from time to time the percentage of full liquidated value that holders of present and future Asbestos Claims are likely to receive, *i.e.*, the "Payment Percentage" described in Section 2.3 above and Section 4.2 below.

**4.2** **Computation of Payment Percentage**. As provided in Section 2.3 above, the Initial Payment Percentage shall be 100% and shall apply to all Asbestos Trust Voting Claims as defined in Section 2.3 above, unless the Trustees, with the consent of the TAC and the Post-Effective Date Future Claimants' Representative, determine that the Initial Payment Percentage should be changed to assure that the Asbestos Trust shall be in a financial position to pay holders of unliquidated and/or unpaid Asbestos Trust Voting Claims and present and future Asbestos Claims in substantially the same manner.

13

In making any such adjustment, the Trustees, the TAC and the Post-Effective Date Future Claimants' Representative shall take into account the fact that the holders of Asbestos Trust Voting Claims voted on the Plan relying on the findings of experts that the Initial Payment Percentage represented a reasonably reliable estimate of the Asbestos Trust's total assets and liabilities over its life based on the best information available at the time, and shall thus give due consideration to the expectations of the holders of Asbestos Trust Voting Claims that the Initial Payment Percentage would be applied to their Asbestos Claims.

Except with respect to Asbestos Trust Voting Claims to which the Initial Payment Percentage applies (subject to the provisions of this Section 4.2 set forth above), the Payment Percentage shall be subject to change pursuant to the terms of this TDP and the Asbestos Trust Agreement if the Trustees with the consent of the TAC and the Post-Effective Date Future Claimants' Representative determine that an adjustment is required.  No less frequently than once every three (3) years, commencing with the first day of January occurring after the Effective Date, the Trustees shall reconsider the then applicable Payment Percentage to assure that it is based on accurate, current information and may, after such reconsideration, change the Payment Percentage if necessary with the consent of the TAC and the Post-Effective Date Future Claimants' Representative.

The Trustees shall also reconsider the then applicable Payment Percentage at shorter intervals if they deem such reconsideration to be appropriate or if requested to do so by the TAC or the Post-Effective Date Future Claimants' Representative.  In any event, no less frequently than once every twelve (12) months, commencing on the date that the Asbestos Trust first makes available the proof of claim form and other claims materials required to file a claim with the Asbestos Trust (the six-month anniversary of the date the Asbestos Trust first makes available

the proof of claim form and other claim materials required to file a claim being referred to herein

as the "**Initial Claims Filing Date**"), the Trustees shall compare the liability forecast on which

the then-applicable Payment Percentage is based with the actual claims filing and payment

experience of the Asbestos Trust to date.  If the results of the comparison call into question the

ability of the Asbestos Trust to continue to rely upon the current liability forecast, the Trustees

shall undertake a reconsideration of the Payment Percentage.

The Trustees must base their determination of the Payment Percentage on current

estimates of the number, types, and values of present and future Asbestos Claims, the value of

the assets then available to the Asbestos Trust for their payment, all anticipated administrative

and legal expenses, and any other material matters that are reasonably likely to affect the

sufficiency of funds to pay a comparable percentage of full value to all holders of Asbestos

Claims.  When making these determinations, the Trustees shall exercise common sense and

flexibly evaluate all relevant factors.  The Payment Percentage applicable to Category A or

Category B claims may not be reduced to alleviate delays in payments of claims in the other

Category; both Categories of claims shall receive the same Payment Percentage, but the payment

may be deferred as needed in compliance with this TDP.

**4.3** **Applicability of the Payment Percentage**.  Except as set forth below in this

Section 4.3 with respect to supplemental payments, no holder of an Asbestos Trust Voting Claim

shall receive a payment that exceeds the Initial Payment Percentage times the liquidated value of

the claim.  Except as otherwise provided (a) in Section 5.1(b) below for Asbestos Claims

involving deceased or incompetent claimants for which approval of the Asbestos Trust's offer by

a court or through a probate process is required and (b) in this Section 4.3 with respect to

Released Claims, no holder of any other Asbestos Claim, other than an Asbestos Claim for Other

15

Asbestos Disease (Disease Level I – Cash Discount Payment), shall receive a payment that exceeds the liquidated value of the claim times the Payment Percentage in effect at the time of payment; provided, however, that if there is a reduction in the Payment Percentage, the Trustees, in their sole discretion, may cause the Asbestos Trust to pay an Asbestos Claim based on the Payment Percentage that was in effect prior to the reduction if such Asbestos Claim was filed and actionable with the Asbestos Trust ninety (90) days or more prior to the date the Trustees proposed the new Payment Percentage in writing to the TAC and the Post-Effective Date Future Claimants' Representative (the "**Proposal Date**") and the processing of such claim was unreasonably delayed due to circumstances beyond the control of the claimant or the claimant's counsel, but only if such claim had no deficiencies for the ninety (90) days prior to the Proposal Date.  Asbestos Claims involving Other Asbestos Disease (Disease Level I – Cash Discount Payment) shall not be subject to the Payment Percentage, but shall instead be paid the full amount of their Scheduled Value as set forth in Section 5.3(a)(3) below.

Except as otherwise set forth in this Section 4.3, if a redetermination of the Payment Percentage has been proposed in writing by the Trustees to the TAC and the Post-Effective Date Future Claimants' Representative but has not yet been adopted, the claimant shall receive the lower of the current Payment Percentage or the proposed Payment Percentage.  However, if the proposed Payment Percentage was the lower amount but was not subsequently adopted, the claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount.  Conversely, if the proposed Payment Percentage was the higher amount and was subsequently adopted, the claimant shall thereafter receive the difference between the lower current amount and the higher adopted amount.

Notwithstanding anything contained herein, if the proposed Payment Percentage is lower than the current Payment Percentage, a claimant whose Asbestos Claim was liquidated prior to the Proposal Date and who either (a) transmitted[5] an executed release to the Asbestos Trust prior to the Proposal Date or (b) with respect to those claimants who had received releases fewer than thirty (30) days prior to the Proposal Date, transmitted an executed release to the Asbestos Trust within thirty (30) days of the claimant's receipt of the release (the claims described in (a) and (b) are collectively referred to herein as the "**Released Claims**") shall be paid based on the current Payment Percentage (the "**Released Claims Payment Percentage**").  For purposes hereof, (a) a claimant represented by counsel shall be deemed to have received a release on the date that the claimant's counsel receives the release, (b) if the Asbestos Trust transmits a release electronically, the release shall be deemed to have been received on the date the Asbestos Trust transmits the offer notification, and (c) if the Asbestos Trust places the release in the U.S. mail, postage prepaid, the release shall be deemed to have been received three (3) business days after such mailing date.  A delay in the payment of the Released Claims for any reason, including delays resulting from limitations on payment amounts in a given year pursuant to Sections 2.4 and 2.5 hereof, shall not affect the rights of the holders of the Released Claims to be paid based on the Released Claims Payment Percentage.

At least thirty (30) days prior to proposing in writing to the TAC and the Post-Effective Date Future Claimants' Representative a change in the Payment Percentage, the Trustees shall issue a written notice to claimants that have filed claims with the Asbestos Trust that have not yet been paid or their counsel indicating that the Trustees are reconsidering such Payment Percentage.

---

[5] For purposes of this sentence, "transmitted" is defined as the date/time postmarked if submitted by mail or the date/time uploaded if submitted electronically.

If the Trustees, with the consent of the TAC and the Post-Effective Date Future Claimants' Representative, make a determination to increase the Payment Percentage, the Trustees shall also make supplemental payments to all claimants who previously liquidated their claims filed with the Asbestos Trust and received payments based on a lower Payment Percentage.  The amount of any such supplemental payment shall be the liquidated value of the claim in question times the newly adjusted Payment Percentage, less all amounts previously paid to the claimant with respect to the claim (excluding the portion of such previously paid amounts that was attributable to any sequencing adjustment paid pursuant to Section 7.5 below).

The Trustees' obligation to make a supplemental payment to a claimant shall be suspended in the event the payment in question would be less than $250.00, and the amount of the suspended payment shall be added to the amount of any prior supplemental payment/payments that was/were also suspended because it/they would have been less than $250.00.  However, the Trustees' obligation shall resume and the Trustees shall pay any such aggregate supplemental payments due the claimant at such time that the total exceeds $250.00.

## SECTION 5

### Resolution of Asbestos Claims.

**5.1     Ordering, Processing and Payment of Asbestos Claims.**

**5.1(a)  Ordering of Asbestos Claims.**

**5.1(a)(1)  Establishment of the FIFO Processing Queue**.  The Asbestos Trust shall order claims that are sufficiently complete to be reviewed for processing purposes on a FIFO basis except as otherwise provided herein (the "**FIFO Processing Queue**").  The claimant's position in the FIFO Processing Queue shall be determined by the date the claim is filed with the Asbestos Trust.  If any claims are filed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the date of the diagnosis of the asbestos-

18

related disease, with claimants with earlier diagnosis dates given priority over later diagnosed claims.  If any claims are filed and diagnosed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the claimant's date of birth, with older claimants given priority over younger claimants.

**5.1(a)(2) Effect of Statutes of Limitations and Repose**.    All unliquidated Asbestos Claims must meet either (i) for claims first filed in the tort system against Old O-I or the Debtor prior to the Petition Date, the applicable federal, state, or foreign statute of limitations and repose that was in effect at the time of the filing of the claim in the tort system, or (ii) for claims not filed against Old O-I or the Debtor in the tort system prior to the Petition Date, the applicable federal, state, or foreign statute of limitations and repose that was in effect at the time of the filing with the Asbestos Trust.  However, the running of the relevant statute of limitations and repose shall be tolled as of the earliest of (A) the actual filing of the claim against Old O-I or the Debtor prior to the Petition Date, whether in the tort system or by submission of the claim to Old O-I or the Debtor pursuant to an administrative claims processing agreement; (B) the tolling of the claim against Old O-I or the Debtor prior to the Petition Date by an agreement or otherwise, provided such tolling is still in effect on the Petition Date; or (C) the Petition Date.

If an Asbestos Claim meets any of the tolling provisions described in the preceding sentence and the claim was not barred by the applicable federal, state, or foreign statute of limitations and repose at the time of the tolling event, it shall be treated as timely filed if it is actually filed with the Asbestos Trust within three (3) years after the Initial Claims Filing Date. In addition, any Asbestos Claims that were first diagnosed after the Petition Date, irrespective of the application of any relevant federal, state or foreign statute of limitations and repose, may be

19

filed with the Asbestos Trust within three (3) years after the date of diagnosis or within three (3) years after the Initial Claims Filing Date, whichever occurs later.  However, the processing of any Asbestos Claim by the Asbestos Trust may be deferred at the election of the claimant pursuant to Section 6.3 below.  Notwithstanding any other provision hereof, if the holder of an Asbestos Claim cannot meet the presumptive medical criteria set forth in Section 5.3(a)(3) below for any Disease Level, the applicable statute of limitations shall not begin running until the holder receives the evidence necessary to establish such medical criteria.

      **5.1(b)  Payment of Asbestos Claims**.  Asbestos Claims that have been liquidated by the Expedited Review Process as provided in Section 5.3(a) below, by the Individual Review Process as provided in Section 5.3(b) below, by arbitration as provided in Section 5.10 below, or by litigation in the tort system provided in Section 5.11 below, shall be paid in FIFO order based on the date their liquidation became final (the "**FIFO Payment Queue**"), all such payments being subject to the applicable Payment Percentage, the Maximum Available Payment, the Claims Payment Ratio, and the sequencing adjustment provided for in Section 7.5 below, except as otherwise provided herein.  Pre-Petition Liquidated Claims, as defined in Section 5.2 below, shall be subject to the Maximum Annual Payment and Payment Percentage limitations, but not to the Maximum Available Payment and Claims Payment Ratio provisions set forth above.

      Where the claimant is deceased or incompetent, and the settlement and payment of his or her claim must be approved by a court of competent jurisdiction or through a probate process prior to acceptance of the claim by the claimant's representative, an offer made by the Asbestos Trust on the claim shall remain open so long as proceedings before that court or in that probate process remain pending, provided that the Asbestos Trust has been furnished with evidence that the settlement offer has been submitted to such court or in the probate process for approval.  If

the offer is ultimately approved by the court or through the probate process and accepted by the claimant's representative, the Asbestos Trust shall pay the claim in the amount so offered, multiplied by the Payment Percentage in effect at the time the offer was first made.

If any claims are liquidated on the same date, the claimant's position in the FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's asbestos-related disease, with claimants having earlier diagnosis dates given priority over later diagnosed claims.  If any claims are liquidated on the same date and the respective holders' asbestos-related diseases were diagnosed on the same date, the position of those claims in the FIFO Payment Queue shall be determined by the Asbestos Trust based on the dates of the claimants' birth, with older claimants given priority over younger claimants.

**5.2      Resolution of Pre-Petition Liquidated Claims.**

**5.2(a)  Processing and Payment**.  As soon as practicable after the Effective Date, the Asbestos Trust shall pay, upon submission by the claimant of the appropriate documentation, all Asbestos Claims that were liquidated (i) by a binding settlement agreement for the particular claim entered into prior to the Petition Date that was judicially enforceable as of the Petition Date by the claimant, (ii) under the terms of a binding administrative claims processing agreement entered into prior to the Petition Date that was judicially enforceable as of the Petition Date by the law firm that entered into such agreement and provided such Asbestos Claim was a calendar year 2019 or earlier claim under the terms of such agreement, (iii) by a jury verdict or non-final judgment in the tort system obtained prior to the Petition Date, provided there is no letter of credit, appeal bond, supersedeas bond or other security or surety (collectively, "**Security**") associated with such verdict or judgment, (iv) by a judgment that is final and non-appealable, or (v) as a result of being allowed by the Bankruptcy Court

21

(collectively "**Pre-Petition Liquidated Claims**").   In order to receive payment from the Asbestos Trust, the holder of a Pre-Petition Liquidated Claim must submit all documentation necessary to demonstrate to the Asbestos Trust that the claim was liquidated in the manner described in the preceding sentence, which documentation shall include (A) a court authenticated copy of the jury verdict (if applicable), a non-final judgment (if applicable), a final judgment (if applicable), the settlement agreement (if applicable), the binding administrative claims processing agreement (if applicable), or the Bankruptcy Court's order allowing the claim (if applicable) and (B) except in the case of a Pre-Petition Liquidated Claim arising from the Bankruptcy Court's order allowing the claim, the name, social security number and date of birth of the claimant and the name and address of the claimant's lawyer; provided, however, that such documentation shall not be required with respect to any Pre-Petition Liquidated Claim that the Debtor has identified to the Asbestos Trust as a Pre-Petition Liquidated Claim as defined above. The Debtor shall deliver to the Asbestos Trust a list of the Pre-Petition Liquidated Claims that the Debtor has approved for payment, which claims shall be entitled to rely upon the exception set forth in the preceding sentence.

The liquidated value of a Pre-Petition Liquidated Claim shall be the unpaid portion of the amount agreed to in the binding settlement agreement or the binding administrative claims processing agreement, the unpaid portion of the amount awarded by the jury verdict or non-final judgment, the unpaid portion of the amount of the final judgment, or the unpaid portion of the amount allowed by the Bankruptcy Court, as the case may be, plus interest, if any, that has accrued on that amount in accordance with the terms of the agreement, if any, or under applicable state law for settlements or judgments as of the Petition Date; however, except as otherwise provided in Section 7.4 below, the liquidated value of a Pre-Petition Liquidated Claim

shall not include any punitive or exemplary damages.  In addition, the amounts payable with respect to such claims shall not be subject to or taken into account in consideration of the Claims Payment Ratio and the Maximum Available Payment limitations, but shall be subject to the Maximum Annual Payment and Payment Percentage provisions.  In the absence of a Final Order of the Bankruptcy Court determining whether a settlement agreement or an administrative claims processing agreement is binding and judicially enforceable, a dispute between the claimant and the Asbestos Trust over this issue shall be resolved pursuant to the same procedures in this TDP that are provided for resolving the validity and/or liquidated value of an Asbestos Claim (i.e., arbitration and litigation in the tort system as set forth in Sections 5.10 and 5.11 below).

Pre-Petition Liquidated Claims shall be processed and paid in accordance with their order in a separate FIFO queue to be established by the Asbestos Trust based on the date the Asbestos Trust received all required documentation for the particular claim.  If any Pre-Petition Liquidated Claims were filed on the same date, the claimants' position in the FIFO queue for such claims shall be determined by the date on which the claim was liquidated.  If any Pre-Petition Liquidated Claims were both filed and liquidated on the same dates, the position of the claimants in the FIFO queue shall be determined by the dates of the claimants' birth, with older claimants given priority over younger claimants.

**5.2(b)  Marshalling of Security**.  Holders of Pre-Petition Liquidated Claims that are secured by any Security shall first exhaust their rights against such Security before making a claim against the Asbestos Trust.  Only in the event that such Security is insufficient to pay such Pre-Petition Liquidated Claim in full shall the deficiency be processed and paid as a Pre-Petition Liquidated Claim by the Asbestos Trust.

**5.3** **Resolution of Unliquidated Asbestos Claims**.  As soon as possible after the establishment of the Asbestos Trust, the Trustees, with the consent of the TAC and the Post-Effective Date Future Claimants' Representative, shall adopt procedures for reviewing and liquidating all unliquidated Asbestos Claims, which shall include deadlines for processing such claims.  Claimants seeking resolution of unliquidated Asbestos Claims shall be required to first file a confidential proof of claim form, together with the required supporting documentation, in accordance with the provisions of Sections 6.1 and 6.2 below.  The proof of claim form, all supporting documentation, and the Asbestos Trust's response thereto are evidence exchanged for the purpose of compromising, settling, and resolving the subject Asbestos Claim.  The submissions and responses are exchanged with reliance on such confidentiality, and all such evidence is inadmissible in any judicial or administrative proceeding for any purpose other than the exceptions stated in Federal Rule of Evidence 408.  The Asbestos Trust shall provide an initial confidential response to the claimant within three (3) months of receiving the proof of claim form.

The proof of claim form shall require the claimant to assert his or her claim for the highest Disease Level for which the claim qualifies at the time of filing.  Irrespective of the Disease Level alleged on the proof of claim form, all claims shall be deemed to be a claim for the highest Disease Level for which the claim qualifies at the time of filing, and all lower Disease Levels for which the claim may also qualify at the time of filing or in the future shall be treated as subsumed into the higher Disease Level for both processing and payment purposes.

Upon the filing of a valid proof of claim form with the required supporting documentation, the claim shall be placed in the FIFO Processing Queue in accordance with the ordering criteria described in Section 5.1(a) above.  When the claim reaches the top of the FIFO

US-DOCS\129026018.1

Processing Queue, the Asbestos Trust shall process and liquidate the claim based upon the medical/exposure evidence submitted by the claimant and under the process elected by the claimant.  If the claimant fails to elect either the Individual Review Process or the Expedited Review Process, then the Asbestos Trust shall process and liquidate the claim under the Expedited Review Process, although the claimant shall retain the right to request Individual Review as described in Section 5.3(b) below.

### 5.3(a)  Expedited Review Process.

**5.3(a)(1)  In General**.  The Asbestos Trust's Expedited Review Process is designed primarily to provide an expeditious, efficient, consistent, and inexpensive method for liquidating all Asbestos Claims (except those involving Lung Cancer 2 – Disease Level VI and Foreign Claims (as defined below), which shall only be liquidated pursuant to the Asbestos Trust's Individual Review Process), where the claim can easily be verified by the Asbestos Trust as meeting the presumptive Medical/Exposure Criteria for the relevant Disease Level.  Expedited Review thus provides claimants with a substantially less burdensome process for pursuing Asbestos Claims than does the Individual Review Process described in Section 5.3(b) below.  Expedited Review is also intended to provide qualifying claimants a fixed and certain claims value.

Thus, claims that undergo Expedited Review and meet the presumptive Medical/Exposure Criteria for the relevant Disease Level shall be liquidated at the Scheduled Value for such Disease Level set forth in Section 5.3(a)(3) below.  However, except for claims involving Other Asbestos Disease (Disease Level I), all claims liquidated by Expedited Review shall be subject to the applicable Payment Percentage, the Maximum Available Payment, and the Claims Payment Ratio limitations set forth above; provided, however, that Exigent Hardship

25

Claims shall not be subject to the Maximum Available Payment or the Claims Payment Ratio. Claimants holding claims that cannot be liquidated by Expedited Review because they do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may elect the Asbestos Trust's Individual Review Process set forth in Section 5.3(b) below.

Subject to the provisions of Section 5.8 below, the claimant's eligibility to have his or her Asbestos Claim liquidated at the Scheduled Value pursuant to the Expedited Review Process shall be determined solely by reference to the Medical/Exposure Criteria set forth below for each of the Disease Levels eligible for Expedited Review.

**5.3(a)(2) Claims Processing Under Expedited Review**. All claimants seeking liquidation of their claims pursuant to Expedited Review shall file a proof of claim form with the Asbestos Trust. As a proof of claim form is reached in the FIFO Processing Queue, the Asbestos Trust shall determine whether the claim described therein meets the Medical/Exposure Criteria for one of the seven Disease Levels eligible for Expedited Review, and shall advise the claimant of its determination. If a Disease Level is determined, the Asbestos Trust shall tender to the claimant an offer of payment of the Scheduled Value for the relevant Disease Level multiplied by the applicable Payment Percentage, together with an Asbestos Claimant Release form. If the claimant accepts the Asbestos Trust's offer of payment and returns the release properly executed, the claim shall be placed in the FIFO Payment Queue, following which the Asbestos Trust shall disburse payment subject to the limitations of the Maximum Available Payment and Claims Payment Ratio, if any.

**5.3(a)(3) Disease Levels, Scheduled Values and Medical/Exposure Criteria**. The eight Disease Levels covered by this TDP, together with the Medical/Exposure Criteria for each and the Scheduled Values for the seven Disease Levels eligible for Expedited

26

Review, are set forth below.  These Disease Levels, Scheduled Values, and Medical/Exposure

Criteria shall apply to all Asbestos Trust Voting Claims filed with the Asbestos Trust (except

Pre-Petition Liquidated Claims) on or before the Initial Claims Filing Date provided in Section

5.1 above for which the claimant elects the Expedited Review Process.  Thereafter, for purposes

of administering the Expedited Review Process and with the consent of the TAC and the Post-

Effective Date Future Claimants' Representative, the Trustees may add to, change, or eliminate

Disease Levels, Scheduled Values, or Medical/Exposure Criteria; develop subcategories of

Disease Levels, Scheduled Values or Medical/Exposure Criteria; or determine that a novel or

exceptional Asbestos Claim is compensable even though it does not meet the Medical/Exposure

Criteria for any of the then current Disease Levels.

| **Disease Level** | **Scheduled Value** | **Medical/Exposure Criteria** |
|---|---|---|
| Mesothelioma (Level VIII) | $100,000 | (1) Diagnosis[6] of mesothelioma, and (2) Debtor Exposure as defined in Section 5.7(b)(3). |
| Lung Cancer 1 (Level VII) | $25,000 | (1) Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease[7], (2) six |

[6] The requirements for a diagnosis of an asbestos-related disease that may be compensated under the provisions of this TDP are set forth in Section 5.7 below.

[7] Evidence of "Bilateral Asbestos-Related Nonmalignant Disease," for purposes of meeting the criteria for establishing Disease Levels I, II, III, V, and VII, means either (i) a chest X-ray read by a qualified B reader of 1/0 or higher on the ILO scale or (ii)(x) a chest X-ray read by a qualified B reader or other Qualified Physician, (y) a CT scan read by a Qualified Physician, or (z) pathology, in each case showing either bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification.  Evidence submitted to demonstrate (i) or (ii) above must be in the form of a written report stating the results (e.g., an ILO report, a written radiology report or a pathology report).  Solely for Asbestos Claims filed against Old O-I, the Debtor or another defendant in the tort system prior to the Petition Date, if an ILO reading is not available, either (i) a chest X-ray or a CT scan read by a Qualified Physician, or (ii) pathology, in each case showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification consistent with or compatible with a diagnosis of asbestos-related disease, shall be evidence of a Bilateral Asbestos-Related Nonmalignant Disease for purposes of meeting the presumptive medical requirements of Disease

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| | | months Debtor Exposure, (3) Significant Occupational Exposure[8] to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |
| Lung Cancer 2 (Level VI) | None | (1) Diagnosis of a primary lung cancer, (2) Debtor Exposure, and (3) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |
| | | Lung Cancer 2 (Level VI) claims are claims that do not meet the more stringent medical and/or exposure requirements of Lung Cancer 1 (Level VII) claims.  All claims in this Disease Level shall be individually evaluated. The estimated likely average of the individual evaluation awards for this category is $29,400, with such awards capped at $53,000 unless the claim qualifies for Extraordinary Claim treatment. |
| | | Level VI claims that show no evidence of either an underlying Bilateral Asbestos-Related Nonmalignant Disease or Significant Occupational Exposure may be individually evaluated, although it is not expected that such claims shall be treated as having any significant value, especially if the claimant is |

Levels I, II, III, V and VII.  Pathological proof of asbestosis may be based on the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine, "Asbestos-associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982).  For all purposes of this TDP, a "Qualified Physician" is a physician who is board-certified (or in the case of Canadian Claims or Foreign Claims, a physician who is certified or qualified under comparable medical standards or criteria of the jurisdiction in question) in one or more relevant specialized fields of medicine such as pulmonology, radiology, internal medicine or occupational medicine; provided, however, subject to the provisions of Section 5.8, that the requirement for board certification in this provision shall not apply to otherwise qualified physicians whose X-ray and/or CT scan readings are submitted for deceased holders of Asbestos Claims.

[8] The term "Significant Occupational Exposure" is defined in Section 5.7(b)(2) below.

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| | | also a Smoker.[9]  In any event, no presumption of validity shall be available for any claims in this category. |
| Other Cancer (Level V) | $10,800 | (1) Diagnosis of a primary colo-rectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease, (2) six months Debtor Exposure, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question. |
| Severe Asbestosis (Level IV) | $28,200 | (1) Either (a) a diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathological evidence of asbestosis, plus (x) TLC less than 65%, or (y) FVC less than 65% and FEV1/FVC ratio greater than 65%,[10] (b) an "Asbestosis Death," which is defined to mean a death where (x) asbestosis is listed as the cause or a significant contributing cause of death on the death certificate or (y) a report from a Qualified Physician who is a pathologist, a pulmonologist or an occupational medicine physician states that asbestosis was a significant contributing cause of death, or (c) a diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathological evidence of asbestosis, plus (x) a |

---

[9] There is no distinction between Non-Smokers and Smokers for either Lung Cancer 1 (Level VII) or Lung Cancer 2 (Level VI), although a claimant who meets the more stringent requirements of Lung Cancer 1 (Level VII) (evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease plus Significant Occupational Exposure), and who is also a Non-Smoker, may wish to have his or her claim individually evaluated by the Asbestos Trust. In such a case, absent circumstances that would otherwise reduce the value of the claim, it is anticipated that the liquidated value of the claim might well exceed the $25,000 Scheduled Value for Lung Cancer 1 (Level VII) shown above.  "Non-Smoker" means a claimant who either (a) never smoked or (b) has not smoked during any portion of the twelve (12) years immediately prior to the diagnosis of the lung cancer.

[10]     This must be the actual measured value as opposed to the percentage of predicted.

US-DOCS\129026018.1

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| | | Qualified Physician who is a pulmonologist or an occupational medicine physician prescribes oxygen to the injured party, (y) the treating Qualified Physician states that the predominant cause of the need for oxygen is asbestosis, and (z) the oxygen is needed by the injured party to perform activities of daily life (e.g., not oxygen that is prescribed only for comfort care, at night, for surgery, or on occasion), (2) six months Debtor Exposure, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Asbestosis/Pleural Disease (Level III) | $5,900 | (1) Diagnosis of Bilateral Asbestos-Related Nonmalignant Disease, plus (a) TLC less than 80%, or (b) FVC less than 80% and FEV1/FVC ratio greater than or equal to 65%, and (2) six months Debtor Exposure, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Asbestosis/Pleural Disease (Level II) | $2,900 | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease, (2) six months Debtor Exposure, and (3) five years cumulative occupational exposure to asbestos. |
| Other Asbestos Disease (Level I – Cash Discount Payment) | $400 | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease or an asbestos-related malignancy other than mesothelioma, and (2) Debtor Exposure. |

**5.3(b)  Individual Review Process.**

**5.3(b)(1)  In General**.   Subject to the provisions set forth below, a claimant may elect to have his or her Asbestos Claim reviewed for purposes of determining

30

whether the claim would be cognizable and valid in the applicable tort system even though it does not meet the presumptive Medical/Exposure Criteria for any of the Disease Levels set forth in Section 5.3(a)(3) above.  In addition or alternatively, a claimant may elect to have a claim undergo the Individual Review Process for purposes of determining whether the liquidated value of a claim involving Disease Levels IV, V, VII or VIII exceeds the Scheduled Value for the relevant Disease Level also set forth in said provision.  However, except for claimants who allege Lung Cancer 2 – Disease Level VI and all claimants with Foreign Claims (as defined below), until such time as the Asbestos Trust has made an offer on a claim pursuant to Individual Review, the claimant may change his or her Individual Review election and have the claim liquidated pursuant to the Asbestos Trust's Expedited Review Process.  In the event of such a change in the processing election, the claimant shall nevertheless retain his or her place in the FIFO Processing Queue.

The liquidated value of all Foreign Claims payable under this TDP shall be established only under the Asbestos Trust's Individual Review Process.  Asbestos Claims of individuals exposed in Canada who were residents in Canada when such claims were filed ("**Canadian Claims**") shall not be considered Foreign Claims hereunder and shall be eligible for liquidation under, at the claimant's election, either the Expedited Review Process or the Individual Review Process.  Accordingly, a "**Foreign Claim**" is an Asbestos Claim with respect to which the claimant's exposure to an asbestos-containing product or conduct for which the Debtor has legal responsibility occurred outside of the United States and its territories and possessions, and outside of the provinces and territories of Canada.[11]

---

[11] Notwithstanding any other provision of this TDP, all issues related to Foreign Claims shall be agreed to by the Trustees, the TAC, and the Post-Effective Date Future Claimants' Representative.

In reviewing Foreign Claims, the Asbestos Trust shall take into account all relevant procedural and substantive legal rules to which the claims would be subject in the Claimant's Jurisdiction as defined in Section 5.3(b)(2) below.  The Asbestos Trust shall determine the liquidated value of Foreign Claims based on historical settlements and verdicts in the Claimant's Jurisdiction, as well as the other valuation factors set forth in Section 5.3(b)(2) below.

For purposes of the Individual Review Process for Foreign Claims, the Trustees, with the consent of the TAC and the Post-Effective Date Future Claimants' Representative, may develop separate Medical/Exposure Criteria and standards, as well as separate requirements for physician and other professional qualifications, which shall be applicable to all Foreign Claims channeled to the Asbestos Trust; provided however, that such criteria, standards or requirements shall not effectuate substantive changes to the claims eligibility requirements under this TDP, but rather shall be made only for the purpose of adapting those requirements to the particular licensing provisions and/or medical customs or practices of the foreign country in question.

At such time as the Asbestos Trust has sufficient historical settlement, verdict and other valuation data for claims from a particular foreign jurisdiction, the Trustees, with the consent of the TAC and the Post-Effective Date Future Claimants' Representative, may also establish a separate valuation matrix for any such Foreign Claims based on that data.

**5.3(b)(1)(A)   Review of Medical/Exposure Criteria**.    The Asbestos Trust's Individual Review Process provides a claimant with an opportunity for individual consideration and evaluation of an Asbestos Claim that fails to meet the presumptive Medical/Exposure Criteria for Disease Levels I–V, VII or VIII.  In such a case, the Asbestos Trust shall either deny the claim or, if the Asbestos Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the applicable tort system, the Asbestos

Trust can offer the claimant a liquidated value amount up to the Scheduled Value for that Disease Level.[12]

> **5.3(b)(1)(B)   Review of Liquidated Value**.  Claimants holding claims in Disease Levels IV–VIII shall also be eligible to seek Individual Review of the liquidated value of their claims, as well as of their medical/exposure evidence.  The Individual Review Process is intended to result in payments equal to the full liquidated value for each claim multiplied by the Payment Percentage; however, the liquidated value of any Asbestos Claim that undergoes Individual Review may be determined to be less than the Scheduled Value the claimant would have received under Expedited Review.  Moreover, the liquidated value for a claim involving Disease Levels IV–VIII shall not exceed the Maximum Value for the relevant Disease Level set forth in Section 5.3(b)(3) below, unless the claim meets the requirements of an Extraordinary Claim described in Section 5.4(a) below, in which case its liquidated value cannot exceed the maximum extraordinary value set forth in Section 5.4(a) for such claims.  Because the detailed examination and valuation process pursuant to Individual Review may require additional time and effort, claimants electing to undergo the Individual Review Process may be paid the liquidated value of their Asbestos Claims later than would have been the case had the claimant elected the Expedited Review Process.  Subject to the provisions of Section 5.8 below, the Asbestos Trust shall devote reasonable resources to the review of all claims to ensure that there is a reasonable balance maintained in reviewing all classes of claims.

---

[12] In reviewing a claim that does not meet the presumptive exposure criteria set forth in Section 5.3(a)(3) above because the alleged exposure to asbestos or Asbestos Containing Products for which the Debtor has legal responsibility occurred after December 31, 1958, the Asbestos Trust shall take into consideration the shelf life of the products that were produced by Old O-I on or before December 31, 1958.

**5.3(b)(2)  Valuation Factors to Be Considered in Individual Review**. The Asbestos Trust shall liquidate the value of each Asbestos Claim that undergoes Individual Review based on the historic liquidated values of other similarly situated claims in the applicable tort system for the same Disease Level.  The Asbestos Trust shall thus take into consideration all of the factors that affect the severity of damages and values within the applicable tort system including, but not limited to, credible evidence of (i) the degree to which the characteristics of a claim differ from the presumptive Medical/Exposure Criteria for the Disease Level in question; (ii) factors such as the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependents, special damages, and pain and suffering; (iii) the industry of exposure; (iv) settlement and verdict histories and other law firms' experience in the Claimant's Jurisdiction for similarly situated claims; and (v) settlement and verdict histories for the claimant's law firm for similarly situated claims.  Where the claimant's law firm submits clear and convincing evidence to the Asbestos Trust, and the Trustees determine, in their sole discretion, that the claimant's law firm, prior to the Petition Date, played a substantial role in the prosecution, trial and resolution of asbestos personal injury claims against Old O-I or the Debtor in the Claimant's Jurisdiction, such as actively participating in court appearances, discovery and trial of the subject cases (evidence will be required of all three phases: prosecution, trial and resolution for each law firm involved; necessary evidence will include evidence of active participation in the cases; and the mere referral of a case, without further involvement, will not be viewed as having played a substantial role in the prosecution and resolution of a case), irrespective of whether a second law firm also was involved, the Asbestos Trust shall include such cases in the settlement and verdict histories for the claimant's law firm in the Claimant's Jurisdiction.  If this occurs, the claimant's law firm shall certify, as required by the Asbestos

Trust, that it has provided all settlement and verdict history information for asbestos cases against Old O-I and the Debtor in which claimant's law firm, prior to the Petition Date, played a substantial role in the prosecution, trial and resolution of the asbestos personal injury claims against Old O-I or the Debtor in the Claimant's Jurisdiction, as described above.

For purposes of this TDP, the "Claimant's Jurisdiction" is the jurisdiction in which the claim was filed (if at all) against Old O-I or the Debtor in the tort system prior to the Petition Date.  If the claim was not filed against Old O-I or the Debtor in the tort system prior to the Petition Date, the claimant may elect as the Claimant's Jurisdiction either (i) the jurisdiction in which the claimant resides at the time of diagnosis or when the claim is filed with the Asbestos Trust or (ii) a jurisdiction in which the claimant experienced exposure to asbestos or an asbestos-containing product or to conduct for which the Debtor has legal responsibility.

With respect to the "Claimant's Jurisdiction" in the event a personal representative or authorized agent makes a claim under this TDP for wrongful death with respect to which the governing law of the Claimant's Jurisdiction could only be the Alabama Wrongful Death Statute, the Claimant's Jurisdiction for such claim shall be the Commonwealth of Pennsylvania, and such claimant's damages shall be determined pursuant to the statutory and common laws of the Commonwealth of Pennsylvania without regard to its choice of law principles.  The choice of law provision in Section 7.4 below applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.3(b)(2) is determined to be the Alabama Wrongful Death Statute, shall only govern the rights between the Asbestos Trust and the claimant.

**5.3(b)(3) Scheduled, Average and Maximum Values**.  The Scheduled, Average and Maximum Values for domestic claims involving Disease Levels I–VIII are the following:

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Mesothelioma (Level VIII) | $100,000 | $145,300 | $382,600 |
| Lung Cancer 1 (Level VII) | $25,000 | $55,900 | $100,700 |
| Lung Cancer 2 (Level VI) | None | $29,400 | $53,000 |
| Other Cancer (Level V) | $10,800 | $13,400 | $32,400 |
| Severe Asbestosis (Level IV) | $28,200 | $39,400 | $82,400 |
| Asbestosis/Pleural Disease (Level III) | $5,900 | None | None |
| Asbestosis/Pleural Disease (Level II) | $2,900 | None | None |
| Other Asbestos Disease – Cash Discount Payment (Level I) | $400 | None | None |

These Scheduled Values, Average Values and Maximum Values shall apply to all Asbestos Trust Voting Claims other than Pre-Petition Liquidated Claims filed with the Asbestos Trust on or before the Initial Claims Filing Date as provided in Section 5.1 above.  Thereafter, the Asbestos Trust, with the consent of the TAC and the Post-Effective Date Future Claimants' Representative pursuant to Sections 5.7(b) and 6.6(b) of the Asbestos Trust Agreement, may change these valuation amounts for good cause and consistent with other restrictions on the amendment power.  In addition, commencing on January 1, 2023, the Asbestos Trust shall increase these valuation amounts by one percent (1%) per annum.  Any such increases shall be applicable to offers made following the dates of such increases.

**5.4     Categorizing Claims as Extraordinary and/or Exigent Hardship.**

**5.4(a)  Extraordinary Claims**.  "Extraordinary Claim" means an Asbestos Claim that otherwise satisfies the Medical/Exposure Criteria for Disease Levels II–VIII, and that is held

36

by a claimant whose exposure to asbestos (i) occurred predominantly as a result of working in a manufacturing facility of Old O-I during a period in which Old O-I was manufacturing asbestos-containing products at that facility, or (ii) was at least 75% the result of Debtor Exposure (as defined in Section 5.7(b)(3) below), and in either case there is little likelihood of a substantial recovery elsewhere.  All such Extraordinary Claims shall be presented for Individual Review and, if valid, shall be entitled to an award of up to a maximum extraordinary value of five (5) times the Scheduled Value set forth in Section 5.3(b)(3) for claims qualifying for Disease Levels II–V, VII and VIII, and five (5) times the Average Value for claims in Disease Level VI, in either case multiplied by the applicable Payment Percentage.

Any dispute as to Extraordinary Claim status shall be submitted to a special Extraordinary Claims Panel (the "**Extraordinary Claims Panel**") established by the Asbestos Trust with the consent of the TAC and the Post-Effective Date Future Claimants' Representative. All decisions of the Extraordinary Claims Panel shall be final and not subject to any further administrative or judicial review.  An Extraordinary Claim, following its liquidation, shall be placed in the FIFO Payment Queue ahead of all other Asbestos Claims except Pre-Petition Liquidated Claims, Disease Level I Claims, and Exigent Hardship Claims, which shall be paid first, based on its date of liquidation, and shall be paid subject to the Maximum Available Payment and Claims Payment Ratio described above.

To be eligible for a payment under this TDP, the holder of an Asbestos Claim submitted for Extraordinary Claim review must provide the following additional information:

**5.4(a)(1)(A)   Requirement to Identify Other Claims**. A claimant seeking Extraordinary Claim review must submit the information described in Section 5.4(a)(1)(B) about all other claims asserted by the claimant that relate in any way to the alleged injuries for which

37

the claimant seeks compensation. Other claims about which information must be submitted include claims by the claimant, the claimant's decedent, and any present or past holder of the Asbestos Claim. Other claims include, but are not limited to, the following: (a) lawsuits filed in any court, arbitration proceedings before any panel or tribunal, and administrative proceedings (such as workers' compensation claims) before any governmental or quasi-governmental body; (b) claims that were resolved or settled without the institution of litigation (such as pre-filing settlements reached after notification of the existence of a claim without the need to file a lawsuit); and (c) claims that have been submitted in bankruptcy proceedings or to other asbestos trusts or claim resolution facilities that resulted from bankruptcy proceedings.

**5.4(a)(1)(B)   Information Required About Other Claims**. A claimant seeking Extraordinary Claim review shall submit the following information for each other claim: (a) the name of the entity against whom the other claim was made, (b) the date of the other claim, and (c) the amounts of all payments received or to be received from the entity to whom the other claim was submitted. The claimant must also submit copies of any documents submitted to or served upon any such entity containing information regarding the alleged injured party's contact with or exposure to asbestos or asbestos-containing products, including without limitation any claim forms submitted to other asbestos trusts or claim resolution facilities that resulted from bankruptcy proceedings (along with any attachments), ballots submitted by or on behalf of the claimant in any bankruptcy case, and any discovery response filed or served in tort litigation. The claimant shall also certify that, to the best of his or her knowledge, at that time, with the exception of the other claims that have been expressly disclosed and identified by the claimant, no other entity is known to the claimant to be potentially responsible for the alleged injuries that are the basis of the Extraordinary Claim.

US-DOCS\129026018.1

**5.4(a)(1)(C)   Authorization for Release of Information**. Any claimant seeking Extraordinary Claim review shall execute a release of information form in favor of the Asbestos Trust, in the form attached as Appendix I, authorizing all other asbestos trusts and claim resolution facilities against whom any such other claim has been made or asserted based on the injured party's injury to release to the Asbestos Trust all information submitted to it by such claimant or entity who made such other claim and to disclose the status of any such claim and the amount and date of any payment on the claim. The release of information form shall authorize the Asbestos Trust to obtain all submissions made by the claimant or his or her heirs, executors, successors, or assigns in the future to any other asbestos trust or claim resolution facility. The Asbestos Trust may amend the form attached as Appendix I from time to time to add newly established asbestos trusts or claim resolution facilities.  The Asbestos Trust may utilize the authorization form not only to verify information provided in connection with particular Extraordinary Claims but also in connection with audits pursuant to the provisions of Section 5.8 hereof.

**5.4(a)(1)(D)   Claimant Certification.** If the claimant seeking Extraordinary Claim review is or has been represented by an attorney in any litigation or in the filing of other asbestos trust claims based on the injury that forms the basis for the Extraordinary Claim, the claimant's attorney shall provide a certification under penalty of perjury. The certification shall affirm that the attorney has fully investigated the alleged injuries that are the basis of the Extraordinary Claim, including conferring with any other attorneys who represent the claimant asserting the Extraordinary Claim with respect to claims against other asbestos trusts or any other entity, and that no good-faith basis exists, at the time the certification is executed, to bring a claim against any entity that is not identified in the proof of claim form submitted to the

Asbestos Trust by the claimant asserting the Extraordinary Claim. If the claimant seeking Extraordinary Claim Review has not been represented by an attorney in any litigation or in the filing of other asbestos trust claims based on the injury that forms the basis for the Extraordinary Claim, the claimant shall provide a certification under penalty of perjury that he or she has fully investigated the alleged injuries that are the basis of the Extraordinary Claim, and that no good-faith basis exists, at the time the certification is executed, to bring a claim against any entity that is not identified in the proof of claim form submitted to the Asbestos Trust by the claimant.

        **5.4(b)  Exigent Hardship Claims**.  At any time the Asbestos Trust may liquidate and pay Asbestos Claims that qualify as Exigent Hardship Claims as defined below.  Such claims may be considered separately no matter what the order of processing otherwise would have been under this TDP.  An Exigent Hardship Claim, following its liquidation, shall be placed first in the FIFO Payment Queue ahead of all other liquidated Asbestos Claims except Pre-Petition Liquidated Claims, and Disease Level I Claims, which claims, together with the Exigent Hardship Claims, shall be paid in accordance with the provisions of Section 2.4 hereof.  An Asbestos Claim qualifies for payment as an Exigent Hardship Claim if the claim meets the Medical/Exposure Criteria for Severe Asbestosis (Disease Level IV) or an asbestos-related malignancy (Disease Levels V–VIII), and the Asbestos Trust, in its sole discretion, determines that (i) the claimant needs financial assistance on an immediate basis based on the claimant's expenses and all sources of available income, and (ii) there is a causal connection between the claimant's dire financial condition and the claimant's asbestos-related disease.

        **5.5**    **Secondary Exposure Claims**.  If a claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally exposed person, such as a family member, the claimant may seek either Expedited Review or Individual Review of his or her claim.  In all

such cases, the claimant must establish that the occupationally exposed person would have met the exposure requirements under this TDP for the claimant's Disease Level that would have been applicable had the occupationally exposed person filed a direct claim against the Asbestos Trust. In addition, the claimant with secondary exposure must establish that he or she is suffering from one of the eight Disease Levels described in Section 5.3(a)(3) above or an asbestos-related disease otherwise compensable under this TDP, that his or her own exposure to the occupationally exposed person occurred within the same time frame as that in which the occupationally exposed person was experiencing Debtor Exposure, and that such secondary exposure was a cause of the claimed disease.  All other liquidation and payment rights and limitations under this TDP shall be applicable to such claims.

      **5.6   Indirect Asbestos Claims**.   Indirect Asbestos Claims asserted against the Asbestos Trust shall be treated as presumptively valid and paid by the Asbestos Trust subject to the applicable Payment Percentage if (a) the holder of such claim (the "**Indirect Claimant**") establishes to the satisfaction of the Trustees that (i) the Indirect Claimant has paid in full the liability and obligation of the Asbestos Trust to the individual claimant to whom the Asbestos Trust would otherwise have had a liability or obligation under this TDP (the "**Direct Claimant**"), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the Asbestos Trust, the Debtor, the Reorganized Debtor, the Non-Debtor Affiliates, and all other Protected Parties from all liability to the Direct Claimant, and (iii) the claim is not otherwise barred by a statute of limitations or repose or by other applicable law and (b) the Asbestos Trust has not yet paid the Direct Claimant.  In no event shall any Indirect Claimant have any rights against the Asbestos Trust superior to the rights of the related Direct Claimant against the Asbestos Trust, including any rights with respect to the timing, amount, or manner of payment.

US-DOCS\129026018.1

In addition, no Indirect Asbestos Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has actually paid the related Direct Claimant.

To establish a presumptively valid Indirect Asbestos Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid fully by the Indirect Claimant by settlement (with an appropriate full release in favor of the Asbestos Trust) or a Final Order (as defined in the Plan) and such claim must be valid under the applicable state, federal, or foreign law.  In any case where the Indirect Claimant has satisfied the claim of a Direct Claimant against the Asbestos Trust under applicable law by way of a settlement, the Indirect Claimant shall obtain a release for the benefit of the Asbestos Trust, the Debtor, the Reorganized Debtor, the Non-Debtor Affiliates, and the other Protected Parties substantially in the form and substance of the Asbestos Claimant Release.

If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the Asbestos Trust, the Debtor, the Reorganized Debtor, the Non-Debtor Affiliates, and the other Protected Parties with a full release of the Direct Claimant's claim, the Indirect Claimant may request that the Asbestos Trust review the Indirect Asbestos Claim individually to determine whether the Indirect Claimant can establish under applicable state, federal, or foreign law that the Indirect Claimant has paid all or a portion of a liability or obligation that the Asbestos Trust had to the Direct Claimant.  If the Indirect Claimant can show that it has paid all or a portion of such a liability or obligation and the Asbestos Trust has not already paid the Direct Claimant, and the Indirect Claimant provides a release of the Asbestos Trust, the Debtor, the Reorganized Debtor, the Non-Debtor Affiliates, and the other Protected Parties pursuant to a document substantially in the form and substance of the Asbestos Claimant Release for the Indirect Asbestos Claim, the Asbestos Trust shall

reimburse the Indirect Claimant the amount of the liability or obligation so paid, times the then applicable Payment Percentage.  However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled.  Further, the liquidated value of any Indirect Asbestos Claim paid by the Asbestos Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of any Asbestos Claim that might be subsequently asserted by the Direct Claimant against the Asbestos Trust.

Any dispute between the Asbestos Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the ADR Procedures provided in Section 5.10 below.  If such dispute is not resolved by said ADR Procedures, the Indirect Claimant may litigate the dispute in the tort system pursuant to Sections 5.11 and 7.6 below.

The Trustees may develop and approve a separate proof of claim form for Indirect Asbestos Claims.  Indirect Asbestos Claims that have not been disallowed, discharged, or otherwise resolved by prior order of the Bankruptcy Court shall be processed in accordance with procedures to be developed and implemented by the Trustees consistent with the provisions of this Section 5.6, which procedures shall (a) determine the validity, acceptability and enforceability of such claims; and (b) otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the Asbestos Trust would have afforded the holders of the underlying Asbestos Claims.

**5.7**      **Evidentiary Requirements.**

**5.7(a)  Medical Evidence.**

**5.7(a)(1)  In General**.    All diagnoses of a Disease Level shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis, or (ii) a history of the claimant's exposure sufficient to establish a 10-year latency period.  A finding by a physician after the Effective Date that a claimant's disease is "consistent with" or "compatible with" asbestosis shall not alone be treated by the Asbestos Trust as a diagnosis.  For all Asbestos Claims, including Foreign Claims, all evidence submitted to the Asbestos Trust must be in English.

**5.7(a)(1)(A)    Disease Levels I–IV**.  Except for asbestos claims filed against Old O-I, the Debtor or any other defendant in the tort system prior to the Petition Date, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I–IV) shall be based in the case of a claimant who was living at the time the claim was filed, upon a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease.  All living claimants must also provide (i) for Disease Levels I–III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 7 above); (ii) for Disease Level III, pulmonary function testing; and (iii) for Disease Level IV, an ILO reading of 2/1 or greater or pathological evidence of asbestosis and pulmonary function testing (unless the claimant is able to meet the requirements in (1)(c) of the Medical/Exposure Criteria for Severe Asbestosis in Section 5.3(a)(3) above).[13] [14]

---

[13] All diagnoses of Asbestos/Pleural Disease (Disease Levels II and III) not based on pathology shall be presumed to be based on findings of bilateral asbestosis or pleural disease, and all

In the case of a claimant who was deceased at the time the claim was filed, all diagnoses of Disease Levels I-III shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease, (ii) pathological evidence of the non-malignant asbestos-related disease, or (iii) evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 7 above).   In the case of a claimant who was deceased at the time the claim was filed, all diagnoses of Severe Asbestosis (Disease Level IV) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis along with an ILO reading of 2/1 or greater, (ii) pathological evidence of asbestosis, or (iii) the medical documentation required for an "Asbestosis Death" in Section 5.3(a)(3) above.  In the case of a Severe Asbestosis diagnosis based on (i) or (ii) in the preceding sentence, the claimant must also provide pulmonary function testing (unless the claimant is able to meet the requirements in 1(c) of the Medical/Exposure Criteria for Severe Asbestosis in Section 5.3(a)(3) above).

**5.7(a)(1)(B)   Disease Levels V–VIII**.   All diagnoses of an asbestos-related malignancy (Disease Levels V–VIII) shall be based upon either (i) a physical

---

diagnoses of Mesothelioma (Disease Level VIII) shall be presumed to be based on findings that the disease involves a malignancy.  However, the Asbestos Trust may rebut such presumptions.

[14] "Pulmonary function testing" or "PFT" shall mean testing that is in material compliance with the quality criteria established by the American Thoracic Society ("**ATS**") and is performed on equipment which is in material compliance with ATS standards for technical quality and calibration. PFT performed in a hospital accredited by the JCAHO, or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician shall be presumed to comply with ATS standards, and the claimant may submit a summary report of the testing. If the PFT was not performed in an JCAHO-accredited hospital, or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician, the claimant must submit the full report of the testing (as opposed to a summary report); provided, however, that if the PFT was conducted prior to the Effective Date of the Plan and the full PFT report is not available, the claimant must submit a declaration signed by a Qualified Physician or other qualified party, in the form provided by the Asbestos Trust, certifying that the PFT was conducted in material compliance with ATS standards.

examination of the claimant by the physician providing the diagnosis of the asbestos-related disease, or (ii) a diagnosis of such a malignant Disease Level by a board-certified pathologist or by a pathology report prepared at or on behalf of a hospital accredited by the Joint Commission on Accreditation of Healthcare Organizations ("**JCAHO**"); provided, however, that in the case of a deceased Disease Level VIII claimant, such claimant may instead elect to establish a diagnosis of mesothelioma by providing (a) medical records or statements from a treating physician demonstrating that the claimant was treated for mesothelioma during his or her lifetime and (b) a death certificate signed by a licensed physician identifying mesothelioma as the cause of death.

**5.7(a)(1)(C)   Exception to the Exception for Certain Pre-Petition Claims**.  If the holder of an Asbestos Claim that was filed against Old O-I, the Debtor or any other defendant in the tort system prior to the Petition Date has available a report of a diagnosing physician engaged by the holder or his or her law firm who conducted a physical examination of the holder as described in Sections 5.7(a)(1)(A), or if the holder has filed such medical evidence and/or a diagnosis of the asbestos-related disease by a physician not engaged by the holder or his or her law firm who conducted a physical examination of the holder with another asbestos-related personal injury settlement trust that requires such evidence, without regard to whether the claimant or the law firm engaged the diagnosing physician, the holder shall provide such medical evidence and/or diagnosis to the Asbestos Trust notwithstanding the exception in Section 5.7(a)(1)(A) above.

**5.7(a)(2)   Credibility of Medical Evidence**.  Before making any payment to a claimant, the Asbestos Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards.

46

The Asbestos Trust may require the submission of X-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examinations or reviews of other medical evidence, and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedures to assure that such evidence is reliable.  Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at trial, (ii) that is consistent with evidence submitted to Old O-I or the Debtor to settle for payment similar disease cases prior to the Petition Date, or (iii) that is a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state or federal judge, is presumptively reliable, although the Asbestos Trust may seek to rebut the presumption. In addition, except for Foreign Claims, claimants who otherwise meet the requirements of this TDP for payment of an Asbestos Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the applicable tort system. However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the claimant or the Asbestos Trust in any Individual Review proceeding conducted pursuant to Section 5.3(b) above or any Extraordinary Claim proceeding conducted pursuant to 5.4(a) above.

**5.7(b)  Exposure Evidence.**

**5.7(b)(1)  In General**.  As set forth above in Section 5.3(a)(3), to qualify for any Disease Level, the claimant must demonstrate a minimum exposure to asbestos or

Asbestos Containing Products[15] for which the Debtor has legal responsibility.  Claims based on conspiracy theories that involve no such exposure are not compensable under this TDP.  To meet the presumptive exposure requirements of Expedited Review set forth in Section 5.3(a)(3) above, the claimant must show (i) for all Disease Levels, Debtor Exposure as defined in Section 5.7(b)(3) below; (ii) for Asbestos/Pleural Disease Level II, six (6) months Debtor Exposure, plus five years cumulative occupational asbestos exposure; and (iii) for Asbestosis/Pleural Disease (Disease Level III), Severe Asbestosis (Disease Level IV), Other Cancer (Disease Level V), or Lung Cancer 1 (Disease Level VII), six (6) months Debtor Exposure, plus Significant Occupational Exposure to asbestos.  If the claimant cannot meet the relevant presumptive exposure requirements for a Disease Level eligible for Expedited Review, the claimant may seek Individual Review pursuant to Section 5.3(b) of his or her Asbestos Claim.

   **5.7(b)(2) Significant    Occupational    Exposure**.    "**Significant Occupational Exposure**" means employment for a cumulative period of at least five (5) years in an industry and an occupation in which the claimant (a) handled raw asbestos fibers on a regular basis; (b) fabricated asbestos-containing products so that the claimant in the fabrication process was exposed on a regular basis to raw asbestos fibers; (c) altered, repaired or otherwise worked with an asbestos-containing product such that the claimant was exposed on a regular basis to asbestos fibers; or (d) was employed in an industry and occupation such that the claimant worked

---

[15] "Asbestos Containing Products" is defined in the Plan to mean asbestos-containing products, equipment, components, parts, improvements to real property, or materials engineered, designed, marketed, manufactured, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, or distributed by, or in any other way made available, or present at any premises owned, leased, occupied or operated by, the Debtor (including, without limitation, any of the Debtor's direct or indirect predecessors), including without limitation any of those products manufactured, sold, or distributed by, or in any other way made available, or present at any premises owned, leased, occupied or operated by, Old O-I.

on a regular basis in close proximity to workers engaged in the activities described in (a), (b), and/or (c) above.

**5.7(b)(3)  Debtor Exposure**.  The claimant must demonstrate meaningful and credible exposure, which occurred on or prior to December 31, 1958, to asbestos or Asbestos Containing Products for which the Debtor has legal responsibility ("**Debtor Exposure**").  That meaningful and credible exposure evidence may be established by an affidavit or sworn statement of the claimant, a co-worker, or a family member in the case of a deceased claimant (providing the Asbestos Trust finds such evidence reasonably reliable), by invoices, employment, construction, or similar records, or by other credible evidence.  The specific exposure information required by the Asbestos Trust to process a claim under either Expedited or Individual Review shall be set forth on the proof of claim form to be used by the Asbestos Trust. The Asbestos Trust may also require submission of other or additional evidence of exposure when it deems such to be necessary.

The Asbestos Trust has no need for, and therefore claimants are not required to furnish the Asbestos Trust with evidence of, exposure to specific asbestos or asbestos-containing products other than those for which Debtor has legal responsibility, except to the extent such evidence is required elsewhere in this TDP.  Similarly, failure to identify Old O-I's products in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from recovering from the Asbestos Trust, provided the claimant satisfies the medical and exposure requirements of this TDP.

**5.8    Claims Audit Program**.  The Asbestos Trust, with the consent of the TAC and the Post-Effective Date Future Claimants' Representative, shall develop a Claims Audit Program.  Such Claims Audit Program may include methods for auditing the reliability of

medical evidence, including additional reading of X-rays, CT scans and verification of pulmonary function tests, as well as the reliability of evidence of exposure to asbestos, including exposure to asbestos-containing products for which the Asbestos Trust has responsibility.  In the event that the Asbestos Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable medical evidence to the Asbestos Trust, it may decline to accept additional evidence from such provider in the future.

The Asbestos Trust shall utilize the services of a third-party claims processing facility (the "**Claims Processor**") to assist in the evaluation of claims submitted to the Asbestos Trust and shall participate in a cross-trust audit program (the "**Cross-Trust Audit Program**").  The Cross-Trust Audit Program shall include a comparison of claims filed with the Asbestos Trust against claims filed with all other asbestos trusts administered by the Claims Processor that participate in the Cross-Trust Audit Program, but shall include no fewer than four other trusts.  The filing of any claim with the Asbestos Trust, regardless of the treatment sought, shall constitute consent for each other asbestos trust participating in the Cross-Trust Audit Program to release to the entity overseeing the Cross-Trust Audit Program (the "**Auditor**") all information submitted to such other asbestos trust by or on behalf of the claimant pursuant to the provisions of the Cross-Trust Audit Program and to disclose the status of any such claim and the amount and the date of any payment on the claim to the Auditor.

To the extent that the Trustees believe that it is relevant, nothing herein shall preclude the Asbestos Trust or the Auditor, in the Trustees' sole discretion, from reviewing or taking into consideration filed state court complaints or claims filed against other asbestos trusts.  Any claimant subject to the Asbestos Trust's Claims Audit Program or Cross-Trust Audit Program shall cooperate and, if requested by the Trustees, provide the Asbestos Trust or the Auditor with

authorization to obtain from other asbestos trusts any information such claimant has submitted to such other asbestos trusts.

In the event that an audit reveals that fraudulent information has been provided to the Asbestos Trust, the Asbestos Trust may penalize any claimant or claimant's attorney by rejecting the Asbestos Claim or by other means including, but not limited to, requiring the source of the fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' Asbestos Claims, raising the level of scrutiny of additional information submitted from the same source or sources, refusing to accept additional evidence from the same source or sources, seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152, and seeking sanctions from the Bankruptcy Court.

**5.9    Second Disease Claims**.  Notwithstanding the provisions of Section 2.1 above, the holder of an Asbestos Claim involving a non-malignant asbestos-related disease (Disease Levels I–IV) may assert a new Asbestos Claim against the Asbestos Trust for a malignant disease (Disease Levels V–VIII) that is subsequently diagnosed.  Any additional payments to which such claimant may be entitled with respect to such malignant asbestos-related disease shall be reduced by the amount paid for the non-malignant asbestos-related disease.

The holder of an Asbestos Claim involving a Disease Level I, II or III claim may assert a new Asbestos Claim against the Asbestos Trust for a Disease Level IV claim that is subsequently diagnosed.  Any additional payments to which such claimant may be entitled with respect to such subsequent claim shall be reduced by the amount paid for the prior claim.

**5.10    Arbitration.**

**5.10(a) Establishment of ADR Procedures**.   The Asbestos Trust, with the consent of the TAC and the Post-Effective Date Future Claimants' Representative, shall establish binding and non-binding arbitration procedures as part of the Alternative Dispute Resolution Procedures (the "**ADR Procedures**") to be established by the Trustees with the consent of the TAC and the Post-Effective Date Future Claimants' Representative for resolving disputes concerning whether a pre-petition settlement agreement or an administrative claims processing agreement with Old O-I is binding and judicially enforceable in the absence of a Final Order of the Bankruptcy Court determining the issue, whether the Asbestos Trust's rejection or denial of a claim was proper, or whether the claimant's medical condition or exposure history meets the requirements of this TDP for purposes of categorizing a claim involving Disease Levels I–VIII. Binding and non-binding arbitration shall also be available for resolving disputes over the liquidated value of a claim, as well as disputes over the Debtor's share of the unpaid portion of a Pre-Petition Liquidated Claim described in Section 5.2 above and disputes over the validity of an Indirect Asbestos Claim.

In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary requirements that are set forth in Section 5.7 above.  In the case of an arbitration involving the liquidated value of a claim involving Disease Levels IV–VIII, the arbitrator shall consider the same valuation factors that are set forth in Section 5.3(b)(2) above.  In order to facilitate the Individual Review Process with respect to such claims, the Asbestos Trust may develop a valuation model that enables the Asbestos Trust to efficiently make initial liquidated value offers on those claims in the Individual Review setting.  In an arbitration involving any such claim, the Asbestos Trust shall neither offer into evidence or describe any such model nor assert that any

information generated by the model has any evidentiary relevance or should be used by the arbitrator in determining the presumed correct liquidated value in the arbitration. The underlying data that was used to create the model may be relevant and may be made available to the arbitrator but only if provided to the claimant or his or her counsel at least ten (10) days prior to the arbitration proceeding.

With respect to all claims eligible for arbitration, the claimant, but not the Asbestos Trust, may elect either non-binding or binding arbitration. The ADR Procedures may be modified by the Asbestos Trust with the consent of the TAC and the Post-Effective Date Future Claimants' Representative.

**5.10(b) Claims Eligible for Arbitration**. In order to be eligible for arbitration, the claimant must first complete the Individual Review Process with respect to the disputed issue as well as any other processes required under the ADR Procedures. Individual Review shall be treated as completed for these purposes when the claim has been individually reviewed by the Asbestos Trust, the Asbestos Trust has made an offer on the claim, the claimant has rejected the liquidated value resulting from the Individual Review, and the claimant has notified the Asbestos Trust of the rejection in writing. Individual Review shall also be treated as completed if the Asbestos Trust has rejected the claim.

**5.10(c) Limitations on and Payment of Arbitration Awards**. In the case of a claim involving Disease Level I - III, the arbitrator shall not return an award in excess of the Scheduled Value for such claim. In the case of a non-Extraordinary Claim involving Disease Levels IV–VIII, the arbitrator shall not return an award in excess of the Maximum Value for the appropriate Disease Level as set forth in Section 5.3(a)(3) above, and for an Extraordinary Claim involving one of those Disease Levels, the arbitrator shall not return an award greater than the

maximum extraordinary value for such a claim as set forth in Section 5.4(a) above.  A claimant who submits to arbitration and who accepts the arbitral award shall receive payments in the same manner as one who accepts the Asbestos Trust's original valuation of the claim.

**5.11    Litigation**.  Claimants who elect non-binding arbitration and then reject their arbitral awards retain the right to institute a lawsuit in the tort system against the Asbestos Trust pursuant to Section 7.6 below.  However, a claimant shall be eligible for payment of a judgment for monetary damages obtained in the tort system from the Asbestos Trust's available cash only as provided in Section 7.7 below.

**SECTION 6**

**Claims Materials**

**6.1    Claims Materials**.  The Asbestos Trust shall prepare suitable and efficient claims materials ("**Claims Materials**") for all Asbestos Claims, and shall provide such Claims Materials upon a written request for such materials to the Asbestos Trust.  The proof of claim form to be submitted to the Asbestos Trust shall require the claimant to assert the highest Disease Level for which the claim qualifies at the time of filing.  The proof of claim form shall also include a certification by the claimant or his or her attorney sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil Procedure.  In developing its claim filing procedures, the Asbestos Trust shall make every effort to provide claimants with the opportunity to utilize currently available technology at their discretion, including filing claims and supporting documentation over the internet and electronically by disk or CD-ROM.  The proof of claim form to be used by the Asbestos Trust shall be developed by the Asbestos Trust and submitted to the TAC and the Post-Effective Date Future Claimants' Representatives for approval; it may be changed by the Asbestos Trust with the consent of the TAC and the Post-Effective Date Future Claimants' Representative.

54

      **6.2**    **Content of Claims Materials**.  The Claims Materials shall include a copy of this TDP, such instructions as the Trustees shall approve, and a detailed proof of claim form.  If feasible, the forms used by the Asbestos Trust to obtain claims information shall be the same or substantially similar to those used by other asbestos claims resolution organizations.   The Asbestos Trust shall accept information provided electronically.  Except as otherwise set forth herein with respect to Extraordinary Claims, the claimant may, but shall not be required to, provide the Asbestos Trust with evidence of recovery from other defendants and claims resolution organizations.

      **6.3**    **Withdrawal or Deferral of Claims**.  A claimant may withdraw an Asbestos Claim at any time upon written notice to the Asbestos Trust and file another claim subsequently without affecting the status of the claim for statute of limitations purposes, but any such claim filed after withdrawal shall be given a place in the FIFO Processing Queue based on the date of such subsequent filing.  A claimant may also request that the processing of his or her Asbestos Claim by the Asbestos Trust be deferred for a period not to exceed three (3) years without affecting the status of the claim for statute of limitations and repose purposes, in which case the claimant shall also retain his or her original place in the FIFO Processing Queue.  During the period of such deferral, a sequencing adjustment on such claimant's Asbestos Claim as provided in Section 7.5 hereunder shall not accrue and payment thereof shall be deemed waived by the claimant.  Except for Asbestos Claims held by representatives of deceased or incompetent claimants for which court or probate approval of the Asbestos Trust's offer is required, or an Asbestos Claim for which deferral status has been granted, a claim shall be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within one (1) year of the Asbestos Trust's written offer of payment or rejection of the claim.  Upon written request and

good cause, the Asbestos Trust may extend the withdrawal or deferral period for an additional six (6) months.

      **6.4**    **Filing Fees**.  The Trustees shall have the discretion to determine, with the consent of the TAC and the Post-Effective Date Future Claimants' Representative, whether a filing fee should be required for any Asbestos Claims.

      **6.5**    **Confidentiality of Claimants' Submissions**.  All submissions to the Asbestos Trust by a holder of an Asbestos Claim, including a proof of claim form and materials related thereto, and all responses by the Asbestos Trust shall be treated as made in the course of settlement negotiations between the holder and the Asbestos Trust, and intended by the parties to be confidential and to be protected by all applicable state and federal privileges, including but not limited to those directly applicable to settlement negotiations.  The submissions and responses are exchanged with reliance on such confidentiality, and all such evidence is inadmissible in any judicial or administrative proceeding for any purpose other than the exceptions stated in Federal Rule of Evidence 408.  The Asbestos Trust will preserve the confidentiality of such claimant submissions and Asbestos Trust responses, and shall disclose the contents thereof only (i) with the permission of the holder, to another trust established for the benefit of asbestos personal injury claimants pursuant to section 524(g) of the Bankruptcy Code or other applicable law, (ii) to such other persons as authorized by the holder, or (iii) in response to a valid subpoena of such materials issued by the Bankruptcy Court, a Delaware State Court, or the United States District Court for the District of Delaware.  Furthermore, the Asbestos Trust shall provide counsel for the holder a copy of any such subpoena immediately after being served; provided, however, that if a subpoena seeks records or information pertaining to more than fifty (50) claimants, the Asbestos Trust may instead first provide a copy of the subpoena to counsel

56

for the TAC and the Post-Effective Date Future Claimants' Representative and delay providing a copy of the subpoena to counsel for individual holders of Asbestos Claims until, in the Trustees' judgment, it appears likely that information or records relating to the holders may have to be produced in response to the subpoena.  In such a case, the Asbestos Trust shall ensure that the notice that is provided to counsel for the holders allows such counsel sufficient time to object to the production.  The Asbestos Trust shall on its own initiative or upon request of the claimant in question take all necessary and appropriate steps to preserve said privileges before the Bankruptcy Court, a Delaware State Court, or the United States District Court for the District of Delaware and before those courts having appellate jurisdiction related thereto.  Nothing in this TDP, the Plan, or the Asbestos Trust Agreement expands, limits or impairs the obligation under applicable law of a claimant to respond fully to lawful discovery in any underlying civil action regarding his or her submission of factual information to the Asbestos Trust for the purpose of obtaining compensation for asbestos-related injuries from the Asbestos Trust.

## SECTION 7

### General Guidelines for Liquidating and Paying Asbestos Claims

**7.1    Showing Required**.  To establish a compensable Asbestos Claim, a claimant must meet the requirements set forth in this TDP.

**7.2    Costs Considered**.  Notwithstanding any provisions of this TDP to the contrary, the Trustees shall always give appropriate consideration to the cost of investigating and uncovering invalid Asbestos Claims so that the payment of compensable Asbestos Claims is not further impaired by such processes with respect to issues related to the validity of the medical evidence supporting an Asbestos Claim.  The Trustees shall also have the latitude to make judgments regarding the costs to be expended by the Asbestos Trust so that compensable Asbestos Claims are not unduly further impaired by the costs of additional investigation.

Nothing herein shall prevent the Trustees, in appropriate circumstances, from contesting the validity of any claim filed with the Asbestos Trust whatever the costs, or declining to accept medical evidence from sources that the Trustees have determined to be unreliable pursuant to the Claims Audit Program implemented pursuant to Section 5.8 above, or otherwise.

7.3     **Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity**.  Consistent with the provisions hereof and subject to the FIFO Processing Queue and the FIFO Payment Queue, the Maximum Annual Payment, the Maximum Available Payment, and the Claims Payment Ratio requirements set forth above, the Trustees shall proceed as quickly as possible to liquidate compensable Asbestos Claims, and shall make payments to holders of such claims in accordance with this TDP promptly as funds become available and as claims are liquidated, while maintaining sufficient resources to pay future compensable claims in substantially the same manner.

Because the Asbestos Trust's income and liabilities over time remain uncertain, and decisions about payments must be based on estimates that cannot be done precisely, such decisions may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to claimants.  However, the Trustees shall use their best efforts to treat similar claims in substantially the same manner, consistent with their duties as Trustees, the purposes of the Asbestos Trust, the established allocation of funds to claims in Categories A and B, and the practical limitations imposed by the inability to predict the future with precision.

In the event that the Asbestos Trust faces temporary periods of limited liquidity, the Trustees may, with the consent of the TAC and the Post-Effective Date Future Claimants' Representative, (a) suspend the normal order of payment, (b) temporarily limit or suspend payments altogether, or (c) commence making payments on an installment basis.

**7.4     Punitive Damages**.  Except as provided below for claims asserted under the Alabama Wrongful Death Statute, in determining the value of any liquidated or unliquidated Asbestos Claim, punitive or exemplary damages, i.e., damages other than compensatory damages, shall not be considered or paid, notwithstanding their availability in the tort system.

Similarly, no punitive or exemplary damages shall be payable with respect to any claim litigated against the Asbestos Trust in the tort system pursuant to Sections 5.11 above and 7.6 below.  The only damages that may be awarded pursuant to this TDP to Alabama Claimants who are deceased and whose personal representatives pursue their claims only under the Alabama Wrongful Death Statute shall be compensatory damages determined pursuant to the statutory and common law of the Commonwealth of Pennsylvania, without regard to its choice of law principles.  The choice of law provision in this Section 7.4 applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.3(b)(2) is determined to be the Alabama Wrongful Death Statute, shall only govern the rights between the Asbestos Trust and the claimant including, but not limited to, suits in the tort system pursuant to Section 7.6.

**7.5     Sequencing Adjustment.**

**7.5(a)  In General**.  Except for any Asbestos Claim involving Other Asbestos Disease (Disease Level I – Cash Discount Payment) and subject to the limitations set forth below, a sequencing adjustment shall be paid on all Asbestos Claims with respect to which the claimant has had to wait a year or more for payment, provided, however, that no claimant shall receive a sequencing adjustment for a period in excess of six (6) years, or for a period when the claim was deferred, withdrawn, or the subject of an outstanding offer from the Asbestos Trust. The sequencing adjustment factor shall be one percent (1%) per year.

**7.5(b)  Unliquidated  Asbestos  Claims**.  A sequencing adjustment shall be payable on the Scheduled Value of any unliquidated Asbestos Claim that meets the requirements of Disease Levels II–V, VII and VIII, whether the claim is liquidated under Expedited Review, Individual Review, or by arbitration.  No sequencing adjustment shall be paid on any claim involving Disease Level I or on any claim liquidated in the tort system pursuant to Section 5.11 above and Section 7.6 below.  The sequencing adjustment on an unliquidated Asbestos Claim that meets the requirements of Disease Level VI shall be based on the Average Value of such a claim.  Sequencing adjustments on all such unliquidated claims shall be measured from the date of payment back to the earliest of the date that is one year after the date on which (a) the claim was filed against Old O-I or the Debtor prior to the Petition Date; (b) the claim was filed against another defendant in the tort system on or after the Petition Date but before the Effective Date; (c) the claim was filed with the Bankruptcy Court during the pendency of the Chapter 11 proceeding; or (d) the claim was filed with the Asbestos Trust after the Effective Date.

**7.5(c)  Pre-Petition Liquidated Claims**.  A sequencing adjustment shall also be payable on the liquidated value of all Pre-Petition Liquidated Claims described in Section 5.2(a) above.  In the case of Pre-Petition Liquidated Claims liquidated by verdict or judgment, the sequencing adjustment shall be measured from the date of payment back to the date that is one (1) year after the date that the verdict or judgment was entered; provided, however, that in no event shall the sequencing adjustment be measured from a date prior to the Petition Date if the liquidated value of the Pre-Petition Liquidated Claim includes pre-petition interest.  In the case of Pre-Petition Liquidated Claims liquidated by a binding, judicially enforceable settlement or a binding, judicially enforceable administrative claims processing agreement, the sequencing

adjustment shall be measured from the date of payment back to the date that is one (1) year after the Petition Date.

7.6     **Suits in the Tort System**.  If the holder of a disputed claim disagrees with the Asbestos Trust's determination regarding the Disease Level of the claim, the claimant's exposure or medical history, the compensability of the claim under the provisions of this TDP, or the liquidated value of the claim, and if the holder has first submitted the claim to non-binding arbitration as provided in Section 5.10 above, the holder may file a lawsuit against the Asbestos Trust in the Claimant's Jurisdiction as defined in Section 5.3(b)(2) above.  Any such lawsuit must be filed by the claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit.  All defenses (including, with respect to the Asbestos Trust, all defenses which could have been asserted by the Debtor or Old O-I, except as otherwise provided in the Plan) shall be available to both sides at trial; however, the Asbestos Trust may waive any defense and/or concede any issue of fact or law.  If the claimant was alive at the time the initial pre-petition complaint was filed or on the date the proof of claim form was filed with the Asbestos Trust, the case shall be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim.

7.7     **Payment of Judgments for Money Damages**.  If and when a claimant obtains a judgment in the tort system, the claim shall be placed in the FIFO Payment Queue based on the date on which the judgment became final.  Thereafter, the claimant shall receive from the Asbestos Trust an initial payment (subject to the applicable Payment Percentage, the Maximum Available Payment, and the Claims Payment Ratio provisions set forth above) of an amount equal to the greater of (i) the Asbestos Trust's last offer to the claimant or (ii) the award that the

61

claimant declined in non-binding arbitration; provided, however, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system.  The claimant shall receive the balance of the judgment, if any, in five (5) equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage, the Maximum Available Payment, and the Claims Payment Ratio provisions above in effect on the date of the payment of the subject installment).

In the case of a claim involving Disease Level I - III, the total amounts paid with respect to such claim shall not exceed the Scheduled Value for such Disease Level.  In the case of a claim that does not attain classification under a Disease Level, the amount payable shall not exceed the Scheduled Value for the Disease Level most comparable to the disease proven.  In the case of non-Extraordinary claims involving Disease Levels IV–VIII, the total amounts paid with respect to such claims shall not exceed the Maximum Values for such Disease Levels set forth in Section 5.3(b)(3).  In the case of Extraordinary Claims, the total amounts paid with respect to such claims shall not exceed the maximum extraordinary values for such claims set forth in Section 5.4(a) above.  Under no circumstances shall (a) sequencing adjustments be paid pursuant to Section 7.5 or (b) interest be paid under any statute on any judgments obtained in the tort system.

**7.8**    **Releases**.  As a condition to receiving any payment from the Asbestos Trust, a claimant shall be required to execute an Asbestos Claimant Release.  The form of the Asbestos Claimant Release shall be substantially in the form attached to the Plan as Exhibit D.  The Trustees may modify the provisions of the Asbestos Claimant Release with the consent of the TAC and the Post-Effective Date Future Claimants' Representative; provided, however, that no

such change shall be inconsistent with the terms of the Plan or the Confirmation Order and/or modify in any way the releases and injunctions contained in the Plan or the Confirmation Order.

7.9    **Third-Party Services**.  Nothing in this TDP shall preclude the Asbestos Trust from contracting with another asbestos claims resolution organization to provide services to the Asbestos Trust so long as decisions about the categorization and liquidated value of Asbestos Claims are based on the relevant provisions of this TDP, including the Disease Levels, Scheduled Values, Average Values, Maximum Values, and Medical/Exposure Criteria set forth above.

<u>**SECTION 8**</u>

<u>**Miscellaneous**</u>

8.1    **Amendments**.  Except as otherwise provided herein, the Trustees may amend, modify, delete, or add to any provisions of this TDP (including, without limitation, amendments to conform this TDP to advances in scientific or medical knowledge or other changes in circumstances), provided the Trustees first obtain the consent of the TAC and the Post-Effective Date Future Claimants' Representative pursuant to the consent process set forth in Sections 5.7(b) and 6.6(b) of the Asbestos Trust Agreement, except that the right to amend the Claims Payment Ratio is governed by the restrictions in Section 2.5 above, and the right to adjust the Payment Percentage is governed by Section 4.2 above.  Nothing herein is intended to preclude the TAC or the Post-Effective Date Future Claimants' Representatives from proposing to the Trustees, in writing, amendments to this TDP.  Any amendment proposed by the TAC or the Post-Effective Date Future Claimants' Representatives shall remain subject to Section 7.3 of the Asbestos Trust Agreement.  Notwithstanding the foregoing, no amendment shall be made to this TDP or the Asbestos Claimant Release that would adversely affect any rights, duties, immunities, indemnification, or liabilities of the Reorganized Debtor or any other Protected Party

provided pursuant to the Plan or Confirmation Order, including, without limitation, the scope and terms of the releases and injunctions provided in the Plan and Confirmation Order, without the advance written consent of the Reorganized Debtor and O-I Glass, Inc., or their respective successors or assigns.

      **8.2**    **Severability**.  Should any provision contained in this TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability or operative effect of any and all other provisions of this TDP.

      **8.3**    **Governing Law**.  Except for purposes of determining the liquidated value of any Asbestos Claim, administration of this TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware.  The law governing the determination of validity and/or liquidation of Asbestos Claims in the case of Individual Review, arbitration, or litigation in the tort system shall be the law of the Claimant's Jurisdiction as described in Section 5.3(b)(2) above.

US-DOCS\129026018.1

## APPENDIX I: AUTHORIZATION FOR ASBESTOS TRUST TO OBTAIN TRUST RECORDS

## <u>AUTHORIZATION FOR RELEASE OF RECORDS OF OTHER ASBESTOS TRUSTS AND CLAIM RESOLUTION FACILITIES</u>

TO WHOM IT MAY CONCERN:

The Claimant named below hereby authorizes each asbestos trust and claim resolution facility listed in the attachment hereto to provide directly to the Owens-Illinois Asbestos Personal Injury Trust (the "Asbestos Trust"), or any of its representatives, all submissions made by Claimant and (if different from the Claimant) the party whose injury forms the basis of the claim (the "Injured Party"), including claim forms, any attachments to claim forms, and any amended or supplemental claim forms. Claimant expressly acknowledges that the other asbestos trust or claim resolution facility may provide such documents directly to the Asbestos Trust and need not obtain any further authorization from the Claimant or his/her representatives.

A copy of this Authorization shall be as valid as the original. This Authorization contains no expiration date and may be exercised by the Asbestos Trust at any time. If Claimant's representative has signed this Authorization, a notarized power of attorney is attached.

Name of Claimant: _____

Social Security No.: _____

Date of Birth: _____

Name of Injured Party (if different from Claimant): _____

Social Security No.: _____

Date of Birth: _____

Name of representative for Claimant or Injured Party: _____

Signing party: _____

Signature: _____

Date: _____

Attachment: List of Asbestos Trusts and Claim Resolution Facilities

US-DOCS\129026018.1

## List of Other Asbestos Trusts and Claim Resolution Facilities

| | | |
|---|---|---|
| A&I Corp. Asbestos Bodily Injury Trust | Forty-Eight Insulations Qualified Settlement Trust | Raytech Corp. Asbestos Personal Injury Settlement Trust |
| A-Best Asbestos Settlement Trust | Fuller-Austin Asbestos Settlement Trust | Rock Wool Mfg Company Asbestos Trust |
| AC&S Asbestos Settlement Trust | G-I Asbestos Settlement Trust | Rutland Fire Clay Company Asbestos Trust |
| Amatex Asbestos Disease Trust Fund | H.K. Porter Asbestos Trust | Shook & Fletcher Asbestos Settlement Trust |
| APG Asbestos Trust | Hercules Chemical Company, Inc. Asbestos Trust | Skinner Engine Co. Asbestos Trust |
| API, Inc. Asbestos Settlement Trust | J.T. Thorpe Settlement Trust | Stone and Webster Asbestos Trust |
| Armstrong World Industries Asbestos Personal Injury Settlement Trust | JT Thorpe Company Successor Trust | Swan Asbestos and Silica Settlement Trust |
| ARTRA 524(g) Asbestos Trust | Kaiser Asbestos Personal Injury Trust | T H Agriculture & Nutrition, LLC Industries Asbestos Personal Injury Trust |
| ASARCO LLC Asbestos Personal Injury Settlement Trust | Keene Creditors Trust | Thorpe Insulation Company Asbestos Personal Injury Settlement Trust |
| Babcock & Wilcox Company Asbestos Personal Injury Settlement Trust | Lummus 524(g) Asbestos PI Trust | United States Gypsum Asbestos Personal Injury Settlement Trust |
| Bartells Asbestos Settlement Trust | Lykes Tort Claims Trust | United States Lines, Inc. and United States Lines (S.A.) Inc. Reorganization Trust |
| Brauer 524(g) Asbestos Trust | M.H. Detrick Company Asbestos Trust | United States Mineral Products Company Asbestos Personal Injury Settlement Trust |
| Burns and Roe Asbestos Personal Injury Settlement | Manville Personal Injury | UNR Asbestos-Disease |

67

| Trust | Settlement Trust | Claims Trust |
|---|---|---|
| C.E. Thurston & Sons Asbestos Trust | Muralo Trust | Utex Industries, Inc. Successor Trust |
| Celotex Asbestos Settlement Trust | NGC Bodily Injury Trust | Wallace & Gale Company Asbestos Settlement Trust |
| Combustion Engineering 524(g) Asbestos PI Trust | Owens Corning Fibreboard Asbestos Personal Injury Trust (OC Sub-Fund) | Western MacArthur-Western Asbestos Trust |
| Congoleum Plan Trust | Owens Corning Fibreboard Asbestos Personal Injury Trust (FB Sub-Fund) | W.R. Grace Trust |
| DII Industries, LLC Asbestos PI Trust | PLI Disbursement Trust | Pittsburgh Corning Trust |
| Eagle-Picher Industries Personal Injury Settlement Trust | Plibrico Asbestos Trust | Bondex Trust |
| Federal Mogul U.S. Asbestos Personal Injury Trust | Porter Hayden Bodily Injury Trust | Flintkote Company and Flintkote Mines Limited Asbestos Personal Injury Trust |
| MLC Asbestos Personal Injury Trust | Metex Asbestos Trust | Leslie Controls, Inc. Asbestos Personal Injury Trust |
| Plant Insulation Company Asbestos Settlement Trust | Quigley Co. Inc. Asbestos Personal Injury Trust | Yarway Asbestos Personal Injury Trust |
| GST Settlement Facility | Geo. V. Hamilton, Inc. Asbestos Trust | |

68

## EXHIBIT C

**ASBESTOS CLAIMS INDEMNIFICATION AGREEMENT**

**ASBESTOS CLAIMS
INDEMNIFICATION AGREEMENT**

This Asbestos Claims Indemnification Agreement (this "Agreement") is made and entered this _____ day of _____, 2022, by and among the Owens-Illinois Asbestos Personal Injury Trust (the "Asbestos Trust"), Paddock Enterprises, LLC, a Delaware limited liability company ("Paddock" or the "Debtor," and as reorganized, the "Reorganized Debtor"), and O-I Glass, Inc., a Delaware corporation ("O-I Glass") on behalf of itself and the other Non-Debtor Affiliates (collectively, and together with Representatives of any of the foregoing entities, the "Indemnified Parties").  The Asbestos Trust is the "Indemnifying Party."  The Indemnified Parties and Indemnifying Party are sometimes referred to herein, collectively, as the "Parties" and, individually, as a "Party."

**R E C I T A L S**

**WHEREAS**, on January 6, 2020, Paddock commenced a case under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") by filing a voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS**, pursuant to the *First Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code*, dated February 14, 2022 [Docket No. 1204] (together with any amendments or modifications thereto, the "Plan"), O-I Glass, on its own behalf and on behalf of all of the other Non-Debtor Affiliates, and Paddock, on its own behalf and on behalf of all of the Non-Debtor Affiliates, are contributing the O-I Glass Contribution and the Paddock Contribution, respectively, in consideration of receiving, *inter alia*, the benefit of the Asbestos Channeling Injunction, releases in favor of the Released Parties, and this Agreement, as well as an Asbestos Claimant Release from each holder of an Asbestos Claim;

**WHEREAS**, on [ ● ], the Bankruptcy Court entered an order [Docket No. [ ● ]] (the "Confirmation Order"), which, among other things, confirmed the Plan;

**WHEREAS**, on [ ● ], the United States District Court for the District of Delaware entered an order affirming the Confirmation Order [Docket No. [ ● ]]; and

**WHEREAS**, as partial consideration for the O-I Glass Contribution, the Indemnifying Party has agreed to indemnify, defend and hold harmless the Indemnified Parties from Asbestos Claims in accordance with the terms and provisions of this Agreement;

**A G R E E M E N T**

**NOW, THEREFORE**, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.     Definitions.  Capitalized terms not defined in this section or otherwise herein shall have the meanings set forth in the Plan.

    a.     "Assert" means to:

        i.     commence a judicial, administrative, or other proceeding or take other action to adjudicate, collect, recover or receive payment of, on, or with respect to any claim;

        ii.     make a written threat to take an action or commence a judicial, administrative, or other proceeding to adjudicate, collect, recover or receive payment of, on, or with respect to any claim;

take any other action with respect to a claim that, if such claim is an Asbestos Claim, would be contrary to the terms of the Asbestos Channeling Injunction, regardless of whether the claimant (or any other Entity) asserts,

2

successfully or not, that the Asbestos Channeling Injunction is not binding on the Entity taking such action; or

iii. give written notice or take action evincing the intent to continue a judicial, administrative, or other proceeding that was initiated prior to the Effective Date to adjudicate, collect, recover or receive payment of, on, or with respect to any claim.

b. "District Court" means the United States District Court for the District of Delaware but excludes the Bankruptcy Court to the extent it is considered an adjunct court or unit of such court.

c. "Indemnifiable Claim" means any action based upon, attributable to, associated with, arising out of, or incurred in connection with (i) any Asbestos Claim Asserted against any Indemnified Party on and/or after the Effective Date or (ii) any other violation of the Asbestos Channeling Injunction.

d. "Indemnification Claim Notice" means notice in the form of Exhibit 1 attached hereto and made a part hereof, or a written notice providing substantially the same information.

e. "Indemnified Parties" has the meaning specified in the Preamble.

f. "Indemnifying Party" has the meaning specified in the Preamble.

g. "Losses" means any and all actual damages, claims, costs, losses, liabilities, expenses, obligations or adverse judgments, administrative awards or binding arbitration awards (including, without limitation, interest, penalties, fines, court costs, costs of preparation and investigation and reasonable and substantiated attorneys', accountants' and other professional advisors' fees and expenses and adverse judgments or binding arbitration awards for compensatory damages, punitive damages, exemplary damages, vindictive damages, presumptive damages, or

3

other specified damages); provided, however, that notwithstanding the foregoing, "Losses" shall not include (i) internal costs or allocations by any Indemnified Party, or (ii) any consequential, special damages or incidental damages on the part of any Indemnified Party, including without limitation lost profits, diminution of market value, the loss of goodwill or injury to the reputation of any Indemnified Party.

2.  Indemnification.  Subject to the provisions of this Agreement, the Indemnifying Party shall defend, indemnify and hold the Indemnified Parties harmless from and against any and all Losses arising from, based upon, associated with, or incurred in connection with any Indemnifiable Claim.

3.  Notice and Procedures.

a.  Time to Give Notice.  Within ten (10) Business Days after an Indemnified Party receives written notice that an Indemnifiable Claim has been Asserted against such Indemnified Party, such Indemnified Party shall deliver an Indemnification Claim Notice to the Indemnifying Party, together with a copy of any papers received by such Indemnified Party regarding such Asserted claim.  Notwithstanding the foregoing, failure of such Indemnified Party to give the notice provided in this Section 3 within ten (10) Business Days shall not be a defense to the liability of the Indemnifying Party for such claim, but the Indemnifying Party may recover from such Indemnified Party any Losses incurred by the Indemnifying Party that have resulted from such Indemnified Party's failure to give such notice within such ten (10) Business Day period.

b.  Procedure.  All claims for indemnification by an Indemnified Party against the Indemnifying Party under this Agreement are governed by the following procedures:

(i)  Response to Notice.  The Indemnifying Party shall notify such Indemnified Party in writing within ten (10) Business Days after receipt of the Indemnification Claim

4

Notice whether the Indemnifying Party intends, at the sole cost and expense of the Indemnifying Party, to defend such Indemnified Parties against the Indemnifiable Claim.

(ii)     Interim Actions of Indemnified Parties.  During the period before the Indemnifying Party responds to the Indemnification Claim Notice (the "Interim Period"), such Indemnified Party may file any motion, answer or other pleading or take any other action that is necessary to protect such Indemnified Party's interests so long as any such action does not prejudice the ability of the Indemnifying Party to defend the underlying claim.  If such Indemnified Party takes any such interim action during the Interim Period that is prejudicial to the ability of the Indemnifying Party to defend the underlying action, the Indemnifying Party shall be entitled to recover from such Indemnified Party any Losses incurred by the Indemnifying Party that result from such Indemnified Party's actions during the Interim Period.  Under no circumstances shall the Interim Period, or the accompanying restriction on such Indemnified Party's actions, last more than ten (10) Business Days after receipt of the Indemnification Claim Notice by the Indemnifying Party.

(iii)     Control of Matter if Indemnifying Party Undertakes Defense.  If the Indemnifying Party notifies such Indemnified Party, in writing, within the ten (10) Business Day period after receipt of an Indemnification Claim Notice that the Indemnifying Party intends to defend such Indemnified Party against the Indemnifiable Claim, then the Indemnifying Party has the right to defend, at its sole cost and expense, such Indemnifiable Claim by all appropriate proceedings, which proceedings shall be diligently defended by the Indemnifying Party to a final conclusion.  The Indemnifying Party shall have discretion to settle any such Indemnifiable Claim so long as any such settlement: (A) provides for an unconditional release of such Indemnified Party from all liability arising out of such

5

Indemnifiable Claim; (B) does not admit or assume any liability or material allegations against any Indemnified Party, or waive any defense of any Indemnified Party, in respect of such Indemnifiable Claim; (C) does not prejudice or otherwise compromise any Indemnified Party's defenses with respect to any Asbestos Claim; and (D) does not impose any financial or other obligation or duty on any Indemnified Party. The Indemnifying Party will have full control of such defense and proceedings; provided, however, that the Indemnifying Party shall not pursue any defense that prejudices or otherwise compromises any Indemnified Party's defenses to such Indemnifiable Claim or any Asbestos Claim. The Indemnified Parties may participate in, but not control, any defense or settlement of any Indemnifiable Claim the Indemnifying Party has undertaken to defend. The Indemnified Parties shall bear their own costs and expenses with respect to such participation, unless the Indemnified Parties are participating pursuant to Section 3(b)(iv) hereof at the request of the Indemnifying Party. The Indemnifying Party shall consult with the Indemnified Parties regarding the choice of counsel to defend such Indemnified Party against an Indemnifiable Claim, and to the extent reasonably practicable shall keep the Indemnified Parties informed in advance of all material events, send copies to the Indemnified Parties of all material documents and correspondence relating to such Indemnifiable Claim and give the Indemnified Parties an opportunity to review any drafts of papers filed relating to the defense. A notification by the Indemnifying Party pursuant to this Section 3(b)(iii) that it is undertaking defense of such Indemnified Party may, but need not, contain an express reservation of the Indemnifying Party's rights to challenge such Indemnified Party's claim for indemnification under this Agreement in respect of such claim. The absence of a reservation of rights in any notification is not an admission that such Indemnified Party is

6

entitled to indemnification hereunder.  If the Indemnifying Party undertakes the defense of an Indemnifiable Claim, regardless of whether the Indemnifying Party undertakes such defense with or without a reservation of rights, the Indemnifying Party must diligently defend such claim to a final conclusion; provided, however, that if the District Court determines prior to the resolution of such Indemnifiable Claim, that the Indemnifying Party has no obligation to defend such Indemnified Party under this Agreement with respect to such Indemnifiable Claim, the Indemnifying Party shall transfer the defense of such Indemnifiable Claim to such Indemnified Party pursuant to Section 3(b)(vi) hereof.

(iv)    Cooperation of Indemnified Parties.  If the Indemnifying Party in writing requests, the Indemnified Parties shall cooperate, at the sole cost and expense of the Indemnifying Party, with the Indemnifying Party and its counsel in contesting any Indemnifiable Claim that the Indemnifying Party elects to contest or in making any counterclaim or cross-claim against any Entity (other than an Indemnified Party) based upon or in connection with substantially the same events or circumstances as those underlying such Indemnifiable Claim.

(v)    No Response; Delayed Undertaking to Defend or Refusal to Defend.  If the Indemnifying Party gives notice to such Indemnified Party, in writing, within ten (10) Business Days after receipt of an Indemnification Claim Notice that the Indemnifying Party does not intend to defend such Indemnified Party with respect to such Indemnifiable Claim, or if the Indemnifying Party fails to respond within such ten (10) Business Day period, then the Indemnified Parties will have the right (but not the obligation), at the sole cost and expense of the Indemnifying Party (unless otherwise determined under Section 3(b)(vi) hereof), to defend the Indemnifiable Claim by all appropriate proceedings.   If any

7

Indemnified Party elects to defend the claim, it must maintain a defense for at least the next subsequent forty-five (45) calendar days.  The Indemnified Parties will have full control of such defense and proceedings, including any compromise or settlement.  The Indemnifying Party shall cooperate with the Indemnified Parties and their counsel in contesting any such Indemnifiable Claim or in making any counterclaim or cross-claim against any Entity (other than the Indemnifying Party) based upon or in connection with substantially the same facts and circumstances as those underlying such Indemnifiable Claim.  Such cooperation shall be at the sole cost and expense of the Indemnifying Party (unless otherwise determined under Section 3(b)(vi) hereof.  If the Indemnifying Party (A) requests to be permitted to undertake the defense of such Indemnifiable Claim in writing at any time within forty-five (45) calendar days after the date of receipt by the Indemnifying Party of an Indemnification Claim Notice for such Indemnifiable Claim and (B) tenders to the Indemnified Parties in cash the amount of their Losses in defending such Indemnifiable Claim during such forty-five (45) calendar day period within fifteen (15) calendar days of being presented with an invoice with reasonable support therefor, the Indemnified Parties must turn over the defense of such Indemnifiable Claim to the Indemnifying Party.  In such event, the Indemnifying Party must diligently defend such Indemnified Party against such Indemnifiable Claim, at the sole expense of the Indemnifying Party, until the earlier of (a) the final resolution of the Indemnifiable Claim and (b) the District Court's determination under Section 3(b)(vi) hereof that the Indemnifying Party has no obligation under this Agreement to such Indemnified Party with respect to such Indemnifiable Claim.

(vi)     Determination Regarding Indemnifying Party's Duty to Defend.  If the Indemnifying Party notifies such Indemnified Party that the Indemnifying Party disputes

any duty to defend or indemnify, in whole or in part, an Indemnified Party against an Indemnifiable Claim identified in an Indemnification Claim Notice, or if the Indemnifying Party fails to respond within the ten (10) Business Day period provided in Section 3(b)(i) hereof, either the Indemnified Parties or the Indemnifying Party may seek a declaratory judgment or other judicial determination regarding this Agreement, which may be brought only in the District Court.  If the District Court determines that the Indemnifying Party has no obligation to such Indemnified Party under Section 2 or 3 of this Agreement with respect to such Indemnifiable Claim, such Indemnified Party shall reimburse the Indemnifying Party in full for any Losses the Indemnifying Party actually incurred prior to such determination in defending such Indemnified Party against such claim and, if such Indemnifiable Claim is still pending at such determination, the Indemnifying Party shall transfer the defense of such claim, together with the defense files (including, but not limited to, the pleadings and other filed documents, discovery, correspondence, evidence, etc.) to such Indemnified Party, and provide reasonable assistance as requested by such Indemnified Party during such transfer, all at the Indemnified Party's expense.  If such dispute is resolved in favor of such Indemnified Party, the Indemnifying Party shall defend, indemnify and hold such Indemnified Party harmless from any and all Losses with respect to such Indemnifiable Claim as set forth in this Agreement, and shall reimburse such Indemnified Party in full for any Losses previously incurred by such Indemnified Party in connection with such claim.  Any prevailing Party in any such action shall be entitled to recover from any opposing Party in such action its reasonable costs and expenses incurred in such action, including its reasonable attorneys' fees.

US-DOCS\125918193.8

4.      Lien.   The Indemnified Parties shall have a first priority lien upon all assets of the Indemnifying Party to secure the obligations of the Indemnifying Party in accordance with the terms of this Agreement.

5.      Limitations.   The Indemnifying Party shall not be liable hereunder for Losses incurred in investigating, defending or otherwise responding to an Indemnifiable Claim prior to the delivery to the Indemnifying Party of a timely Indemnification Claim Notice with respect to such Indemnifiable Claim, other than necessary action taken by Indemnified Parties pursuant to Section 3(b)(ii) hereof.

6.      Covenant Not To Sue.   The Indemnifying Party agrees that it shall not assert, commence, maintain, or continue any claim, lawsuit or other proceeding against any Indemnified Party based on any Asbestos Claim or assist in, or permit the assets of the Indemnifying Party to be used to fund, the assertion, commencement, maintenance, or continuance by any other Entity of any such claim, lawsuit or other proceeding other than with respect to any disputes among the Parties arising under this Agreement.   Without limitation of the foregoing, the Indemnifying Party agrees that its failure to comply with this provision will cause irreparable harm to the Indemnified Parties and that specific performance and injunctive relief shall be available in the event of any breach or threatened breach hereof.

7.      No Requirement to Hold Assets in Trust or Escrow.   The Indemnifying Party shall not have any duty or obligation to hold any funds or assets in trust or escrow, or otherwise segregate any funds or assets, for any purpose related to or in connection with this Agreement.   The Indemnifying Party may establish and later terminate any reserve with respect to its obligations to the Indemnified Parties under this Agreement that the Indemnifying Party believes appropriate for any reason or necessary to comply with generally accepted accounting principles.

US-DOCS\125918193.8

8.      Miscellaneous.

a.      Benefit.

This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective legal representatives, successors and assigns.

b.      No Third-Party Beneficiary.

The terms and provisions of this Agreement are intended solely for the benefit of the Parties (including, without limitation, any Indemnified Parties who are not currently Parties, which for the avoidance of doubt, includes the (i) Non-Debtor Affiliates, (ii) Representatives of the Debtor, (iii) Representatives of the Reorganized Debtor, and (iv) Representatives of the Non-Debtor Affiliates) and their respective successors and permitted assigns, and are not intended to confer third-party beneficiary rights upon any other Entity.

c.      Waiver of Breach, Right or Remedy.

The waiver by any Party of any breach or violation by another Party of any provision of this Agreement or of any right or remedy of the waiving Party in this Agreement (i) shall not waive or be construed to waive any subsequent breach or violation of the same provision, (ii) shall not waive or be construed to waive a breach or violation of any other provision and (iii) shall be made in writing and may not be presumed or inferred from any Party's conduct.

d.      Notices.

Any notice, demand or communication required, permitted or desired to be given under this Agreement must be (a) in writing and is deemed given when (i) delivered personally to the recipient, (ii) sent by facsimile or e-mail before 5:00 p.m. prevailing Eastern Time on a Business Day with a copy of such facsimile or e-mail sent to the recipient by reputable overnight courier service (charges prepaid) on the same day, (iii) five (5) calendar days after deposit in the United

US-DOCS\125918193.8

States mail, mailed by registered or certified mail, return receipt requested, postage prepaid, or

(iv) one (1) Business Day after being sent to the recipient by reputable overnight courier service

(charges prepaid); and (b) addressed to the Parties to whom such notice, demand or communication

is directed (and, if required, its counsel) at the addresses set forth below, or at such other address

as such Party may designate from time to time in writing in accordance with this section:

> If to any Indemnified Party:
>
> O-I Glass, Inc.
> One Michael Owens Way
> Perrysburg, Ohio 43551
> Attn: Darrow A. Abrahams, Esq.
> Email: darrow.abrahams@o-i.com
>
> with a copy (which alone will not constitute notice) to:
>
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 North Market Street, 16th Floor
> Wilmington, Delaware 19899-1347
> Attn: Derek C. Abbott, Esq.
> Facsimile: (302) 658-3989
> Email: dabbott@morrisnichols.com
>
> and
>
> Reorganized Debtor
> Paddock Enterprises, LLC
> One Michael Owens Way
> Perrysburg, Ohio 43551
> Attn: David J. Gordon, President and Chief Restructuring Officer
> Email: dgordon@djoservicesllc.com
>
> with copies (which alone will not constitute notice) to:

| Latham & Watkins LLP | Richards, Layton & Finger, P.A. |
|---|---|
| 355 South Grand Avenue, Suite 100 | One Rodney Square |
| Los Angeles, California 90071 | 920 N. King Street |
| Attn: Jeffrey E. Bjork, Esq. | Wilmington, Delaware 19801 |
| Kimberly A. Posin, Esq. | Attn: John H. Knight, Esq. |
| Helena G. Tseregounis, Esq. | Michael J. Merchant, Esq. |
| Christina M. Craige, Esq. | Brendan J. Schlauch, Esq. |

Telephone:  (213) 485-1234                     Sarah Silveira, Esq.
Facsimile:  (213) 891-8763            Telephone:  (302) 651-7700
Emails:  jeff.bjork@lw.com           Facsimile:  (302) 651-7701
       kim.posin@lw.com            Emails:  knight@rlf.com
       helena.tseregounis@lw.com         merchant@rlf.com
       chris.craige@lw.com               schlauch@rlf.com
                                silveira@rlf.com

If to the Indemnifying Party:

Owens-Illinois Asbestos Personal Injury Trust
[ ● ]
Attn: [ ● ]
Email: [ ● ]

    e.      <u>Entire Agreement; Counterparts; Amendment</u>.

This Agreement supersedes all prior or contemporaneous contracts, agreements, letters of intent and understandings and constitutes the entire agreement of whatsoever kind or nature existing between or among the Parties representing the subject matter of this Agreement, and no Party shall be entitled to benefits other than those specified herein.  This Agreement may be executed in counterparts, including by means of facsimile or electronic signature, each of which shall be deemed an original and which together shall constitute but one and the same instrument. This Agreement may not be amended except in a written instrument executed by all of the Parties affected by such amendment, in which case such amendment shall only be effective against the signing Parties.

    f.      <u>Severability</u>.

If any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.  The Parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with

13

valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

g.     Drafting.

No provision of this Agreement shall be interpreted for or against any Party on the basis that such Party was the draftsman of such provision, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Further, neither the existence of this Agreement nor anything contained herein shall mean or be construed to suggest that the Parties believe that the injunctions and provisions of the Plan and Plan Documents prohibiting the assertion of Asbestos Claims against the Indemnified Parties are not fully enforceable in accordance with their terms.

h.     Assignment.

Neither this Agreement, nor any right, remedy, obligation or liability arising hereunder or by reason hereof, nor any of the documents executed in connection herewith, may be assigned by any Party without the consent of the Parties.

i.     Governing Law; Dispute Resolution.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to such state's conflicts of law rules.  Each of the Parties hereby submits to the exclusive jurisdiction of the District Court for such purposes.

j.     Venue.  Each of the Parties hereto irrevocably waives, to the fullest extent permitted by law, any objection to the laying of venue of any proceeding brought under this Agreement in Wilmington, Delaware and any claim in connection with any such proceeding that a court of competent jurisdiction in Wilmington, Delaware is an inconvenient forum.

14

US-DOCS\125918193.8

k.      <u>Common Interest</u>.  The Parties agree that they have a common legal interest with respect to the Indemnifiable Claims and intend to preserve to the fullest extent permitted by law the protection against disclosure afforded under the work-product doctrine, attorney-client privilege, common interest or joint-defense doctrines, self-evaluative privilege, and/or other applicable statutes and rules of law with respect to any communications, documents, deposition transcripts, electronically or computer generated data, research, factual material and summaries, digests, strategy, mental impressions, memoranda, reports and other non-public and confidential information relating to any Indemnifiable Claims.

[SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be executed and delivered as of the date first written above.

**O-I GLASS, INC.** on behalf of itself and the other Non-Debtor Affiliates

By: _____
Name: Darrow A. Abrahams
Title: SVP, General Counsel and Corporate Secretary

**OWENS-ILLINOIS ASBESTOS PERSONAL INJURY TRUST**

By: _____
Name: _____
Title: _____

**REORGANIZED PADDOCK**

By: _____
Name: David J. Gordon
Title: President and Chief Restructuring Officer

**EXHIBIT 1**
**ASBESTOS CLAIMS INDEMNIFICATION AGREEMENT**

**INDEMNIFICATION CLAIM NOTICE**

Date: _____

To:      Owens-Illinois Asbestos Personal Injury Trust

From: [Name of Indemnified Party]

Date Indemnifiable Claim was Asserted against the party claiming indemnification:

_____

This Indemnification Claim Notice serves as notice to the Indemnifying Party pursuant to Section 3(a) of the Asbestos Claims Indemnification Agreement, dated as of _____, 2022 (the "Indemnification Agreement"), by and among the Asbestos Trust, Paddock Enterprises, LLC, a Delaware limited liability company ("Paddock" or the "Debtor," and as reorganized, the "Reorganized Debtor"), and O-I Glass, Inc., a Delaware corporation ("O-I Glass") on behalf of itself and the Non-Debtor Affiliates.  Capitalized terms not defined herein shall have the meanings given them in the Indemnification Agreement.

The following is a short summary of the facts surrounding the Indemnifiable Claim, including, to the extent known, the purported basis for such Indemnifiable Claim, the amount of damages claimed, and any pending response or other deadlines with respect to such Indemnifiable Claim:

[to be completed]

Any papers received by the party claiming indemnification under the Indemnification Agreement in connection with the Indemnifiable Claim described herein are attached to this Indemnification Claim Notice.

Signed: _____

US-DOCS\125918193.8

[Name of Indemnified Party]

2

## EXHIBIT D

**ASBESTOS CLAIMANT RELEASE**

US-DOCS\123556013.57

## ASBESTOS CLAIMANT RELEASE

This Asbestos Claimant Release (this "Release") is made and entered on the date set forth on the signature page hereof by the undersigned who is either the "Injured Party" or the "Official Representative"[1] (either being referred to herein as the "Claimant"), the Holder of an Asbestos Claim.

## RECITALS

WHEREAS, on January 6, 2020, Paddock Enterprises, LLC ("Paddock" or the "Debtor") commenced a case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§101-1532 (as amended, the "Bankruptcy Code") by filing a voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, pursuant to the *First Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code*, dated February 14, 2022 [Docket No. 1204] (together with any amendments or modifications thereto, the "Plan"), O-I Glass, Inc. ("O-I Glass"), on its own behalf and on behalf of all of the other Non-Debtor Affiliates, and Paddock, on its own behalf and on behalf of all of the Non-Debtor Affiliates, are contributing the O-I Glass Contribution and the Paddock Contribution, respectively (collectively, the "Asbestos Trust Contribution") to the Asbestos Trust in consideration of receiving, *inter alia*, the benefit of the Asbestos Channeling Injunction, releases in favor of the Released Parties, and the Asbestos Claims Indemnification Agreement, as well as receiving this Release from each Holder of an Asbestos Claim who desires to receive a distribution from the Asbestos Trust;

WHEREAS, all Asbestos Claims have been channeled to the Asbestos Trust pursuant to the Asbestos Channeling Injunction;

WHEREAS, in connection with the Asbestos Trust Contribution, the Asbestos Trust has agreed to indemnify, defend and hold harmless the Reorganized Debtor, the Non-Debtor Affiliates and the Representatives of the Debtor, Reorganized Debtor, and the Non-Debtor Affiliates from Asbestos Claims in accordance with the terms and provisions of the Plan and the Asbestos Claims Indemnification Agreement;

WHEREAS, the Claimant has filed an Asbestos Claim with the Asbestos Trust (the "Asbestos Claim")and desires to receive a distribution from the Asbestos Trust with respect to the Asbestos Claim; and

WHEREAS, it is a condition precedent to receiving a distribution from the Asbestos Trust that the Claimant execute and deliver this Release for the benefit of the Protected Parties and the Asbestos Trust and its trustees, officers, agents, consultants, financial advisors, servants, employees, attorneys, heirs, and executors (collectively, the "Asbestos Trust Released Parties").

---

[1]   The "Official Representative" is the/a person who under applicable state law or legal documentation has the authority to represent the Injured Party, the Injured Party's estate, or the Injured Party's heirs.

## RELEASE

NOW, THEREFORE, in consideration of the foregoing recitals, which recitals are expressly incorporated herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Claimant agrees as follows:

1. Capitalized terms not defined herein shall have the meanings set forth in the Plan, the Asbestos Trust Agreement, or the Asbestos Trust Distribution Procedures, as applicable, and such definitions are incorporated herein by reference.

2. The words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to this Release as a whole and not to any particular section, subsection or clause contained in this Release.

3. On behalf of the Injured Party, the Injured Party's estate, the Injured Party's heirs and/or anyone else claiming rights through the Injured Party, now and in the future, the Claimant hereby **COMPLETELY AND UNCONDITIONALLY RELEASES AND FOREVER DISCHARGES** the Asbestos Trust Released Parties from any and all known or unknown current and future Asbestos Claims except as expressly provided herein ("Released Claims").

4. Notwithstanding the paragraph immediately above or anything to the contrary contained herein, if the Asbestos Claim involves a non-malignant asbestos-related disease, the Injured Party may file a new Asbestos Claim against the Asbestos Trust for a malignant disease that is diagnosed after the date of the Claimant's original submission of a proof of claim form to the Asbestos Trust with respect to the Asbestos Claim.

5. The release set forth herein shall inure to the benefit of the Asbestos Trust Released Parties and their successors and assigns, each of which is an express third-party beneficiary hereof.

6. The release set forth herein shall be binding on any and all successors and assigns of the Claimant.

7. The Claimant expressly warrants and represents that the Claimant has not assigned, conveyed, hypothecated, pledged, or otherwise transferred the Asbestos Claim.  If the Claimant is an Official Representative, the Claimant represents and warrants that the Claimant has all requisite legal authority to act for, bind, and accept payment on behalf of the Injured Party and all heirs of the Injured Party on account of the Asbestos Claim and hereby agrees to indemnify and hold harmless, to the extent of payment hereunder, excluding attorneys' fees and costs, the Asbestos Trust Released Parties from any loss, cost, damage, or expense arising out of the rightful claim of any other Entity or Person with respect to the Asbestos Claim.

8. The Claimant expressly warrants and represents that, if it is not a natural person, it is in good standing in its place of domicile; that the execution of this Release is fully authorized by it; that the person or persons executing this Release have the necessary and appropriate authority to do so; and that there are no pending agreements, transactions or negotiations to which it is a party that would render this Release or any part thereof void, voidable or unenforceable.

-2-

9.      The Claimant agrees to execute promptly any and all voluntary dismissals, stipulations, supplemental agreements, releases, affidavits, waivers and other documents of any nature or kind which any Asbestos Trust Released Party at any time may reasonably require in order to implement the provisions of this Release.

10.     This Release may be executed in counterparts, including by means of facsimile or electronic signature, each of which shall be deemed an original and which together shall constitute but one and the same instrument.

11.     The Claimant agrees that it will not assert any Released Claims against the Asbestos Trust Released Parties or, unless compelled to testify by subpoena, voluntarily assist in any way in the prosecution by any other Entity of any Released Claims against the Asbestos Trust Released Parties.

12.     The Claimant states that the Claimant has carefully read and understands the contents of this Release, that the Claimant has had the opportunity to consult with the Claimant's own counsel (if any) regarding the terms of this Release, and that this Release is entered into freely and voluntarily, and without coercion.

13.     This Release is not intended to bar any cause of action, right, lien or claim that the Claimant may have against any alleged tortfeasor, or any other person or entity, not included in the definition of Asbestos Trust Released Parties. The Claimant hereby expressly reserves all of his or her rights against such persons or entities. Notwithstanding anything to the contrary herein, this Release is not intended to release or discharge any Asbestos Claim or potential Asbestos Claim that the Injured Party's heirs (if any), spouse (if any), the Official Representative (if any) or the Official Representative's heirs (if any) (other than the Injured Party) may have as a result of their own exposure to asbestos or asbestos-containing products.

14.     The Claimant represents and warrants that all valid liens, subrogation and reimbursement claims relating to benefits paid to or on account of the Injured Party in connection with, or relating to, the Asbestos Claim have been resolved or will be resolved from the net proceeds of the settlement payment to the Claimant under this Release or otherwise. It is further agreed and understood that no Asbestos Trust Released Party shall have any liability to the Claimant or any other person or entity in connection with such liens or reimbursement claims and that the Claimant will indemnify and hold the Asbestos Trust Released Parties harmless from any and all such alleged liability as provided in the following sentence. The Claimant will indemnify and hold the Asbestos Trust Released Parties harmless, to the extent of the amount of payment hereunder, excluding attorney's fees and costs, from any and all liability arising from subrogation, indemnity or contribution claims related to the Asbestos Claim released herein and from any and all compensation or medical payments due, or claimed to be due, under any applicable law, regulation or contract related to the Asbestos Claim released herein.

15.     The Claimant understands that the Asbestos Claim released herein is being resolved by the Asbestos Trust, and a liquidated value ($_____) has been established for such Asbestos Claim. The Claimant acknowledges that, pursuant to the Asbestos Trust Distribution Procedures, the Asbestos Trust will only be able to pay the Claimant a percentage (the "Payment Percentage") of the liquidated value of such Asbestos Claim. The Payment Percentage applicable to the Asbestos

Claim will be determined in the manner set forth in the Asbestos Trust Distribution Procedures. The Claimant further acknowledges that the Payment Percentage is based on estimates that change over time, and that other claimants may have in the past received, or may in the future receive, a smaller or larger percentage of the value of their claims than the Claimant. The Claimant further acknowledges that, other than as specifically set forth in the Asbestos Trust Distribution Procedures, the fact that earlier or later claimants may have been paid or may in the future be paid a smaller or larger percentage of the value of their claims shall not entitle the Claimant to any additional compensation from the Asbestos Trust.

16.    In the event of a verdict against others, any judgment entered on the verdict that takes into account the status of the Asbestos Trust as a joint tortfeasor legally responsible for the Injured Party's injuries shall be reduced by no more than the total and actual amount paid as consideration for this Release or such lesser amount as allowed by law.

17.    The Claimant understands, represents, and warrants that this Release is a compromise of a disputed claim and not an admission of liability by, or on the part of, the Asbestos Trust Released Parties. Neither this Release, the compromise and settlement evidenced hereby, nor any evidence relating thereto, will ever be admissible as evidence against the Asbestos Trust in any suit, claim, or proceeding of any nature except to enforce this Release. However, this Release is and may be asserted by the Asbestos Trust Released Parties as an absolute and final bar to any claim or proceeding now pending or hereafter brought by or on behalf of the Injured Party with respect to the Asbestos Claim released herein, except as expressly provided herein.

18.    The Claimant (a) represents that no judgment debtor has satisfied in full or in part, the Asbestos Trust's liability with respect to the Asbestos Claim as the result of a judgment entered in the tort system, and (b) upon information and belief, represents that the Claimant has not entered into a release (other than this Release) that discharges or releases the Asbestos Trust's liability to the Claimant with respect to the Asbestos Claim.

19.    The Claimant represents that he or she understands that this Release constitutes a final and complete release of the Asbestos Trust Released Parties with respect to the Asbestos Claim. The Claimant has relied solely upon his or her own knowledge and information, and the advice of his or her attorneys (if any), as to the nature, extent and duration of the Injured Party's injuries, damages, and legal rights, as well as the alleged liability of the Asbestos Trust and the legal consequences of this Release, and not on any statement or representation made by or on behalf of the Asbestos Trust Released Parties.

20.    This Release contains the entire agreement between the parties and supersedes all prior or contemporaneous, oral or written agreements or understandings relating to the subject matter hereof between or among any of the parties hereto, including, without limitation, any prior agreements or understandings with respect to the liquidation of the Asbestos Claim.

21.    This Release shall be governed by and shall be construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law principles thereof.

22.    **IT IS THE INTENTION OF THE CLAIMANT EXPRESSLY TO WAIVE AND RELINQUISH ALL CLAIMS THAT ARE RELEASED HEREBY TO THE**

-4-

**FULLEST EXTENT PERMITTED BY LAW, INCLUDING, TO THE EXTENT THAT IT IS OR MAY BECOME APPLICABLE, WAIVER OF THE PROVISIONS, RIGHTS AND BENEFITS OF SECTION 1542 OF THE CALIFORNIA CIVIL CODE, WHICH PROVIDES:**

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY;**

**AND ANY AND ALL PROVISIONS, RIGHTS AND BENEFITS OF ANY SIMILAR STATUTE OR COMMON-LAW RULE OF ANY OTHER JURISDICTION, WHOSE LAW MIGHT BE OR BECOME APPLICABLE TO THIS RELEASE. CLAIMANT FURTHER ACKNOWLEDGES THAT CLAIMANT IS AWARE THAT CLAIMANT MAY HEREAFTER DISCOVER FACTS IN ADDITION TO, OR DIFFERENT FROM, THOSE THAT CLAIMANT NOW KNOWS OR BELIEVES TO BE TRUE WITH RESPECT TO THE SUBJECT MATTER OF THE RELEASE, BUT IT IS CLAIMANT'S INTENTION TO, AND CLAIMANT DOES, FULLY, FINALLY AND FOREVER, RELEASE AND DISCHARGE ANY AND ALL RELEASED CLAIMS KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, THAT MAY NOW EXIST, MAY HEREAFTER EXIST, OR HERETOFORE HAVE EXISTED, WITHOUT REGARD TO THE SUBSEQUENT DISCOVERY OR EXISTENCE OF SUCH DIFFERENT OR ADDITIONAL FACTS.**

23.     The Claimant acknowledges that the Asbestos Trust's obligation to pay the Claimant is not triggered until the Asbestos Trust receives this executed Release.

24.     If the Claimant's counsel directed the Asbestos Trust's claims processing facility (the "Facility") to transmit to the Asbestos Trust any information from the Facility for purposes of settling the Asbestos Claim, the Claimant acknowledges that the Claimant consented to the disclosure, transfer, and/or exchange of information related to the Asbestos Claim (including medical information) between the Asbestos Trust and the Facility in connection with the Facility's processing of the Asbestos Claim.

25.     The Claimant authorizes payment pursuant to paragraph 15 to the Claimant or the Claimant's counsel, as agent for the Claimant.

26.     [THE CLAIMANT REPRESENTS AND WARRANTS THAT ALL EXPOSURE TO ASBESTOS-CONTAINING PRODUCTS OR CONDUCT FOR WHICH THE CLAIMANT IS ALLEGING THE DEBTOR HAS LEGAL RESPONSIBILITY OCCURRED PRIOR TO DECEMBER 5, 1980 AND MAKES NO CLAIM FOR EXPOSURE AFTER THIS DATE. THE CLAIMANT UNDERSTANDS THAT THE ASBESTOS TRUST HAS RELIED ON THESE STATEMENTS TO CONCLUDE THAT NO REPORTING OR REIMBURSEMENT

-5-

OBLIGATIONS EXIST UNDER THE MEANING OF THE MEDICARE SECONDARY PAYOR ACT.][2]

## CERTIFICATION

I state that I have carefully read the foregoing Release and know the contents thereof, and I sign the same as my own free act. I additionally certify, under penalty of perjury, that the information that has been provided to support the Asbestos Claim is true according to my knowledge, information, and belief, and further that I have the authority as the Claimant to sign this Release.

## MEDICARE SECONDARY PAYER CERTIFICATION

I further represent and certify to the Asbestos Trust that, in respect of the Asbestos Claim, the Claimant has paid or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, the Asbestos Claim.

[signatures appear on following pages]

---

[2] [To be included as applicable]

US-DOCS\125619163.7

IN WITNESS WHEREOF, the undersigned has executed this Release as of this _____ day of _____, 20__.

Claimant:        _____

Name of the Claimant:

Name of the Injured Party if different from the Claimant:

If the Claimant is not executing this Release electronically using an Asbestos Trust authorized electronic signature program, the Claimant's signature must be authenticated by a notary public or by the signature of two persons who witnessed the signing of this Release.

STATE OF                           )
                                   ) SS
_____COUNTY)                )

SWORN TO AND SUBSCRIBED before me this _____ day of _____.

_____
Notary Public
My Commission Expires:

**OR**

Signatures of two persons who witnessed the signing of this Release:

_____        _____
Witness Signature                      Witness Signature

# **EXHIBIT E**

## **COVERED CLAIMS INDEMNIFICATION AGREEMENT**

## COVERED CLAIMS INDEMNIFICATION AGREEMENT

This Covered Claims Indemnification Agreement (the "Agreement") is made as of [ ● ], 2022 between Paddock Enterprises, LLC, a Delaware limited liability company ("Paddock" or, the "Debtor," and as reorganized, "Reorganized Paddock" or the "Reorganized Debtor"), and O-I Glass, Inc., a Delaware corporation ("O-I Glass").  All capitalized terms not defined herein shall have the meanings ascribed to them in the Plan (as defined below).  For convenience, and as the context may require, the Reorganized Debtor and O-I Glass shall each be referred to individually as a "Party" and collectively as the "Parties."

### RECITALS

WHEREAS, on January 6, 2020, Paddock commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, on February 14, 2022, Paddock filed the *First Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 1204] (as may be amended, modified, or supplemented, the "Plan"), a true and correct copy of which is attached hereto as Exhibit A;

WHEREAS, on [ ● ], [ ● ], the Bankruptcy Court entered an order [Docket No. [ ● ]] (the "Confirmation Order"), which, among other things, confirmed the Plan;

WHEREAS, on [ ● ], [ ● ], the District Court entered an order affirming the Confirmation Order [Docket No. [ ● ]];

WHEREAS, under the terms of the Plan as confirmed, and in consideration of the releases in favor of the Released Parties, including O-I Glass, the imposition of the Asbestos Channeling Injunction in favor of all of the Protected Parties, and the other benefits of the Plan to O-I Glass, O-I Glass has agreed to indemnify, defend, pay the defense costs for, and hold harmless the Reorganized Debtor from and against all Covered Claims and associated costs, expenses, actions, Causes of Action, suits, controversies, damages, demands, debts, liabilities, or obligations of any nature whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, liquidated or unliquidated, matured or not matured, contingent or direct, whether arising at common law, in equity or under any statute, as set forth in and to the extent provided under this Agreement;

THEREFORE, in consideration of the promises and mutual covenants set forth below and other good and valuable consideration, the receipt and sufficiency whereof are hereby acknowledged, the Parties agree as follows:

### ARTICLE I
### DEFINITIONS

"Affiliate" has the meaning set forth in Section 1.1 of the Plan.

"Agreement" has the meaning specified in the Preamble.

"Allowed" has the meaning set forth in Section 1.1 of the Plan.

"Asbestos Channeling Injunction" has the meaning set forth in Section 1.1 of the Plan.

1

"<u>Asbestos Claim</u>" has the meaning set forth in <u>Section 1.1</u> of the Plan.

"<u>Bankruptcy Code</u>" has the meaning specified in the Recitals.

"<u>Bankruptcy Court</u>" has the meaning specified in the Recitals.

"<u>Business Day</u>" means any day other than a Saturday, a Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"<u>Cash</u>" has the meaning set forth in <u>Section 1.1</u> of the Plan.

"<u>Cause of Action</u>" has the meaning set forth in <u>Section 1.1</u> of the Plan.

"<u>Chapter 11 Case</u>" has the meaning set forth in <u>Section 1.1</u> of the Plan.

"<u>Claim</u>" has the meaning set forth in <u>Section 1.1</u> of the Plan.

"<u>Covered Claims</u>" has the meaning set forth in <u>Section 1.1</u> of the Plan.

"<u>Debtor</u>" or "<u>Paddock</u>" has the meaning specified in the Preamble.

"<u>District Court</u>" has the meaning set forth in <u>Section 1.1</u> of the Plan.

"<u>Effective Date</u>" has the meaning set forth in <u>Section 1.1</u> of the Plan.

"<u>Environmental Claim or Cause of Action</u>" has the meaning set forth in <u>Section 1.1</u> of the Plan.

"<u>File</u>" or "<u>Filed</u>" or "<u>Filing</u>" has the meaning set forth in <u>Section 1.1</u> of the Plan.

"<u>Governmental Authority</u>" has the meaning set forth in <u>Section 1.1</u> of the Plan.

"<u>Holder</u>" has the meaning set forth in <u>Section 1.1</u> of the Plan.

"<u>Indemnified Party</u>" and "<u>Indemnified Parties</u>" have the meanings specified in <u>Section 2.1(a)</u>.

"<u>Indemnitor</u>" has the meaning specified in <u>Section 2.1(a)</u>.

"<u>Law</u>" means any U.S. or non-U.S. federal, state, provincial, local, municipal, regional, territorial statute, law, common law, ordinance, regulation, rule, code, Order or other requirement or rule of law.

"<u>Non-Paddock Indemnified Party</u>" means any Indemnified Party that is not Reorganized Paddock.

"<u>O-I Glass</u>" has the meaning specified in the Preamble.

"<u>Order</u>" means any order, writ, judgment, injunction, temporary restraining order, decree, stipulation, determination or award entered by or with any Governmental Authority.

"<u>Party</u>" and "<u>Parties</u>" have the meanings specified in the Preamble.

US-DOCS\126464565.7

"Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"Plan" has the meaning specified in the Recitals.

"Proof of Claim" has the meaning set forth in Section 1.1 of the Plan.

"Protected Party" has the meaning set forth in Section 1.1 of the Plan.

"Released Party" has the meaning set forth in Section 1.1 of the Plan.

"Reorganized Debtor" or "Reorganized Paddock" has the meaning specified in the Preamble.

"Third Party Claim" has the meaning specified in Section 2.2(a).

## ARTICLE II
## INDEMNIFICATION

Section 2.1    Indemnification by O-I Glass.

(a)    As of and after the Effective Date of the Plan, O-I Glass (the "Indemnitor") shall indemnify the Reorganized Debtor, its Affiliates and its current and former trustees, fiduciaries, officers, members, managers, directors, employees, agents, representatives, attorneys, accountants and other advisors (collectively the "Indemnified Parties" and each, an "Indemnified Party") and save and hold each of them harmless against, and pay on behalf of or reimburse any of the Indemnified Parties as and when incurred for any liability which any of the Indemnified Parties suffers, sustains or becomes subject to as a result of, arising out of, or in connection with any Covered Claims. Reorganized Paddock shall manage and control any such Covered Claims. Indemnitor may fulfill its obligations under this Agreement by providing funding sufficient to resolve, satisfy, or adjudicate each such Covered Claim, including any funding necessary to object to, contest, or otherwise defend against the validity of any Covered Claims, whether or not such Covered Claims are ultimately deemed Allowed by the Bankruptcy Court. To the extent additional Cash is necessary to satisfy Covered Claims, O-I Glass shall indemnify the Reorganized Debtor for any such additional amounts. For the avoidance of doubt, this Section 2.1(a) shall not apply to, and O-I Glass is not undertaking any indemnification under this Agreement for, any Asbestos Claim or Environmental Claim or Cause of Action.

(b)    Any Holder of a Covered Claim shall retain all legal, equitable, and contractual rights to which such Covered Claim entitles such Holder, subject to: (i) the rights of the Reorganized Debtor, the other Indemnified Parties, and the Indemnitor to object to, contest, or otherwise defend against such Covered Claim; (ii) any deadline established in the Chapter 11 Case to File a Proof of Claim on account of such Covered Claim, including pursuant to the Plan; and (iii) any limitations set forth under the Bankruptcy Code or applicable nonbankruptcy Law. Reorganized Paddock shall control all correspondence, discussions, and negotiations with any Holder of a Covered Claim or any objections relating to any Covered Claims. Unless required by applicable nonbankruptcy Law, all Non-Paddock Indemnified Parties shall refrain from communicating either orally or in writing, or in any other manner, with any Holder of a Covered Claim concerning Indemnitor's obligations under this Agreement. Non-

3

Paddock Indemnified Parties shall reasonably cooperate with Reorganized Paddock with respect to any action required of such Non-Paddock Indemnified Parties relating to any Covered Claim.  Without limiting the generality of the foregoing, Non-Paddock Indemnified Parties shall reasonably cooperate with Reorganized Paddock and/or Indemnitor to the extent any of their participation is required in order for Indemnitor and/or Reorganized Paddock to object to any Covered Claim or execute, file and record any legal instrument to establish any covenants or agreements that Indemnitor and/or Reorganized Paddock may determine from time to time are necessary relating to the Covered Claims, all at Indemnitor's expense.

(c)      Without limiting any other indemnification provided herein, Indemnitor shall indemnify the Reorganized Debtor for any indemnification claims asserted against the Reorganized Debtor by any current and former managers and officers of the Debtor or Reorganized Debtor.

(d)      If and to the extent any provision of Section 2.1(a) is unenforceable for any reason (except as contemplated under this Agreement), Indemnitor hereby agrees to pay to any Indemnified Party an amount necessary to indemnify such Indemnified Party for any Covered Claim as to which such provision of Section 2.1(a) has been determined to be unenforceable.

Section 2.2      Notice; Third Party Claims.

(a)      If any Non-Paddock Indemnified Party receives notice of the assertion or commencement of any action, suit or proceeding asserted against such Non-Paddock Indemnified Party by a third Person (a "Third Party Claim") in respect of any matter that is subject to indemnification under Section 2.1(a), such Non-Paddock Indemnified Party shall give Reorganized Paddock and Indemnitor prompt written notice thereof, specifying the facts constituting the basis for such claim, the amount, to the extent known, and the Non-Paddock Indemnified Party shall tender to Indemnitor copies of any documents that it has received in respect of the claim.  The failure of the Non-Paddock Indemnified Party to provide prompt notice as provided herein with respect to any claim for which indemnification is sought shall not relieve Indemnitor of its obligations hereunder, except to the extent that Indemnitor is prejudiced by the failure to provide prompt notice.

(b)      If, within ten (10) Business Days after the receipt of notice from the Non-Paddock Indemnified Party pursuant to Section 2.2(a), Indemnitor acknowledges in writing to the Non-Paddock Indemnified Party its obligation to indemnify the Non-Paddock Indemnified Party hereunder against any Covered Claim that may result from such Third Party Claim, the Indemnitor shall assume the defense at its sole expense of that Third Party Claim, and Indemnitor shall prosecute such defense diligently with counsel that it selects; *provided*, *however*, that the Non-Paddock Indemnified Party shall be entitled to retain its own counsel in each jurisdiction for which the Non-Paddock Indemnified Party determines counsel is required, at the sole expense of the Non-Paddock Indemnified Party.  The Non-Paddock Indemnified Party shall cooperate with the Indemnitor in such defense, including by entering into a mutually acceptable joint defense, common interest, or similar other agreement, and the Non-Paddock Indemnified Party shall make available to the Indemnitor, at the Indemnitor's expense, all witnesses, pertinent records, materials and information in the Non-Paddock Indemnified Party's possession or under its control relating thereto as is reasonably

4

required by the Indemnitor. No Third Party Claim may be settled by the Indemnitor without the prior written consent of the Non-Paddock Indemnified Party that is the subject of such Third Party Claim; *provided*, *however*, that the Non-Paddock Indemnified Party shall not unreasonably withhold, condition or delay such consent.

## ARTICLE III
## REPRESENTATIONS, WARRANTIES AND ADDITIONAL COVENANTS

Section 3.1    Each Party hereby represents and warrants to each other Party as follows:

(a)    Such Party is duly incorporated, organized or formed (as applicable), validly existing and in good standing under the Laws of the jurisdiction of its incorporation, organization or formation; if required by applicable Laws, that it is duly qualified and in good standing in the jurisdiction of its principal place of business, if different from its jurisdiction of incorporation, organization or formation; and that it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and all necessary actions by the board of directors, shareholders, managers, members, partners, trustees, beneficiaries or other applicable Persons necessary for the due authorization, execution, delivery and performance of this Agreement by that Party have been duly taken.

(b)    Such Party has duly executed and delivered this Agreement and it constitutes the legal, valid and binding obligations of such Party, enforceable against it in accordance with its terms (except as may be limited by bankruptcy, insolvency, reorganization or similar laws of general application relating to or affecting creditors' rights generally, and by the effect of general principles of equity, regardless of whether considered at Law or in equity).

(c)    Such Party's authorization, execution, delivery and performance of this Agreement does not and will not (A) conflict with, or result in a breach, default or violation of, (1) its organizational documents, (2) any contract or agreement to which that Party is a party or is otherwise subject, or (3) any Law, order, judgment, decree, writ, injunction or arbitral award to which that Party is subject; or (B) require any consent, approval or authorization from, filing or registration with, or notice to, any Governmental Authority or other Person, unless such requirement has already been satisfied.

## ARTICLE IV
## MISCELLANEOUS

Section 4.1    No Third-Party Beneficiaries. This Agreement will not confer any rights or remedies upon any person other than the Parties and the other Indemnified Parties.

Section 4.2    Entire Agreement. As of the Effective Date, this Agreement and the Plan constitute the entire agreement among the Parties hereto with respect to the subject matter hereof and supersedes any prior understandings, agreements, or representations between or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

US-DOCS\126464565.7

Section 4.3    Effectiveness of Agreement. This Agreement will be of no force or effect unless and until (a) this Agreement is duly executed by the Parties and (b) the Effective Date of the Plan has occurred.

Section 4.4    Succession and Assignment. This Agreement will be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns. Reorganized Paddock may not assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of Indemnitor, and Indemnitor may not assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of Reorganized Paddock.  Any assignment without the consent required in the foregoing sentence (which may be made effective retroactively) shall be void.

Section 4.5    Counterparts. This Agreement may be executed in one or more counterparts, including by means of facsimile or electronic signature, each of which will be deemed an original but all of which together will constitute one and the same instrument.

Section 4.6    Headings. The section headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

Section 4.7    Notices. Any notice, statement, or other report required or permitted by this Agreement must be: (a) in writing and is deemed given when (i) delivered personally to the recipient, (ii) sent by facsimile or e-mail before 5:00 p.m. prevailing Eastern Time on a Business Day with a copy of such facsimile or e-mail sent to the recipient by reputable overnight courier service (charges prepaid) on the same day, (iii) five (5) days after deposit in the United States mail, mailed by registered or certified mail, return receipt requested, postage prepaid, or (iv) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); and (b) addressed to the parties to whom such notice, statement or report is directed (and, if required, its counsel) at the addresses set forth below, or at such other address as such party may designate from time to time in writing in accordance with this section.

If to Reorganized Paddock:

Paddock Enterprises, LLC
One Michael Owens Way
Perrysburg, Ohio 43551
Attention: David J. Gordon
Email: dgordon@djoservicesllc.com

with a copy to:

Latham & Watkins LLP
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Attn: Jeffrey E. Bjork, Esq.
Kimberly A. Posin, Esq.
Helena G. Tseregounis, Esq.
Christina M. Craige, Esq.
Facsimile:  (213) 891-8763
Emails:  jeff.bjork@lw.com

6

kim.posin@lw.com
helena.tseregounis@lw.com
chris.craige@lw.com

If to O-I Glass:

O-I Glass, Inc.
One Michael Owens Way
Perrysburg, Ohio 43551
Attn: Darrow A. Abrahams
Email: darrow.abrahams@o-i.com

with a copy to:

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 16th Floor
Wilmington, Delaware 19899-1347
Attn: Derek C. Abbott, Esq.
Facsimile: (302) 658-3989
Email: dabbott@morrisnichols.com

Any Party may change the address and other information to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

Section 4.8    Bankruptcy Court Jurisdiction. Notwithstanding anything to the contrary contained in this Agreement, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or related to disputes arising in connection with the interpretation, implementation or enforcement of this Agreement, and the Parties consent to the exclusive jurisdiction of the Bankruptcy Court.  To the extent that the Bankruptcy Court does not or cannot exert jurisdiction over any matters arising out of or related to disputes arising in connection with the interpretation, implementation or enforcement of this Agreement, the District Court shall have exclusive jurisdiction over such matters, and the Parties consent to the jurisdiction of the District Court.

Section 4.9    Governing Law.  This Agreement will be governed by and construed in accordance with the laws of the State of Delaware.

Section 4.10    Amendments and Waivers. No amendment of any provision of this Agreement will be valid unless the same is in writing and signed by each of the Parties hereto and any Non-Paddock Indemnified Party that is affected by such amendment. No waiver of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether or not intentional, will be valid unless the same is in writing and signed by the Party making such waiver; nor will such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation, or breach of warranty or covenant.

Section 4.11    Severability. Any term or provision of this Agreement that is invalid or unenforceable in any circumstance in any jurisdiction will not affect the validity or enforceability of the offending term or provision in any other circumstance or in any other

jurisdiction, nor will it affect the validity or enforceability of the remaining terms and provisions hereof, unless the prohibition or unenforceability of such provisions will materially change the purpose or effect of this Agreement.

Section 4.12   Incorporation. The exhibits and schedules attached hereto and identified in this Agreement are incorporated by reference and made a part of this Agreement.

Section 4.13   Further Assurances. Each of the Parties shall execute and deliver, at the reasonable request of the other Party hereto, such additional documents, instruments, conveyances and assurances and take such further actions as such other Party may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

*[Remainder of Page Intentionally Blank]*

US-DOCS\126464565.7

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their authorized representatives as indicated below as of the date set forth in the preamble.

O-I GLASS, INC.

By:_____
    Name: Darrow A. Abrahams
    Title: SVP, General Counsel and Corporate
        Secretary

PADDOCK ENTERPRISES, LLC

By:_____
    Name: David J. Gordon
    Title: President and Chief Restructuring Officer

**<u>Exhibit A</u>**

Plan

**<u>EXHIBIT F</u>**

**ENVIRONMENTAL CLAIMS OR CAUSES OF ACTION INDEMNIFICATION AGREEMENT**

## ENVIRONMENTAL CLAIMS OR CAUSES OF ACTION
## INDEMNIFICATION AGREEMENT

This Environmental Claims or Causes of Action Indemnification Agreement (the "Agreement") is made as of [ ● ], 2022 among Paddock Enterprises, LLC, a Delaware limited liability company ("Paddock" or, the "Debtor," and as reorganized, "Reorganized Paddock" or the "Reorganized Debtor"), and O-I Glass, Inc., a Delaware corporation ("O-I Glass"). All capitalized terms not defined herein shall have the meanings ascribed to them in the Plan (as defined below). For convenience, and as the context may require, the Reorganized Debtor and O-I Glass shall each be referred to individually as a "Party" and collectively as the "Parties."

## RECITALS

**WHEREAS**, on January 6, 2020, Paddock commenced a voluntary case under chapter 11 of title 11 of United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS**, on February 14, 2022, Paddock filed the *First Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 1204] (as may be amended, modified, or supplemented, the "Plan"), a true and correct copy of which is attached hereto as Exhibit A;

**WHEREAS**, on [ ● ], [ ● ], the Bankruptcy Court entered an order [Docket No. [ ● ]] (the "Confirmation Order"), which, among other things, confirmed the Plan;

**WHEREAS**, on [ ● ], [ ● ], the United States District Court for the District of Delaware entered an order affirming the Confirmation Order [Docket No. [ ● ]];

**WHEREAS**, under the terms of the Plan as confirmed, and in consideration of the releases in favor of the Released Parties, including O-I Glass, the imposition of the Asbestos Channeling Injunction in favor of all of the Protected Parties, and the other benefits of the Plan to O-I Glass, O-I Glass has agreed to indemnify, defend, pay the defense costs for, and hold harmless Reorganized Paddock from and against any Environmental Claims or Causes of Action and associated costs, expenses, actions, suits, controversies, damages, demands, debts, liabilities, or obligations of any nature as set forth in and to the extent provided under this Agreement;

**THEREFORE**, in consideration of the promises and mutual covenants set forth below and other good and valuable consideration, the receipt and sufficiency whereof are hereby acknowledged, the Parties agree as follows:

# ARTICLE I
## DEFINITIONS

"Affiliate" has the meaning set forth in Section 1.1 of the Plan.

"Agreement" has the meaning specified in the Preamble.

"Asbestos Channeling Injunction" has the meaning set forth in Section 1.1 of the Plan.

"Asbestos Claim" has the meaning set forth in Section 1.1 of the Plan.

"Bankruptcy Code" has the meaning specified in the Recitals.

"Bankruptcy Court" has the meaning specified in the Recitals.

"Business Day" means any day other than a Saturday, a Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"Cause of Action" has the meaning set forth in Section 1.1 of the Plan.

"Claim" has the meaning set forth in Section 1.1 of the Plan.

"Debtor" has the meaning specified in the Preamble.

"Designated Courts" has the meaning specified in Section 4.8.

"Effective Date" has the meaning set forth in Section 1.1 of the Plan.

"Environmental Claim or Cause of Action" has the meaning set forth in Section 1.1 of the Plan.

"Environmental Law" has the meaning set forth in Section 1.1 of the Plan.

"Governmental Authority" has the meaning set forth in Section 1.1 of the Plan.

"Holder" has the meaning set forth in Section 1.1 of the Plan.

"Indemnified Party" and "Indemnified Parties" have the meanings specified in Section 2.1(a).

"Indemnitor" has the meaning specified in Section 2.1(a).

"Law" means any U.S. or non-U.S. federal, state, provincial, local, municipal, regional, territorial statute, law, common law, ordinance, regulation, rule, code, Order or other requirement or rule of law.

"Non-Paddock Indemnified Party" means any Indemnified Party that is not Reorganized Paddock.

"O-I Glass" has the meaning specified in the Preamble.

"Order" means any order, writ, judgment, injunction, temporary restraining order, decree, stipulation, determination or award entered by or with any Governmental Authority.

2

"Paddock" has the meaning specified in the Preamble.

"Party" and "Parties" have the meanings specified in the Preamble.

"Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"Plan" has the meaning specified in the Recitals.

"Protected Party" has the meaning set forth in Section 1.1 of the Plan.

"Released Party" has the meaning set forth in Section 1.1 of the Plan.

"Reorganized Debtor" or "Reorganized Paddock" has the meaning specified in the Preamble.

"Third Party Claim" has the meaning specified in Section 2.2(a).

## ARTICLE II
## INDEMNIFICATION

Section 2.1    Indemnification by O-I Glass.

(a)    As of and after the Effective Date of the Plan, O-I Glass (the "Indemnitor") shall indemnify the Reorganized Debtor, its Affiliates and its current and former trustees, fiduciaries, officers, members, managers, directors, employees, agents, representatives, attorneys, accountants and other advisors (collectively the "Indemnified Parties" and each, an "Indemnified Party") and save and hold each of them harmless against, and pay on behalf of or reimburse any of the Indemnified Parties as and when incurred for any liability which any of the Indemnified Parties suffers, sustains or becomes subject to as a result of, arising out of, or in connection with any Environmental Claims or Causes of Action.  As between Reorganized Paddock and Indemnitor, Reorganized Paddock shall manage and control any such Environmental Claims or Causes of Action.  Reorganized Paddock and Indemnitor, as applicable, may fulfill their obligations under this Agreement by complying with, or providing funding for, any investigation or remediation required by applicable Environmental Law or otherwise deemed sufficient by the relevant Governmental Authority to resolve or satisfy each such Environmental Claim or Cause of Action.  For the avoidance of doubt, this Section 2.1(a) shall not apply to, and O-I Glass is not undertaking any indemnification under this Agreement for: (i) any Claim qualifying as an Asbestos Claim; (ii) the post-Effective Date operations of the Reorganized Debtor; or (iii) an asset owned by the Reorganized Debtor after the Effective Date for which neither the Debtor nor O-I Glass is liable under Environmental Law pre-Effective Date.

(b)    Any Holder of an Environmental Claim or Cause of Action shall retain all legal, equitable, and contractual rights to which such Environmental Claim or Cause of Action entitles such Holder, subject to the rights of the Reorganized Debtor, the other Indemnified Parties, and the Indemnitor to contest or otherwise defend against such Environmental Claim or Cause of Action when and if such Environmental Claim or Cause of Action is asserted or sought to be enforced.  As between Reorganized Paddock and Indemnitor, Reorganized Paddock shall have control over the performance of any work or obligations, if any, related to any Environmental Claims or Causes of Action, including without limitation the exclusive right to (i) investigate any suspected

3

contamination or noncompliance, (ii) conduct and obtain any tests, reports, samples, surveys and investigations, (iii) prepare any plan to address, whether in whole or in part, such Environmental Claims or Causes of Action, and (iv) conduct or direct any work regarding such Environmental Claims or Causes of Action.  Reorganized Paddock shall control all correspondence, discussions and negotiations with, and submissions to, any Governmental Authority concerning, or that may affect, any Environmental Claim or Cause of Action.  Unless required by applicable Environmental Law or other nonbankruptcy law, all Non-Paddock Indemnified Parties shall refrain from communicating either orally or in writing, or in any other manner, with any Governmental Authority concerning Indemnitor's obligations under this Agreement.  Non-Paddock Indemnified Parties shall reasonably cooperate with Reorganized Paddock with respect to any action required of such Non-Paddock Indemnified Parties relating to any Environmental Claim or Cause of Action.  Without limiting the generality of the foregoing, Non-Paddock Indemnified Parties  shall reasonably cooperate with Reorganized Paddock and/or Indemnitor to the extent any of their participation is required in order for Indemnitor and/or Reorganized Paddock to execute, file and record any legal instrument to establish any covenants or agreements that Indemnitor and/or Reorganized Paddock may determine from time to time are necessary relating to the Environmental Claims or Causes of Action, all at Indemnitor's expense.

(c)     If and to the extent any provision of Section 2.1(a) is unenforceable for any reason, Indemnitor hereby agrees to pay to any Indemnified Party an amount necessary to indemnify such Indemnified Party for any Environmental Claim or Cause of Action as to which such provision of Section 2.1(a) has been determined to be unenforceable; provided that such payment to resolve each such Environmental Claim or Cause of Action need only provide funding (i) sufficient to meet any investigation or remediation required by applicable Environmental Law in the absence of settlement or consensual resolution between the relevant Governmental Authority and Reorganized Paddock or (ii) sufficient to satisfy any obligations of Reorganized Paddock set forth in a settlement or consensual resolution between the relevant Governmental Authority and Reorganized Paddock; provided further that, in the event Reorganized Paddock intends to settle any Environmental Claim or Cause of Action in an amount exceeding the payment referred to in the preceding clause, Reorganized Paddock shall give Indemnitor not less than two (2) weeks' written notice to object to such settlement, in the absence of which objection, Indemnitor shall promptly fund the amount by which such settlement exceeds the amount already funded by Indemnitor in respect of such Environmental Claim or Cause of Action; provided further that, for the avoidance of doubt, if Indemnitor (i) objects to any settlement proposed by Reorganized Paddock under this subsection or (ii) otherwise disputes the amount necessary to satisfy its funding obligations under this subsection, Indemnitor shall also fully fund the estimated costs and expenses (including professionals' fees) of Reorganized Paddock necessary to litigate the applicable Environmental Claim or Cause of Action to a final judgment.

Section 2.2     Notice; Third Party Claims.

(a)     If any Non-Paddock Indemnified Party receives notice of the assertion or commencement of any action, suit or proceeding asserted against such Non-Paddock Indemnified Party by a third Person (a "Third Party Claim") in respect of any matter

US-DOCS\125355395.18

that is subject to indemnification under Section 2.1(a), such Non-Paddock Indemnified Party shall give Reorganized Paddock and Indemnitor prompt written notice thereof, specifying the facts constituting the basis for such claim, the amount, to the extent known, and the Non-Paddock Indemnified Party shall tender to Indemnitor copies of any documents that it has received in respect of the claim.  The failure of the Non-Paddock Indemnified Party to provide prompt notice as provided herein with respect to any claim for which indemnification is sought shall not relieve Indemnitor of its obligations hereunder, except to the extent that Indemnitor is prejudiced by the failure to provide prompt notice.

(b)     If, within ten (10) Business Days after the receipt of notice from the Non-Paddock Indemnified Party pursuant to  Section 2.2(a), Indemnitor acknowledges in writing to the Non-Paddock Indemnified Party its obligation to indemnify the Non-Paddock Indemnified Party hereunder against any Environmental Claim or Cause of Action that may result from such Third Party Claim, the Indemnitor shall assume the defense at its sole expense of that Third Party Claim, and Indemnitor shall prosecute such defense diligently with counsel that it selects; *provided*, *however*, that the Non-Paddock Indemnified Party shall be entitled to retain its own counsel in each jurisdiction for which the Non-Paddock Indemnified Party determines counsel is required, at the sole expense of the Non-Paddock Indemnified Party.  The Non-Paddock Indemnified Party shall cooperate with the Indemnitor in such defense, including by entering into a mutually acceptable joint defense, common interest, or similar other agreement, and the Non-Paddock Indemnified Party shall make available to the Indemnitor, at the Indemnitor's expense, all witnesses, pertinent records, materials and information in the Non-Paddock Indemnified Party's possession or under its control relating thereto as is reasonably required by the Indemnitor.  No such Third Party Claim may be settled by the Indemnitor without the prior written consent of the Non-Paddock Indemnified Party; *provided*, *however*, that the Non-Paddock Indemnified Party shall not unreasonably withhold, condition or delay such consent.

## ARTICLE III
## REPRESENTATIONS, WARRANTIES AND ADDITIONAL COVENANTS

Section 3.1     Each Party hereby represents and warrants to each other Party as follows:

(a)     Such Party is duly incorporated, organized or formed (as applicable), validly existing and in good standing under the Laws of the jurisdiction of its incorporation, organization or formation; if required by applicable Laws, that it is duly qualified and in good standing in the jurisdiction of its principal place of business, if different from its jurisdiction of incorporation, organization or formation; and that it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and all necessary actions by the board of directors, shareholders, managers, members, partners, trustees, beneficiaries or other applicable Persons necessary for the due authorization, execution, delivery and performance of this Agreement by that Party have been duly taken.

(b)     Such Party has duly executed and delivered this Agreement and it constitutes the legal, valid and binding obligations of such Party, enforceable against it in accordance with its terms (except as may be limited by bankruptcy, insolvency, reorganization or similar laws of general application relating to or affecting creditors'

rights generally, and by the effect of general principles of equity, regardless of whether considered at Law or in equity).

(c)     Such Party's authorization, execution, delivery and performance of this Agreement does not and will not (A) conflict with, or result in a breach, default or violation of, (1) its organizational documents, (2) any contract or agreement to which that Party is a party or is otherwise subject, or (3) any Law, order, judgment, decree, writ, injunction or arbitral award to which that Party is subject; or (B) require any consent, approval or authorization from, filing or registration with, or notice to, any Governmental Authority or other Person, unless such requirement has already been satisfied.

Section 3.2     O-I Glass represents and warrants that Paddock is and will remain its affiliate during all times in which O-I Glass has any obligations under this Agreement.

## ARTICLE IV
## MISCELLANEOUS

Section 4.1     Limited Third-Party Beneficiaries. This Agreement will not confer any rights or remedies upon any person other than the Parties and the other Indemnified Parties, *provided*, *however*, *that*, pursuant to Section 8.10 of the Plan, any Governmental Authority asserting any Environmental Claim or Cause of Action shall be an express third party beneficiary of this Agreement and may apply to any court of competent jurisdiction for an order to require the Reorganized Debtor to enforce against Indemnitor the provisions in this Agreement.  In the event of any event of bankruptcy or dissolution of the Reorganized Debtor, the Governmental Authority may proceed directly against Indemnitor to seek compliance in accordance with the terms and conditions of this Agreement and Environmental Law.

Section 4.2     Entire Agreement. As of the Effective Date, this Agreement and the Plan constitute the entire agreement among the Parties hereto with respect to the subject matter hereof and supersedes any prior understandings, agreements, or representations between or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

Section 4.3     Effectiveness of Agreement. This Agreement will be of no force or effect unless and until (a) this Agreement is duly executed by the Parties and (b) the Effective Date of the Plan has occurred.

Section 4.4     Succession and Assignment.  This Agreement will be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns. Reorganized Paddock may not assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of Indemnitor, and Indemnitor may not assign either this Agreement or any of its rights, interests, or obligations hereunder without the written consent of Reorganized Paddock and any affected Governmental Authority; provided that any affected Governmental Authority shall be deemed to have given such written consent thirty (30) calendar days after receipt of a written notice of Indemnitor's intent to assign this Agreement unless such Governmental Authority has provided written notice of its objection thereto to Indemnitor in accordance with Section 4.7 hereof so long as the notice sent to a Governmental Authority under this Section includes a copy of this Agreement and the first page of any such notice contains the following sentence underlined and in bold font: "**Failure to object as set forth in Section 4.4 within thirty (30) calendar days after receipt of this**

6

**notice constitutes consent to Indemnitor's assignment of the enclosed Agreement.**" Assignment of this Agreement will not bind an affected Governmental Authority that either: (i) has not provided affirmative written consent to assignment or (ii) is not deemed to have provided such written consent in accordance with the preceding sentence. Any assignment without the written consent of Indemnitor or Reorganized Paddock required in this paragraph shall be void.

Section 4.5    Counterparts. This Agreement may be executed in one or more counterparts, including by means of facsimile or electronic signature, each of which will be deemed an original but all of which together will constitute one and the same instrument.

Section 4.6    Headings. The section headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

Section 4.7    Notices. Any notice, statement, or other report required or permitted by this Agreement must be: (a) in writing and is deemed given when (i) delivered personally to the recipient, (ii) sent by facsimile or e-mail before 5:00 p.m. prevailing Eastern Time on a Business Day with a copy of such facsimile or e-mail sent to the recipient by reputable overnight courier service (charges prepaid) on the same day, (iii) five (5) days after deposit in the United States mail, mailed by registered or certified mail, return receipt requested, postage prepaid, or (iv) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); and (b) addressed to the parties to whom such notice, statement or report is directed (and, if required, its counsel) at the addresses set forth below, or at such other address as such party may designate from time to time in writing in accordance with this section.

If to Reorganized Paddock:

    Paddock Enterprises, LLC
    One Michael Owens Way
    Perrysburg, Ohio 43551
    Attention: David J. Gordon
    Email: dgordon@djoservicesllc.com

with a copy to:

    Latham & Watkins LLP
    355 South Grand Avenue, Suite 100
    Los Angeles, California 90071
    Attn: Jeffrey E. Bjork, Esq.
    Kimberly A. Posin, Esq.
    Christina M. Craige, Esq.
    Helena G. Tseregounis, Esq.
    Facsimile:  (213) 891-8763
    Emails:  jeff.bjork@lw.com
            kim.posin@lw.com
            chris.craige@lw.com
            helena.tseregounis@lw.com

US-DOCS\125355395.18

If to O-I Glass:

> O-I Glass, Inc.
> One Michael Owens Way
> Perrysburg, Ohio 43551
> Attn: Darrow A. Abrahams
> Email: darrow.abrahams@o-i.com

with a copy to:

> Morris, Nichols, Arsht & Tunnell LLP
> 1201 North Market Street, 16th Floor
> Wilmington, Delaware 19899-1347
> Attn: Derek C. Abbott, Esq.
> Facsimile: (302) 658-3989
> Email: dabbott@morrisnichols.com

If to a Governmental Authority:

> Please refer to Exhibit B for contact information for applicable Governmental Authorities.

Any Party may change the address and other information to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

Section 4.8    Jurisdiction and Venue. Notwithstanding anything to the contrary contained in this Agreement, but subject to Section 4.1 hereof, all disputes arising in connection with the interpretation, implementation and enforcement of this Agreement shall be brought in the Bankruptcy Court or another United States federal court (collectively, the "Designated Courts"). The Parties consent to the jurisdiction of the Designated Courts and waive any objection to venue in any of the Designated Courts, including but not limited to any objections based on forum non conveniens.

Section 4.9    Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of Delaware.

Section 4.10   Amendments and Waivers. No amendment of any provision of this Agreement will be valid unless the same is in writing and signed by each of the Parties hereto. No waiver of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether or not intentional, will be valid unless the same is in writing and signed by the Party making such waiver; nor will such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation, or breach of warranty or covenant.

Section 4.11   Severability. Any term or provision of this Agreement that is invalid or unenforceable in any circumstance in any jurisdiction will not affect the validity or enforceability of the offending term or provision in any other circumstance or in any other jurisdiction, nor will it affect the validity or enforceability of the remaining terms and

8

provisions hereof, unless the prohibition or unenforceability of such provisions will materially change the purpose or effect of this Agreement.

Section 4.12    Incorporation. The exhibits and schedules attached hereto and identified in this Agreement are incorporated by reference and made a part of this Agreement.

Section 4.13    Further Assurances. Each of the Parties shall execute and deliver, at the reasonable request of the other Party hereto, such additional documents, instruments, conveyances and assurances and take such further actions as such other Party may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

*[Remainder of Page Intentionally Blank]*

9

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their authorized representatives as indicated below as of the date set forth in the preamble.

O-I GLASS, INC.

By: _____
    Name: Darrow A. Abrahams
    Title: SVP, General Counsel and Corporate
        Secretary

PADDOCK ENTERPRISES, LLC

By: _____
    Name: David J. Gordon
    Title: President and Chief Restructuring Officer

**<u>Exhibit A</u>**

Plan

**Exhibit B**

Governmental Authorities

**SCHEDULE 1.1(A)**

**GOVERNMENTAL AUTHORITIES**

**Governmental Authorities[1]**

| Governmental Authority | Contact Information |
|---|---|
| California Department of Justice | Attn: Bryant Cannon<br>　　　　Annadel Almendras<br>Natural Resources Law Section<br>455 Golden Gate Ave, Ste 11000<br>San Francisco, CA 94102<br>Bryant.Cannon@doj.ca.gov<br>Annadel.Almendras@doj.ca.gov<br>Docketing-sf@doj.ca.gov |
| California Department of Toxic Substances Control | 1001 I Street<br>Sacramento, CA 95814-2828<br><br>Mr. Jordan R. Gaskins<br>Office of Legal Counsel<br>9211 Oakdale Avenue<br>Chatsworth, California 91311<br>Jordan.Gaskins@dtsc.ca.gov |
| California Regional Water Quality Control Board | Los Angeles Region<br>Attention:  Executive Officer and Legal Counsel<br>320 West Fourth Street, Suite 200<br>Los Angeles, CA 90013<br><br>San Francisco Bay Region<br>Attention: Executive Officer and Legal Counsel<br>1515 Clay St., Ste 1400<br>Oakland, CA  94612 |
| Commonwealth of Kentucky, Energy and Environment Cabinet | Attn: Office of Legal Services<br>Lena Seward<br>Timothy Mayer<br>300 Sower Blvd Third Floor<br>Frankfort, Kentucky 40601 |
| Connecticut Department of Energy and Environmental Protection Remediation Division | Brownfields Coordinator<br>79 Elm Street<br>Hartford, CT 06106-5127 |
| Florida Department of Environmental Protection | Jennifer Farrell, Program Administrator<br>Waste Cleanup Program |

---

[1]　The inclusion of a Governmental Authority on this schedule shall not constitute or be construed to constitute an admission that the Debtor or any successor in interest to the Debtor (including the Reorganized Debtor) has any liability to such Governmental Authority nor does it impact the validity of any Claim Filed or asserted by any Governmental Authority.

|  | 2600 Blair Stone Rd. MS. 4505<br>Tallahassee, FL. 32399-2400<br>Jennifer.A.Farrell@FloridaDEP.gov<br><br>3900 Commonwealth Blvd<br>Tallahassee, FL 32399-3000 |
|---|---|
| Georgia Department of Natural Resources; Georgia Environmental Protection Division | Environmental Protection Division<br>Attn: Director<br>2 Martin Luther King Jr. Drive<br>Suite 1456 East Tower<br>Atlanta, GA 30334<br><br>Environmental Protection Division<br>Attn:  Land Branch Chief<br>2 Martin Luther King Jr. Drive<br>Suite 1054 East Tower<br>Atlanta, GA 30334 |
| Illinois Environmental Protection Agency | Attn: Division of Legal Counsel<br>1021 North Grand Avenue East<br>P.O. Box 19276<br>Springfield, IL 62794-9276 |
| Indiana Department of Environmental Management | April Lashbrook, Attorney<br>Office of Legal Counsel<br>Indiana Government Center North 1307<br>100 North Senate Avenue<br>Indianapolis, IN 46204-2251<br><br>Kevin Davis, Chief of the Remediation Branch<br>Office of Land Quality<br>Indiana Government Center North 1101<br>100 N. Senate Ave.<br>Indianapolis, Indiana 46204 |
| Louisiana Department Of Environmental Quality | Deputy General Counsel<br>P.O. Box 4302<br>Baton Rouge, LA 70821 |
| Michigan Department of Environment, Great Lakes, and Energy | Director of the Remediation and Redevelopment Division<br>Constitution Hall, 5th Floor South<br>525 West Allegan Street<br>Lansing, MI 48909-7973 |
| New Jersey Department of Environmental Protection | NJDEP OFFICE OF LEGAL AFFAIRS<br>PO Box 402<br>Mail Code 401-04L<br>401 East State Street, Floor 7<br>Trenton, NJ 08625-0402 |

| | |
|---|---|
| | Section Chief, Environmental Enforcement and Environmental Justice Section<br>Department of Law and Public Safety, Division of Law<br>Richard J. Hughes Justice Complex<br>25 Market Street, P.O. Box 093<br>Trenton, NJ 08625-0093 |
| New York State Department of Environmental Conservation | Attn: Stephen M. Nagle<br>Special Counsel<br>Environmental Protection Bureau - Albany<br>The Capitol<br>Albany, New York 12224-0341<br>625 Broadway<br>Albany, NY 12233<br>Stephen.Nagle@ag.ny.gov |
| Ohio EPA | C/O Environmental Enforcement Section<br>Attn: Michael E. Idzkowski, Timothy J. Kern<br>Ohio Attorney General's Office<br>Environmental Enforcement Section<br>30 E. Broad Street, 25th Floor<br>Columbus, OH 43215 |
| Pennsylvania Department of Environmental Protection | Program Manager<br>Environmental Cleanup and Brownfields Program<br>Southeast Regional Office<br>2 East Main Street<br>Norristown, PA 19401<br><br>Program Manager<br>Environmental Cleanup and Brownfields Program<br>Northeast Regional Office<br>2 Public Square<br>Wilkes-Barre, PA  18701-1915<br><br>Rachel Carson State Office Building<br>400 Market Street<br>Harrisburg, PA 17101 |
| United States Department of Interior | Sari Mandel Levin<br>U.S. Department of the Interior, Office of the Solicitor<br>Division of Land Resources, Environmental Compliance and Response Branch<br>1849 C Street, NW; MS 6422<br>Washington, DC 20240<br>Sari.Levin@sol.doi.gov<br><br>Amy Horner Hanley<br>1849 C Street, NW; MS 6422<br>Washington, DC 20240 |

| | |
|---|---|
| | amy.hanley@sol.doi.gov |
| | Environmental Compliance and Cleanup Branch<br>P.O. Box 25287<br>Denver, CO 80225 |
| United States Environmental Protection Agency | Kerriann Shabanowitz<br>Attorney-Advisor, Office of Site Remediation Enforcement<br>1200 Pennsylvania Avenue NW<br>WJC-S 6108A<br>Mail Code: 2272A<br>Washington D.C. 20460<br>Shabanowitz.Kerriann@epa.gov<br><br>**Region 1**<br>5 Post Office Square, Suite 100<br>Boston, MA 02109-3912<br><br>**Region 2**<br>Andrea Leshak<br>Assistant Regional Counsel<br>New York Caribbean Superfund Branch<br>290 Broadway, 17th Floor<br>New York, NY 10007-1866<br>Leshak.Andrea@epa.gov<br><br>**Region 3**<br>Thomas A. Cinti<br>Senior Assistant Regional Counsel<br>1650 Arch Street<br>Philadelphia, PA 19103<br>r3_ORC_mailbox@epa.gov<br><br>**Region 4**<br>F. Marshall Binford, Jr.<br>Associate Regional Counsel<br>Office of Regional Counsel<br>61 Forsyth Street, SW<br>Atlanta, Georgia 30303<br>binford.marshall@epa.gov<br><br>**Region 5**<br>Josh Zaharoff<br>Office of Regional Counsel (C-14J)<br>77 W. Jackson Blvd<br>Chicago, IL 60604<br>zaharoff.josh@epa.gov<br><br>**Region 6**<br>Matthew Miller<br>Leonard Schilling<br>Assistant Regional Counsel |

| | 1201 Elm Street, Suite 500<br>Dallas, Texas 75270<br>miller.matthew@epa.gov<br>schilling.leonard@epa.gov<br><br>**Region 9**<br>Rebecca Sugerman<br>Assistant Regional Counsel<br>75 Hawthorne Street (ORC-3-1)<br>San Francisco, CA 94105<br>(415) 972-3893<br>Sugerman.rebecca@epa.gov |
|---|---|
| United States National Park Service | 1849 C Street NW<br>Washington D.C. 20240 |

## SCHEDULE 1.1(B)

## NON-DEBTOR AFFILIATES

**Non-Debtor Affiliates**

A/S Jarvakandi Klaas
ACI (Shanghai) Glass Company Limited
ACI America Holdings Inc.
ACI Beijing Limited
ACI Finance Pty. Ltd.
ACI Glass Packaging Penrith Pty Ltd
ACI Guangdong Glass Co. Ltd.
ACI Guangdong Limited
ACI India LLC
ACI International Ltd.
ACI International Pty Ltd
ACI New Zealand Nominees Ltd.
ACI Operations New Zealand Ltd.
ACI Operations Pty Ltd
ACI Packaging Services Pty Ltd
ACI Plastics Packaging (Thailand) Ltd.
ACI Qingdao Plastic Packaging Co. Ltd.
ACI Shanghai Glass Company Ltd.
ACI Shanghai Limited
ACI Technical Services Pty. Ltd.
ACI Tianjin Limited
ACI Tianjin Mould Company Ltd.
ACI Ventures, Inc.
Actien-Gesellschaft der Gerresheimer
    Glashuttenwerke vorm. Ferd. Heye
American Structural Products Company
Ampolletas, S.A.
Ampolmex, S.A.
Anamed International, Inc.
Antilles Closure & Packaging Services
    (Netherlands) B.V.
Ascilusa SL
Atlantique Emballage
Australian Consolidated Industries Pty. Ltd.
Avir France
AVIR S.P.A.
Avirunion, a.s.
Bahamas Agricultural Industries Limited
BJC Glass Company Limited
BJC Glass Vietnam Limited
BJC O-I Glass PTE. Ltd.
Blair Veneer Company
Blair-Vermont Plywood Company
Bolivian Investments, Inc.
Bramlage GmbH
Breadalbane Shipping PTE Ltd.
BriGam Medical Inc.
BriGam Ventures, Inc.

BriGam, Inc.
Brisbane Cullet Pty Ltd
British Glass Recycling Company Ltd.
Brockway Realty Corporation
Brockway Research, Inc.
BSN Distr. CO
BSN Distr. SE
BSN Distr. SO
BSN Financing Co. S.A.
BSN Glasspack Beteiligungs & Verwaltungs
    GmbH
BSN Glasspack Espana
BSN Glasspack Finance
BSN Glasspack GmbH & Co. KG
BSN Glasspack N.V.
BSN Glasspack Obligation
BSN Glasspack RE
BSN Glasspack Services
BSN Glasspack Treasury S.A.
BSN Glasspack Verwalthung GmbH
Bünder Glas GmbH
Cajas Corrugadas de Mexico, S.A.
Cajas y Empaques de Occidente, S.A.
Cajas y Empaques del Pacifico, S.A.
Calina Ltd.
Cangzhou Cangshun Industry Co Ltd
Cangzhou Cangshun Plastic Production Co Ltd
Centro Vidriero de Venezuela, C. A.
Champagne Emballage
Cisper da Amazonia S.A.
Closure & Packaging Services (Antilles) N.V.
Closure & Packaging Services (Netherlands)
    B.V.
Closures and Packaging Services (UK) Limited
CMC S.A.
CO Vidrieria GmbH
Compañia de Vidrios Owens-Illinois de Cuba, S.
    A.
Compañia Industrial de Vidros SA (CIV)
Compañia Industrial São Paulo e Rio
Compañia Manufactura De Vidrio Del Peru
Compañia Nacional De Vidrios S.A.
Consol Limited
Consolidated Glass Works Limited
Container Company Ltd.
Continental PET do Brasil Ltda.
Continental PET Holdings Pty Ltd

Continental PET Technologies de Mexico, S.A. de C. V.
Continental PET Technologies Inc.
Continental PET Technologies Magyaoroszag Kft.
Cristal Owens Plasticas Ltda.
Cristalautos, Ltda.
Cristaleria del Ecuador, S.A.
Cristaleria Peldar S.A.
Cristalerias Rosario SA
Cristal-Owens Plasticos Ltda.
Cristar S.A.S.
Cristar Tabletop S.A.S.
DBC Inc.
Distribuidora Industrial y Comercial de Centroamerica, S.A. (Costa Rica)
Distribuidora Industrial y Comercial de Centroamerica, S.A. (Guatemala)
Dougherty Brothers Company
Durobor, S.A.
Emballages Laurent, S.A.
Empresas Comegua, S.A.
EntraCare Corporation
Envases de Borosilicato, S.A.
Envases de Vidrio de las Americas, S. de R.L. de C.V.
Envases de Vidrio, S.A.
Especialidades Operativas de America, S. de R.L. de C.V.
Fabrica Boliviana de Vidrios S.A.
Fabrica de Vidrio Los Andes, C.A.
Fapeteries Etienne, S.A.
FBG-Trident Limited
Fiaver
Fomento Industrial Centroamericano, S.A. (Panama)
Gebruder Stoevesandt Vertriebsgellschaft GmbH
Gerresheimer Glas A.G.
Gerro Kaiser Aluminum Dosenwerk GmbH & Co. KG
Gerro Kaiser Dosenwerk GmbH & Co., KG
Gerro Karton GmbH
Gerro Plastik GmbH
Giralt Laporta, S.A.
Glasco Products Company
Glass Crafts S.A.
Glass International OISPV, S.A.P.I. DE C.V., SOFOM, E.N.R.
Glass to Glass, LLC
Glassworks Limited

Hankuk Electric Glass Co., Ltd
Harbor Capital Advisors, Inc.
Harbor Transfer, Inc.
HCA Securities, Inc.
Health Care and Retirement Corporation of America
Health Group Inc.
Hebei Rixin Glass Group Co. Ltd
Hellenic-Owens Elefsis Glass Company, S.A.
Hellenic-Owens Glass Company Limited
Huta Szkła Antoninek SP. z o.o.
Huta Szkła Jaroslaw S.A.
Hygienic-Lily Limited
Industria de Materias Primas Limitiada
Industria de Materias Primas LTDA
Industria Vidrieria de Coahuila S de RL de CV
Industria, Comercio e Administracao ICAL SA
Industrial de Materias Primas S.A.S.
Industrial de Vidrio Plano, S.A.
Industrias Zanzibar, S.A.
Inmeubles Heda, S.A.
Inverglass SAS
Johnson Radley (U.G.)
Johnson Radley Grangefield (Leeds)
Julia Vitrum S.p.A.
K&M Plastics, Inc.
Karhulan Lasi Oy
Key Glassworks Limited
Kimble Glass Company
Kimble Glass Inc.
Kimble Italiana, S.P.A.
Kimble-Terumo, Inc.
Kontes Glass Company
Kraft, S.A.
L.E. Smith Glass Co.
Lauterbach Corporation
Le Puy Papeteries Etienne, S.A.
Libbey Glass Inc.
Libbey St. Clair Inc.
Lily Plastics Pty, Limited
LLC Novgorod Steklo
Maderas el Alto, S.A.
Malaya Glass Products Sdn Bhd
Malaya Vietnam Glass Ltd
Maltha Groep B.V.
Manufacturera de Vidrios Planos, C. A.
MARC Industries, Inc.
MARC Medical Inc.
Martell Medical Products, Inc.
Materiales y Silice del Pacifico S.R.L.
Maumee Air Associates Inc.

2

Maumee Valley Community Urban
Redevelopment Corporation
Meigs Investments LLC
Metalicas Peldar, S.A.
Middle East Glass Manufacturing Co.
Mineracao Descalvado Ltda.
Mineracao Silminas Ltda.
National Container Corporation
National Petro Chemicals Corporation
NHW Auburn, LLC
Nippon Electric Glass Company, Ltd.
Nippon Glass Company, Ltd.
Nova PET Ltda.
Nueva Fábrica Nacional de Vidrio S. de R.L. de
C.V.
OB Cal South Inc.
O-I (Shanghai) Glass Container Co., Ltd.
O-I (Shanghai) Management Co Ltd.
O-I (Tianjin) Glass Container Co., Ltd.
O-I (Zhaoqing) Glass Container Co., Ltd.
OI Advisors, Inc.
OI AID STS Inc.
O-I Americas C.V.
O-I Americas Holding LLC
O-I Americas LLC
OI Andover Group Inc.
O-I Asia-Pacific Holdings
OI Auburn Inc.
OI Australia Inc.
O-I Birmingham Machine Assembly Limited
O-I Bolivia Holdings Limited
OI Brazil Closure Inc.
OI Brazil Inc.
OI Brockway Plastics, Inc.
O-I Business Service Center Sp. Z o. o.
OI California Containers Inc.
O-I Canada Corp.
OI Canada Holdings B.V.
O-I Caribbean Sales & Distribution Inc.
OI Castalia STS Inc.
OI China Inc.
OI China LLC
OI Closure FTS Inc.
OI Consol STS Inc.
O-I Czech Republic, a.s.
O-I Distribution SO
OI Domestic Holdings Inc.
O-I Dongtai Glass Container Co. Ltd.
OI Dougherty STS Inc.
OI Eastern Europe Holdings BV
O-I Ecuador LLC

OI Ecuador STS Inc.
OI Ecuador STS LLC
O-I Estonia AS
OI Europe & Asia Inc.
O-I Europe (Machinery and Distribution)
Limited
O-I Europe Sàrl
O I Europe SAS
OI European Group B.V.
OI Finance Ltd.
OI Finnish Holdings OY
O-I France SAS
OI General Finance Inc.
OI General FTS Inc.
O-I Germany GmbH & Co. KG
O-I Glass C.V.
OI Glass Holdings B.V.
O-I Glass JV Mexico SARL
O-I Glass Limited
O-I Glass, Inc.
O-I Glasspack Beteiligungs & Verwaltungs
GmbH
O-I Glasspack Beteiligungs &
Verwaltungsgesellschaft mbH
O-I Glasspack GmbH & Co KG
O-I Glasspack Verwaltungs GmbH
OI Global C.V.
O-I Global Holdings C.V.
O-I Global Holdings LLC
O-I GMEC Lurin srl
O-I Health Care Holding Corp.
OI Healthcare Packaging de Mexico S. de R.L.
de C.V.
OI Holding Company, Inc.
O-I Holding LLC
O-I Hungary Inc.
O-I Hungary Kft.
OI Hungary LLC
OI India Inc.
OI International Holdings Inc.
O-I International Pty Ltd
O-I International Sales Corporation
OI Ione STS Inc.
OI Italia S.R.L.
OI Italy Holdings Inc.
OI Italy Inc.
O-I Italy S.P.A.
O-I Jaroslaw Machine Service Center
O-I LATAM B.V.
O-I Latam HQ, Inc.
O-I Latam Services S.A.S.

OI Latin America Inc.
OI Levis Park STS Inc.
OI Machineworks Inc.
O-I Manufacturing (UK) Limited
O-I Manufacturing Czech Republic a.s.
O-I Manufacturing Finland Oy
O-I Manufacturing France SAS
O-I Manufacturing Holdings Spain SL
O-I Manufacturing Hungary Ltd.
O-I Manufacturing Italy SpA
OI Manufacturing Limited
O-I Manufacturing Netherlands B.V.
O-I Manufacturing Poland SA
O-I Manufacturing UK Ltd.
OI Medical Holdings Inc.
OI Medical Inc.
O-I Mexico Holdings I B.V.
O-I Mexico Holdings II B.V.
OI Mfg Hungary Ltd.
OI MVCURC STS Inc.
OI Napoli Stampi S.r.l.
O-I Netherlands B.V.
O-I New Mexico Holdings B.V.
O-I Operations (Australia) Pty Ltd
O-I Operations (NZ) Limited
O-I Overseas Management Company Ltd.
OI Overseas Management LLC
OI Pacific (Machinery and Distribution) Limited
O-I Packaging Solutions LLC
OI Peldar STS Inc.
OI Peru STS Inc.
OI Plastic Products FTS Inc.
OI Plasticos de Venezuela C.A.
OI Poland Inc.
OI Poland SA
O-I Polish Holdings B.V.
O-I Production Estonia AS
OI Puerto Rico STS Inc.
OI Regioplast STS Inc.
O-I Sales & Distribution Germany GmbH
O-I Sales & Distribution Hungary Kft
O-I Sales and Distribution Czech Republic, s.r.o.
O-I Sales and Distribution Estonia OÜ
O-I Sales and Distribution Finland Oy
O-I Sales and Distribution France SAS
O-I Sales and Distribution Italy SRL
O-I Sales and Distribution LT
O-I Sales and Distribution Netherlands B.V.
OI Sales and Distribution SAS
OI Sales and Distribution Spain SL
O-I Sales and Distribution UK Limited

O-I Sales Distribution Poland Sp Zoo
O-I Schott Process Systems, Inc.
OI Schott STS Inc.
OI Securities, Inc.
OI Services, Inc.
O-I Sihui Glass Recycling Co. Ltd.
OI Spanish Holdings B.V.
OI Tampas do Brasil Ltda.
OI Thailand Inc.
OI Tianjin Glass Co. Ltd.
O-I Timber Corporation
OI Trading (Shanghai) Company Ltd.
OI Transfer, Inc.
OI Treitler STS Inc.
OI UMI STS Inc.
O-I US Procurement Company, Inc.
OI Venezuela Plastic Products Inc.
OI Venezuela STS Inc.
O-I Zhaoqing Glass Co. Ltd.
OIB Produvisa Inc.
OI-NEG TV Products Inc.
OIV Holding, C.A.
Orion S.p.A.
Oroshaza Glass Manufacturing and Trading Kft.
OST Tara
Overseas Finance Co.
Owens America, S. de R.L. de C.V.
Owens Brockwae Venezuela Holding C.A.
Owens Brush Company
Owens Glass Manufacturing, S. de R.L. de C.V.
Owens Hotel Industry, Inc.
Owens Industries, Inc.
Owens Insurance Ltd.
Owens International Ltd.
Owens Vigusa, S. de R.L. de C.V.
Owens Vimosa S. de R.L. de C.V.
Owens Viquesa, S. de R.L. de C.V.
Owens Virreyes, S. de R.L. de C.V.
Owens Vitolsa, S. de R.L. de C.V.
Owens-Administração, Participações e
    Representações, Limitada
Owens-BILT Limited
Owens-BriGam de Mexico
Owens-BriGam Medical Company
Owens-Brockway (India) Limited
Owens-Brockway Glass Container Inc.
Owens-Brockway Glass Container Trading Co.
Owens-Brockway Packaging, Inc.
Owensglass & Cia
Owens-Illinois (Asia) Ltd.
Owens-Illinois (Australia) Pty Ltd

Owens-Illinois (HK) Limited
Owens-Illinois (NZ) Limited
Owens-Illinois (Ventas) S. A.
Owens-Illinois America Latina Administracao Ltda
Owens-Illinois Argentina S.A.
Owens-Illinois China Holdings B.V.
Owens-Illinois Closure Inc.
Owens-Illinois Closures de Mexico, S. de R.L. de C.V.
Owens-Illinois de Cuba, S.A.
Owens-Illinois de Puerto Rico LLC
Owens-Illinois de Venezuela, C. A.
Owens-Illinois Development Corporation
Owens-Illinois do Brasil Industria e Comercio Ltda.
Owens-Illinois do Brasil Industria e Comercio S.A.
Owens-Illinois do Brasil S.A.
Owens-Illinois Finance Corporation
Owens-Illinois Foreign Sales Corp.
Owens-Illinois General Inc.
Owens-Illinois Group, Inc.
Owens-Illinois Healthcare Packaging Inc.
Owens-Illinois Holding (Australia) Pty Ltd. (Australia)
Owens-Illinois Holding (Australia) Pty Ltd. (New Zealand)
Owens-Illinois Inter-America Corporation
Owens-Illinois International B. V.
Owens-Illinois International Division
Owens-Illinois International Group
Owens-Illinois International Management & Trading Kft.
Owens-Illinois International Operations
Owens-Illinois International, S.A. (Republic of Panama)
Owens-Illinois International, S.A. (Switzerland)
Owens-Illinois Kft
Owens-Illinois Labels Inc.
Owens-Illinois Leasing, Inc.
Owens-Illinois of Canada Limited
Owens-Illinois of Panama, S. A.
Owens-Illinois of the Bahamas, Limited
Owens-Illinois Overseas Capital Corporation
Owens-Illinois Participacoes Ltda.
Owens-Illinois Perú S.A.
Owens-Illinois Plasicos do Brasil Ltda.
Owens-Illinois Plastic Products Inc.
Owens-Illinois Plastics Kft
Owens-Illinois Plastics PTE, Ltd.

Owens-Illinois Plywood Company
Owens-Illinois Polska S. A.
Owens-Illinois Prescription Products Inc.
Owens-Illinois Services HK Ltd
Owens-Illinois Singapore Pte. Ltd.
Owens-Illinois Specialty Products Puerto Rico, Inc.
Owens-Illinois Ventas, S. A.
Owens-Kimble Limited
Pacific Coast Glass Co., Ltd.
Packaging Superannuation Fund Pty. Ltd.
Papeteries d'Espaly Le Puy (Department of Haute Loire)
Papeteries d'Espaly S.A.R.L.
Papeteries Etienne, S.A.
PET Technologies B. V.
PET Technologies Limited
Plant-Kimble Ltd.
Precision Medical Molding, Inc.
Procesamiento de Materias Primas, Silice y Derivados de Centroamerica, S.A.
Product Design & Engineering, Inc.
Productos Kimax de Mexico, S.A.
Produvisa
Proveedora Centroamericana de Industria y Comercio, S.A.
Prover SAS
Prudent Supply, Inc.
PT Igar Jaya
PT. Kangar Consolidated Industries
Ravenhead St. Helens
Red River Paper Mill, Inc.
Regioplast S.A. de C.V.
Renfort
Rexam Closures and Packaging Services (UK) Limited
Rocky Mountain Bottle Company
Ryttylan Muovi Oy
San Domenico Vetraria S.p.A.
San Domenico Vetraria S.r.l.
São Raimundo Administracao Participações e Representações, Limitada
São Raimundo, Participações e Representações, Limitada
Sasaki-Owens Glass Co., Ltd
SCI Le Mourtis
Seagate II, Inc.
Seagate III, Inc.
Seagate, Inc.
Sefipal
Services (Netherlands) B.V.

Sharpe, Inc.
Sichuan Skyhorse Glass
Silice de Cartago S.R.L.
Soluciones Del Empaque S.A.C.
Sonator Investments B.V.
Sovereign Air, LLC
Specialty Packaging Licensing Company
    Limited
Specialty Packaging Products de Mexico, S. A.
    de C.V.
Spessarter Hohlglaswerke GmbH
Sun-Lily Company, Ltd.
Tata Chemical (Soda Ash Partners Holding)
Tata Chemical (Soda Ash) Partners LLC
Tata Chemical Soda Ash
The Andover Group, Inc.
The Ravenhead Company Limited (U.G.)
The Toledo Automatic Brush Machine Co.
Toledo Air Associates, Inc.
Totsu International Co., Ltd
Trasve S.r.l.
Treitler-Owens, Inc.
Trentino Holding Corporation
Trentino Sucursal
U.G. Closures and Plastics Ltd.
U.G. Glass Containers Ltd.
U.S.I. Far East Corporation
UAB Karhulan Lasi Oy
UGG Holdings Ltd.
Union Glass
Union Glass and Container Corporation
Union Glass Centres Limited
United Caribbean Containers Ltd.
United Glass Group Ltd.
United Glass Holdings, plc
United Glass Properties Limited

United Glass, Limited
United Hungarian Glass Containers Kft.
United Polymers Corporation
Universal Materials, Inc.
Veglarec B.V.
Verdome Exploitation SNC
Vermont Plywood, Inc.
Verpackungsindustrie Kutenholz GmbH
Vetrerie Meridionali S.p.A.
Vetri Speciali S.p.A.
VG Holdings B.V.
Vidriera Centroamericana, S.A.
Vidriera Guatemalteca, S.A.
Vidrieria Fenicia S.A.S.
Vidrieria Holdings GmbH
Vidrieria Rovira SA
Vidrieria Rovira SL
Vidrio Caribe Internacional, S.A.
Vidrio Lux S.A.
Vidrio Neutro, S.A.
Vidrios de Exportacion, S. A.
Vidrios Industriales S.A.
Vidrios Panamenos, S.A.
Vina Santa Rita, Ltda.
Visy Glass Operations (Australia) Pty Ltd
Visy Glass Operations (NZ) Limited
Visy Glass Packaging Penrith Pty Ltd
Visy Glass Packaging Services Pty Ltd
Vitro America, S. de R.L. de C.V.
Vitro Vigusa, S. de R.L. de C.V.
Vitro Vimosa, S. de R.L. de C.V.
Vitro Viquesa, S. de R.L. de C.V.
Vitro Virreyes, S. de R.L. de C.V.
Vitro Vitolsa, S. de R.L. de C.V.
Wuhan-Owens Glass Container Co., Ltd.
Zanotti Vetro S.p.a.

## **SCHEDULE 7.6**

## **CONSENT DECREES, COVENANTS, AND AGREEMENTS**

**SCHEDULE 7.6[1]**

**CONSENT DECREES, COVENANTS, AND AGREEMENTS**

| |
|---|
| Consent Decree entered in the *United States and the Commonwealth of Pennsylvania v. Air Products and Chemicals, Inc., et al.*, Civil Action No. 87-7352 (E.D. Pa, June 3, 1988) |
| Administrative Order of Consent, In the Matter of Chemical Recycling, Inc. under Section 106(a), 104(a) and 122 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as Amended 42 U.S.C. §§ 9606(a), 9604(a), and 9622, Docket No. CERCLA-VI-08-89 (U.S. EPA Region VI Dallas, Texas, July 19, 1989) |
| Consent Decree entered in the *United States of America v. Acton Corporation, et al.*, Civil Action No. 89-3652 (D.N.J., Jan. 31, 1990) |
| Consent Decree entered in *United States and the State of Indiana v. Richard Yount, et al.*, Civil Action No. F90-00142 (N.D. Ind., April 24, 1991) |
| Consent Decree entered in the *United States v. Ben Hardy et al.*, Civil Action No. 90-0695 (W.D. Ky., Aug. 4, 1993) |
| Consent Decree entered in *United States and the Commonwealth of Kentucky v. Donald Distler, et al.*, Civil Action No. C88-0200-L(J) (W.D. Ky., Apr. 26, 1994) |
| Consent Decree entered in *Frank J. Kelley, Attorney General of the State of Michigan v. Owens-Illinois, Inc., et al.*, Civil Action No. 94-77835-CE (Mar. 13, 1995) |
| Consent Decree entered in the *United States of America v. American National Can Company, et al.*, Civil Action No. 95-585-CIV-J-16 (M.D. Fla., Oct. 11, 1995) |
| Consent Decree entered in the *Frank J. Kelley, Attorney General of the State of Michigan, et al. v. Owens-Illinois, Inc., et al.,* Civil Action No. 94-77835-CE (Circuit Court County of Ingham, Mar. 13, 1995) |
| Consent Decree entered in the *United States v. Alcan Aluminum, Inc., et al.*, Civil Action No. 88-4970 (E.D. Pa, May 26, 1998) |
| Consent Decree entered in the *United States and the Commonwealth of Pennsylvania v. Alcan Aluminum, Inc., et al.*, Civil Action No. 97-7140 (E.D. Pa, May 26, 1998) |

---

[1]   For the avoidance of doubt, the Debtor intends to include all active consent decrees, covenants, and related agreements on this Schedule 7.6. All consent decrees, covenants, and related agreements not listed herein shall be constructively deemed to be listed in this Schedule 7.6.

| |
|---|
| Consent Decree entered in the *United States and the Commonwealth of Pennsylvania v. Alcan Aluminum, Inc., et al*., Civil Action No. 97-7144 (E.D. Pa, May 26, 1998) |
| Georgia Dept. of Natural Resources Environmental Protection Division; In Re: HSI#10032 Brockway Standard/Homerville Plant Site; Consent Order; Order No. EPD-HSR-127 (Aug. 25, 1999) |
| Consent Decree entered in the *Granholm v. AM Todd Company, et al.*, Civil Action No. 00-92229-CE (Circuit Court County of Ingham, Aug. 17, 2000) |
| Consent Decree entered in the *United States of America and the State of Illinois v. Alpha Construction et al.*, Docket No. 02-cv-3609 (N.D. Ill., Mar. 8, 2001) |
| Consent Decree entered in the *Michael A. Cox, Attorney General of the State of Michigan, and Michigan Department of Environmental Quality v. 3M Company et al.*, Civil Action No. 03-1362-CE (Circuit Court County of Ingham, July 16, 2003) |
| Administrative Order of Consent, In the Matter of General Oil Site, Ford Pond Operable Unit, Docket No. V-W-04-C-768 (U.S. EPA Region V, Dec. 4, 2003) |
| Consent Decree entered in the *State of Michigan and Michigan Department of Environmental Quality v. American Cyanamid Company, et al*., Civil Action No. 04-143-CE (Circuit Court County of Ingham, Feb. 4, 2004) |
| Consent Decree entered in the *United States of America and the State of Indiana v. General Motors Corp., et al*., Civil Action No. 3:07-CV-239 (N.D. Ind., Aug. 8, 2007) |
| New York State Department of Environmental Conservation, In the Matter of Development and Implementation of a Remedial Program for an Inactive Hazardous Waste Disposal Site under Article 27, Title 13 of the Environmental Conservation Law of the State of New York by: *AEP Industries, Inc., et al*, Order on Consent and Administrative Settlement Agreement, Index #D7-0001-07-07; Site #: 7-34-013 Quanta Resources Site (Nov. 7, 2007) |
| Director's Final Findings and Orders, In the Matter of Universal Materials, Inc. and Owens-Illinois, Inc. before the Ohio Environmental Protection Agency (Nov. 17, 2008) |
| New York State Department of Environmental Conservation, In the Matter of Development and Implementation of a Remedial Program for an Inactive Hazardous Waste Disposal Site under Article 27, Title 13 of the Environmental Conservation Law of the State of New York by: *AEP Industries, Inc., et al*, Amendment to Order on Consent and Administrative Settlement Agreement, Index #D7-0001-07-07; Site #: 7-34-013 Quanta Resources Site (Mar. 27, 2009) |
| Voluntary Environmental Remediation Order, Common Wealth of Kentucky Environmental and Public Protection Cabinet Division of Waste Management, DWM-32870-149 (Mar. 17, 2009) |

Environmental Covenant relating to the American Fuji Seal Facility, 1051 Bloomfield Road, Bardstown, Kentucky, Nov. 16, 2010 (Nelson County Clerk's Office - D476; Pg 714)

Imminent and Substantial Endangerment Determination and Order and Remedial Action Order enter In the Matter of Panoche Facility, Benicia, California, Docket No. HSA-FY 16/17-050 (California Environmental Protection Agency Department of Toxic Substances Control, Nov. 29, 2016)

## **Exhibit B**

Notice of Effective Date

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
--------------------------------------------------------- x
```
In re:                                      :     Chapter 11
                                            :
PADDOCK ENTERPRISES, LLC                    :     Case No. 20-10028 (LSS)
                                            :
          Debtor.¹                          :     **Re Docket Nos.: [ ● ]**
                                            :
```
--------------------------------------------------------- x
```

### NOTICE OF EFFECTIVE DATE

     **PLEASE TAKE NOTICE** that, on [ ● ], 2022, the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") entered the *Findings of Fact, Conclusions of Law, and Order Confirming the Third Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. [ ● ]] (the "**Confirmation Order**") confirming the *Third Amended Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. [ ● ] (as may be amended, modified, or supplemented from time to time, the "**Plan**")² in the above-captioned chapter 11 case of Paddock Enterprises, LLC (the "**Debtor**").³

     **PLEASE TAKE FURTHER NOTICE** that on [ ● ], 2022 the United States District Court for the District of Delaware (the "**District Court**") entered an order (the "**Affirmation Order**") affirming the Confirmation Order and adopting the findings of fact and conclusions of law contained therein.  The Affirmation Order was entered on the District Court docket on [ ● ], 2022 [Case No. 22-[ ● ] ([ ● ]) (D. Del. [ ● ], 2022), Docket No. [ ● ].

     **PLEASE TAKE FURTHER NOTICE** that the Plan has been substantially consummated and the Effective Date of the Plan occurred on [ ● ], 2022.

     **PLEASE TAKE FURTHER NOTICE** that pursuant to the Plan, the Confirmation Order, and the Affirmation Order, the Asbestos Trust shall assume all liabilities and responsibility for all Asbestos Claims.  Pursuant to section 524(g) of the Bankruptcy Code, from and after the Effective

---

[1]    The last four digits of the Debtor's federal tax identification number are 0822.  The Debtor's mailing address is One Michael Owens Way, Perrysburg, Ohio 43551.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or Confirmation Order, as applicable.

[3]    Please note that this notice is intended to provide notice of the Effective Date and the entry of the Confirmation Order and Affirmation Order, among other things, and it does not, and shall not be construed to, limit, modify or interpret any of the provisions of the Plan or Confirmation Order.  Some of the provisions of the Plan and Confirmation Order are included herein for the convenience of creditors; *however*, creditors should refer to the full text of the Plan and Confirmation Order and should not rely upon the summary provided herein.

Date the sole recourse of any Holder of an Asbestos Claim or Demand on account of such Asbestos Claim or Demand shall be to the Asbestos Trust pursuant to <u>Section 10.3</u> of the Plan and the Asbestos Trust Distribution Procedures, and such Holder shall have no right whatsoever at any time to assert its Asbestos Claim or Demand against any Protected Party or any property or interest in property of any Protected Party.

**PLEASE TAKE FURTHER NOTICE** that the Plan contains certain provisions regarding releases, exculpation, and injunctions, which are set forth in <u>Article X</u> thereof and below.  Pursuant to the Confirmation Order and the Affirmation Order, such provisions are now in full force and effect.

**Debtor's Discharge Injunction.**

**Except as specifically provided in the Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims against the Debtor are permanently enjoined, on and after the Effective Date, from: (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Reorganized Debtor, or their respective property with respect to such Claim, other than to enforce any right to a Distribution pursuant to the Plan; (b) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, or their respective property with respect to such Claim, other than as permitted pursuant to (a) above; (c) creating, perfecting, or enforcing any Encumbrance of any kind against the Debtor, the Reorganized Debtor, or their respective property with respect to such Claim; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to the Debtor or against the property or interests in property of the Debtor, with respect to such Claim; and/or (e) commencing or continuing any action, in any manner and in any place in the world, against the Debtor, the Reorganized Debtor, or their respective property that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.  The foregoing injunction shall extend to the successors of the Debtor (including, without limitation, the Reorganized Debtor) and its properties and interests in property.  The discharge provided in this provision shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim.**

**Asbestos Channeling Injunction**.

(a)      **Terms.  Pursuant to section 524(g) of the Bankruptcy Code, from and after the Effective Date the sole recourse of any Holder of an Asbestos Claim or Demand on account of such Asbestos Claim or Demand shall be to the Asbestos Trust pursuant to <u>Section 10.3</u> of the Plan and the Asbestos Trust Distribution Procedures, and such Holder shall have no right whatsoever at any time to assert its Asbestos Claim or Demand against any Protected Party or any property or interest in property of any Protected Party.  On and after the Effective Date, all present and future Holders of Asbestos Claims and Demands shall be permanently and forever stayed, restrained, barred and enjoined from taking any actions for the purpose of, directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Asbestos Claim or Demand other than from the Asbestos Trust**

pursuant to the Asbestos Trust Documents, including, but not limited to, the following:

(i)     commencing, conducting, or continuing in any manner, directly, indirectly or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party or any property or interests in property of any Protected Party;

(ii)     enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party;

(iii)     creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party;

(iv)     setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and

(v)     proceeding in any manner in any place with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Asbestos Trust, except in conformity and compliance with the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures.

(b)     <u>Reservations</u>.  This Asbestos Channeling Injunction shall not stay, restrain, bar, or enjoin:

(i)     the rights of Holders of Asbestos Claims (including Demands) to the treatment accorded to Class 3 as described in the Plan, including without limitation the right to assert Asbestos Claims (including Demands) against the Asbestos Trust in accordance with the Asbestos Trust Distribution Procedures;

(ii)     the rights of Entities to assert any Claim, debt, obligation, or liability for payment of Asbestos Trust Expenses against the Asbestos Trust; and

(iii)     the rights of Entities to assert any Claim, debt, obligation, or liability for payment against an Entity that is not a Protected Party unless otherwise enjoined by order of the Bankruptcy Court (including but not limited to the Confirmation Order).

3

(c)    **Modifications**.    There shall be no modification, dissolution, or termination of the Asbestos Channeling Injunction, which shall be a permanent injunction.

(d)    **Non-Limitation of Asbestos Channeling Injunction**.  Nothing in the Asbestos Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Asbestos Channeling Injunction issued in connection with the Plan or the Asbestos Trust's assumption of all liabilities and responsibility for the Asbestos Claims.

(e)    Any Protected Party may enforce the Asbestos Channeling Injunction as a defense to any Claim brought against such Protected Party that is enjoined under the Plan as to such Protected Party and may seek to enforce such injunction in a court of competent jurisdiction.

**Exculpation**.

None of the Exculpated Parties shall have or incur any liability to any Entity for any act or omission taken or to be taken on or after the Petition Date through and including the Effective Date in connection with, related to, or arising out of: (a) the Chapter 11 Case; (b) negotiation, formulation and preparation of the Plan and the other Plan Documents, and any of the terms and/or settlements and compromises reflected in the Plan and the other Plan Documents; (c) pursuit of confirmation of the Plan; (d) consummation of the Plan, or administration of the Plan or the property to be distributed under the Plan or the Asbestos Trust Distribution Procedures; or (e) the releases and injunctions contained in the Plan, except for any liability that results from such Entity's criminal acts, actual fraud, willful misconduct, or gross negligence as determined by a Final Order, and, in all respects, the Debtor, the Reorganized Debtor, and each of the other Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities in and under the Chapter 11 Case, the Plan and the Plan Documents.

**Releases by Debtor and Its Estate and Related Injunction.**

(a)    Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, the Reorganized Debtor, and any Entity seeking to exercise the rights of the Estate, in each case, whether individually or collectively, including, without limitation, any successor to the Debtor or any Estate representative appointed or selected pursuant to the applicable provisions of the Bankruptcy Code, shall, and shall be deemed to, irrevocably, completely and forever release, waive and discharge unconditionally the Released Parties from any and all claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action and liabilities which any of the Debtor, the Reorganized Debtor, or the Estate is entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, whether direct, indirect, or derivative, based upon, attributable to, or in any manner arising

4

out of, in whole or in part, any act, omission, transaction, event, occurrence, or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) (other than the rights under the Plan, the Plan Documents, and the contracts, instruments, releases and other agreements or documents delivered or to be delivered hereunder).

(b)     Except as provided in the Plan or the Confirmation Order, the Debtor, the Reorganized Debtor, and any Entity seeking to exercise the rights of the Estate, in each case, whether individually or collectively, including, without limitation, any successor to the Debtor or any Estate representative appointed or selected pursuant to the applicable provisions of the Bankruptcy Code, are permanently enjoined from taking any actions on account of or based upon any and all Claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action and liabilities released pursuant to <u>Section 10.5</u> of the Plan, including but not limited to the following: (a) commencing or continuing any action or other proceeding against the Released Parties or their respective property; (b) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Released Parties or their respective property; (c) creating, perfecting or enforcing any Encumbrance against the Released Parties or their respective property; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to the Released Parties or against their respective property; and (e) commencing or continuing any action, in any manner and in any place in the world, against the Released Parties that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.

Releases by Holders of Claims.

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Releasing Parties shall be deemed to irrevocably and forever release, waive, and discharge all claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action, losses, and liabilities whatsoever against the Released Parties, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, based in whole or in part upon any act, omission, event, transaction, occurrence, or any other circumstance taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating or connected to the Debtor, the Estate, the Debtor's assets and properties, the conduct of the Debtor's (or any predecessor's) businesses, the Prepetition Restructuring Transaction, the Chapter 11 Case, the Plan (including the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated by the Plan), the Plan Documents, or the Reorganized Debtor, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Case or the negotiation, formulation, preparation or implementation thereof, the pursuit of confirmation of the Plan, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the Distribution of property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing (other than the rights under the Plan, the Plan Documents, and the contracts,

5

instruments, releases and other agreements or documents delivered or to be delivered hereunder), including, for the avoidance of doubt, any and all Causes of Action that the Holder of an Asbestos Claim, the Asbestos Claimants Committee, the Asbestos Trust, or the Future Claimants' Representative did or could have commenced against any current or former officer, manager, or director of the Debtor (in such capacity) that is based upon, related to, or arising from any acts or omissions of such officer, manager, or director occurring prior to the Effective Date on account of such Asbestos Claim, to the fullest extent permitted under section 524(g) of the Bankruptcy Code and applicable law (as now in effect or subsequently extended), other than Claims or Causes of Action arising out of any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted a criminal act, actual fraud, gross negligence or willful misconduct.

**Injunction Related to Releases.**

Except as otherwise provided in the Plan, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any of the following released pursuant to the Plan: Claims, commitments, obligations, suits, judgments, damages, Demands, debts, claims, causes of action and liabilities (collectively, the "<u>Enjoined Matters</u>").

PLEASE TAKE FURTHER NOTICE that in accordance with the Confirmation Order and <u>Section 2.2(c)</u> of the Plan, all Professionals or other Entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) and/or section 1103 of the Bankruptcy Code for services rendered on or before the Effective Date (including, without limitation, any compensation requested by any Professional or any other Entity for making a substantial contribution in the Chapter 11 Case) shall File no later than the Professional Fee Claims Bar Date, which is [ ● ], 2022, and serve on (a) counsel to the Reorganized Debtor or the Debtor, as applicable, and (b) the United States Trustee, an application for final allowance of compensation and reimbursement of expenses for services rendered on or before the Effective Date; *provided, however*, that, notwithstanding a Professional's Filing of such final application, Professionals may, subject to <u>Section 9.1</u> of the Plan, continue to request and receive compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) and/or section 1103 of the Bankruptcy Code for services rendered after the Effective Date.  For the avoidance of doubt, the Professional Fee Claims Bar Date shall not apply to and shall have no effect on any Professional Fee Claim for services rendered post-Effective Date pursuant to <u>Section 9.1</u> of the Plan.  Objections to Professional Fee Claims must be Filed and served on (a) counsel to the Reorganized Debtor or the Debtor, as applicable, (b) the United States Trustee, (c) the requesting Professionals or other Entities, and (d) the Fee Examiner, no later than twenty (20) days after the Professional Fee Claims Bar Date.

PLEASE TAKE FURTHER NOTICE that, as of the Effective Date and subject to the terms of the Confirmation Order, all provisions of the Plan, including all agreements, instruments and other Plan Documents executed by the Debtor or the Reorganized Debtor in connection with the Plan, are binding on the Debtor, the Reorganized Debtor, all Holders of Claims against or Equity Interests in the Debtor and such Holders' respective successors and assigns, and all other parties that are affected in any manner by the Plan.

6

**PLEASE TAKE FURTHER NOTICE** that, to the extent you filed a request for notice under Bankruptcy Rule 2002 prior to the Effective Date, you must file a renewed request with the Bankruptcy Court after the Effective Date to receive documents pursuant to Bankruptcy Rule 2002 after the date hereof.

**PLEASE TAKE FURTHER NOTICE** that copies of the Confirmation Order, the Affirmation Order, the Plan, or any other pleadings filed in the Chapter 11 Case may be obtained free of charge by visiting https://cases.ra.kroll.com/Paddock/ or, for a fee, the Bankruptcy Court's website (http://www.deb.uscourts.gov) by following the directions for accessing the ECF system on such website.

[*Remainder of Page Intentionally Left Blank.*]

7

Dated: [ ● ], 2022
　　　Wilmington, Delaware

John H. Knight (No. 3848)
Michael J. Merchant (No. 3854)
Brendan J. Schlauch (No. 6115)
Sarah Silveira (No. 6580)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
Email:  Knight@rlf.com
Merchant@rlf.com
Schlauch@rlf.com
Silveira@rlf.com

-and-

Jeffrey E. Bjork (admitted *pro hac vice*)
Kimberly A. Posin (admitted *pro hac vice*)
Helena G. Tseregounis (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
Email:  Jeff.Bjork@lw.com
Kim.Posin@lw.com
Helena.Tseregounis@lw.com

-and-

Christina M. Craige (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh St. NW, Suite 1000
Washington, D.C. 20004
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201
Email:  Chris.Craige@lw.com

*Counsel for the Reorganized Debtor*